EXHIBIT: 25
NAME: PIS
DATE: 10-9-2019
J Leitz Moran



# SOFTWARE AS A SERVICE AGREEMENT

This Software as a Service Agreement is made between Tyler Technologies, Inc. and Client.

WHEREAS, Client selected Tyler to provide certain products and services set forth in the Investment Summary, including providing Client with access to Tyler's proprietary software products, and Tyler desires to provide such products and services under the terms of this Agreement;

NOW THEREFORE, in consideration of the foregoing and of the mutual covenants and promises set forth in this Agreement, Tyler and Client agree as follows:

## SECTION A – DEFINITIONS

- **"Agreement"** means this Software as a Services Agreement.
- **"Business Travel Policy"** means our business travel policy. A copy of our current Business Travel Policy is attached as <u>Schedule 1</u> to <u>Exhibit B</u>.
- **"Client"** means the City of Oak Harbor, WA.
- **"Data"** means your data necessary to utilize the Tyler Software.
- **"Data Storage Capacity"** means the contracted amount of storage capacity for your Data identified in the Investment Summary.
- **"Defect"** means a failure of the Tyler Software to substantially conform to the functional descriptions set forth in our written proposal to you, or their functional equivalent. Future functionality may be updated, modified, or otherwise enhanced through our maintenance and support services, and the governing functional descriptions for such future functionality will be set forth in our then-current Documentation.
- **"Defined Concurrent Users"** means the number of concurrent users that are authorized to use the SaaS Services. The Defined Concurrent Users for the Agreement are indicated in the Investment Summary.
- **"Developer"** means a third party who owns the intellectual property rights to Third Party Software.
- **"Documentation"** means any online or written documentation related to the use or functionality of the Tyler Software that we provide or otherwise make available to you, including instructions, user guides, manuals and other training or self-help documentation.
- **"Effective Date"** means the date on which your authorized representative signs the Agreement.
- **"Force Majeure"** means an event beyond the reasonable control of you or us, including, without limitation, governmental action, war, riot or civil commotion, fire, natural disaster, or any other cause that could not with reasonable diligence be foreseen or prevented by you or us.
- **"Investment Summary"** means the agreed upon cost proposal for the products and services attached as <u>Exhibit A</u>.
- **"Invoicing and Payment Policy"** means the invoicing and payment policy. A copy of our current Invoicing and Payment Policy is attached as <u>Exhibit B</u>.
- **"SaaS Fees"** means the fees for the SaaS Services identified in the Investment Summary.
- **"SaaS Services"** means software as a service consisting of system administration, system

management, and system monitoring activities that Tyler performs for the Tyler Software, and includes the right to access and use the Tyler Software, receive maintenance and support on the Tyler Software, including Downtime resolution under the terms of the SLA, and Data storage and archiving. SaaS Services do not include support of an operating system or hardware, support outside of our normal business hours, or training, consulting or other professional services.

- **"SLA"** means the service level agreement. A copy of our current SLA is attached hereto as Exhibit C.
- **"Support Call Process"** means the support call process applicable to all of our customers who have licensed the Tyler Software. A copy of our current Support Call Process is attached as Schedule 1 to Exhibit C.
- **"Third Party Terms"** means, if any, the end user license agreement(s) or similar terms for the Third Party Software, as applicable and attached as Exhibit D.
- **"Third Party Hardware"** means the third party hardware, if any, identified in the Investment Summary.
- **"Third Party Products"** means the Third Party Software and Third Party Hardware.
- **"Third Party Software"** means the third party software, if any, identified in the Investment Summary.
- **"Tyler"** means Tyler Technologies, Inc., a Delaware corporation.
- **"Tyler Software"** means our proprietary software, including any integrations, custom modifications, and/or other related interfaces identified in the Investment Summary and licensed by us to you through this Agreement.
- **"we", "us", "our"** and similar terms mean Tyler.
- **"you"** and similar terms mean Client.

## SECTION B – SAAS SERVICES

1. Rights Granted. We grant to you the non-exclusive, non-assignable limited right to use the SaaS Services solely for your internal business purposes for the number of Defined Concurrent Users only. The Tyler Software will be made available to you according to the terms of the SLA. You acknowledge that we have no delivery obligations and we will not ship copies of the Tyler Software as part of the SaaS Services. You may use the SaaS Services to access updates and enhancements to the Tyler Software, as further described in Section C(8).

2. SaaS Fees. You agree to pay us the SaaS Fees. Those amounts are payable in accordance with our Invoicing and Payment Policy. The SaaS Fees are based on the number of Defined Concurrent Users and amount of Data Storage Capacity. You may add additional concurrent users or additional data storage capacity on the terms set forth in Section H(1). In the event you regularly and/or meaningfully exceed the Defined Concurrent Users or Data Storage Capacity, we reserve the right to charge you additional fees commensurate with the overage(s).

3. Ownership.

   3.1 We retain all ownership and intellectual property rights to the SaaS Services, the Tyler Software, and anything developed by us under this Agreement. You do not acquire under this Agreement any license to use the Tyler Software in excess of the scope and/or duration of the SaaS Services.

   3.2 The Documentation is licensed to you and may be used and copied by your employees for internal, non-commercial reference purposes only.

3.3 You retain all ownership and intellectual property rights to the Data.

4. <u>Restrictions</u>. You may not: (a) make the Tyler Software or Documentation resulting from the SaaS Services available in any manner to any third party for use in the third party's business operations; (b) modify, make derivative works of, disassemble, reverse compile, or reverse engineer any part of the SaaS Services; (c) access or use the SaaS Services in order to build or support, and/or assist a third party in building or supporting, products or services competitive to us; or (d) license, sell, rent, lease, transfer, assign, distribute, display, host, outsource, disclose, permit timesharing or service bureau use, or otherwise commercially exploit or make the SaaS Services, Tyler Software, or Documentation available to any third party other than as expressly permitted by this Agreement.

5. <u>Software Warranty</u>.  We warrant that the Tyler Software will perform without Defects during the term of this Agreement.  If the Tyler Software does not perform as warranted, we will use all reasonable efforts, consistent with industry standards, to cure the Defect in accordance with the maintenance and support process set forth in Section C(8), below, the SLA and our then current Support Call Process.

6. <u>SaaS Services</u>.

6.1 Our SaaS Services are audited at least yearly in accordance with the AICPA's Statement on Standards for Attestation Engagements ("SSAE") No. 16, Type 2. We have attained, and will maintain, Type II SSAE compliance, or its equivalent, for so long as you are timely paying for SaaS Services.  Upon execution of a mutually agreeable Non-Disclosure Agreement ("NDA"), we will provide you with a summary of our SSAE-16 compliance report or its equivalent. Every year thereafter, for so long as the NDA is in effect and in which you make a written request, we will provide that same information.

6.2 You will be hosted on shared hardware in a Tyler data center, but in a database dedicated to you, which is inaccessible to our other customers.

6.3 We have fully-redundant telecommunications access, electrical power, and the required hardware to provide access to the Tyler Software in the event of a disaster or component failure.  In the event any of your data has been lost or damaged due to an act or omission of Tyler or its subcontractors or due to a defect in Tyler's software, we will use best commercial efforts to restore all the data on servers in accordance with the architectural design's capabilities and with the goal of minimizing any data loss as greatly as possible.  In no case shall the recovery point objective ("RPO") exceed a maximum of twenty-four (24) hours from declaration of disaster.  For purposes of this subsection, RPO represents the maximum tolerable period during which your data may be lost, measured in relation to a disaster we declare, said declaration will not be unreasonably withheld.

6.4 In the event we declare a disaster, our Recovery Time Objective ("RTO") is twenty-four (24) hours.  For purposes of this subsection, RTO represents the amount of time, after we declare a disaster, within which your access to the Tyler Software must be restored.

6.5 We conduct annual penetration testing of either the production network and/or web application to be performed.  We will maintain industry standard intrusion detection and prevention systems to monitor malicious activity in the network and to log and block any such

activity.  We will provide you with a written or electronic record of the actions taken by us in the event that any unauthorized access to your database(s) is detected as a result of our security protocols.  We will undertake an additional security audit, on terms and timing to be mutually agreed to by the parties, at your written request.  You may not attempt to bypass or subvert security restrictions in the SaaS Services or environments related to the Tyler Software. Unauthorized attempts to access files, passwords or other confidential information, and unauthorized vulnerability and penetration test scanning of our network and systems (hosted or otherwise) is prohibited without the prior written approval of our IT Security Officer.

6.6 We test our disaster recovery plan on an annual basis. Our standard test is not client-specific. Should you request a client-specific disaster recovery test, we will work with you to schedule and execute such a test on a mutually agreeable schedule.

6.7 We will be responsible for importing back-up and verifying that you can log-in.  You will be responsible for running reports and testing critical processes to verify the returned data.  At your written request, we will provide test results to you within a commercially reasonable timeframe after receipt of the request.

6.8 We provide secure data transmission paths from each of your workstations to our servers.

6.9 For at least the past ten (10) years, all of our employees have undergone criminal background checks prior to hire. All employees sign our confidentiality agreement and security policies. Our data centers are accessible only by authorized personnel with a unique key entry. All other visitors must be signed in and accompanied by authorized personnel. Entry attempts to the data center are regularly audited by internal staff and external auditors to ensure no unauthorized access.

## SECTION C – OTHER PROFESSIONAL SERVICES

1.  Other Professional Services. We will provide you the various implementation-related services itemized in the Investment Summary and described in our industry standard implementation plan. We will finalize that documentation with you upon execution of this Agreement.

2.  Professional Services Fees.  You agree to pay us the professional services fees in the amounts set forth in the Investment Summary. Those amounts are payable in accordance with our Invoicing and Payment Policy.  You acknowledge that the fees stated in the Investment Summary are good-faith estimates of the amount of time and materials required for your implementation.  We will bill you the actual fees incurred based on the in-scope services provided to you. Any discrepancies in the total values set forth in the Investment Summary will be resolved by multiplying the applicable hourly rate by the quoted hours.

3.  Additional Services.  The Investment Summary contains the scope of services and related costs (including programming and/or interface estimates) required for the project based on our understanding of the specifications you supplied.  If additional work is required, or if you use or request additional services, we will provide you with an addendum or change order, as applicable, outlining the costs for the additional work.  The price quotes in the addendum or change order will be valid for thirty (30) days from the date of the quote.

4.  Cancellation. If travel is required, we will make all reasonable efforts to schedule travel for our

personnel, including arranging travel reservations, at least two (2) weeks in advance of commitments. Therefore, if you cancel services less than two (2) weeks in advance (other than for Force Majeure or breach by us), you will be liable for all (a) non-refundable expenses incurred by us on your behalf, and (b) daily fees associated with cancelled professional services if we are unable to reassign our personnel. We will make all reasonable efforts to reassign personnel in the event you cancel within two (2) weeks of scheduled commitments.

5. <u>Services Warranty</u>. We will perform the services in a professional, workmanlike manner, consistent with industry standards. In the event we provide services that do not conform to this warranty, we will re-perform such services at no additional cost to you.

6. <u>Site Access and Requirements</u>. At no cost to us, you agree to provide us with full and free access to your personnel, facilities, and equipment as may be reasonably necessary for us to provide implementation services, subject to any reasonable security protocols or other written policies provided to us as of the Effective Date, and thereafter as mutually agreed to by you and us.

7. <u>Client Assistance</u>. You acknowledge that the implementation of the Tyler Software is a cooperative process requiring the time and resources of your personnel. You agree to use all reasonable efforts to cooperate with and assist us as may be reasonably required to meet the agreed upon project deadlines and other milestones for implementation. This cooperation includes at least working with us to schedule the implementation-related services outlined in this Agreement. We will not be liable for failure to meet any deadlines and milestones when such failure is due to Force Majeure or to the failure by your personnel to provide such cooperation and assistance (either through action or omission).

8. <u>Maintenance and Support</u>. For so long as you timely pay your SaaS Fees according to the Invoicing and Payment Policy, then in addition to the terms set forth in the SLA and the Support Call Process, we will:

   8.1 perform our maintenance and support obligations in a professional, good, and workmanlike manner, consistent with industry standards, to resolve Defects in the Tyler Software (limited to the then-current version and the immediately prior version);

   8.2 provide telephone support during our established support hours;

   8.3 maintain personnel that are sufficiently trained to be familiar with the Tyler Software and Third Party Software, if any, in order to provide maintenance and support services;

   8.4 make available to you all major and minor releases to the Tyler Software (including updates and enhancements) that we make generally available without additional charge to customers who have a maintenance and support agreement in effect; and

   8.5 provide non-Defect resolution support of prior releases of the Tyler Software in accordance with our then-current release life cycle policy.

We will use all reasonable efforts to perform support services remotely. Currently, we use a third-party secure unattended connectivity tool called Bomgar, as well as GotoAssist by Citrix. Therefore, you agree to maintain a high-speed internet connection capable of connecting us to your PCs and server(s). You agree to provide us with a login account and local administrative privileges as we may reasonably

require to perform remote services. We will, at our option, use the secure connection to assist with proper diagnosis and resolution, subject to any reasonably applicable security protocols. If we cannot resolve a support issue remotely, we may be required to provide onsite services. In such event, we will be responsible for our travel expenses, unless it is determined that the reason onsite support was required was a reason outside our control. Either way, you agree to provide us with full and free access to the Tyler Software, working space, adequate facilities within a reasonable distance from the equipment, and use of machines, attachments, features, or other equipment reasonably necessary for us to provide the maintenance and support services, all at no charge to us. We strongly recommend that you also maintain your VPN for backup connectivity purposes.

For the avoidance of doubt, SaaS Fees do not include the following services: (a) onsite support (unless Tyler cannot remotely correct a Defect in the Tyler Software, as set forth above); (b) application design; (c) other consulting services; or (d) support outside our normal business hours as listed in our then-current Support Call Process. Requested services such as those outlined in this section will be billed to you on a time and materials basis at our then current rates. You must request those services with at least one (1) weeks' advance notice.

## SECTION D – THIRD PARTY PRODUCTS

1. <u>Third Party Hardware</u>. We will sell, deliver, and install onsite the Third Party Hardware, if you have purchased any, for the price set forth in the Investment Summary. Those amounts are payable in accordance with our Invoicing and Payment Policy.

2. <u>Third Party Software</u>. As part of the SaaS Services, you will receive access to the Third Party Software and related documentation for internal business purposes only. Your rights to the Third Party Software will be governed by the Third Party Terms.

3. <u>Third Party Products Warranties</u>.

   3.1 We are authorized by each Developer to grant access to the Third Party Software.

   3.2 The Third Party Hardware will be new and unused, and upon payment in full, you will receive free and clear title to the Third Party Hardware.

   3.3 You acknowledge that we are not the manufacturer of the Third Party Products. We do not warrant or guarantee the performance of the Third Party Products. However, we grant and pass through to you any warranty that we may receive from the Developer or supplier of the Third Party Products.

## SECTION E - INVOICING AND PAYMENT; INVOICE DISPUTES

1. <u>Invoicing and Payment</u>. We will invoice you the SaaS Fees and fees for other professional services in the Investment Summary per our Invoicing and Payment Policy, subject to Section E(2).

2. <u>Invoice Disputes</u>. If you believe any delivered software or service does not conform to the warranties in this Agreement, you will provide us with written notice within thirty (30) days of your receipt of the applicable invoice. The written notice must contain reasonable detail of the issues you contend are in dispute so that we can confirm the issue and respond to your notice with either a justification of the invoice, an adjustment to the invoice, or a proposal addressing the issues presented in your notice. We will work with you as may be necessary to develop an action plan that

outlines reasonable steps to be taken by each of us to resolve any issues presented in your notice. You may withhold payment of the amount(s) actually in dispute, and only those amounts, until we complete the action items outlined in the plan. If we are unable to complete the action items outlined in the action plan because of your failure to complete the items agreed to be done by you, then you will remit full payment of the invoice. We reserve the right to suspend delivery of all SaaS Services, including maintenance and support services, if you fail to pay an invoice not disputed as described above within fifteen (15) days of notice of our intent to do so.

## SECTION F – TERM AND TERMINATION

1. <u>Term</u>. The initial term of this Agreement is three (3) years from the first day of the first month following the Effective Date, unless earlier terminated as set forth below. Upon expiration of the initial term, this Agreement will renew automatically for additional one (1) year renewal terms at our then-current SaaS Fees unless terminated in writing by either party at least sixty (60) days prior to the end of the then-current renewal term. Your right to access or use the Tyler Software and the SaaS Services will terminate at the end of this Agreement.

2. <u>Termination</u>. This Agreement may be terminated as set forth below. In the event of termination, you will pay us for all undisputed fees and expenses related to the software, products, and/or services you have received, or we have incurred or delivered, prior to the effective date of termination. Disputed fees and expenses in all terminations other than your termination for cause must have been submitted as invoice disputes in accordance with Section E(2).

   2.1 <u>Failure to Pay SaaS Fees</u>. You acknowledge that continued access to the SaaS Services is contingent upon your timely payment of SaaS Fees. If you fail to timely pay the SaaS Fees, we may discontinue the SaaS Services and deny your access to the Tyler Software. We may also terminate this Agreement if you don't cure such failure to pay within forty-five (45) days of receiving written notice of our intent to terminate.

   2.2 <u>For Cause</u>. If you believe we have materially breached this Agreement, you will invoke the Dispute Resolution clause set forth in Section H(3). You may terminate this Agreement for cause in the event we do not cure, or create a mutually agreeable action plan to address, a material breach of this Agreement within the thirty (30) day window set forth in Section H(3).

   2.3 <u>Force Majeure</u>. Either party has the right to terminate this Agreement if a Force Majeure event suspends performance of the SaaS Services for a period of forty-five (45) days or more.

   2.4 <u>Lack of Appropriations</u>. If you should not appropriate or otherwise make available funds sufficient to utilize the SaaS Services, you may unilaterally terminate this Agreement upon thirty (30) days written notice to us. You will not be entitled to a refund or offset of previously paid, but unused SaaS Fees. You agree not to use termination for lack of appropriations as a substitute for termination for convenience.

   2.5 <u>Fees for Termination without Cause during Initial Term</u>. If you terminate this Agreement during the initial term for any reason other than cause, Force Majeure, or lack of appropriations, or if we terminate this Agreement during the initial term for your failure to pay SaaS Fees, you shall pay us the following early termination fees:

      a.  if you terminate during the first year of the initial term, 100% of the SaaS Fees through

the date of termination plus 25% of the SaaS Fees then due for the remainder of the
initial term;

b. if you terminate during the second year of the initial term, 100% of the SaaS Fees
through the date of termination plus 15% of the SaaS Fees then due for the remainder
of the initial term; and

c. if you terminate after the second year of the initial term, 100% of the SaaS Fees through
the date of termination plus 10% of the SaaS Fees then due for the remainder of the
initial term.

**SECTION G – INDEMNIFICATION, LIMITATION OF LIABILITY AND INSURANCE**

1. Intellectual Property Infringement Indemnification.

   1.1 We will defend you against any third party claim(s) that the Tyler Software or Documentation
   infringes that third party's patent, copyright, or trademark, or misappropriates its trade secrets,
   and will pay the amount of any resulting adverse final judgment (or settlement to which we
   consent). You must notify us promptly in writing of the claim and give us sole control over its
   defense or settlement. You agree to provide us with reasonable assistance, cooperation, and
   information in defending the claim at our expense.

   1.2 Our obligations under this Section G(1) will not apply to the extent the claim or adverse final
   judgment is based on your use of the Tyler Software in contradiction of this Agreement,
   including with non-licensed third parties, or your willful infringement.

   1.3 If we receive information concerning an infringement or misappropriation claim related to the
   Tyler Software, we may, at our expense and without obligation to do so, either: (a) procure for
   you the right to continue its use; (b) modify it to make it non-infringing; or (c) replace it with a
   functional equivalent, in which case you will stop running the allegedly infringing Tyler Software
   immediately. Alternatively, we may decide to litigate the claim to judgment, in which case you
   may continue to use the Tyler Software consistent with the terms of this Agreement.

   1.4 If an infringement or misappropriation claim is fully litigated and your use of the Tyler Software
   is enjoined by a court of competent jurisdiction, in addition to paying any adverse final
   judgment (or settlement to which we consent), we will, at our option, either: (a) procure the
   right to continue its use; (b) modify it to make it non-infringing; (c) replace it with a functional
   equivalent; or (d) terminate this Agreement and refund you the prepaid but unused SaaS Fees
   for the year in which the Agreement terminates. We will pursue those options in the order
   listed herein. This section provides your exclusive remedy for third party copyright, patent, or
   trademark infringement and trade secret misappropriation claims.

2. General Indemnification.

   2.1 We will indemnify and hold harmless you and your agents, officials, and employees from and
   against any and all third-party claims, losses, liabilities, damages, costs, and expenses (including
   reasonable attorney's fees and costs) for (a) personal injury or property damage to the extent
   caused by our negligence or willful misconduct; or (b) our violation of a law applicable to our
   performance under this Agreement. You must notify us promptly in writing of the claim and
   give us sole control over its defense or settlement. You agree to provide us with reasonable

assistance, cooperation, and information in defending the claim at our expense.

2.2 To the extent permitted by applicable law, you will indemnify and hold harmless us and our agents, officials, and employees from and against any and all third-party claims, losses, liabilities, damages, costs, and expenses (including reasonable attorney's fees and costs) for personal injury or property damage to the extent caused by your negligence or willful misconduct; or (b) your violation of a law applicable to your performance under this Agreement. We will notify you promptly in writing of the claim and will give you sole control over its defense or settlement. We agree to provide you with reasonable assistance, cooperation, and information in defending the claim at your expense.

3. <u>DISCLAIMER</u>. EXCEPT FOR THE EXPRESS WARRANTIES PROVIDED IN THIS AGREEMENT AND TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, WE HEREBY DISCLAIM ALL OTHER WARRANTIES AND CONDITIONS, WHETHER EXPRESS, IMPLIED, OR STATUTORY, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTIES, DUTIES, OR CONDITIONS OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

4. <u>LIMITATION OF LIABILITY</u>. EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT, OUR LIABILITY FOR DAMAGES ARISING OUT OF THIS AGREEMENT, WHETHER BASED ON A THEORY OF CONTRACT OR TORT, INCLUDING NEGLIGENCE AND STRICT LIABILITY, SHALL BE LIMITED TO YOUR ACTUAL DIRECT DAMAGES, NOT TO EXCEED (A) DURING THE INITIAL TERM, AS SET FORTH IN SECTION F(2), TOTAL FEES PAID AS OF THE TIME OF THE CLAIM; OR (B) DURING ANY RENEWAL TERM, THE THEN-CURRENT ANNUAL SAAS FEES PAYABLE IN THAT RENEWAL TERM. THE PRICES SET FORTH IN THIS AGREEMENT ARE SET IN RELIANCE UPON THIS LIMITATION OF LIABILITY. THE FOREGOING LIMITATION OF LIABILITY SHALL NOT APPLY TO CLAIMS THAT ARE SUBJECT TO SECTIONS G(1) AND G(2).

5. <u>EXCLUSION OF CERTAIN DAMAGES</u>. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, IN NO EVENT SHALL WE BE LIABLE FOR ANY SPECIAL, INCIDENTAL, PUNITIVE, INDIRECT, OR CONSEQUENTIAL DAMAGES WHATSOEVER, EVEN IF WE HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

6. <u>Insurance</u>. During the course of performing services under this Agreement, we agree to maintain the following levels of insurance: (a) Commercial General Liability of at least $1,000,000; (b) Automobile Liability of at least $1,000,000; (c) Professional Liability of at least $1,000,000; (d) Workers Compensation complying with applicable statutory requirements; and (e) Excess/Umbrella Liability of at least $5,000,000. We will add you as an additional insured to our Commercial General Liability and Automobile Liability policies, which will automatically add you as an additional insured to our Excess/Umbrella Liability policy as well. We will provide you with copies of certificates of insurance upon your written request.

**SECTION H – GENERAL TERMS AND CONDITIONS**

1. <u>Additional Products and Services</u>. You may purchase additional products and services at the rates set forth in the Investment Summary for twelve (12) months from the Effective Date by executing a mutually agreed addendum. If no rate is provided in the Investment Summary, or those twelve (12) months have expired, you may purchase additional products and services at our then-current list price, also by executing a mutually agreed addendum. The terms of this Agreement will control any such additional purchase(s), unless otherwise specifically provided in the addendum.

2. Optional Items. Pricing for any listed optional products and services in the Investment Summary will be valid for twelve (12) months from the Effective Date.

3. Dispute Resolution. You agree to provide us with written notice within thirty (30) days of becoming aware of a dispute. You agree to cooperate with us in trying to reasonably resolve all disputes, including, if requested by either party, appointing a senior representative to meet and engage in good faith negotiations with our appointed senior representative. Senior representatives will convene within thirty (30) days of the written dispute notice, unless otherwise agreed. All meetings and discussions between senior representatives will be deemed confidential settlement discussions not subject to disclosure under Federal Rule of Evidence 408 or any similar applicable state rule. If we fail to resolve the dispute, either of us may assert our respective rights and remedies in a court of competent jurisdiction. Nothing in this section shall prevent you or us from seeking necessary injunctive relief during the dispute resolution procedures.

4. Taxes. The fees in the Investment Summary do not include any taxes, including, without limitation, sales, use, or excise tax. If you are a tax-exempt entity, you agree to provide us with a tax-exempt certificate. Otherwise, we will pay all applicable taxes to the proper authorities and you will reimburse us for such taxes. If you have a valid direct-pay permit, you agree to provide us with a copy. For clarity, we are responsible for paying our income taxes, both federal and state, as applicable, arising from our performance of this Agreement.

5. Nondiscrimination. We will not discriminate against any person employed or applying for employment concerning the performance of our responsibilities under this Agreement. This discrimination prohibition will apply to all matters of initial employment, tenure, and terms of employment, or otherwise with respect to any matter directly or indirectly relating to employment concerning race, color, religion, national origin, age, sex, sexual orientation, ancestry, disability that is unrelated to the individual's ability to perform the duties of a particular job or position, height, weight, marital status, or political affiliation. We will post, where appropriate, all notices related to nondiscrimination as may be required by applicable law.

6. E-Verify. We have complied, and will comply, with the E-Verify procedures administered by the U.S. Citizenship and Immigration Services Verification Division for all of our employees assigned to your project.

7. Subcontractors. We will not subcontract any services under this Agreement without your prior written consent, not to be unreasonably withheld.

8. Binding Effect; No Assignment. This Agreement shall be binding on, and shall be for the benefit of, either your or our successor(s) or permitted assign(s). Neither party may assign this Agreement without the prior written consent of the other party; provided, however, your consent is not required for an assignment by us as a result of a corporate reorganization, merger, acquisition, or purchase of substantially all of our assets.

9. Force Majeure. Except for your payment obligations, neither party will be liable for delays in performing its obligations under this Agreement to the extent that the delay is caused by Force Majeure; provided, however, that within ten (10) business days of the Force Majeure event, the party whose performance is delayed provides the other party with written notice explaining the cause and extent thereof, as well as a request for a reasonable time extension equal to the estimated duration of the Force Majeure event.

10. No Intended Third Party Beneficiaries. This Agreement is entered into solely for the benefit of you and us. No third party will be deemed a beneficiary of this Agreement, and no third party will have the right to make any claim or assert any right under this Agreement. This provision does not affect the rights of third parties under any Third Party Terms.

11. Entire Agreement; Amendment. This Agreement represents the entire agreement between you and us with respect to the subject matter hereof, and supersedes any prior agreements, understandings, and representations, whether written, oral, expressed, implied, or statutory. Purchase orders submitted by you, if any, are for your internal administrative purposes only, and the terms and conditions contained in those purchase orders will have no force or effect. This Agreement may only be modified by a written amendment signed by an authorized representative of each party.

12. Severability. If any term or provision of this Agreement is held invalid or unenforceable, the remainder of this Agreement will be considered valid and enforceable to the fullest extent permitted by law.

13. No Waiver. In the event that the terms and conditions of this Agreement are not strictly enforced by either party, such non-enforcement will not act as or be deemed to act as a waiver or modification of this Agreement, nor will such non-enforcement prevent such party from enforcing each and every term of this Agreement thereafter.

14. Independent Contractor. We are an independent contractor for all purposes under this Agreement.

15. Notices. All notices or communications required or permitted as a part of this Agreement, such as notice of an alleged material breach for a termination for cause or a dispute that must be submitted to dispute resolution, must be in writing and will be deemed delivered upon the earlier of the following: (a) actual receipt by the receiving party; (b) upon receipt by sender of a certified mail, return receipt signed by an employee or agent of the receiving party; (c) upon receipt by sender of proof of email delivery; or (d) if not actually received, five (5) days after deposit with the United States Postal Service authorized mail center with proper postage (certified mail, return receipt requested) affixed and addressed to the other party at the address set forth on the signature page hereto or such other address as the party may have designated by proper notice. The consequences for the failure to receive a notice due to improper notification by the intended receiving party of a change in address will be borne by the intended receiving party.

16. Client Lists. You agree that we may identify you by name in client lists, marketing presentations, and promotional materials.

17. Confidentiality. Both parties recognize that their respective employees and agents, in the course of performance of this Agreement, may be exposed to confidential information and that disclosure of such information could violate rights to private individuals and entities, including the parties. Confidential information is nonpublic information that a reasonable person would believe to be confidential and includes, without limitation, personal identifying information (*e.g.*, social security numbers) and trade secrets, each as defined by applicable state law. Each party agrees that it will not disclose any confidential information of the other party and further agrees to take all reasonable and appropriate action to prevent such disclosure by its employees or agents. The confidentiality covenants contained herein will survive the termination or cancellation of this Agreement. This obligation of confidentiality will not apply to information that:

    (a) is in the public domain, either at the time of disclosure or afterwards, except by breach of this Agreement by a party or its employees or agents;

(b) a party can establish by reasonable proof was in that party's possession at the time of initial disclosure;

(c) a party receives from a third party who has a right to disclose it to the receiving party; or

(d) is the subject of a legitimate disclosure request under the open records laws or similar applicable public disclosure laws governing this Agreement; provided, however, that in the event you receive an open records or other similar applicable request, you will give us prompt notice and otherwise perform the functions required by applicable law.

18. <u>Business License</u>. In the event a local business license is required for us to perform services hereunder, you will promptly notify us and provide us with the necessary paperwork and/or contact information so that we may timely obtain such license.

19. <u>Governing Law</u>. This Agreement will be governed by and construed in accordance with the laws of your state of domicile, without regard to its rules on conflicts of law.

20. <u>Multiple Originals and Authorized Signatures</u>. This Agreement may be executed in multiple originals, any of which will be independently treated as an original document. Any electronic, faxed, scanned, photocopied, or similarly reproduced signature on this Agreement or any amendment hereto will be deemed an original signature and will be fully enforceable as if an original signature. Each party represents to the other that the signatory set forth below is duly authorized to bind that party to this Agreement.

21. <u>Cooperative Procurement</u>. To the maximum extent permitted by applicable law, we agree that this Agreement may be used as a cooperative procurement vehicle by eligible jurisdictions. We reserve the right to negotiate and customize the terms and conditions set forth herein, including but not limited to pricing, to the scope and circumstances of that cooperative procurement.

22. <u>Contract Documents</u>. This Agreement includes the following exhibits:

| | |
|---|---|
| Exhibit A | Investment Summary |
| Exhibit B | Invoicing and Payment Policy |
| | Schedule 1: Business Travel Policy |
| Exhibit C | Service Level Agreement |
| | Schedule 1: Support Call Process |

IN WITNESS WHEREOF, a duly authorized representative of each party has executed this Agreement as of the date(s) set forth below.

Tyler Technologies, Inc.

By:

Name: Robert Kennedy - Jensen

Title: Senior Corporate Tyler

Date: 9/5/17

City of Oak Harbor, WA

By:

Name: ROBERT SEVERNS

Title: MAYOR

Date: 9/1/2017

<u>Address for Notices:</u>

<u>Address for Notices:</u>

Tyler Technologies, Inc.
One Tyler Drive
Yarmouth, ME 04096
Attention: Chief Legal Officer

City of Oak Harbor
865 SE Barrington Drive
Oak Harbor, WA 98277
Attention: _Patricia Soule_



## Exhibit A
## Investment Summary

The following Investment Summary details the software and services to be delivered by us to you under the Agreement.  This Investment Summary is effective as of the Effective Date.  Capitalized terms not otherwise defined will have the meaning assigned to such terms in the Agreement.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK



**tyler** technologies

**Sales Quotation For**
City of Oak Harbor
865 SE Barrington Drive
Oak Harbor, Washington  98277
Phone (360) 240-6441

| | |
|---|---|
| Quoted By: | Christina Hendrickson |
| Date: | 6/23/2017 |
| Quote Expiration: | 10/28/2017 |
| Quote Name: | City of Oak Harbor-ERP-ExecuTime |
| Quote Number: | 2017-28279 |
| Quote Description: | Execulime Time/Attendance and Advance Scheduling |

**SaaS**

| Description | # Years | Annual Fee | Impl. Hours | One Time Fees | | |
|---|---|---|---|---|---|---|
| | | | | Impl. Cost | Data Conversion | |
| **Human Capital Management:** | | | | | | |
| ExecuTime Advance Scheduling Mobile Access | 3.0 | $1,438.00 | 0 | $0.00 | $0.00 | |
| ExecuTime Advance Scheduling - Up to 150 Employees | 3.0 | $6,694.00 | 48 | $7,680.00 | $0.00 | |
| ExecuTime Time & Attendance Mobile Access | 3.0 | $1,826.00 | 0 | $0.00 | $0.00 | |
| ExecuTime Time & Attendance - Up to 150 Employees | 3.0 | $5,276.00 | 80 | $12,800.00 | $0.00 | |
| **TOTAL:** | | $15,234.00 | 128 | $20,480.00 | $0.00 | |

**Other Services**

| Description | Quantity | Unit Price | Unit Discount | Extended Price |
|---|---|---|---|---|
| VPN Device | 1 | $4,000.00 | $0.00 | $4,000.00 |
| **TOTAL:** | | $4,000.00 | | $4,000.00 |

2017-28279 - Execulime Time/Attendance and Advance Scheduling

CONFIDENTIAL

1 of 4

| Summary | One Time Fees | Recurring Fees |
|---|---|---|
| Total SaaS | $0.00 | $15,234.00 |
| Total Tyler Software | $0.00 | $0.00 |
| Total Tyler Services | $24,480.00 | $0.00 |
| Total 3rd Party Hardware, Software and Services | $0.00 | $0.00 |
| Summary Total | $24,480.00 | $15,234.00 |
| Contract Total | $70,182.00 | |

Unless otherwise indicated in the contract or Amendment thereto, pricing for optional items will be held for Six (6) months from the Quote date or the Effective Date of the Contract, whichever is later.

Customer Approval: _____ Date: 08/02/2017

Print Name: ROBERT T. SEVERNS  P.O. #: 08/04/2017

All primary values quoted in US Dollars

2017-28279 - Executime Time/Attendance and Advance Scheduling

CONFIDENTIAL

## Comments

Tyler's quote contains estimates of the amount of services needed, based on our preliminary understanding of the size and scope of your project. The actual amount of services depends on such factors as your level of involvement in the project and the speed of knowledge transfer.

Unless otherwise noted, prices submitted in the quote do not include travel expenses incurred in accordance with Tyler's then-current Business Travel Policy.

Tyler's prices do not include applicable local, city or federal sales, use excise, personal property or other similar taxes or duties, which you are responsible for determining and remitting.

In the event Client cancels services less than two (2) weeks in advance, Client is liable to Tyler for (i) all non-refundable expenses incurred by Tyler on Client's behalf; and (ii) daily fees associated with the cancelled services if Tyler is unable to re-assign its personnel.

Tyler provides onsite training for a maximum of 12 people per class. In the event that more than 12 users wish to participate in a training class or more than one occurrence of a class is needed, Tyler will either provide additional days at then-current rates for training or Tyler will utilize a Train-the-Trainer approach whereby the client designated attendees of the initial training can thereafter train the remaining users.

Tyler's cost is based on all of the proposed products and services being obtained from Tyler. Should significant portions of the products or services be deleted, Tyler reserves the right to adjust prices accordingly.

The Munis SaaS fees are based on 50 concurrent users.  Should the number of concurrent users be exceeded, Tyler reserves the right to re-negotiate the SaaS fees based upon any resulting changes in the pricing categories.

Client agrees that items in this sales quotation are, upon Client's signature of same, hereby added to the Agreement between the parties, and subject to its terms. Additionally, and notwithstanding anything in the Agreement to the contrary, payment for said items shall conform to the following conditions: License fees for Tyler and 3rd party products are due when Tyler makes such software available for download by the Client (for the purpose of this quotation, the 'Availability Date') or delivery (if not software); Maintenance fees, prorated for the term commencing when on the Availability Date and ending on the last day of the current annual support term for Tyler Software currently licensed to the Client, are due on the Availability Date; Fees for services, unless otherwise indicated, plus expenses, are payable upon delivery.

**Note:  Proposal is based on ExecuTime License level up to 150 employees; City will be covered for up to 190 employees**

**Not Included:
1.  Conversion Services – converting data from another Time & Attendance or Scheduling system
2.  Reasonable and customary travel-related expenses.
3.  Shipping/Handling fees
4.  Charges from third party software companies or providers.
5.  Server (please see Server Requirements on last page)
6.  Time Clocks (please see following pages for options) and cabling
7.  Custom programming and modifications to ExecuTime Software and standard payroll export.
8.  Payroll Timekeeping Interface

*Estimated Travel expenses for On-site services*
*3 visits, approximately $1,795 per trip - $5385*

2017-28279 - Executime Time/Attendance and Advance Scheduling                CONFIDENTIAL                3 of 4

CONFIDENTIAL

2017-28279 - Executime Time/Attendance and Advance Scheduling

Comments



**Exhibit B**
**Invoicing and Payment Policy**

We will provide you with the software and services set forth in the Investment Summary of the Agreement. Capitalized terms not otherwise defined will have the meaning assigned to such terms in the Agreement.

<u>Invoicing</u>: We will invoice you for the applicable software and services in the Investment Summary as set forth below. Your rights to dispute any invoice are set forth in the Agreement.

1. <u>SaaS Fees</u>. SaaS Fees are invoiced on an annual basis, beginning on the commencement of the initial term as set forth in Section F (1) of this Agreement. Your annual SaaS fees for the initial term are set forth in the Investment Summary. Upon expiration of the initial term, your annual SaaS fees will be at our then-current rates.

2. <u>Other Tyler Software and Services</u>.

   2.1 *Project Planning Services*: Project planning services are invoiced upon delivery of the implementation planning document.

   2.2 *VPN Device*: The fee for the VPN device will be invoiced upon installation of the VPN.

   2.3 *Implementation and Other Professional Services (including training)*: Implementation and other professional services (including training) are billed and invoiced as delivered, at the rates set forth in the Investment Summary.

   2.4 *Consulting Services*: If you have purchased any Business Process Consulting services, if they have been quoted as fixed-fee services, they will be invoiced 50% upon your acceptance of the Best Practice Recommendations, by module, and 50% upon your acceptance of custom desktop procedures, by module. If you have purchased any Business Process Consulting services and they are quoted as an estimate, then we will bill you the actual services delivered on a time and materials basis.

   2.5 *Conversions*: Fixed-fee conversions are invoiced 50% upon initial delivery of the converted data, by conversion option, and 50% upon Client acceptance to load the converted data into Live/Production environment, by conversion option. Where conversions are quoted as estimated, we will bill you the actual services delivered on a time and materials basis.

   2.6 *Requested Modifications to the Tyler Software*: Requested modifications to the Tyler Software are invoiced 50% upon delivery of specifications and 50% upon delivery of the applicable modification. You must report any failure of the modification to conform to the specifications within thirty (30) days of delivery; otherwise, the modification will be deemed to be in compliance with the specifications after the 30-day window has passed. You may still report Defects to us as set forth in this Agreement.

2.7 *Other Fixed Price Services*: Other fixed price services are invoiced upon complete delivery of the service. For the avoidance of doubt, where "Project Planning Services" are provided, payment will be due upon delivery of the Implementation Planning document. Dedicated Project Management services, if any, will be billed monthly in arrears, beginning on the first day of the month immediately following the project kick-off meeting.

2.8 *Change Management Services*: If you have purchased any change management services, those services will be invoiced in the following amounts and upon the following milestones:

| | |
|---|---|
| Acceptance of Change Management Discovery Analysis | 15% |
| Delivery of Change Management Plan and Strategy Presentation | 10% |
| Acceptance of Executive Playbook | 15% |
| Acceptance of Resistance Management Plan | 15% |
| Acceptance of Procedural Change Communications Plan | 10% |
| Change Management Coach Training | 20% |
| Change Management After-Action Review | 15% |

3. <u>Third Party Products</u>.

   3.1 *Third Party Software License Fees*: License fees for Third Party Software, if any, are invoiced when we make it available to you for downloading.

   3.2 *Third Party Software Maintenance*: The first year maintenance for the Third Party Software is invoiced when we make it available to you for downloading.

   3.3 *Third Party Hardware*: Third Party Hardware costs, if any, are invoiced upon delivery.

4. <u>Expenses</u>. The service rates in the Investment Summary do not include travel expenses. Expenses will be billed as incurred and only in accordance with our then-current Business Travel Policy, plus a 10% travel agency processing fee. Our current Business Travel Policy is attached to this Exhibit B at Schedule 1. Copies of receipts will be provided upon request; we reserve the right to charge you an administrative fee depending on the extent of your requests. Receipts for miscellaneous items less than twenty-five dollars and mileage logs are not available.

<u>Payment</u>. Payment for undisputed invoices is due within forty-five (45) days of the invoice date. We prefer to receive payments electronically. Our electronic payment information is:

| | |
|---|---|
| Bank: | Wells Fargo Bank, N.A. |
| | 420 Montgomery |
| | San Francisco, CA 94104 |
| ABA: | ███████████ |
| Account: | ███████████ |
| Beneficiary: | Tyler Technologies, Inc. – Operating |



**Exhibit B**
**Schedule 1**
**Business Travel Policy**

1. Air Travel

   A. Reservations & Tickets

   Tyler's Travel Management Company (TMC) will provide an employee with a direct flight within two hours before or after the requested departure time, assuming that flight does not add more than three hours to the employee's total trip duration and the fare is within $100 (each way) of the lowest logical fare. If a net savings of $200 or more (each way) is possible through a connecting flight that is within two hours before or after the requested departure time and that does not add more than three hours to the employee's total trip duration, the connecting flight should be accepted.

   Employees are encouraged to make advanced reservations to take full advantage of discount opportunities. Employees should use all reasonable efforts to make travel arrangements at least two (2) weeks in advance of commitments. A seven (7) day advance booking requirement is mandatory. When booking less than seven (7) days in advance, management approval will be required.

   Except in the case of international travel where a segment of continuous air travel is six (6) or more consecutive hours in length, only economy or coach class seating is reimbursable. Employees shall not be reimbursed for "Basic Economy Fares" because these fares are non-refundable and have many restrictions that outweigh the cost-savings.

   B. Baggage Fees

   Reimbursement of personal baggage charges are based on trip duration as follows:

   - Up to five (5) days = one (1) checked bag
   - Six (6) or more days = two (2) checked bags

   Baggage fees for sports equipment are not reimbursable.

2. Ground Transportation

   A. Private Automobile

      Mileage Allowance – Business use of an employee's private automobile will be reimbursed
      at the current IRS allowable rate, plus out of pocket costs for tolls and parking. Mileage will
      be calculated by using the employee's office as the starting and ending point, in compliance
      with IRS regulations. Employees who have been designated a home office should calculate
      miles from their home.

   B. Rental Car

      Employees are authorized to rent cars only in conjunction with air travel when cost,
      convenience, and the specific situation reasonably require their use. When renting a car for
      Tyler business, employees should select a "mid-size" or "intermediate" car. "Full" size cars
      may be rented when three or more employees are traveling together. Tyler carries leased
      vehicle coverage for business car rentals; except for employees traveling to Alaska and
      internationally (excluding Canada), additional insurance on the rental agreement should be
      declined.

   C. Public Transportation

      Taxi or airport limousine services may be considered when traveling in and around cities or
      to and from airports when less expensive means of transportation are unavailable or
      impractical. The actual fare plus a reasonable tip (15-18%) are reimbursable. In the case of
      a free hotel shuttle to the airport, tips are included in the per diem rates and will not be
      reimbursed separately.

   D. Parking & Tolls

      When parking at the airport, employees must use longer term parking areas that are
      measured in days as opposed to hours. Park and fly options located near some airports may
      also be used. For extended trips that would result in excessive parking charges, public
      transportation to/from the airport should be considered. Tolls will be reimbursed when
      receipts are presented.

3. Lodging

      Tyler's TMC will select hotel chains that are well established, reasonable in price, and
      conveniently located in relation to the traveler's work assignment. Typical hotel chains
      include Courtyard, Fairfield Inn, Hampton Inn, and Holiday Inn Express. If the employee has
      a discount rate with a local hotel, the hotel reservation should note that discount and the
      employee should confirm the lower rate with the hotel upon arrival. Employee
      memberships in travel clubs such as AAA should be noted in their travel profiles so that the
      employee can take advantage of any lower club rates.

      "No shows" or cancellation fees are not reimbursable if the employee does not comply with
      the hotel's cancellation policy.

Tips for maids and other hotel staff are included in the per diem rate and are not reimbursed separately.

Employees are not authorized to reserve non-traditional short-term lodging, such as Airbnb, VRBO, and HomeAway. Employees who elect to make such reservations shall not be reimbursed.

4. Meals and Incidental Expenses

Employee meals and incidental expenses while on travel status within the continental U.S. are in accordance with the federal per diem rates published by the General Services Administration. Incidental expenses include tips to maids, hotel staff, and shuttle drivers and other minor travel expenses. Per diem rates are available at www.gsa.gov/perdiem.

Per diem for Alaska, Hawaii, U.S. protectorates and international destinations are provided separately by the Department of Defense and will be determined as required.

A. Overnight Travel
For each full day of travel, all three meals are reimbursable. Per diems on the first and last day of a trip are governed as set forth below.

Departure Day

Depart before 12:00 noon                        Lunch and dinner
Depart after 12:00 noon                         Dinner

Return Day

Return before 12:00 noon                        Breakfast
Return between 12:00 noon & 7:00 p.m.           Breakfast and lunch
Return after 7:00 p.m.*                         Breakfast, lunch and dinner

*7:00 p.m. is defined as direct travel time and does not include time taken to stop for dinner.

The reimbursement rates for individual meals are calculated as a percentage of the full day per diem as follows:

| Breakfast | 15% |
|-----------|-----|
| Lunch     | 25% |
| Dinner    | 60% |

B. Same Day Travel

Employees traveling at least 100 miles to a site and returning in the same day are eligible to claim lunch on an expense report. Employees on same day travel status are eligible to claim dinner in the event they return home after 7:00 p.m.*

*7:00 p.m. is defined as direct travel time and does not include time taken to stop for dinner.

5.  Internet Access – Hotels and Airports

Employees who travel may need to access their e-mail at night.  Many hotels provide free high speed internet access and Tyler employees are encouraged to use such hotels whenever possible.  If an employee's hotel charges for internet access it is reimbursable up to $10.00 per day.  Charges for internet access at airports are not reimbursable.

6.  International Travel

All international flights with the exception of flights between the U.S. and Canada should be reserved through TMC using the "lowest practical coach fare" with the exception of flights that are six (6) or more consecutive hours in length. In such event, the next available seating class above coach shall be reimbursed.

When required to travel internationally for business, employees shall be reimbursed for photo fees, application fees, and execution fees when obtaining a new passport book, but fees related to passport renewals are not reimbursable. Visa application and legal fees, entry taxes and departure taxes are reimbursable.

The cost of vaccinations that are either required for travel to specific countries or suggested by the U.S. Department of Health & Human Services for travel to specific countries, is reimbursable.

Section 4, Meals & Incidental Expenses, and Section 2.b., Rental Car, shall apply to this section.



## Exhibit C

## SERVICE LEVEL AGREEMENT

**I.    Agreement Overview**

This SLA operates in conjunction with, and does not supersede or replace any part of, the Agreement. It outlines the information technology service levels that we will provide to you to ensure the availability of the application services that you have requested us to provide. All other support services are documented in the Support Call Process.

**II.    Definitions.** Except as defined below, all defined terms have the meaning set forth in the Agreement.

*Attainment*: The percentage of time the Tyler Software is available during a calendar quarter, with percentages rounded to the nearest whole number.

*Client Error Incident*: Any service unavailability resulting from your applications, content or equipment, or the acts or omissions of any of your service users or third-party providers over whom we exercise no control.

*Downtime*: Those minutes during which the Tyler Software is not available for your use. Downtime does not include those instances in which only a Defect is present.

*Service Availability*: The total number of minutes in a calendar quarter that the Tyler Software is capable of receiving, processing, and responding to requests, excluding maintenance windows, Client Error Incidents and Force Majeure.

**III.    Service Availability**

The Service Availability of the Tyler Software is intended to be 24/7/365. We set Service Availability goals and measures whether we have met those goals by tracking Attainment.

        a.    Your Responsibilities

Whenever you experience Downtime, you must make a support call according to the procedures outlined in the Support Call Process. You will receive a support incident number.

You must document, in writing, all Downtime that you have experienced during a calendar quarter. You must deliver such documentation to us within 30 days of a quarter's end.

The documentation you provide must evidence the Downtime clearly and convincingly. It must include, for example, the support incident number(s) and the date, time and duration of the Downtime(s).

        b.    Our Responsibilities

When our support team receives a call from you that Downtime has occurred or is occurring, we will work with you to identify the cause of the Downtime (including whether it may be the result of a Client Error Incident or Force Majeure). We will also work with you to resume normal operations.

Upon timely receipt of your Downtime report, we will compare that report to our own outage logs and support tickets to confirm that Downtime for which we were responsible indeed occurred.

We will respond to your Downtime report within 30 day(s) of receipt. To the extent we have confirmed Downtime for which we are responsible, we will provide you with the relief set forth below.

> c. Client Relief

When a Service Availability goal is not met due to confirmed Downtime, we will provide you with relief that corresponds to the percentage amount by which that goal was not achieved, as set forth in the Client Relief Schedule below.

Notwithstanding the above, the total amount of all relief that would be due under this SLA per quarter will not exceed 5% of one quarter of the then-current SaaS Fee. The total credits confirmed by us in one or more quarters of a billing cycle will be applied to the SaaS Fee for the next billing cycle. Issuing of such credit does not relieve us of our obligations under the Agreement to correct the problem which created the service interruption.

Every quarter, we will compare confirmed Downtime to Service Availability. In the event actual Attainment does not meet the targeted Attainment, the following Client relief will apply, on a quarterly basis:

| Targeted Attainment | Actual Attainment | Client Relief |
|---|---|---|
| 100% | 98-99% | Remedial action will be taken. |
| 100% | 95-97% | 4% credit of fee for affected calendar quarter will be posted to next billing cycle |
| 100% | <95% | 5% credit of fee for affected calendar quarter will be posted to next billing cycle |

You may request a report from us that documents the preceding quarter's Service Availability, Downtime, any remedial actions that have been/will be taken, and any credits that may be issued.

**IV.    Applicability**

The commitments set forth in this SLA do not apply during maintenance windows, Client Error Incidents, and Force Majeure.

We perform maintenance during limited windows that are historically known to be reliably low-traffic times. If and when maintenance is predicted to occur during periods of higher traffic, we will provide advance notice of those windows and will coordinate to the greatest extent possible with you.

**V.    Force Majeure**

You will not hold us responsible for not meeting service levels outlined in this SLA to the extent any failure to do so is caused by Force Majeure. In the event of Force Majeure, we will file with you a signed request that said failure be excused. That writing will at least include the essential details and circumstances supporting our request for relief pursuant to this Section. You will not unreasonably withhold its acceptance of such a request.



**Exhibit C**
**Schedule 1**
**Support Call Process**

**Support Channels**
Tyler Technologies, Inc. provides the following channels of software support:
    (1) Tyler Community – an on-line resource, Tyler Community provides a venue for all Tyler clients with current maintenance agreements to collaborate with one another, share best practices and resources, and access documentation.
    (2) On-line submission (portal) – for less urgent and functionality-based questions, users may create unlimited support incidents through the customer relationship management portal available at the Tyler Technologies website.
    (3) Email – for less urgent situations, users may submit unlimited emails directly to the software support group.
    (4) Telephone – for urgent or complex questions, users receive toll-free, unlimited telephone software support.

*Support Resources*
A number of additional resources are available to provide a comprehensive and complete support experience:
    (1) Tyler Website – www.tylertech.com – for accessing client tools and other information including support contact information.
    (2) Tyler Community – available through login, Tyler Community provides a venue for clients to support one another and share best practices and resources.
    (3) Knowledgebase – A fully searchable depository of thousands of documents related to procedures, best practices, release information, and job aides.
    (4) Program Updates – where development activity is made available for client consumption

**Support Availability**
Tyler Technologies support is available during the local business hours of 8 AM to 5 PM (Monday – Friday) across four US time zones (Pacific, Mountain, Central and Eastern). Clients may receive coverage across these time zones. Tyler's holiday schedule is outlined below. There will be no support coverage on these days.

| New Year's Day | Thanksgiving Day |
| --- | --- |
| Memorial Day | Day after Thanksgiving |
| Independence Day | Christmas Day |
| Labor Day | |

**Issue Handling**
*Incident Tracking*
Every support incident is logged into Tyler's Customer Relationship Management System and given a unique incident number. This system tracks the history of each incident. The incident tracking number is used to track and reference open issues when clients contact support. Clients may track incidents, using the incident number, through the portal at Tyler's website or by calling software support directly.

*Incident Priority*

Each incident is assigned a priority number, which corresponds to the client's needs and deadlines. The client is responsible for reasonably setting the priority of the incident per the chart below. This chart is not intended to address every type of support incident, and certain "characteristics" may or may not apply depending on whether the Tyler software has been deployed on customer infrastructure or the Tyler cloud. The goal is to help guide the client towards clearly understanding and communicating the importance of the issue and to describe generally expected responses and resolutions.

| Priority Level | Characteristics of Support Incident | Resolution Targets |
|---|---|---|
| 1 Critical | Support incident that causes (a) complete application failure or application unavailability; (b) application failure or unavailability in one or more of the client's remote location; or (c) systemic loss of multiple essential system functions. | Tyler shall provide an initial response to Priority Level 1 incidents within one (1) business hour of receipt of the support incident. Tyler shall use commercially reasonable efforts to resolve such support incidents or provide a circumvention procedure within one (1) business day.  For non-hosted customers, Tyler's responsibility for lost or corrupted data is limited to assisting the client in restoring its last available database. |
| 2 High | Support incident that causes (a) repeated, consistent failure of essential functionality affecting more than one user or (b) loss or corruption of data. | Tyler shall provide an initial response to Priority Level 2 incidents within four (4) business hours of receipt of the support incident.  Tyler shall use commercially reasonable efforts to resolve such support incidents or provide a circumvention procedure within ten (10) business days.  For non-hosted customers, Tyler's responsibility for loss or corrupted data is limited to assisting the client in restoring its last available database. |
| 3 Medium | Priority Level 1 incident with an existing circumvention procedure, or a Priority Level 2 incident that affects only one user or for which there is an existing circumvention procedure. | Tyler shall provide an initial response to Priority Level 3 incidents within one (1) business day of receipt of the support incident.  Tyler shall use commercially reasonable efforts to resolve such support incidents without the need for a circumvention procedure with the next published maintenance update or service pack.  For non-hosted customers, Tyler's responsibility for lost or corrupted data is limited to assisting the client in restoring its last available database. |
| 4 Non-critical | Support incident that causes failure of non-essential functionality or a cosmetic or other issue that does not qualify as any other Priority Level. | Tyler shall provide an initial response to Priority Level 4 incidents within two (2) business days. Tyler shall use commercially reasonable efforts to resolve such support incidents, as well as cosmetic issues, with a future version release. |

*Incident Escalation*

Tyler Technology's software support consists of four levels of personnel:

(1) Level 1: front-line representatives
(2) Level 2: more senior in their support role, they assist front-line representatives and take on escalated issues
(3) Level 3: assist in incident escalations and specialized client issues
(4) Level 4: responsible for the management of support teams for either a single product or a product group

If a client feels they are not receiving the service needed, they may contact the appropriate Software Support Manager. After receiving the incident tracking number, the manager will follow up on the open issue and determine the necessary action to meet the client's needs.

On occasion, the priority or immediacy of a software support incident may change after initiation. Tyler encourages clients to communicate the level of urgency or priority of software support issues so that we can respond appropriately. A software support incident can be escalated by any of the following methods:

(1) Telephone – for immediate response, call toll-free to either escalate an incident's priority or to escalate an issue through management channels as described above.
(2) Email – clients can send an email to software support in order to escalate the priority of an issue
(3) On-line Support Incident Portal – clients can also escalate the priority of an issue by logging into the client incident portal and referencing the appropriate incident tracking number.

*Remote Support Tool*

Some support calls require further analysis of the client's database, process or setup to diagnose a problem or to assist with a question. Tyler will, at its discretion, use an industry-standard remote support tool. Support is able to quickly connect to the client's desktop and view the site's setup, diagnose problems, or assist with screen navigation. More information about the remote support tool Tyler uses is available upon request.