1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF GEORGIA

3               ATLANTA DIVISION

4

5      CIVIL ACTION NO:  1:19-CV-01338-AT

6

7   SUZANNE GREENE,

8        Plaintiff,

9   vs.

10  TYLER TECHNOLOGIES,

11       Defendant.

12

13       DEPOSITION OF:  SUZANNE GREENE

14             AUGUST 29, 2019

15                9:53 A.M.

16

17

18

19

20

21

22

23

24

25



```
 1                    APPEARANCES

 2

 3   APPEARING ON BEHALF OF THE PLAINTIFF:

 4        DELONG, CALDWELL, BRIDGERS,

 5        FITZPATRICK & BENJAMIN, LLC

 6        Mr. Matthew W. Herrington

 7        101 Marietta Street

 8        Suite 2650

 9        Atlanta, Georgia 30303

10        404-979-3150

11        matthew.herrington@dcblflegal.com

12

13   APPEARING ON BEHALF OF THE DEFENDANT:

14        REED SMITH

15        Mr. Paula B. McKeeby

16        2501 North Harwood Street

17        Suite 1700

18        Dallas, Texas 75201

19        469-680-4200

20        pmckeeby@reedsmith.com

21

22

23        TYLER TECHNOLOGIES

24        Ms. Abigail Diaz

25
```



1                            INDEX

2      WITNESS                              PAGE

3      SUZANNE GREENE

4      Examination by Mr. McKeeby            4

5

6                      INDEX OF EXHIBITS

7      NUMBER                               PAGE

8      Exhibit 1                             29

9      Exhibit 2                             55

10     Exhibit 3                            137

11     Exhibit 4                            137

12     Exhibit 5                            142

13     Exhibit 6                            160

14

15

16

17

18

19

20

21

22

23

24

25



```
 1                    PROCEEDINGS
 2   AUGUST 29, 2019                      9:53 A.M.
 3              THE VIDEOGRAPHER:  This is the
 4   deposition of Suzanne Greene in the matter of
 5   Suzanne Greene versus Tyler Technologies, Inc.
 6   Today's date is August 29th, 2019.  The time
 7   on the record is 9:53 a.m.
 8              My name is Todd Parker.  I'm the
 9   videographer.  The court reporter is Cindy
10   Jenkins.
11              Counsel, please introduce
12   yourselves, state who you represent, after
13   which, the court reporter will swear in the
14   witness.
15              MR. MCKEEBY:  Paulo McKeeby, I
16   represent Tyler Technologies.  And I'm here
17   with in-house counsel, Abby Diaz.
18              MR. HERRINGTON:  I'm Matthew
19   Herrington, and I'm here representing the
20   plaintiff, Suzanne Greene.
21              SUZANNE GREENE,
22   having been first duly sworn, was examined and
23   testified as follows:
24   EXAMINATION BY MR. MCKEEBY:
25       Q.    Ms. Greene, will you state your
```



1    full name for the record, please.

2         A.     It's Suzanne Greene.

3         Q.     What is your current residential

4    address?

5         A.     It's 110 Sheldon Way in

6    Fayetteville, Georgia.

7         Q.     How long have you lived there?

8         A.     About a year now.

9         Q.     Have you ever had your deposition

10   taken before today?

11        A.     No, I have not.

12        Q.     I'm sure your counsel may have

13   gone over some of the ground rules; but I want

14   to do that as well for the purposes of the

15   record.  You understand you're under oath?

16        A.     Yes, sir.

17        Q.     Is that yes?

18        A.     (Nodding head.)

19        Q.     And you understand that the court

20   reporter is taking down your testimony?

21        A.     Yes.

22        Q.     And because she's taking it down

23   in what will be memorialized in a transcript,

24   if you could do your best to do a couple of

25   things:  One is to answer me audibly as



1  opposed to nodding or shrugging; is that

2  agreeable?

3       A.    Yes.

4       Q.    If you don't do that, I might ask

5  you to state your answer as opposed to --

6       A.    Okay.

7       Q.    -- making a gesture.

8            The other thing to mention in that

9  regard is that there are going to be times

10 when you're going to know where I'm going with

11 my question, perhaps, and you're going to want

12 to talk before I finish.  If you could do your

13 best to not give your answer until I'm done

14 with my question so we're not talking over

15 each other and we'll have a cleaner record; is

16 that agreeable?

17      A.    Yes, sir.

18      Q.    And I'll try to do my best as well

19 in waiting until you're finished with an

20 answer before I ask you the next question.

21      A.    Okay.

22      Q.    And if I don't do that, which has

23 happened before, if you could let me know that

24 you're not finished and then we can go back to

25 your answer; is that agreeable?



```
 1          A.      Yes, sir.
 2          Q.      If I ask you a question that you
 3   don't understand because I'm using a technical
 4   term incorrectly or for whatever reason, just
 5   let me know, and I'll try to ask you a more
 6   understandable question; is that agreeable?
 7          A.      Yes.
 8          Q.      Have you ever been a party to a
 9   lawsuit before this?
10          A.      No.
11          Q.      Have you ever given testimony
12   under oath before today?
13          A.      No.
14          Q.      Have you ever filed an
15   administrative charge with the government
16   against any employer?
17          A.      Can you explain that, what does
18   that mean?
19          Q.      Well, like a -- like a charge with
20   the Equal Employment Opportunity Commission or
21   the Department of Labor or a government agency
22   like that?
23          A.      No.
24          Q.      When did you first obtain counsel
25   in this matter?
```



1        A.      It was around February -- around
2    that time, February of this year, 2019.
3        Q.      What were your dates of employment
4    with Tyler Technologies?
5        A.      I started -- so now just with
6    Tyler Technologies?  Or with ExecuTime as
7    well?
8        Q.      Yeah, that's a good point --
9        A.      I'm sorry.
10       Q.      I just violated what I told you.
11   Yes.  So I understand that Tyler acquired
12   ExecuTime in June of 2016?
13       A.      Yes, that's correct.
14       Q.      And you commenced employment with
15   ExecuTime in February of 2016; correct?
16       A.      Yes, that is correct.
17       Q.      And so for the purposes of this
18   deposition, when I say "Tyler," I'm going to
19   mean the entirety of your employment with both
20   ExecuTime and Tyler; agree?
21       A.      Okay.
22       Q.      There may be times when you need
23   to answer separately or there may be questions
24   that I ask that called for separate answers.
25   If that's the case, I'm going to tell you.



1        A.      Yes.

2        Q.      But rather than try to -- when I'm

3   saying, "your employer," when I'm saying

4   "Tyler," I'm referring to the entire tenure of

5   your employment between February of 2016 until

6   your resignation.

7        A.      Okay.  Thank you.

8               MR. HERRINGTON:  Paulo, can you

9   remind me, are we -- are y'all contesting

10  successor liability?  I realize liability is

11  contested.  But the successor -- because if

12  it's not, that changes what I need to object

13  to; potentially, I cannot make objections

14  that I otherwise would have.

15              MR. MCKEEBY:  Let's talk, can we

16  talk about that during a break?

17              MR. HERRINGTON:  Sure.  Okay.

18              MR. MCKEEBY:  I think the answer

19  is no, but I want to confirm that that's the

20  case.  Or -- I mean, what would be your

21  objection if you don't --

22              MR. HERRINGTON:  Yeah, if I

23  need -- if I -- vagueness, you know.

24              MR. MCKEEBY:  Yeah.

25              MR. HERRINGTON:  If I suspect that



 1   a distinction needs to be made, you know?
 2              MR. MCKEEBY:  Well, I mean, I
 3   don't think that depends on our position with
 4   respect to successor liability.  So I would
 5   just suggest that you make your objection
 6   based on the question.
 7              MR. HERRINGTON:  Okay.
 8        Q.    (By Mr. McKeeby) And again, if
 9   there's some ambiguity in the question where
10   you need to make a distinction between the way
11   something was at -- after the acquisition as
12   opposed to during the first few months of your
13   employment when ExecuTime was your technical
14   employer, you can let me know in your answer;
15   agreeable?
16        A.    Okay.  Yes.
17        Q.    When you contacted an attorney in
18   February of 2019, was that Mr. Herrington?
19        A.    It was actually Mitch -- what's
20   his real name?  I'm sorry, I don't know his
21   full name.
22        Q.    It was someone else at
23   Mr. Herrington's firm?
24        A.    Yes, that is correct.
25        Q.    And his first name is Mitch?



```
 1          A.     Yes.

 2                 MR. HERRINGTON:  For the record,

 3     it's Mitchell Benjamin.

 4                 THE WITNESS:  Mitchell, sorry.

 5          Q.     (By Mr. McKeeby) Did you know

 6     Mitchell Benjamin before you contacted him?

 7          A.     He was actually referred to me.

 8     Somebody else recommended him.

 9          Q.     Who referred him?

10          A.     My sister did.

11          Q.     What's your sister's name?

12          A.     Her name is Holly.

13          Q.     Where is she?

14          A.     She lives here in Georgia as

15     well.

16          Q.     What did you discuss with your

17     sister as to the reason for you needing a

18     lawyer?

19          A.     So the initial reason for my

20     call was my incentive was cut down in half.

21     And no one had explained to me the reason

22     why.  So when I had reached out to my

23     supervisor's supervisor, she said I should

24     have been informed, which I wasn't.

25                 And then my manager actually
```



1  scheduled a meeting on my calendar for that

2  Friday to tell me why my check -- my

3  incentive had decreased already.

4       Q.    And when you say "incentive," you

5  mean your bonus compensation?

6       A.    That is correct, yes.

7       Q.    And you say it was cut in half?

8       A.    About, yes, sir.

9       Q.    From what to what?

10      A.    So in this specific payout, my

11 incentive was supposed to be around, I want

12 to say, probably about 13- or 1,400.  And my

13 check was only about 7.  So I noticed a large

14 decrease, and that's when I reached out.

15      Q.    Reached out to a lawyer?

16      A.    No, I reached out to my

17 supervisor first, to see if I could resolve

18 it.

19      Q.    Right.  And who was your

20 supervisor?

21      A.    It was my supervisor's

22 supervisor, so it was Jamie Burns.  And at

23 that moment, I also copied my direct

24 supervisor -- excuse me, to see if we could

25 get this resolved.



1        Q.    And who was your direct
2    supervisor?
3        A.    Her name is Hillary Pasch.
4        Q.    And that's P-a-s-c-h?
5        A.    Yes.
6        Q.    So we can get this firm, Ms. Pasch
7    was your supervisor throughout your employment
8    with ExecuTime and Tyler; correct?
9        A.    No, that is not correct.
10       Q.    Okay.  At what point was Ms. Pasch
11   your supervisor?
12       A.    I don't recall the exact date
13   when she became my supervisor.  I would say
14   about a year and a half or so, estimating.
15       Q.    How long was she your supervisor?
16       A.    Until I left the company.
17       Q.    So she was your supervisor for the
18   last year and a half of your employment with
19   Tyler?
20       A.    An estimate, yes.
21       Q.    Estimate?
22       A.    Yeah.
23       Q.    Who was your supervisor before
24   then?
25       A.    So prior to that, we had Jamie



1  Burns, which ended up being her direct

2  supervisor.  And then prior to that, I had

3  John Jenkins.

4       Q.    So who did you talk to first,

5  Ms. Burns, about the decrease in your

6  incentive compensation?

7       A.    I actually sent an e-mail with

8  both of them on there in regards to, you

9  know, the discrepancy with my bonus.

10      Q.    What did they explain to you the

11 reason for the change was?

12      A.    Jamie was under the assumption

13 that we had already been informed about it,

14 and we had not.  So Jamie's response was,

15 well, something to the extent -- I can't

16 remember verbatim, but this is something

17 that, you know, Hillary would have already

18 gone over with you.  And I responded and

19 said, this is not something that was

20 discussed.

21      Q.    Was it just a change to the way

22 the bonus was calculated?

23      A.    That's correct.

24      Q.    And these bonuses were paid on a

25 monthly basis?



1        A.      That is correct.

2        Q.      Did you ever have an individual

3   bonus plan?

4        A.      Can you explain that a little

5   further, I'm sorry?

6        Q.      Yes.  Let me clarify.  I

7   understand that there was an incentive bonus

8   plan that I can show you later on in the

9   deposition that was generic in the sense that

10  it applied to other employees who performed

11  your role at ExecuTime and Tyler.  Do you

12  recall that document?

13       A.      I do.

14       Q.      Was there something that dealt

15  with you specifically and told you what your

16  bonus allocation would be?

17       A.      So the bonus structure was based

18  on the amount of time that you were with

19  Tyler.  So that's what determined what bonus

20  structure you fell under.

21       Q.      Right.  Okay.  That doesn't answer

22  my question.

23              I'm asking, was there a document,

24  apart from the general incentive bonus plan,

25  that was given to you that would have allowed



1  you to calculate what your bonus would have

2  been?  Something that you might have signed or

3  that had your name on it or -- you've never

4  seen anything like that?

5       A.    Not that I recall.

6       Q.    Okay.  And did you later have a

7  discussion with Ms. Pasch about your bonus

8  compensation?

9       A.    Well, she actually scheduled a

10  call for all of the implementation

11  consultants, because nobody was informed.

12  And at that time, everyone found out, the

13  Friday after I sent the e-mail.

14       Q.    And what was discussed in that

15  call, what was the reason for the change?

16       A.    The changes that were made.  It

17  was just -- her reasoning was it was a Tyler

18  change.

19       Q.    And what was the change?

20       A.    So the change was based on the

21  amount of time that you were there, based on

22  the amount of years.  Where I fell -- because

23  at that time, I was right around three years.

24  Not many others were -- in fact, I don't

25  think anyone else was affected other than



1    myself.  But the amount of incentive that I

2    was to receive actually went down.

3          Q.    So there was a -- what was

4    explained to you was that there was a change

5    in the calculation related to your years of

6    seniority with Tyler?

7          A.    That is correct.

8          Q.    And that resulted in your bonus

9    compensation being less?

10         A.    That is correct.

11         Q.    What was the last day that you

12   performed services as an employee for Tyler?

13         A.    The last physical work day was

14   in March 2019.

15         Q.    And you went on FMLA leave after

16   that?

17         A.    That is correct.

18         Q.    How long was your FMLA leave?

19         A.    About two months.

20         Q.    And you resigned your employment

21   at the end of that two-month period?

22         A.    Yes, sir, that is correct.

23         Q.    How did you do that?

24         A.    I sent an e-mail to my HR

25   manager.



1        Q.      Who was that?

2        A.      Lindsey -- I don't recall her --

3    I think Ryto or Roto, something like that.

4        Q.      Was she affiliated with ExecuTime

5    before --

6        A.      She was not.

7        Q.      -- Tyler's acquisition?

8        A.      No.

9        Q.      How long did you -- how long was

10   she your HR manager?

11       A.      So I would say about a year and

12   a half to two years.

13       Q.      Do you know where she was located?

14       A.      I'm not absolutely sure, sorry.

15       Q.      Had you ever communicated with

16   Ms. Rotell, this Lindsey person on any other

17   occasion?

18       A.      I have, yes.

19       Q.      Was that in connection with your

20   leave?

21       A.      Well, I did communicate with her

22   in regards to my leave, but there was other

23   issues that I had at Tyler as well that I had

24   to communicate with her.

25       Q.      Any of those issues relate to your



1    compensation?

2           A.     No, sir.

3           Q.     What did they relate to?

4           A.     I was actually being, like,

5    verbally abused by another employee, he was

6    calling me B word and all types of other

7    unnecessary things.

8           Q.     Who was that employee?

9           A.     Michael Howell.

10          Q.     So you made a complaint?

11          A.     I did, yes.

12          Q.     Did you understand that this HR

13   manager, Lindsey, was dedicated exclusively to

14   the ExecuTime division?

15          A.     From my understanding, yes.

16          Q.     I'm sorry, what was Michael's last

17   name?

18          A.     Howell.

19          Q.     Howell?

20          A.     Yeah.

21          Q.     What was his position?

22          A.     He was -- I believe he's an

23   implementation consultant, as well, but he's

24   on the advanced scheduling side.

25          Q.     And advanced scheduling is a



1   separate module of the software?

2          A.     So it's within the ExecuTime

3   software, but they deal primarily with, like,

4   police departments, fire departments, things

5   of that sort.

6          Q.     In your role as an implementation

7   consultant, did you support advanced

8   scheduling at all?

9          A.     Initially, when I started with

10  ExecuTime, I actually started out on the

11  advanced scheduling side.  But they did not

12  see that as a good fit, and that's when I

13  went over to the time and attendance side,

14  and they started only hiring retired police

15  officers and retired fire fighters to deal

16  with that side.

17         Q.     ExecuTime software consists of

18  advanced scheduling and time and attendance?

19         A.     That is correct.  And --

20         Q.     Am I correct that the time and

21  attendance was sort of the basic software and

22  that you had to purchase it in order to also

23  purchase the advanced scheduling module?

24         A.     From my understanding, yes.

25  It's more like the -- like a preference



```
 1   option, so to say, in the back where you can
 2   turn on certain things like advanced
 3   scheduling and things of that sort.
 4        Q.    When in your career -- you said
 5   you started out supporting advanced
 6   scheduling?
 7        A.    Yes, sir.
 8        Q.    How long did you do that?
 9        A.    About six months.
10        Q.    And after that, for the remainder
11   of your tenure of employment with Tyler, you
12   supported time and attendance?
13        A.    That is correct.
14        Q.    Did your job duties change at all
15   as a result of that change in the module that
16   you were supporting?
17        A.    Can you be a little more
18   specific?  What do you mean as far as, like,
19   my job duties?
20        Q.    I'm not sure I can.  But I'll try.
21        A.    Okay.
22        Q.    I'll ask it a different way.  I
23   may not be more specific, but I can ask it in
24   a different way.
25              So it sounded like within six
```



1    months of your employment, a decision at Tyler

2    was made to move you from supporting the

3    advanced scheduling software to the time and

4    attendance software?

5         A.    Yes, sir.

6         Q.    You still had the title of -- I

7    guess at that point, implementation

8    consultant; correct?

9         A.    No.

10        Q.    Your title, at that point, was

11   what?

12        A.    So when I initially started with

13   ExecuTime, I was a project manager.  And once

14   we were acquired by Tyler, they made a

15   decision as far as based on experience and,

16   you know, separating the roles, who would

17   remain project managers and who would then

18   change their titles to implementation

19   consultants, and at that time, my title was

20   changed.

21        Q.    And that was a change that was

22   separate and distinct from the change in the

23   software that you were supporting?

24        A.    So as --

25        Q.    Or was that part of the same



1   process?

2        A.    It was different, I believe.

3   I'm trying to recall the exact time that I

4   switched over to time and attendance opposed

5   to advanced scheduling.  And it was right

6   around the same time we were acquired.  So I

7   can't say specifically if --

8        Q.    Okay.  But it was a separate

9   decision in terms of you weren't -- when you

10  transferred over from supporting time and

11  attendance from advanced scheduling, it wasn't

12  like at that point you suddenly became an

13  implementation consultant as opposed to a

14  project manager; correct?

15       A.    That is correct.

16       Q.    Okay.  So they happened in close

17  proximity time-wise, but they were sort of

18  separate decisions or events, if you will?

19       A.    Yes, sir.

20       Q.    Okay.  So in terms of your job

21  duties, what you did -- and we're going to

22  talk about that at some length today -- but in

23  terms of your day-to-day responsibilities, did

24  they -- did those responsibilities change when

25  you started supporting the time and attendance



1  software as opposed to the advanced scheduling
2  software?
3         A.    They were slightly different,
4  yes.
5         Q.    How so?
6         A.    So, for example, with the
7  advanced scheduling side, it's a completely
8  different setup and a different process, you
9  can say, than the time and attendance side.
10        Q.    How did that affect your
11 day-to-day responsibilities?
12        A.    Well, it was basically -- it
13 was, of course, a large learning curve for me
14 going from one part of the module to another.
15 So I definitely had to learn the time and
16 attendance -- the entire time and attendance
17 side of the application.
18        Q.    Okay.  But other than the actual
19 learning curve and understanding the new
20 module, in terms of what you did on a
21 day-to-day basis in terms of your job
22 responsibilities, did those change?
23        A.    Yes.  Because they're
24 different -- they're different sides of the
25 module.  So...



1    Q.    Well --

2    A.    Go ahead, I'm sorry.

3    Q.    I'm sorry.  Let me ask it in a

4  different way.  What things did you do once

5  you started supporting time and attendance

6  that you didn't do while you were supporting

7  advanced scheduling?

8    A.    So with the time and attendance

9  side, we more so focused on clocking in,

10  clocking out, because it was more of the time

11  and attendance side of things.  Where for

12  advanced scheduling, the majority of my time

13  was put into building schedules, because

14  police officers and fire departments have

15  unique schedules where they would

16  automatically populate them.

17          So that took out a big bulk of

18  what you do within advanced scheduling, which

19  is not very common on the time and attendance

20  side.

21    Q.    So you no longer had to build

22  schedules?

23    A.    In some circumstances, I did;

24  but majority of the time, no.

25    Q.    Okay.  What does it mean to build



1  a schedule?

2       A.    So to build a schedule, so let's

3  say that we have a police officer who rotates

4  their shifts, and one week they have Tuesdays

5  and Thursdays off, the next week, they have

6  Wednesdays and Fridays off.  We would

7  automatically build that schedule on the back

8  end so that it would populate for them and

9  they were not required to, like, clock in and

10  clock out.

11       Q.    But in terms of what your

12  responsibility was to, quote, unquote, build

13  the schedule, are you actually programming the

14  software or what is it that you're doing?

15       A.    No, I'm not very technical, so

16  when it comes to, like, programming and

17  things in depth on the technical side, I did

18  not handle any of that.  All of that would go

19  through tickets.

20       Q.    Right.  So when you say you would

21  build the software, what do you mean in terms

22  of -- what would you do, integrate information

23  or just fill out templates or what was your

24  role in terms of the buildup of these -- of

25  the advanced scheduling software?



 1          A.     So as far as that's concerned,

 2   the project manager would meet with the

 3   actual client and get, like, a questionnaire

 4   filled out, which is where the client would

 5   tell us their specific policies and

 6   procedures, and we would base any schedules

 7   and anything that's done within the

 8   application off of their specific policies

 9   and procedures.

10          So it's coming from the client,

11   and when they tell us, okay, these are our

12   expectations or this is how we would like to

13   utilize the software, I would then base the

14   schedules off of that questionnaire.

15          Q.     So you would create the schedule

16   based on the questionnaire that the client

17   filled out?

18          A.     Yes, that is correct.

19          Q.     So you would create the schedule,

20   then, in the client's -- well, I guess at that

21   point, in the ExecuTime software?

22          A.     That is correct.  Yes.

23          Q.     Was there any change in your

24   duties, as we discussed them, when your title

25   changed from project manager to implementation



1   consultant?

2           A.      Yes.  There was.

3           Q.      Okay.  And I'm not sure if I asked

4   this, if I did, I apologize, but when did that

5   change occur?

6           A.      When we were actually acquired

7   or?

8           Q.      No.  Well, maybe that's the

9   answer.  But when did you -- when did your

10  title change from project manager to

11  implementation consultant?

12          A.      When we were acquired.

13          Q.      Okay.  So June of 2016?

14          A.      Yes, sir.

15          Q.      Let me ask you this -- I'll back

16  up.  Did your compensation change at all when

17  you moved from advanced scheduling to time and

18  attendance?

19          A.      Well, we did not always receive

20  compensation.  So we were not receiving it at

21  that time.  So then the answer would be, no,

22  there was not a change because within

23  ExecuTime, we did not receive compensation,

24  like billable hours.

25          Q.      I'm talking about what you were



 1  paid?

 2        A.     Oh, as far as --

 3        Q.     Your salary?

 4        A.     -- my salary.  My salary,

 5  because of the federal guidelines, there was

 6  something where you had to be at -- don't

 7  quote me on this, please, I believe it was

 8  like 47,500 or something, it was some federal

 9  thing they passed out, so they had to bump me

10  up.

11        Q.     Okay.  When did that occur?

12        A.     When we were acquired by Tyler.

13        Q.     Okay.

14        A.     Around that time.

15        Q.     So you -- let me just --

16               MR. HERRINGTON:  I've never heard

17  anyone say, don't quote me on this, in a

18  deposition before.

19               THE WITNESS:  Sorry.

20               As you're typing.

21        Q.     (By Mr. McKeeby) I'm going to mark

22  this as Exhibit 1?

23        A.     Okay, thank you.

24               (Whereupon, Defendant's

25               Exhibit 1 was marked for



 1              identification.)

 2              THE WITNESS:  45, I'm sorry.

 3         Q.    (By Mr. McKeeby) Wait.  Wait.  Let

 4    me ask a question.

 5              I've marked as Exhibit 1 what I

 6    understand to be your offer letter with

 7    ExecuTime; would you agree with that?

 8         A.    Yes.  This looks about accurate,

 9    yes, sir.

10         Q.    And it lists a start date of

11    February 1st, 2016?

12         A.    That is correct.

13         Q.    Is that when you started with

14    ExecuTime?

15         A.    Yes.

16         Q.    This lists your salary at $45,000?

17         A.    That is correct.

18         Q.    On an annual basis?

19         A.    Yes, sir.

20         Q.    And it also mentions bonus

21    opportunity?

22         A.    It does, yes.

23         Q.    Okay.  And so is it your testimony

24    that you -- your salary increased to 47,500 in

25    June of 2016 when Tyler acquired ExecuTime?



 1        A.     I don't know if it was June of
 2   2016, but it was right around the time that
 3   we were acquired.
 4        Q.     How did you find out that your job
 5   title would be changed from project manager to
 6   implementation consultant?
 7        A.     Management let us know.
 8        Q.     Who?
 9        A.     I believe it was Kathy, at that
10   time.
11        Q.     And that's Kathy who?
12        A.     I can't think of her last name
13   right now.
14        Q.     Okay.  How did your duties change
15   when you went from a project manager to
16   implementation consultant?
17        A.     So with that as -- how Tyler
18   actually does it is it breaks it up as two
19   people on a team for a project.  So you have
20   the project manager who essentially leads the
21   project, does majority of like the
22   integration, they do the solution designs,
23   the questionnaire, all of that, first direct
24   contact with the actual client.  Where at
25   this point, now as an implementation



1    consultant, I would be primarily doing setup,

2    training, as far as any troubleshooting once

3    they start utilizing the application.

4            Q.    Okay.  So let me make sure I

5    understand that, because that's going to be an

6    important sort of piece of testimony that

7    we'll come back to.

8                So there's an implementation

9    process, if you will; correct?

10           A.    Yes, sir.

11           Q.    And I understand that the project

12   manager handles the first part of that

13   process?

14           A.    Yes, sir.

15           Q.    And then there's a handoff to the

16   implementation consultant?

17           A.    That is correct.

18           Q.    Okay.  And after that handoff, the

19   implementation can -- it leads the remainder

20   of the implementation processes?

21           A.    To an extent, with, of course,

22   the backup of the project manager for any

23   questions, directions, things of that sort.

24           Q.    But at that time, after the

25   handoff, the implementation consultant is



1   having the direct client interface?

2        A.    As far as meetings and the

3   direct contact, are you referring to?

4        Q.    Yes.

5        A.    Yes, sir.

6        Q.    I mean, the project manager might

7   have -- continue to have some discussions with

8   the client, but in terms of the majority of

9   the on-site meetings for the training and for

10  weekly -- or whatever periodic calls, that's

11  something that the implementation consultant

12  does after the handoff; correct?

13       A.    That is correct.

14       Q.    Okay.  So you mentioned that at

15  Tyler they would put two people on a team:

16  One project manager and one implementation

17  consultant; correct?

18       A.    That is correct.

19       Q.    Did they not -- was that not the

20  way it was done before the Tyler acquisition?

21       A.    No, it was not.

22       Q.    So that the project manager was

23  doing both roles at that point?

24       A.    That is correct.

25       Q.    So the change -- and we can go



1    into more specifics if we need to, but at a

2    general level, when you became an

3    implementation consultant, you were no longer

4    doing the project manager duties?

5          A.    Essentially, no, I was not.

6          Q.    Okay.  Now, throughout your

7    employment with ExecuTime and Tyler, you

8    worked at home; correct?

9          A.    That is correct.

10         Q.    Did you report to a particular

11   office?

12         A.    I worked from home.  I don't

13   really understand.  What do you mean, did I

14   report?

15         Q.    Was there -- there -- where was

16   your -- who was your immediate supervisor at

17   that point?  Was that Ms. Burns?

18         A.    Well --

19         Q.    Initially?

20         A.    Jamie Burns for part of the time

21   and then Hillary.  But Hillary actually

22   worked remote and Jamie was at our home

23   office, I guess you could say.

24         Q.    That's in Little Rock?

25         A.    That is correct, yes.



1      Q.     Where was Hillary located?  North
2   Carolina?
3      A.     One of the Carolinas, yes.
4      Q.     Was it North Carolina or do you
5   know?
6      A.     I'm not sure, it's one of the --
7   either North or South.
8      Q.     We will stick with one of the
9   Carolinas.
10      A.     Okay.
11      Q.     So that's something that didn't
12   change.  Throughout your employment, you were
13   always working out of your home?
14      A.     That is correct.
15      Q.     And did you understand that to be
16   unique to you or was that typical of other
17   implementation consultants?
18      A.     A lot -- whoever did not live in
19   Little Rock, Arkansas, worked from home.  So
20   we did have several people who worked from
21   home.
22      Q.     How many ExecuTime implementation
23   consultants were there at any one time?
24      A.     So they rotated a lot, because a
25   lot of people left.  I was the only one that



1   kind of stayed for a little while.

2              So we had kind of like a

3   resolving door; there was a lot of people in

4   and out, so it's kind of hard to say.

5        Q.    All right.  Were there ever more

6   than ten implementation consultants?

7        A.    No, sir.

8        Q.    Was it ever any less than any four

9   implementation consultants?

10       A.    Yes.

11       Q.    Okay.  Now, am I correct that the

12  team that you described, whether it be a

13  project manager and implementation consultant,

14  that setup, if you will, began as of the Tyler

15  acquisition or shortly thereafter?

16       A.    That is correct.

17       Q.    And that wasn't project specific,

18  was it?  You were assigned or you were teamed

19  with a project manager for periods of time

20  until there was a change; correct?

21       A.    Can you reword that question?

22  Do you mean did I have the same project

23  manager, is that what you're asking me?

24       Q.    I think so.  I understand you had

25  different project managers.



 1          A.     That is correct.

 2          Q.     But they weren't -- the -- that

 3   happened over time as opposed to as a result

 4   of being put on different implementation

 5   projects; correct?

 6          A.     So, it -- so first I had Hillary

 7   and she was promoted.  So then they gave me

 8   another project manager.  So I stayed with

 9   those project -- or excuse me, stayed with

10   those project managers while I worked on

11   projects.

12          Q.     Okay.  So you worked on multiple

13   projects with each project manager?

14          A.     Yes, sir.

15          Q.     Maybe it's easier to go through --

16   so Hillary was your first project manager,

17   Hillary Pasch.  Who was your second project

18   manager?

19          A.     Mikeya Henderson.

20          Q.     And who was your next project

21   manager?

22          A.     Talia Harrison.

23          Q.     That was your last one?

24          A.     Yes.

25          Q.     How did you find out about a



1   position at ExecuTime?

2       A.      Talia Harrison had told me about

3   it.

4       Q.      She was working there at that

5   time?

6       A.      She was, yes, sir.

7       Q.      And she was a friend of yours?

8       A.      She was, yes, sir.

9       Q.      Where does she live?

10      A.      I believe she moved to Memphis

11  now, but she did live in Little Rock,

12  Arkansas, for quite some time.

13      Q.      Did you interview for a position?

14      A.      I did, yes, sir.

15      Q.      With whom did you interview?

16      A.      Kathy.

17      Q.      Last name we don't know?

18      A.      Yes, I cannot remember it.  I'm

19  going to remember it though, and I'll tell

20  you.

21      Q.      How about this, if it's agreeable

22  to counsel, we can put a blank at the -- in

23  the transcript, and if you can remember her

24  name, you can fill it in?

25      A.      Yes, sir, okay.  That works.



 1          Q.      And if you can't remember, we'll

 2     leave it blank.

 3          A.      Okay.

 4          Q.      Did you fly to Little Rock for the

 5     interview?

 6          A.      I drove.

 7          Q.      Okay.

 8          A.      But that wasn't -- my first one

 9     was over Skype.

10          Q.      Okay.  That first one was with

11     Kathy?

12          A.      It was, yes, sir.

13          Q.      Okay.  And ultimately, you were

14     presented with an offer letter that you signed

15     on January 12th, 2016?

16          A.      Yes, sir.

17          Q.      What was your -- where were you

18     employed before that?

19          A.      Allconnect.

20          Q.      What kind of company is that?

21          A.      So it's primarily sales.

22          Q.      Is it software?

23          A.      No, it is not.  This was

24     actually my first time ever working with

25     software.



1        Q.    Okay.  And the increase in salary
2    you mentioned to 47,500, was that the only
3    increase to your salary while you were
4    employed with ExecuTime/Tyler?
5        A.    That was not, no.  I had another
6    increase around -- it was about a year.
7    Probably about a year ago, when Mikeya was
8    promoted to project manager.  The manager
9    reached out to me and said I was doing a
10   really good job and she wanted to give me an
11   increase.
12       Q.    What manager was that?
13       A.    That was Hillary Pasch.  Like,
14   it wasn't a review time, it was just, hey,
15   you're doing a great job, here's an increase.
16       Q.    What was your increase to?
17       A.    48,500, I believe.
18       Q.    And when was that?
19       A.    It was --
20       Q.    Approximately?
21       A.    -- approximately, I would say --
22   it was last year, 2018.  I want to say around
23   mid-year.  It was around the same exact time
24   Mikeya was changed to a project manager.
25       Q.    Okay.  When you started at



1   ExecuTime, you understood that it was a

2   salaried position?

3          A.      Yes, sir.

4          Q.      You understood that your salary

5   plus any bonus would compensate you for all

6   hours that you worked?

7          A.      Yes, sir.

8          Q.      You knew you wouldn't be getting

9   overtime; correct?

10         A.      That is correct.

11         Q.      Is that something that you

12  discussed with either Ms. Harrison or with

13  anyone with whom you interviewed?

14         A.      No, I didn't really bring it up.

15  I didn't think twice about it, I guess you

16  could say.

17         Q.      Is it something that you ever made

18  a complaint about during your employment at

19  Tyler?

20         A.      In regards to the overtime?

21         Q.      Right.

22         A.      No, sir.

23         Q.      Did it ever cross your mind while

24  you were employed at Tyler?

25         A.      It did.  But I felt like I had



1    never really had a salaried job before, so

2    this was new to me, and I just felt like,

3    hey, if I have to work 50, 55 hours or

4    whatever the case may be for that week, then

5    I need to get it done and my check is

6    accordingly.

7         Q.    Was there any specific occurrence

8    or incident that made it cross your mind when

9    it did?

10        A.    In regards to the overtime?

11        Q.    Right.  In regards to thinking

12   about -- you said you didn't complain about

13   not receiving overtime, because it didn't

14   really cross your mind.

15             At some point, you said, the

16   concept of receiving overtime did cross your

17   mind.  And my question was simply, was there

18   anything specific by way of a conversation or

19   anything else that made it cross your mind

20   when it did?

21        A.    Not really.  It was just I was

22   working a lot.  And I said, gosh, you know,

23   being salaried, you sure do have to put in

24   the work to get your check.  But no, nothing

25   specific you can say came up.



1        Q.      Okay.  Would you agree with me
2    that after around June of 2016, when you
3    became an implementation consultant, that your
4    job duties were more or less the same for the
5    remainder of your employment?
6        A.      Now, are you referring to my
7    implementation consultant role from when we
8    were bought out from Tyler until the day that
9    I actually left or?
10       Q.      I think the answer to that
11   question is yes.
12       A.      Okay.
13       Q.      But let me ask it in a different
14   way to make sure we're on the same page.
15       A.      Yes, sir.
16       Q.      I understand that at some point
17   your title was changed from project manager to
18   implementation consultant; right?
19       A.      Yes, sir.
20       Q.      And that coincided with the
21   acquisition of ExecuTime by Tyler; correct?
22       A.      Yes, sir.
23       Q.      So and we think that was around
24   June of 2016?
25       A.      Yes, sir.



1      Q.     And I think you told me earlier,
2   to be fair, that it wasn't exactly -- the
3   title change didn't occur exactly with the
4   acquisition, but occurred, you know, maybe a
5   few weeks or even a month thereafter; correct?
6      A.     Right, it was right around the
7   time, yes.
8      Q.     So right around the time.  But
9   once that happened, once you became an
10  implementation consultant, is it fair to say
11  that your duties remained the same for the
12  duration of your employment?
13     A.     For the most part, yes.
14     Q.     Right.
15     A.     But not completely.
16     Q.     And why do you -- why -- how did
17  they change, if they did?
18     A.     So towards the end, they were
19  trying to put more responsibilities on the
20  implementation consultant, which we weren't
21  doing prior to, in regards to, like,
22  uploading files with integration information.
23  So the initial integration was still
24  something we did not handle -- or like the
25  technical stuff.  But we started doing, like,



```
 1   integrating their, for example, employees'
 2   names, like uploading a file, so to say, with
 3   the employees' names and things of that sort,
 4   which we weren't really doing before; that
 5   was the project manager.
 6        Q.     When did that happen?
 7        A.     That happened right around the
 8   time I got trained for the first time, which
 9   was January, 2019.  Around that time.
10        Q.     When you say the first time that
11   you got trained, you mean the first time that
12   you got trained on these additional
13   responsibilities?
14        A.     No.  So initially -- and this
15   was something that I had brought up to my
16   managers multiple times, was I never got
17   trained and this was new to me.
18             So it was basically, listen to
19   the videos, figure it out, sink or swim.
20   There was not a structure, so to say, of
21   training.  And Hillary continued to bring up
22   the amount that I needed to rely on my
23   project manager for certain items and I
24   explained to her, I was never trained.  Like,
25   I need someone to really sit down and train
```



 1  me on the process and what I'm supposed to

 2  do.

 3           And at that time, they flew

 4  Talia Harrison out to Atlanta, January 2019,

 5  to actually go through the actual process

 6  step by step as well as, at that time, we

 7  discussed me starting to handle uploading

 8  files and things of that sort.

 9       Q.    Okay.  So you met with Talia

10  Harrison and she gave you general training on

11  the role of implementation consultant and also

12  these new responsibilities that were going to

13  be added; correct?

14       A.    Yes, that's correct.

15       Q.    Where did that training take

16  place?

17       A.    In Atlanta, Georgia, right here.

18       Q.    Where?

19       A.    At my house.

20       Q.    How long was the training?

21       A.    It was about a week.  So she

22  flew out on Monday, flew back on Friday.  So

23  she was here for a week, but really about

24  three full days.

25       Q.    And that was training that you



1  requested?

2          A.      Yes.

3          Q.      Did you receive any on-the-job

4  training?

5          A.      What do you mean by on-the-job

6  training?

7          Q.      Let me ask it a different way.

8          A.      I'm sorry.

9          Q.      Did the -- what was the first

10  implementation for which you were a project

11  manager?

12          A.      I don't recall the first one I

13  was --

14          Q.      Okay.  Did you do it on your own

15  or with assistance?

16          A.      No, I had assistance.

17          Q.      Okay.  How many, approximately,

18  did you -- implementations did you serve as

19  the project manager on with assistance?

20          A.      Well, I only did that for a few

21  months.  So I didn't really have any that I

22  went with completely no assistance, I guess

23  you could say.  I still had to reach out

24  because I was a new employee at that time as

25  well.



```
 1         Q.     Right.  But was there another
 2   project manager who you worked with during
 3   that period on these first implementations?
 4         A.     John Jenkins, he was the manager
 5   over advanced scheduling.
 6         Q.     So he sort of was a co-project
 7   manager with you during this initial period?
 8         A.     Yeah, when I first started.
 9   Like, he was kind of, you know, guiding me in
10   regards to -- because a lot of it was, like,
11   police terms and things that I was not
12   familiar with, and he was a cop forever, so.
13         Q.     Okay.  Okay.
14               Let me step back a little bit and
15   ask some kind of more basic questions.
16               The customers who purchased
17   ExecuTime are government entities; correct?
18         A.     That is correct.
19         Q.     States and municipalities?
20         A.     That is correct.
21         Q.     And one of the things that they're
22   purchasing is the actual software; correct?
23         A.     Yes.
24         Q.     The -- either the advanced
25   scheduling or the time and attendance software
```



1 | or in some cases both?

2 |      A.     I believe -- and I could be

3 | wrong, because I don't do sales, I believe

4 | you have to have time and attendance to do

5 | advanced scheduling, though.

6 |      Q.     Right.  But you wouldn't

7 | necessarily have to have time and

8 | attendance -- or I'm sorry, you wouldn't --

9 | you could have time and attendance only?

10 |      A.     Yes.

11 |      Q.     Okay.  And you did not create the

12 | software; correct?

13 |      A.     No.

14 |      Q.     You're not a technical person, you

15 | said?

16 |      A.     No, sir.

17 |      Q.     Is that correct?

18 |      A.     That is correct.

19 |      Q.     Sometimes we'll get a double

20 | negative and I'll need to clear that up as I

21 | just did there.

22 |      A.     No problem.

23 |      Q.     The software is something that

24 | developers created?

25 |      A.     Yes, sir.



1          Q.     You supported the software, I've

2    used that term, in the sense of your duties as

3    an implementation consultant?

4          A.     When you say support?

5          Q.     Well, you're -- obviously, your

6    job duty functions related in some way to the

7    software in terms of teaching it through

8    training, some of the integration work that

9    you mentioned was related, at least at some

10   level, to the software?

11         A.     Yes, that is correct.

12         Q.     At a general level, you worked

13   with the software?

14         A.     That is correct.

15         Q.     But you did not create the

16   software?

17         A.     Yes, that is correct.

18         Q.     Okay.  And you also didn't sell

19   the software; correct?

20         A.     No, I did not.  That is correct.

21         Q.     Okay.  I take it that even before

22   the acquisition, ExecuTime had a sales team?

23         A.     That is correct.

24         Q.     And the sales team would be the

25   one that would pitch and market the software



1   independent of anything that you as either a

2   project manager or implementation consultant

3   would do; correct?

4           A.     Yes, sir.

5           Q.     Back to your offer letter, if I

6   asked this, I apologize.  You understood that

7   as a salaried employee, you would receive the

8   same compensation no matter how many hours you

9   worked during a particular pay period;

10  correct?

11          A.     That was my understanding, yes,

12  sir.

13          Q.     And that was, in fact, the case;

14  correct?

15          A.     Yes, sir.

16          Q.     One of the rules of depositions

17  that I neglected to tell is that if you need a

18  break at any time during the deposition, you

19  can take one.

20          A.     Okay, thank you.

21          Q.     But the other rule is that

22  sometimes I'm going to need a break, like

23  right now.

24          A.     Okay, no worries.

25                 MR. MCKEEBY:  Is it okay if we



1    take a break?

2              MR. HERRINGTON:  Sure.  Thank

3    you.

4              THE VIDEOGRAPHER:  Going off the

5    record at 10:39.

6              (A short break was taken.)

7              THE VIDEOGRAPHER:  We are back on

8    the record at 10:50 a.m.

9         Q.    (By Mr. McKeeby) Okay.  Back on

10   the record.  Ms. Greene, you understand you're

11   still under oath?

12        A.    Yes, sir.

13        Q.    Do you -- did you graduate from

14   college?

15        A.    I did not.

16        Q.    Have you ever attended college?

17        A.    I have, yes.

18        Q.    How many years?

19        A.    About one.

20        Q.    Where was that?

21        A.    In Delaware, Del Tech.

22        Q.    Have you -- when was that one

23   year?

24        A.    Geez.  When I got out of high

25   school.  So that would have been, like, 2002,



 1   2003ish.
 2        Q.    Other than associated with
 3   employment, since 2002, have you had any other
 4   education in terms of classes or curriculums
 5   or courses?
 6        A.    I took a real estate class.  I
 7   mean, nothing like technical or towards this
 8   job, but....
 9        Q.    And how -- are you currently
10   employed?
11        A.    Yes, sir.
12        Q.    With whom?
13        A.    With O'Ryan.
14        Q.    What kind of company is that?
15        A.    It's similar as far as software
16   is concerned.
17        Q.    What type of software do they
18   provide?
19        A.    So they provide law management
20   software that deals more with, like, the
21   accounting aspect of things, not so much,
22   like, time and attendance, like this job.
23        Q.    Okay.
24             MR. HERRINGTON:  She can get you a
25   good deal.



1        Q.     (By Mr. McKeeby) So your

2   clients -- I assume you anticipated my next

3   question.  Your clients are no longer

4   government entities, I take it, since -- at

5   O'Ryan?

6        A.     That is correct, yes, sir.

7        Q.     They're law firms?

8        A.     That is correct.

9        Q.     And are you -- what's your

10  position?

11       A.     I'm a project manager here.

12       Q.     Do you work out of your home?

13       A.     I do not, no, sir.

14       Q.     What office do you report to?

15       A.     Right in Marietta.

16       Q.     And when did you first start

17  working at O'Ryan?

18       A.     June of this year.

19       Q.     And are you paid salary or by the

20  hour at O'Ryan?

21       A.     I'm paid salary.

22       Q.     Do you receive overtime?

23       A.     I do not, no, sir.

24       Q.     What's your salary?

25       A.     It's 60,000.



1          Q.     And I take it you interviewed for

2     a position at O'Ryan?

3          A.     I did, yes, sir.

4          Q.     And did you present them with a

5     copy of your resume?

6          A.     Yes.  Excuse me, let me actually

7     back up a little bit.  I didn't give them the

8     copy of the resume there.  I had applied on

9     Indeed and uploaded the copy of my resume on

10    Indeed.  So they received my resume from

11    Indeed.

12         Q.     Thank you for --

13         A.     Yes.

14         Q.     -- that correction.

15                (Whereupon, Exhibit 2 was marked

16                for identification.)

17         Q.     (By Mr. McKeeby) I've marked as

18    Deposition Exhibit 2 what's been produced in

19    this case as your resume.  Would you agree

20    with that characterization?

21         A.     Yes, sir.

22         Q.     Is this, as far as you know, a

23    true and correct copy of the resume that you

24    presented to O'Ryan in connection with your

25    employment?



 1        A.      Yes, sir.

 2        Q.      And did you present this -- well,

 3   I don't know how to honor your correction.  Do

 4   you have an understanding that this resume was

 5   presented to other employers as well or just

 6   O'Ryan?

 7        A.      I don't understand that

 8   question, I'm sorry.

 9        Q.      You uploaded a resume on Indeed, a

10   job site service; correct?

11        A.      Yes, sir.

12        Q.      This is the resume that you

13   uploaded?

14        A.      Yes, sir.

15        Q.      Were there any other versions of

16   the resume that you utilized since your

17   employment with Tyler other than this

18   document?

19        A.      No, sir.

20        Q.      Did you actually provide this

21   resume to any employers other than through

22   Indeed?

23        A.      No -- hold on, let me back that

24   up.  Because I also uploaded this on

25   LinkedIn.  So then, I guess that would also



1  technically count for other people getting it

2  off of Indeed.

3       Q.    So you uploaded the resume on

4  LinkedIn as well as Indeed?

5       A.    Yes, sir.

6       Q.    And I guess you would agree with

7  me that the resume is truthful and accurate?

8       A.    Yes, sir.

9       Q.    Is -- in terms of your job duties,

10 I understand it's a different kind of software

11 with a different kind of client.  But is the

12 project manager position that you have with

13 O'Ryan similar to the project manager position

14 that you had during the first several months

15 of your employment with ExecuTime before the

16 Tyler acquisition?

17      A.    Similar in what ways?

18      Q.    Any ways?

19      A.    So in certain ways, yes, because

20 I am -- I'm actually managing the projects

21 with this company, I'm not assisting.

22      Q.    Okay.  And you were assisting

23 while you were at ExecuTime because you were

24 new, as you testified to, and Mr. Jenkins and

25 you worked together; correct?



1        A.      And there was Jason Eps, he
2   worked along -- just if I had questions and
3   stuff, I would reach out to them.  Because
4   keep in mind, when I was on the advanced
5   scheduling side, there was a lot of police
6   questions that would come up, fire department
7   questions that I was not familiar with how to
8   answer or even approach those.
9        Q.      As a project manager at O'Ryan,
10  are you doing any of the roles that you
11  performed as an implementation consultant when
12  you were with Tyler?
13       A.      Yes, sir.
14       Q.      What functions are those?
15       A.      Like, the training aspect of
16  things.
17       Q.      What else?
18       A.      The initial setup based off of
19  the client's policies and procedures.
20       Q.      That's something you do at O'Ryan
21  and that's something you did as an
22  implementation consultant at Tyler?
23       A.      Yes.  The initial setup, yes,
24  sir.
25       Q.      And you said initial setup of the



1  client's information or?

2       A.      That is correct.

3       Q.      What other tasks or duties do you

4  have at O'Ryan that you also had as an

5  implementation consultant at Tyler?

6       A.      That's about it, is training and

7  the initial setup.  Because now, of course,

8  I'm doing more with my new role.

9       Q.      Right.  So that wouldn't be

10  responsive to my question.

11       A.      Yes, sir.

12       Q.      So in terms of the different job

13  functions as an implementation consultant at

14  Tyler, we've covered -- we've mentioned -- I

15  shouldn't say we've covered -- but we

16  mentioned training and we mentioned the

17  initial setup.  What other duties and

18  responsibilities did you have as an

19  implementation consultant?

20       A.      I did either weekly or biweekly

21  calls with the client.

22       Q.      Okay.

23       A.      I also did certain levels of

24  troubleshooting if they ran into issues

25  while, you know, utilizing the software, of



1  course.

2          Q.      What else?

3          A.      Um --

4          Q.      Travel?

5          A.      Yes, yes, sir.  And I would

6  travel and do those specific things, like go

7  train people and travel, yes.

8          Q.      Right.  Obviously, you're

9  traveling to do some of these things, but

10 you're also traveling as part of your job?

11         A.      Yes, sir.

12         Q.      What other duties did you have,

13 again, just sort of listing them by category?

14 Are there any other duties?

15         A.      Not that I can think of off the

16 top of my head.

17         Q.      We can come back to it if we need

18 to.

19         A.      Okay.

20         Q.      Just so that we're clear, are you

21 comfortable if I refer to the ExecuTime

22 software -- you mentioned that it's divided

23 between time and attendance -- the time and

24 attendance module and the advanced scheduling

25 module.  But it all relates to payroll;



1   correct?

2        A.    Essentially, that is the end

3   result, is producing the actual payroll.

4        Q.    I mean, that's what the objective

5   of the software is, to make sure the payroll

6   is done properly; correct?

7        A.    So we don't actually do the

8   payroll portion, but to make sure that the

9   time is accurate, yes.

10        Q.    And the time needs to be accurate

11   because if it's not, then the compensation

12   won't be accurate?

13        A.    That is correct.

14        Q.    So you would agree with me that --

15   that it was critical that the software be --

16   that the software perform correctly?

17        A.    Yes, sir.

18        Q.    And, for example, as I understand

19   it, before you could quote, Go-Live, unquote

20   with the software, you actually had to have

21   two test runs before the hand to make sure the

22   software was operating properly; correct?

23        A.    That is correct.

24        Q.    And the concept of going live,

25   tell me what that means.



 1        A.     So once the client actually goes

 2   live, then they are no longer doing, like,

 3   what you would call a parallel test.  So a

 4   parallel test would be when they're using our

 5   application, the ExecuTime application as

 6   well as however they were currently doing to

 7   basically parallel test to make sure it was

 8   accurate.

 9               Once they're actually live, they

10   only utilize ExecuTime software for clocking

11   in, clocking out, adding time, things of that

12   nature.

13        Q.     And therefore, at that point, when

14   they went live, it was critical that the

15   software was being operating correctly?

16        A.     Yes, sir.

17        Q.     And so the certain level of

18   troubleshooting that you mentioned, that would

19   have occurred, obviously, before the customer

20   went live?

21        A.     Yes, sir.  That is correct.

22   Now, sometimes there may be a situation where

23   something may come up, you know, on their

24   Go-Live or after, of course, but majority of

25   troubleshooting was within the parallel



1   testing, for the most part.

2        Q.    Did you ever have a situation

3   after Go-Live when the software didn't work

4   properly that you were involved in while you

5   were at Tyler?

6        A.    After the Go-Live?  I'm just --

7   I'm trying to just think if there were any

8   situations, because essentially, once they

9   Go-Live, they go over to support.  So I don't

10  deal with them, once they go to support,

11  they're off my plate and I'm completely done

12  with them.

13       Q.    And there's a concept of being

14  passed to support; correct?

15       A.    Yes, sir.

16       Q.    And that's at the end of the

17  implementation process?

18       A.    Yes, sir.

19       Q.    And is that before or after

20  Go-Live?

21       A.    After Go-Live, the project

22  manager then steps up to transfer them over

23  to support.

24       Q.    And the project manager would

25  consult with you in connection with passing



 1   the client to support; correct?

 2        A.    Yeah.  Well, they're involved

 3   the whole way, so they know where the client

 4   is.  And because we were in so much contact

 5   with different scenarios, when I would reach

 6   out to the project manager, they knew where

 7   the client was, you know, the whole time

 8   through parallel testing and stuff.

 9        Q.    They knew -- the project manager

10   would know based on communications from you?

11        A.    That is correct, yes, sir.

12        Q.    And so you would be updating the

13   project manager periodically about how the

14   implementation was going, were they meeting

15   deadlines, were they ready to be passed to

16   support, that type of thing?

17        A.    Yes.  And the project manager

18   also -- so different project managers handle

19   it currently.

20        Q.    Okay.

21        A.    When I was with Talia, she would

22   request and receive all of the checklists

23   throughout the process.  So she knew very

24   well where everyone was at, because she's

25   requesting the documents that are needed to



1    sign off.

2         Q.     And being passed to support, is

3    something that's communicated to the client;

4    correct?

5         A.     Yes, sir.

6         Q.     And that's a phone call; correct?

7         A.     Or an e-mail.

8         Q.     Or an e-mail?

9         A.     Yes.

10        Q.     If it was a phone call, would you

11   be typically on the line as the implementation

12   consultant?

13        A.     On the pass to support call --

14   and excuse me, were you asking was it a phone

15   call when they actually transition or when

16   we're scheduling them to transition?  My

17   apologies.

18        Q.     That's okay.  That's a fine

19   distinction.  I'm -- was referring more to

20   what I think is the former, when they're

21   passed to support, is there a phone call with

22   the client or a communication with the client

23   saying, hey, you're through with the

24   implementation process, we're now passing you

25   to support?



1        A.      Yes, sir.

2        Q.      Okay.  And would you be on that

3   call typically?

4        A.      I just started being on those

5   calls probably around December or January,

6   but before, no, I was never on those calls.

7        Q.      And just so we're clear, support

8   is a different service that the client

9   purchases when they buy the ExecuTime

10  software; correct?

11       A.      I'm not sure how that goes on

12  the sales side.

13       Q.      Okay.  But you know -- you would

14  review the client contracts as part of your

15  preparation for particular implementations;

16  correct?

17       A.      Yes, sir.

18       Q.      But those contracts didn't discuss

19  support or you just don't remember?

20       A.      I don't recall.  That may have

21  been something that was just included, but

22  I -- honestly, I'm not sure.

23       Q.      And did you have discussions with

24  your project managers about where clients were

25  as to whether or not they were ready to be



1  passed through support?

2       A.    Yes.

3       Q.    And what would that be based on?

4       A.    If there were any issues that

5  they ran into, if the time wasn't matching up

6  correctly, I mean, there could be numerous

7  different things that could prevent a

8  Go-Live.

9       Q.    Well, I'm not talking about a

10  Go-Live, I don't think.  I was saying, okay,

11  being passed to support -- which I understood

12  occurred after Go-Live?

13       A.    Right.  So essentially you have

14  to Go-Live to go to support.  So my

15  apologies.

16       Q.    No, that's all right.  But I'm

17  going to make sure you were answering the

18  question you thought you were answering.  So

19  in order to be passed to support, you had to

20  make sure that there were no technical issues,

21  I guess?

22       A.    Yes, sir, that's correct.

23       Q.    Okay.  And you would discuss those

24  issues with the project manager?

25       A.    If needed, yes.



1        Q.      Okay.  Did you -- what else had to
2    be done to pass the client to support after
3    the Go-Live?
4        A.      Well, they had to have all of
5    their checklists in.  So through each -- I
6    guess you could say, item they needed to
7    complete, a checklist needed to be completed
8    as well.
9        Q.      And their employees had to know
10   how to use the software; correct?
11       A.      Yes, that is correct.
12       Q.      Were there ever any instances
13   where you -- well, I guess if the employees
14   weren't properly trained on the software, they
15   wouldn't be in a position to Go-Live in the
16   first place; correct?
17       A.      Well, not necessarily, because
18   sometimes they only do certain groups.  So
19   they may not -- I'm just -- let's just say
20   that we did the City of Atlanta, they may not
21   have the entire City Go-Live that first
22   group.  They may only do one department or
23   two departments and then start, you know,
24   bringing everyone else in as they're using
25   the software.



1          Q.     Right.  Okay.

2               But -- all right.  So maybe I

3    didn't ask it precisely enough.  But what --

4    whether it be a particular department or the

5    client as a whole --  and I guess that would

6    depend on the particular implementation -- but

7    in either case, was there ever any instance

8    where the training wasn't going as well as it

9    could have to warrant going live?

10         A.     When you say the training wasn't

11   going as well as it could have?

12         Q.     The people weren't getting it.

13   You know, there was a Go-Live date that's part

14   of the -- I don't know is it part of the

15   checklist?

16         A.     It is, yes.  It is part of the

17   checklist as well.

18         Q.     So when you say checklist -- I'm

19   going a little bit off track here, but the

20   checklist is something that you drafted?

21         A.     No.

22         Q.     Okay.  The project manager

23   drafted?

24         A.     That is correct.  It's part of

25   their project plan.



1        Q.      And the project plan has various

2   deadlines?

3        A.      That the project manager does,

4   yes.

5        Q.      Okay.  For training?

6        A.      Uh-huh.

7        Q.      For integration?

8        A.      (Nodding.)

9        Q.      Yes?

10       A.      That is correct, yes, and the

11  project manager sets all of those dates.

12       Q.      Okay.  So that's a checklist that

13  you have when you take over -- when the

14  implementation is handed off to you?

15       A.      I can see the dates, yes.

16       Q.      Were there any situations where

17  you had to -- you being Tyler, had to postpone

18  a Go-Live date?

19       A.      Oh, yes, for sure.  That was not

20  uncommon.

21       Q.      That could be the result of

22  technical issues?

23       A.      Could be -- it could be

24  technical issues, it could be time not adding

25  up.  It could be they just need more time.  I



1  mean, it could vary on numerous different

2  things.

3       Q.     Need more time to do what?

4       A.     To maybe, you know, get more

5  people in the application or whatever it is

6  that they may need more time for.  Sometimes

7  they have other things coming up or other

8  projects, things of that sort.

9       Q.     And that could, for example, delay

10  the training?

11       A.     It could, yes, sir.

12       Q.     Did you ever have a situation

13  where you delayed a Go-Live date because the

14  training wasn't going well in the sense that

15  the users -- I know there's power users and

16  end users, but in situations where the users

17  weren't picking up on the training as well as

18  you thought they should have?

19       A.     I mean, there has been

20  situations; like there was one client where

21  it was majority older -- I guess you could

22  say seasoned people.

23       Q.     Fair enough.

24       A.     And with that, a lot of them

25  didn't even know how to work, like, smart



1   phones.  I actually had to go on site and do

2   a little bit more hand holding.  So depending

3   on the client, situations like that could

4   happen, yes.

5            Q.     What client was that?

6            A.     Alexander County, they were in

7   North Carolina.

8            Q.     Okay.  Did you have to delay the

9   Go-Live date with them?

10           A.      They drug their feet for a

11  while.  They were actually around for a

12  couple of years because they were -- how is a

13  nice way to put this.  They were kind of

14  doing their time, like, old school, where

15  they were writing it all down on paper and --

16  yeah.

17           Q.     But that's a situation where the

18  Go-Live date had to be changed?

19           A.      Yeah, multiple times with them,

20  they were around for a while.  They kept

21  putting it on -- because what you can do is

22  but a project on hold, quote, unquote, where

23  you basically put it on hold and then you

24  pick back up when the client's ready.

25           Q.     And is that a situation where you



1   went to the customer's location to do what
2   I'll call on-site training?
3        A.    Once I went on site, we were
4   able to move through with the actual project.
5   But I did go on site for them, yes.
6        Q.    Was it -- on that project
7   specifically, was it not originally
8   contemplated that you would be going on site?
9        A.    I'm not sure.  The project
10  manager discusses all of that.
11       Q.    Okay.  Did you report to the
12  project manager what you observed in terms of
13  the training in that example?
14       A.    Well, with that actual training,
15  I only went on site for the power user
16  training.
17       Q.    Okay.
18       A.    But yeah, I let her know they
19  were elder and they were -- seasoned, I'm
20  sorry, they were having a little bit harder
21  time using the software.
22       Q.    Got it.
23             And that ultimately resulted in a
24  delay of the original Go-Live date?
25       A.    Well, yeah, but they were --



1  once I got them, they had already been

2  lingering for about a year and a half with

3  ExecuTime.

4        Q.    Okay.  But was it -- was there

5  another Go-Live date that had to be postponed

6  as a result of them being slow learners of

7  having trouble using the software, for

8  whatever reason, be it their seasonedness or

9  otherwise?

10       A.    Yeah.  I want to say we had to

11 push it out slightly, but it wasn't like

12 another year or anything.  They just needed a

13 little bit more time to work in the

14 application.

15       Q.    Did -- what was the -- maybe a

16 question that you can't answer but I'll ask

17 it.  Was there a typical duration of

18 implementation process?

19       A.    Typically, yes, about 120 days.

20       Q.    Okay.  Now, does that 120 -- I

21 understand that's going to vary depending on

22 some of the factors that we've already touched

23 on.  Is that a period that would be set forth

24 in the contract?

25       A.    I'm not sure they put it in the



 1 | contract.
 2 |        Q.      When you say 120 days, does that
 3 | account for the time that the project manager
 4 | is in charge of the process and after the
 5 | handoff to the implementation consultant?
 6 |        A.      Yes, sir.
 7 |        Q.      Okay.  Of that 120 days, how much
 8 | is devoted or how much is -- how much time is
 9 | the project manager in charge of before the
10 | handoff?
11 |        A.      I'm not sure exactly how long
12 | they would have it.
13 |        Q.      Approximately?
14 |        A.      Maybe -- it depends because
15 | integration -- because they do a lot of more
16 | of the back-end stuff.  So when it comes to
17 | that, sometimes they would have projects for
18 | longer, because I don't really know the exact
19 | time the project manager would start working
20 | on that.  So it's hard for me to answer that
21 | question.
22 |        Q.      Fair enough.  I thought it might
23 | be.  So -- but at some point during that
24 | typically 120 days, there is a handoff to the
25 | implementation consultant?



1          A.      That is correct, yes, sir.

2          Q.      Which would be you?

3          A.      Yes.

4          Q.      And that occurs during a -- is

5    there something called a handoff call with a

6    client at that point?

7          A.      So essentially -- and different

8    project managers would handle it different --

9    the most recent, generally, we would do like

10   a call where I would sit in on the call and

11   she would introduce me as well, and I would,

12   you know, meet the client and all of that

13   good stuff and then we would discuss next

14   steps.

15         Q.      Okay.  And the client, would

16   that -- obviously referring, at some level, to

17   a state or municipality, was there a

18   particular title at the client with whom you

19   would typically coordinate -- a project

20   manager?

21         A.      They would have project managers

22   most of the time.  You know, every client is

23   a little different.  So sometimes we would

24   deal with, like, HR managers or payroll

25   supervisors, or there would be different



 1   people on the team.

 2        Q.     Okay.  So it might be more than

 3   one person?

 4        A.     Yes, sir.

 5        Q.     So the different phases of the

 6   implementation that you mentioned earlier, the

 7   training, the initial setup, the weekly calls,

 8   the travel, and the certain levels of

 9   troubleshooting that you performed as an

10   implementation consultant, am I right that all

11   of that would occur after the handoff?

12        A.     Yes, that is correct.

13        Q.     Okay.  And I guess the amount of

14   time that you would have to -- to -- to do

15   those -- perform those roles, would depend on

16   the timing of the handoff?

17        A.     As well as the timing that the

18   project manager put together in the project

19   plan.

20        Q.     How would you -- let me ask you

21   this:  I know you listed those different

22   categories of tasks.  The training, the

23   initial setup, the weekly calls, the

24   troubleshooting and the travel.  Is there an

25   order in which they would occur, typically?



1          A.     So essentially, when I get the

2     actual client, I go through with the client

3     and do, like, a power user training.  And --

4     excuse me, let me back up.

5                 Prior to the power user

6     training, I go through the questionnaire and

7     the solution design that the project manager

8     had put together from the actual client.  So

9     I go through the information that they have

10    gathered based on their specific policies and

11    procedures.

12         Q.     Based on the client's specific

13    policies and procedures?

14         A.     Yes, sir, that is correct.  So

15    based on the client's specific policies and

16    procedures, and then I would do --

17         Q.     Now, what are you reviewing?  I'm

18    sorry to interrupt.

19         A.     The questionnaire and the

20    solution design that the project manager put

21    together with the client.

22         Q.     Okay.

23         A.     So they went through a series of

24    questions with them and kind of noted, you

25    know, everything down.



1          Q.      These are two separate documents?

2          A.      Yes, sir.

3          Q.      You would review those -- is this

4     after handoff or before handoff?

5          A.      This would be around the time of

6     handoff, I would go through the documents.

7          Q.      What would be your objective in

8     reviewing the questionnaire and the solution

9     design?

10         A.      To see what their policies are

11    and how the application needs to be set up.

12    Because there are certain things that I would

13    need to turn on -- like, in the system admin

14    preferences, I guess we can call it, like the

15    preferences option, where, for example, maybe

16    some places use comp time and some places do

17    not.  It's as simple as going under the

18    preferences and checking a box to allow them

19    to actually use it.

20         Q.      And you would know from the

21    questionnaire -- or I guess both the

22    questionnaire and the solution design, for

23    example, whether or not this particular client

24    used comp time?

25         A.      Yes, sir.



1          Q.     And that would affect the initial
2    setup?
3          A.     Yes, sir.
4          Q.     Would that be the next thing you
5    would do in the process, would the initial
6    setup?
7          A.     Yes, once I go through the
8    solution design and the questionnaire, then I
9    do pretty much like a generic setup so to
10   say, based off of their solution design for
11   the power admin training that I'm going to do
12   with them.  Because I want to allow them to
13   be able to see how they would use the
14   software.
15         Q.     Okay.  And then would the next
16   step in the process typically be the power
17   admin training?
18         A.     Yes, sir.  Typically, yes.
19         Q.     And that could occur either
20   remotely or on site; correct?
21         A.     Yes, depending on what the
22   client and the project manager discussed.
23         Q.     In terms of the implementations
24   that you performed, generally -- or
25   approximately, what percentage were remote



1  versus on site, in terms of the training?

2         A.    So some clients would only do

3  power admin on site.  And then they would

4  split up and do some of the end user, super

5  user remote.  Some would do it vice versa.

6  So it really depends.

7               I would guesstimating about 40

8  percent of them would go -- like 30 to 40

9  would do onsite on different portions of the

10  training.

11        Q.    Okay.  So -- so I think you

12  answered my question but I want to make sure.

13  So of all of the implementations that you did

14  at Tyler, you were actually at the customer

15  location approximately 30 to 40 percent of the

16  time?

17        A.    Around that, yes, sir.

18        Q.    Okay.  And the reason that you

19  were on site could vary too, but typically

20  would involve power user training?

21        A.    Typically, yes, sir.

22        Q.    And it may or may not involve end

23  user and super user training?

24        A.    Yes, sir.

25        Q.    Okay.  So I guess the -- we've



 1 | talked about the different -- well, we've
 2 | talked about the power training -- the power
 3 | admin training.  And then I guess the
 4 | troubleshooting that you discussed or
 5 | mentioned, that kind of occurs throughout the
 6 | process; is that fair?
 7 |        A.     Yes, sir.  Yes.
 8 |        Q.     As does -- obviously, the travel
 9 | happens before the power user training,
10 | assuming you're doing that on site?  And it
11 | happens afterward, I guess?  Well, we --
12 |        A.     As far as the troubleshooting is
13 | concerned?
14 |        Q.     No, no.  I'm talking about just in
15 | terms of the different categories of functions
16 | that we listed.  We listed training, initial
17 | setup, weekly calls, certain level of
18 | troubleshooting and travel, is what you
19 | mentioned.  And I'm trying to now, get a sense
20 | of what -- in what order those occurred --
21 |        A.     Okay.
22 |        Q.     -- and you've told me -- well,
23 | first, you looked at the questionnaire and the
24 | solution design.  And that was at or around
25 | the time that you had the handoff call.



1          A.      (Nodding.)

2          Q.      And then there was the initial

3   setup process.  Then there was the training.

4   And my question is:  I take it that that --

5   that the troubleshooting that you mentioned

6   occurs kind of throughout the process, not at

7   one particular time necessarily?

8          A.      Yes, sir.  Now, majority of it

9   is towards the parallel testing, but of

10  course, we may run into -- you know, little

11  things here and there that I may have to

12  troubleshoot along the way as well.

13         Q.      So does the parallel testing

14  typically occur after the training?

15         A.      Yes, sir.

16         Q.      Okay.

17         A.      After the end user, super user

18  training.  Because that's when the actual

19  employees will start utilizing the

20  application.

21         Q.      Okay.  Okay.  What's a power user?

22         A.      So the power user training would

23  be with the higher ups like their project

24  manager, possibly the head of their payroll,

25  if they're -- you know, doing the project



1  alongside with the project manager.  Possibly
2  the HR manager.  It's the higher ups who can
3  actually make decisions on how they would
4  like to use the application.
5       Q.    And those are decisions that the
6  client obviously makes?
7       A.    Yes, sir.
8       Q.    Those decisions are based on the
9  training that they get, in part?
10       A.    Well, it's based off of -- and
11  when you say those decisions --
12       Q.    Well, you said -- mentioned how
13  they wanted to use the software, was this
14  something that the client had to decide?
15       A.    Yes, sir.  So an example of that
16  would be more so, let's say that City of
17  Atlanta is using comp time.  Okay.  So a
18  decision that may need to make is how do you
19  want to use the comp time within the
20  application?  Would you like it to
21  automatically populate once they exceed 40
22  hours?  Would you like them to submit a time
23  off request for that comp time?  Would you
24  like them to just send their supervisor an
25  e-mail?  So it would be -- internally they



1  would decide how do they want to handle
2  certain situations like that.
3        Q.    And they would communicate that
4  decision to you?
5        A.    Absolutely, yes, sir.
6        Q.    And I take it they would typically
7  communicate the decision to you after the
8  training, once they knew what the options
9  were?
10       A.    Yes.  Yes, sir.
11       Q.    And did they -- did -- I guess
12 different clients had different preferences
13 about how to do it in the example that you
14 gave of comp time?
15       A.    Yes, sir.  And some of them
16 would determine it like as soon as they
17 talked to the project managers.  Some of them
18 would determine and say, hey, we just want to
19 automatically populate this.
20       Q.    Okay.  Would they ever ask you for
21 recommendations on how to do it?  How you've
22 done it before or what are other people doing,
23 anything like that?
24       A.    Well, they would sometimes ask,
25 you know, how do other agencies?  It's not a



1    super common question, though, because a lot
2    of agencies know how they want to do things
3    like that, because they've been doing a
4    certain process for so many years.
5          Q.    Okay.  Okay.  What happens after
6    parallel -- I'm sorry.  Back up.  What's --
7    under user training, I take it, are the actual
8    people that are inputting time?
9          A.    Employees and supervisors, yes,
10   sir.
11         Q.    Okay.  And then super user
12   training?
13         A.    And I'm sorry.  Supervisors
14   would sit in on the end user training and the
15   employees and then the super users only for
16   the supervisors.
17         Q.    I see.  So super user training
18   refers to supervisor training?
19         A.    Yes, sir.
20         Q.    Now, did every implementation
21   contain power user training, end user training
22   and super user training?
23         A.    Yes, sir.
24         Q.    Okay.  And they would always be
25   separate?



1        A.      End user and super user was
2    usually together.  So for example, I would
3    schedule like a two-hour block, and I would
4    say, okay, the first hour is going to be your
5    end users or your employees that are within
6    the pilot group or the group that's going to
7    be using the application for parallel
8    testing.  And then we would take a break so
9    that the employees could leave the training
10   and then the supervisors would remain for the
11   supervisor -- or the super user, so to say,
12   portion.
13        Q.      Okay.  And what -- you mentioned
14   parallel testing.  After that is Go-Live?
15        A.      Yes, sir.
16        Q.      And did you have responsibilities
17   during the Go-Live process?
18        A.      When you say responsibilities as
19   far as -- because it's not really a process,
20   so to say.  It's kind of once they have two
21   successful parallels, they're live.
22        Q.      Right.  But they're not passed to
23   support yet?
24        A.      Generally, once they Go-Live
25   within -- I'm not sure how the project



 1  manager did it, it's usually within, like,

 2  that week once they Go-Live, they start going

 3  over to support.

 4        Q.    Right.  And I think you testified

 5  earlier that at that point, you no longer have

 6  responsibilities with respect to the client,

 7  the support team does?

 8        A.    That is correct.  And there

 9  would be rare circumstances where maybe there

10  was a ticket that I was working on for

11  something.  I mean, very minimal would that

12  happen, but that would happen sometimes.

13        Q.    Right.  But my question is:  Would

14  it happen -- would the transition to support

15  where you're generally not responsible for the

16  account, for the project, would that happen

17  before or after going live?

18        A.    Right after Go-Live.

19        Q.    What were your responsibilities,

20  if any, when the client went live?  Were you

21  supposed to kind of monitor and oversee?

22        A.    Just be available, if they had,

23  like, questions or issues, especially

24  through, like, the parallel testing too, just

25  making sure that if there was something that



1    I needed to assist with, I was available.

2          Q.    Okay.  And would that be typical

3    that you would be called on when the client

4    went live with questions or?

5          A.    More throughout the parallel

6    testing, not really Go-Live.  Because we

7    basically tell the client, once you're over

8    to support, you don't e-mail us anymore.  Of

9    course we say it in a nicer way, but.

10         Q.    Okay.  Of course.  Okay.

11               Okay.

12               And I guess -- scratch that.

13               So let me, again, approximate as

14   best we can the percentage of time that you

15   spent on these different functions.

16               And I know it's not going to be

17   precise and there's going to be guesstimates

18   and I'm not, you know, trying to pin you down

19   completely.  But I want to get a sense, so we

20   can talk later about what you're spending the

21   majority of time doing.  And you've talked

22   about training, you've talked about initial

23   setup, you've talked about the weekly calls,

24   troubleshooting, obviously, you had to go over

25   the questionnaire and the documents prior to



 1  or in conjunction with the handoff.
 2              I want to get a sense of what
 3  percentage of your time was spent on each of
 4  those functions or responsibilities.  Did you
 5  understand?
 6      A.    Kind of.  Can you elaborate a
 7  little bit more, I'm sorry?
 8      Q.    I will.  So you -- while you were
 9  working as an implementation consultant, you
10  did these things that we've discussed?
11      A.    Uh-huh.
12      Q.    One of the things that you did was
13  training.  What percentage of time, while you
14  were working, were you training?
15      A.    So --
16      Q.    Approximately, again?
17      A.    So I had multiple clients at
18  once, and the training, essentially, the
19  power -- or excuse me, the power user
20  training, used to run about three hours or
21  so.
22      Q.    Right.
23      A.    But because it was so rushed,
24  they just recently changed it to do three
25  days of three hours.



 1        Q.     Right.  But I'm trying -- I think
 2    you're maybe a little confused about where I'm
 3    trying to -- how I'm trying to ask this.
 4               I'm trying to say, you know, like,
 5    if someone asked me about my job, I would tell
 6    them, well, one of the things that I do is
 7    write briefs.
 8        A.     Uh-huh.
 9        Q.     And they might ask, well, what
10    percentage of your job is writing briefs?  I
11    would say, well, it's probably 10 percent of
12    the time I write briefs.
13        A.     Uh-huh.
14        Q.     How often are you in depositions
15    like this?  I might say that's probably 15
16    percent of my time, and I'm not sure if I'm
17    right.  I'm just giving you an example.  So I
18    want you to translate that into your role as
19    an implementation consultant, and I understand
20    you don't take depositions or write briefs,
21    but you do perform training and I understand
22    there's a lot of different types of training,
23    but I'm just talking about training in
24    general.  What percentage of your work time
25    was spent training, approximately?



1          A.      Approximately, like a

2     guesstimate, I would say maybe 30 to 40

3     percent as far as the actual training is

4     concerned.  Now, that's not including the

5     setup that's required prior and things of

6     that sort.

7          Q.      Okay.  How much of the -- what

8     percentage would you give to the initial

9     setup?

10         A.      So the initial setup or setup

11    throughout the project?  Because there's the

12    initial setup that we do for the power user

13    training and there's also additional setup

14    that we do prepping for end user, super user

15    payroll, export training?

16         Q.      How about all setup?

17         A.      So, all setup, probably 30, 40

18    percent as well.

19         Q.      Okay.  And weekly calls?

20         A.      I would have them every week and

21    they would be either -- well, I'm sorry.

22    Depending on the client, it would either be

23    weekly or biweekly.

24         Q.      Okay.

25         A.      They would range anywhere from



```
 1   30 minutes to an hour.

 2        Q.     Okay.  So that's a smaller

 3   percentage of time?

 4        A.     Yes.  Yes, sir.

 5        Q.     And troubleshooting would be a

 6   small percentage as well?

 7        A.     Yeah.  And it would just kind of

 8   be throughout.  So the troubleshooting is

 9   really hard to gauge, just because some

10   clients were really great and I didn't need

11   to help them as much, and then you have

12   others like my more seasoned clients who

13   would need a little bit more help.

14        Q.     Okay.  You mentioned that you were

15   having to do multiple implementations at one

16   time.  Did I understand your testimony

17   correctly?

18        A.     Yes, sir.

19        Q.     How many, typically, would you

20   have at one time?

21        A.     It ranged so often.  It's hard

22   to say.  I would say at least --

23        Q.     Between what and what?

24        A.     Between 5 and 20.  Like, it was

25   really a big range as far as how many at
```



1   once.

2        Q.      And I take it having that many

3   implementations at one time would create

4   challenges for you schedule-wise?

5        A.      Yes, for sure.

6        Q.      And when you look at your resume,

7   the first bullet under your title,

8   Responsibilities, is "Manage multiple client

9   implementations simultaneously while meeting

10  all project planned deadlines."  Did I read

11  that correctly?

12       A.      That is correct.

13       Q.      So all of these implementations

14  would have particular deadlines?

15       A.      As far as, like, checklists are

16  concerned that the project manager put

17  together, when like the end user, super user,

18  was supposed to be completed, things of that

19  sort, yes, sir.

20       Q.      So you didn't set the deadlines,

21  but you had to be aware of the deadlines?

22       A.      Yes, sir.

23       Q.      And you were aware of the

24  deadlines through your review of the document

25  that is -- is that in the checklist?



1    A.    That would be -- the checklist

2  is actually within the project plan.

3    Q.    Project plan?

4    A.    Yes, sir.

5    Q.    Okay.  So was the project plan

6  something that you reviewed prior to the

7  handoff to implementation consultant?

8    A.    So --

9    Q.    And I understood -- let me back

10  up.  I understood you reviewed -- I think you

11  told me that you reviewed -- I thought I

12  highlighted it, but the questionnaire --

13    A.    Solution design.

14    Q.    -- the solution design.  Is

15  that -- is the project plan something

16  different from that?

17    A.    Yes, sir, it is.

18    Q.    Okay.  And the project plan is

19  something you create or the project manager

20  created?

21    A.    The project manager creates.

22    Q.    Is that something that you review

23  separate and apart, I take it, from the

24  questionnaire and the solution design?

25    A.    Yeah, I use that kind of as



1   my -- I guess you could say kind of like a

2   calendar, so to say, of when these items are

3   due.

4         Q.     Okay.

5         A.     I'll use that for --

6         Q.     So the project plan contains the

7   deadlines?

8         A.     Yes, sir.

9         Q.     Within these checklists?

10        A.     Yes, sir.  And additional

11  details about what exactly is due on the

12  checklist, it kind of breaks it all down for

13  them.

14        Q.     And because you were dealing with

15  multiple implementations at any one time,

16  that's what you mean when you have to manage

17  the client implementations simultaneously?

18        A.     Right.

19        Q.     And so you would have to determine

20  your schedule from week to week based on these

21  deadlines?

22        A.     That is correct, yes, sir.

23        Q.     It wasn't like every week you got

24  a schedule saying, hey, you need to do this on

25  a particular date, and then Wednesday you need



1   do initial setup for this project, and on

2   Thursday, you need to do end user training?

3   You didn't get itemized schedules delineating

4   your functions on a week-to-week basis?

5          A.     No, I did not.

6          Q.     That's a true statement?

7          A.     That is a true statement.

8                 MR. HERRINGTON:  Sir, would you

9   repeat that question?

10                MR. MCKEEBY:  No.

11                MR. HERRINGTON:  Can you read

12   it?

13                When lawyers say, Is that a true

14   statement, I get worried.

15                MR. MCKEEBY:  Oh, no, I just

16   thought we had a double negative there.

17                MR. HERRINGTON:  Okay.

18                MR. MCKEEBY:  And I'll not

19   repeat the question, I'll ask the court

20   reporter to read it back.

21                (Record read.)

22                MR. HERRINGTON:  Okay.  Thank

23   you.

24                MR. MCKEEBY:  Okay.  All right.

25                MR. HERRINGTON:  I thought she



1   had to say -- oh, you're not exempt -- oh,

2   you're exempt, aren't you, yes, of course I'm

3   exempt.  You know.

4              MR. MCKEEBY:  I'm not -- that's

5   not even on my outline.

6              MR. HERRINGTON:  Okay.

7        Q.    (By Mr. McKeeby)  Okay.  All

8   right.  Let's look at the next bullet on your

9   -- well, let me ask you about -- about the

10  first bullet.

11             Would you agree with me that

12  meeting the project -- you didn't set the

13  project deadlines, but meeting the project

14  deadlines was your responsibility?

15       A.    Yes, sir.

16       Q.    That's something you kept the

17  project manager updated on in terms of where

18  things stood vis-a-vis your functions as

19  identified on the checklist that the project

20  manager created?

21       A.    Can you repeat that question,

22  I'm sorry?

23       Q.    I'll try to ask it differently.

24       A.    Okay.  Thanks.

25       Q.    Would you -- would one of the



1  things you would do as an implementation

2  consultant be to update the project manager in

3  terms of where things stood on the deadlines?

4       A.    Yes, but they were so involved,

5  I didn't really need to send updates, too

6  much.

7       Q.    So it wasn't a discrete function?

8       A.    Yes.

9       Q.    Okay.  They were involved, so they

10 knew where things stood without you having to

11 send in some type of report or something like

12 that?

13      A.    That is correct.

14      Q.    Okay.  Looking at that next bullet

15 on the resume, it says "Build, lead and direct

16 project teams to meet project objectives."

17 Did I read that correctly?

18      A.    Yes, sir.

19      Q.    When you say "project teams," are

20 you referring to internal Tyler teams or teams

21 at the customer or both?

22      A.    No, just the client, the actual

23 client, their project team.  I would make

24 sure they clearly understood what the project

25 manager already went over with them.  I would



1   kind of reiterate, hey, these are your
2   objectives, these are your deadlines.
3          Q.     And again, the project team at the
4   client would consist of a project manager
5   typically?
6          A.     It's usually a few people and it
7   varies.  I've been one place where they had
8   ten people on their team, but I've been other
9   places where it's only two.  So it definitely
10  varies.
11         Q.     And how did you build the team,
12  what does that mean?
13         A.     They build -- you mean, how do
14  they build -- like, how do they determine
15  who's on their team?
16         Q.     No.  I mean, what did you mean in
17  the resume that you provided to your current
18  employer when you said you build a project
19  team?
20         A.     So I don't necessarily build the
21  project team, so to say.
22         Q.     What did you mean by that?
23         A.     So I -- that's a great question,
24  because I don't build the actual -- the
25  actual teams.



1         Q.     But you do lead the teams?

2         A.     As far as when their due dates

3    and things are concerned, I will reiterate

4    that, yes.

5         Q.     And the project objectives, how

6    did you know what the project objectives were?

7         A.     That was based off of the

8    project manager.  And what was within the

9    actual project plan.  So even though the

10   project manager already goes through that

11   with the client, it's still my job to make

12   sure they understand they have to stay on

13   that track.

14        Q.     But you had to understand what the

15   project objectives were?

16        A.     Yes, sir, like as far as the

17   checklists and things are concerned.

18        Q.     You would determine those

19   objectives by reviewing the solution design

20   and the project plan?

21        A.     More so the project plan.

22   Because the solution design more so gives

23   information of their internal policies and

24   procedures and the project plan is what the

25   project manager puts together, actually,



 1   putting dates for their deadlines.

 2        Q.     The next bullet and then we will

 3   take a break, if that's okay?

 4        A.     Sure.

 5        Q.     Strong leadership and delegation

 6   skills.  To whom did you delegate tasks?

 7        A.     To the client.

 8        Q.     What kinds of things would you

 9   delegate to the client?

10        A.     I would do certain things like,

11   let's say, we had the power user checklist,

12   so it's already listed out as far as what

13   they need to do.  And I would just delegate

14   and say, okay, these are the specific items

15   that need to be completed by this date,

16   pretty much like reiterating the project plan

17   that was already put together.

18        Q.     So you're delegating particular

19   functions associated with the implementation

20   process to someone on the project team?

21        A.     Can you repeat that for me?

22             MR. MCKEEBY:  Can you read that

23   back?

24             (Record read.)

25             THE WITNESS:  Yes.



 1              MR. MCKEEBY:  Go off the record.

 2              THE VIDEOGRAPHER:  Going off the

 3  record at 11:42 a.m.

 4              (A short break was taken.)

 5              THE VIDEOGRAPHER:  We are back on

 6  the record at 11:59 a.m.

 7       Q.     (By McKeeby) All right.  Back on

 8  the record after a break.  And I'm going

 9  through your resume.  I think we're on the

10  fourth bullet.  That says you set clear

11  expectations and goals for project teams;

12  correct?

13       A.     That is correct.

14       Q.     And again, I take it the project

15  team has the same meaning as previously used

16  in the resume?

17       A.     As the client, yes.

18       Q.     And how would you set the

19  expectations and goals, would that be in your

20  communications with the client during your

21  weekly calls or -- well, I'll ask it that way.

22  Was that one of the ways that you would set

23  the clear expectations and goals during the

24  weekly or biweekly calls that you mentioned

25  with the client?



1          A.      That was one of ways, yes, sir.

2          Q.      What were the other ways?

3          A.      We could even do an e-mail;

4    generally speaking, I set the clear

5    expectations and make sure they understand

6    the goal and everything on that initial call,

7    just kind of reiterating what the project

8    manager set up for a timeline and for the

9    goals.

10         Q.      And the initial call is the -- the

11   hand-off call?

12         A.      Yes, sir.

13         Q.      Got it.

14                 And you and the project manager

15   would be on that call?

16         A.      Yes.

17         Q.      Okay.  Now, so I'm clear, so that

18   the record is clear, when you were actually on

19   site -- well, let me ask it a different way.

20                 The -- you, I think, told me that

21   between 30 to 40 percent of the

22   implementations that you performed while you

23   were an implementation consultant at Tyler

24   were at the client's location.

25         A.      Around about, yes, sir.



1        Q.      Right.  And again, I know about --

2     that's an approximation and the record will so

3     reflect.

4                When you were at the client's

5     site, I take it you were doing training?

6        A.      Yes, sir.

7        Q.      Okay.  Were there other of these

8     functions that we've discussed that would also

9     typically occur at the client site when you

10    were there?

11       A.      Generally, when I was on site

12    with the client, it was for power user

13    training, end user and super user training;

14    those were the main reasons I would travel.

15       Q.      To be at the client.

16       A.      Yes.

17       Q.      Okay.  And there might be some

18    troubleshooting mixed in or something like

19    that, but that didn't necessarily have to

20    happen at the client site, certainly?

21       A.      Right.  Absolutely correct.

22       Q.      Okay.  So typically, then, I want

23    to re-characterize and make sure we're on the

24    same page, if you were at the client site on

25    these 30 to 40 percent of the times, it would



1    be to perform the training?

2          A.      Most of the time, yes.

3          Q.      Okay.  And then the next part of

4    the fourth bullet says, "Track project against

5    timeline, milestones and budget and revise as

6    needed"?

7          A.      That is correct.

8          Q.      What would you be revising?

9          A.      So with that, if there was

10   something within the progress -- I'll just

11   give you an example.  Let's say that they're

12   behind schedule as far as doing the end user,

13   super user training, so prior to the

14   trainings, there's generally a checklist that

15   is required prior to.  So, for example, you

16   have the power user checklist, that's

17   supposed to be completed prior to the end

18   user, super user.  If it was not, then at

19   that point, I would reach out to the project

20   manager to let them know, hey, this needs to

21   be revised, we may need to push out the date,

22   and then they would actually update the

23   project plan.

24         Q.      Okay.  So you wouldn't actually

25   revise the -- the revise in that bullet in



1   your resume doesn't mean changing the actual

2   terms of a document?

3        A.     No.  That's not what that means

4   there, no.

5        Q.     Right.  It means communicating

6   that something needs to be changed and then

7   the project manager would make that change?

8        A.     That is correct.

9        Q.     Got it.  Okay.

10              I set up the question about the

11  training and I didn't ask what I wanted to.

12              So when you're at -- when you're

13  training at the facility -- and I understand

14  sometimes it happened on the web training too,

15  where you weren't at the facility?

16       A.     Yes.

17       Q.     But when you were at the facility

18  doing the training that you described, you're

19  there by yourself; correct?

20       A.     Sometimes.

21       Q.     Typically?

22       A.     Typically, yes.

23       Q.     Okay.  Who else, on those

24  occasions that are atypical, would the project

25  manager might also be there?



1        A.        Sometimes yes, not very common.

2        Q.        Okay.

3        A.        Usually, they're just available

4   if I need something.

5        Q.        Right.  But when you're doing the

6   training -- it's a classroom-type training, I

7   take it?

8        A.        Yes, sir.

9        Q.        And you are training either the

10   super users, power users or end users in that

11   classroom?

12        A.        Yes, sir.

13        Q.        And you're up in front of them

14   doing the training?

15        A.        Most of the time sitting down.

16        Q.        Most of the time sitting down.

17   Okay.  But you're there typically by --

18   there's no other Tyler employee there?

19        A.        Yes, that is correct.

20        Q.        That is correct.  Okay.

21                  What does the term, in that bullet

22   point on your resume, "milestones" mean?

23        A.        So milestones.  There were two

24   different things:  There were milestones that

25   had to be met as well as Go-Live checklists.



1  So milestones are essentially -- they're kind

2  of like a checklist so to say.  But that's

3  something that, you know, I would make sure

4  that whatever the project manager put within

5  the project plan, I need to ensure that the

6  client's essentially meeting those.

7        Q.    But is milestones the same as a

8  deadline?

9        A.    Pretty much, yes, sir.

10       Q.    Okay.  And if the client wasn't

11 meeting a milestone or deadline, you would

12 communicate that to the project manager?

13       A.    Absolutely.

14       Q.    And that's the kind of thing that

15 might result in postponing a Go-Live deadline?

16       A.    That could be one of the many

17 reasons, yes.

18       Q.    Now, what is the budgeting -- what

19 is the budget -- the "Track progress against

20 budget" mean?

21       A.    So the budget, each client can

22 purchase different amounts of hours.  So

23 depending on how many hours they had, that

24 would be communicated from the manager to the

25 project manager and myself.



```
 1                   And for a short period of time,
 2      we were updating the actual -- within the
 3      project plan, there was a portion that would
 4      show the hours they had and then it would
 5      subtract the time that we were working on
 6      that.  So if they got under, I believe it was
 7      10 or 12 hours, then I needed to notify the
 8      project manager so then they can speak to the
 9      client and have them purchase more hours, if
10      necessary.
11           Q.    Okay.  Did you ever recommend to
12      the client that they might need more hours?
13           A.    Not unless I spoke to the
14      project manager first, no.
15           Q.    Okay.  You would recommend -- you
16      would alert the project manager to the fact
17      that they needed more hours based on the
18      budget?
19           A.    That is correct.
20           Q.    Okay.  And when you're saying
21      "hours," you're meaning training hours?
22           A.    Right.  Yes.  Yes, sir.  And
23      those hours could also be used for some
24      troubleshooting and setup and things of that
25      sort as well.
```



1      Q.    But they're hours that you're

2   tracking as an implementation consultant?

3      A.    That is correct.

4      Q.    And they're hours that you

5   actually perform services?

6      A.    That is correct.

7      Q.    Okay.

8      A.    For the billable -- quote,

9   unquote, billable items.

10     Q.    Okay.  So it was your

11  responsibility -- or something that you did as

12  an implementation consultant would be to

13  review what the budget was and compare that to

14  the amount of hours that you had billed to the

15  project to make a determination if additional

16  hours are needed?

17     A.    So it wasn't like that.  With --

18  the project manager built a template within

19  the project plan.

20     Q.    Right.

21     A.    And it started -- and I'm just

22  going to throw out a number, it started at

23  120 hours.  So the items that were billable

24  that I was working on, when I would type it

25  in, it would automatically deduct from that

1  amount based off of what the project manager

2  set up.

3          So it would actually -- all I

4  would do is enter in the time that I worked

5  that was actually billable, and it would

6  deduct it automatically, so I didn't really

7  have to factor anything.

8      Q.    Well, but you did have to track

9  the budget; correct?  Is what your resume says

10  or?

11     A.    Yes.  Yes.  Yes, sir, that is

12  correct.

13     Q.    Okay.  Now, am I right that there

14  are -- one of the things that you did at the

15  initial stage of an implementation would be to

16  review the contract; did you do that?

17     A.    Yes, sir.

18     Q.    Okay.

19     A.    I would briefly look over the

20  contract; I didn't go into much detail with

21  that.

22     Q.    And would you agree with me that

23  there were different types of contract options

24  that the client had?

25     A.    Yes, sir.



1        Q.      What were those -- examples of
2    those types of options?
3        A.      So they used to do where -- I
4    believe they stopped doing that, but where
5    you would have a certain amount of billable
6    hours or you could do, like, a certain amount
7    of, like, days they used to do it.  But I
8    believe they changed that.
9        Q.      Okay.  Was that a paid-in-full
10   contract?
11       A.      Yes, something -- something to
12   that extent, yes.
13       Q.      So that means that they would --
14   the client would pay an amount up front for a
15   certain amount of billable hours?
16       A.      So I'm not sure how the billing
17   went, because I didn't handle any of that, so
18   I can't really answer that question.
19       Q.      So what's a paid-in-full contract?
20       A.      So a paid-in-full contract --
21   see you're getting into contracts, which is
22   something I don't deal with.  So when you're
23   using these terms, I can't really answer it
24   with confidence and say, this is exactly what
25   that means, because I didn't deal with it.  I



1   briefly looked over the contracts.

2        Q.    Right.  Okay.

3              So when I use the term

4   "paid-in-full contract," is that something

5   that you've heard before while you were an

6   implementation consultant or is that a phrase

7   that you're not familiar with?

8        A.    Don't quote me on this, once

9   again, because I don't -- and I know that's

10  horrible to say while I'm sitting here, but I

11  don't deal intimately with the contracts at

12  all.

13       Q.    Right.  But you did review them as

14  part of the process?

15       A.    Briefly review, yeah.

16       Q.    But you didn't really care as much

17  what type of contract they were?

18       A.    No, that wasn't something that I

19  was really too focused on, because everything

20  is within the actual project plan, so I could

21  look there and determine --

22       Q.    Right.

23       A.    -- how I would handle the

24  client.

25       Q.    Are you aware that there's certain



1  contracts that provided for a fixed price?

2         A.    I believe there is.  But I'm not

3  confident in saying yes.

4         Q.    Okay.  Who would I ask about the

5  different types of contracts?

6         A.    Probably, like, the sales

7  department, because they handle contracts and

8  things of that sort.

9         Q.    You weren't an expert on that?

10        A.    Not on the sales, no, sir.

11        Q.    I mean, because it didn't matter

12 in terms of the implementation consultant

13 duties that you were performing whether they

14 paid up front or whether they were being

15 billed by the hour; correct?

16        A.    They still have to get the work

17 done, either way they purchase the contract.

18        Q.    So is that a yes to my question?

19        A.    Can you repeat that question for

20 me?

21             MR. MCKEEBY:  Can you read it

22 back?

23             (Record read.)

24        Q.    (By Mr. McKeeby) Do you understand

25 it or do you need another question?



1        A.     Can you do another question, if
2    you don't mind?
3        Q.     Well, let me do another question.
4        A.     Thank you.
5        Q.     Okay.  In terms of your duties, it
6    didn't matter whether the contract was a fixed
7    fee or whether it might vary depending on the
8    hours billed, did it?
9        A.     What you're saying is correct.
10   I would still have to do the same duties
11   regardless of how the contract was.
12       Q.     Okay.  So the next meeting -- the
13   next bullet in your resume says, "Hold
14   regularly scheduled meetings with the client
15   to ensure that milestones are met."  Did I
16   read that correctly?
17       A.     That is correct.
18       Q.     Does that refer to the weekly or
19   biweekly phone calls that you mentioned?
20       A.     That is correct.
21       Q.     So by "meetings" there, you're not
22   taking about a face-to-face meetings
23   necessarily?
24       A.     No.  I'm referring to, like, my
25   weekly calls that I would do.



1        Q.      Okay.  And would those be just

2    between you and the client contact person?

3        A.      Sometimes the entire team would

4    attend.  If needed, sometimes the project

5    manager would attend.  But generally

6    speaking, it was usually me and the project

7    manager or whoever is running the project on

8    the client side.

9        Q.      Got it.

10               And would those calls be -- how

11   would you schedule those calls?

12       A.      So it's actually determined by

13   the project manager from the beginning.  And

14   I can't remember if it's the solution design

15   or the questionnaire, but in one of those

16   documents they generally determine do they

17   want weekly or biweekly calls and do they

18   want 30-minute calls or hour calls.

19       Q.      Okay.  But in terms of when they

20   occur during -- let's say it's a weekly

21   call --

22       A.      Uh-huh.

23       Q.      -- when in the week they occur, is

24   that something that you schedule with the

25   client?



1          A.      I would, yes, sir.

2          Q.      And is that -- would there be sort

3    of an agenda or schedule that you would create

4    that would contain various functions including

5    the meeting or the call?

6          A.      No, not necessarily, no.

7          Q.      You would just reach out to the

8    client and say, we need to have our weekly

9    call, what's your schedule look like?

10   Something along those lines?

11         A.      No.  I'm sorry, maybe I

12   misunderstood your question.  They were set

13   for a certain day and certain time, either

14   weekly or biweekly.

15         Q.      Right.

16         A.      I set that up.

17         Q.      Okay.  How did you go about

18   setting that up?  Communicating with the

19   client about what was best on their schedule?

20         A.      Yes, sir.

21         Q.      Okay.  So that was just kind of

22   a -- would be a weekly reminder then that you

23   were scheduled to have that call at that time?

24         A.      Absolutely.  We would literally

25   just log onto the call and meet.  So if we



1    had it scheduled Wednesdays at two o'clock, I

2    would send out a reoccurring GoToMeeting and

3    then we would log in.

4         Q.    Got it.  Okay.  And that would, I

5    guess, relate to the first point in your

6    resume about managing multiple client

7    implementations simultaneously, you would --

8    might have multiple of those calls every week,

9    I take it?

10        A.    Oh, yes, that is correct.

11        Q.    Okay.  And the next bullet

12   references providing "software application

13   training using a variety of delivery methods

14   including web-based and on-site training."

15   Did I read that correctly?

16        A.    Yes, you did.

17        Q.    That's the various types of

18   training that we've mentioned and at some

19   level discussed, the power user, end user and

20   super user training, that's what you're

21   referring to; correct?

22        A.    Yes, sir.

23        Q.    Okay.  And the next bullet says,

24   "Coordinate new customer implementations

25   providing effective training to maximize the



1    use of software."

2              Is that something distinct from

3    these other bullets?

4         A.    What do you mean is that

5    something distinct from the other bullets?

6         Q.    What did you mean by "Coordinate

7    new customer implementations"?

8         A.    So with that, basically,

9    coordinating their effective training,

10   coordinating when the training would occur

11   based off of the project manager, just making

12   sure that they understood the software and

13   kind of getting everything, you know,

14   coordinated for the client.

15        Q.    Right.  But aren't all of the

16   customers new customers?

17        A.    Yes.

18        Q.    Okay.  And so you would agree with

19   me then, based on this bullet, that the

20   effectiveness of your training at least played

21   a role in whether or not the client was able

22   to maximize the use of the software?

23        A.    Can you repeat that for me,

24   please?

25        Q.    Your resume says that one of the



1  things you did was "Provide effective training

2  to maximize the use of the software"?

3       A.    Yes, sir.

4       Q.    So is it a true statement then

5  that the effectiveness of your training

6  affected whether or not the customer, client

7  was able to maximize their use of the

8  software?

9       A.    Not necessarily, because it

10  depends on if they're -- for example, like my

11  seasoned client where my training was still

12  the same as I do with every other client,

13  they were just having a harder time

14  understanding.

15       Q.    Right.  So I understand that

16  effective training might not always lead to

17  maximization of the use of the software.

18  Right?

19       A.    Yes.

20       Q.    But if you provided ineffective

21  training, you wouldn't expect that the

22  maximization of the use of the software to

23  occur; correct?

24       A.    Correct.

25       Q.    And then the last two bullets are



1  just kind of general descriptions of things

2  that you needed to do your job well at Tyler,

3  excellent communications and effectiveness at

4  engaging with people from all backgrounds?

5      A.    Yes, sir.

6      Q.    Why did you decide to not return

7  to Tyler after your FMLA leave of absence?

8      A.    I had every intention to, but

9  the amount of stress and -- that was just

10 going on within Tyler, I just decided to

11 start looking for another job.

12     Q.    What stress do you mean?

13     A.    Well, there were several

14 situations where -- and I also reported that

15 to HR, with the hostile work environment with

16 the one gentleman.

17     Q.    That you mentioned before?

18     A.    Yes.  And there was a few

19 situations with that.  There was my manager

20 did not like me; so she was not very nice to

21 me at all.  There were --

22     Q.    Which manager do you mean?

23     A.    Hillary.  There were a few

24 situations there.

25     Q.    Is she the person to whom you



1  reported at the end of your employment with

2  Tyler?

3          A.     Uh-huh.

4          Q.     Is that yes?

5          A.     Yes, that is correct.

6          Q.     You would agree with me that you

7  didn't -- well, I'm sorry.  What was her job

8  title?

9          A.     I believe her actual title was

10  the implementation manager.

11          Q.     And the project managers that you

12  worked for, you understood they also reported

13  to Ms. Pasch?

14          A.     That is correct.

15          Q.     Any other reason you didn't go

16  back to Tyler?

17          A.     Not that I can think of off the

18  top of my head, no.

19          Q.     Let me talk a little bit about the

20  training that you provided as an

21  implementation consultant.  We addressed some

22  of it.  You described it as classroom training

23  where you would either be standing or

24  sitting -- maybe more sitting than standing --

25  with a group of people depending on whether or



1   not you were training power users, end users

2   or super users; correct?

3        A.    Yes, sir.

4        Q.    And would -- you would be training

5   them on how to use the time and attendance

6   software; correct?

7        A.    Yes, sir.

8        Q.    Okay.  And you would do that by

9   pulling up -- you would have a screen?

10       A.    Yes.

11       Q.    Okay.  And what would be on the

12   screen?  Their system; correct?

13       A.    It would be their -- the

14   ExecuTime application with their setup within

15   the application.  So their employees, so

16   essentially would be their information.

17       Q.    And that was -- that information

18   was in the ExecuTime application as a result

19   of the initial setup work that you had done;

20   correct?

21       A.    Some of it was from the initial

22   setup.  Some of it was integrated and put in

23   through the project manager and our tech

24   team.

25       Q.    Okay.  But in terms of the



 1   training, you had on a screen the software
 2   with the client information?
 3        A.    That is correct.
 4        Q.    Okay.  It wasn't like a PowerPoint
 5   that you had prepared prior to the training
 6   session; correct?
 7        A.    No, sir, that is correct.
 8        Q.    And so the -- the client
 9   information being used in the executive -- I'm
10   sorry, ExecuTime application, would -- that
11   would vary from client to client; correct?
12        A.    That is correct.
13        Q.    And how did you conduct the
14   training?  Did you just kind of walk through
15   different aspects of the software to show
16   different functionalities?
17        A.    Yes, sir.
18        Q.    Did you ask questions of the
19   attendees?
20        A.    Within the power user training,
21   yes.  The end user and super user, no.  I
22   would allow them to ask questions at the end,
23   once the training was completed, but I
24   didn't, like, ask them questions throughout
25   the training.



1        Q.      But you did that when you were
2    training the power users?
3        A.      Power users, yes.
4        Q.      And why is that?
5        A.      Because I needed to confirm and
6    make sure that the information that I have in
7    regards to how they run their actual
8    department or, you know, the city, however
9    they run it, I need to make sure that it's
10   put within the application correct.
11       Q.      Did you ever have instances where
12   you would let the -- one of the power users
13   actually kind of take over the operation of
14   the system that was on the screen and
15   manipulate that during the training?
16       A.      Well, that's usually the first
17   time they've really seen it.  So in that
18   class, generally no.
19       Q.      Okay.
20       A.      But the weeks after when we had,
21   like, the weekly calls after the power user
22   training, at that point, they have been in
23   the application and doing things then.
24       Q.      Okay.  So then you might be more
25   inclined to let them take over and run the



1   software, so to speak?

2        A.      They wouldn't really run it, so

3   to say, but absolutely, we encouraged them to

4   get into the application and start doing

5   different things in there and using it.

6        Q.      And that was part of the power

7   user training?

8        A.      Well, it's usually done after

9   the power user training when they get in the

10  application, because essentially the power

11  user training, they're really watching me

12  show them where everything's located.

13       Q.      How long would the -- would the

14  power user training typically occur, in one

15  session or multiple sessions?

16       A.      So the power user training, we

17  actually struggled with that, that's why they

18  made internal changes within Tyler for that,

19  because it was only three, to three and a

20  half hours, and the clients were having a

21  really hard time because it was too much

22  information crammed in.  So now they do

23  three, three-hour classes on three different

24  days.  Because when you travel on site,

25  you're always on site for at least three full



1   days.  But if it's remote, it's three and a

2   half hours, so it's just very, very crammed.

3        Q.    Okay.  So if you're on site, you

4   would do it in -- on three separate days, each

5   three-hour training session?

6        A.    No, I would be in there eight

7   hours.

8        Q.    Right.  But the power user

9   training would be?

10       A.    Eight hours for three full days;

11  I would go and I would go into it in more

12  detail.  And I think that's why we were

13  having complaints, is because three and a

14  half hours is not enough time to go through

15  it remote.

16       Q.    When did this change occur in

17  terms of how these were scheduled?

18       A.    They were just starting to do

19  that, like, right before I left.

20       Q.    Okay.  So the majority of the time

21  when you were doing on-site training while you

22  were an implementation consultant, you would

23  do it for -- in multiple sessions or in the

24  single session, power user training?

25       A.    It would be 8:00 to 5:00, you've



1    blocked off your calendar and I get you for
2    the entire day.  We sit in a room and we're
3    in the computer except for minus lunch and
4    breaks.
5         Q.    And when you say, "We're in the
6    computer," you mean you and the power users?
7         A.    That is correct.
8         Q.    Which are typically more than one
9    person?
10        A.    Typically, yes.
11        Q.    And that would be for three full
12   days?
13        A.    Yes.
14        Q.    So I'm confused.  You said that
15   something changed where the power user
16   training was done differently with respect to
17   time towards the end of your employment?
18        A.    The remote power user training.
19        Q.    Okay.  So the on-site power user
20   training was always done 8:00 to 5:00, three
21   consecutive days?
22        A.    Generally speaking, yes.
23        Q.    Okay.  But the remote training
24   changed from three, to three and a half hours
25   to three hour sessions on three consecutive



1  days?

2         A.     Different days.

3         Q.     Three different dates?  Okay.

4         A.     Yes.  Usually like a week in

5  between, so it would be three hours this

6  week, three hours next --

7         Q.     Yeah.  Okay.  So instead of 3 to

8  3.5 hours, it was nine hours?

9         A.     That is correct.

10        Q.     Okay.  Was that for every client

11 or did it depend on the particular client

12 contract?

13        A.     They were starting to do that

14 for every client.

15        Q.     Okay.  And your understanding of

16 the reason for that was that it just wasn't

17 enough time, the three to three and a half

18 hours wasn't enough time to train the power

19 users remotely?

20        A.     Absolutely.  Yeah, a lot of the

21 clients were starting to complain and they

22 were having a hard time grasping it with such

23 a short amount of time.

24        Q.     The clients would complain to you?

25        A.     Yes.  And even management, they



1    started reaching out just saying, it's just
2    not enough time to do the power user.
3          Q.    Did you communicate those
4    complaints to Ms. Pasch?
5          A.    Yes.
6          Q.    And did you agree with the
7    substance of the complaints, that the three to
8    three and a half hours wasn't enough time for
9    them to be trained on the software?
10         A.    Yes.
11         Q.    And did you communicate that to
12   Ms. Pasch?
13         A.    Yes.  And there were others that
14   did as well.  I think that's why they went
15   ahead and changed it, because you could see
16   it was clearly challenging for our client to
17   grasp that much information in three and a
18   half hours.
19         Q.    When you say others, you think
20   there were other implementation consultants
21   that may have had the same issues that you
22   did?
23         A.    Yes.
24         Q.    Why do you say that?  Did you talk
25   to other implementation consultants?



```
 1          A.      Yes.
 2          Q.      So since we're talking about other
 3   implementation consultants, did you ever talk
 4   to other implementation consultants about the
 5   reasons for your lawsuit in this case in terms
 6   of overtime compensation?
 7          A.      No.
 8          Q.      Have you ever talked to any
 9   lawyers other than Mr. Herrington or the other
10   members of his firm about this case?
11          A.      I have not.  I received a letter
12   from another one, but I did not contact them.
13          Q.      Was the letter from someone in
14   Baltimore?
15          A.      I don't recall exactly where it
16   was.  But it was for, like, a class action.
17   But I didn't -- I didn't reach out to them.
18          Q.      Was -- did you receive the letter
19   before or after you filed this lawsuit?
20          A.      It was after.
21          Q.      Do you still have the letter?
22          A.      Honestly, I don't know.  I don't
23   think I do, but I may.
24          Q.      Okay.  Have you talked to any
25   other Tyler employees about receiving a
```



1  similar letter?

2         A.    No.

3         Q.    Have you ever talked to other

4  Tyler employees about the letter that you

5  received?

6         A.    No.

7         Q.    Let me talk to you a little bit

8  about the troubleshooting work that you did.

9  I think to use your term that kind of -- well,

10 not your term, but your testimony -- that

11 throughout the process, and this would vary,

12 you would do certain levels of

13 troubleshooting?

14        A.    Yes, sir.

15        Q.    What type of troubleshooting would

16 you do?

17        A.    So an example would be the

18 client is within the application and overtime

19 is not populating.  Or the client's in the

20 application and they can't convert their

21 overtime to comp time.  Excuse me.  Those

22 would be a few examples --

23        Q.    So what was the second one, I'm

24 sorry, can't convert?

25        A.    Overtime to comp time.



1        Q.      Okay.   And how would you become
2   aware that these problems were occurring?   The
3   client would advise you or were you able to
4   see this during training or through some other
5   way?
6        A.      They would communicate that with
7   me.
8        Q.      Okay.   They might communicate that
9   to you during a weekly call, for example?
10        A.      Absolutely, yes.
11        Q.      Can you think of an example where
12   an issue like this was communicated to you by
13   a particular client?
14        A.      I mean, Turlock, California, is
15   a good example, because they used to run into
16   different issues.   One they had even -- was a
17   visual issue within the application.   So
18   those types of troubleshooting would not be
19   billable, but of course, we would still have
20   to complete the troubleshooting.
21        Q.      How did you know what was billable
22   and what wasn't?   Or did you make that
23   determination?
24        A.      Well, we would make the
25   determination based off of the list that our



1  implementation manager had sent out as far as

2  what's billable and what is not.

3       Q.    And troubleshooting wasn't on the

4  list?

5       A.    Well, certain troubleshooting

6  is, yes.  But if it had something to do with

7  a defect, then no.  You would basically

8  troubleshoot and not bill the time.

9       Q.    Okay.  And so what troubleshooting

10 would not involve a defect?

11      A.    Overtime not populating, that's

12 not a defect, that's just either the correct

13 employee is not attached to the correct

14 policy, that could be something as simple as

15 under the preferences in the back end.  But

16 that's not necessarily a quote, unquote,

17 defect.

18      Q.    So when -- a situation when

19 overtime wasn't populating in the software,

20 would that be something you could address and

21 fix yourself or would you have to escalate

22 that?

23      A.    Generally, that type of

24 troubleshooting, I would be able to fix,

25 because it's not very technical.  It's just



1  basically trying to copy the error that

2  they're receiving.

3       Q.     Were there types of errors that

4  you trouble shot and then determined that you

5  could not fix?

6       A.     Absolutely.

7       Q.     And those you would escalate to

8  the...

9       A.     First the project manager and

10  then it would go to our tech team, which we

11  would submit a ticket for them.

12       Q.     Who would prepare the ticket?

13       A.     I would.

14       Q.     And when you say the "tech team,"

15  is that a group that sits in Little Rock or

16  was it a group that sits in Little Rock?

17       A.     Not all of them are in Little

18  Rock, because we have probably more remote

19  employees than we do in office, but some of

20  them are in Little Rock, yes.

21       Q.     Would there be a specific tech

22  person to whom you would submit the ticket?

23       A.     No, it's whoever is available.

24  It would go to a queue and I'm not sure how

25  they distributed it on their side.



1        Q.     And then were you responsible to
2   keep in contact with the tech person to ensure
3   that the problem was addressed?
4        A.     Well, essentially, they would
5   send me an e-mail once they have it and
6   they're working on it.
7        Q.     You mentioned Turlock, California.
8   That was an implementation that you handled on
9   site?
10       A.     Yes, sir.  The power user
11  training -- I did -- I actually went back out
12  for the end user, super user as well.
13       Q.     So you were out there on two
14  occasions?
15       A.     Yes.
16       Q.     Once for power user training and
17  once for end user, super user training?
18       A.     That is correct.
19       Q.     I'm going to mark two exhibits, 3,
20  and 4.
21              (Whereupon, Exhibit 3 was marked
22              for identification.)
23              (Whereupon, Exhibit 4 was marked
24              for identification.)
25       Q.     (By Mr. McKeeby) And just to keep



1   us all on our toes, I'm going ask you about 4

2   first.

3          A.     Okay.

4          Q.     That is 3.  I may not have another

5   copy of 4.

6                 Did I give you two documents?

7          A.     I have two, yes, sir.  I have an

8   extra one, sorry.

9          Q.     Give that one to your counsel,

10  please.

11                MR. HERRINGTON:  Wait.  Which one

12  is which?

13                THE WITNESS:  This is the first

14  one we're going over.

15                MR. MCKEEBY:  That's 4, actually.

16                MR. HERRINGTON:  This is 4.

17         Q.     (By Mr. McKeeby) That was a user

18  error in terms of the numbering.  So I guess

19  let's talk about both of the documents at a

20  general level.  These both deal with the

21  Turlock, California implementation that we

22  were just discussing; correct?

23         A.     Yes, sir.

24         Q.     And your project manager on that

25  was Mikeya Henderson?



 1          A.     That is correct.

 2          Q.     Okay.  And in Exhibit 4, on the

 3   second page, is -- starts some e-mail

 4   communications between you and Ms. Henderson?

 5          A.     That is correct.

 6          Q.     There's an e-mail from you dated

 7   May 16th, 2018, where you're saying, "Attached

 8   is my on-site agenda for Turlock"?

 9          A.     That is correct.

10          Q.     Okay.  And is Exhibit 3 the

11   on-site agenda that you created?

12          A.     Give me one moment to look

13   through this.

14          Q.     Yeah, take your time.

15          A.     So this looks accurate.  I did

16   not create the actual agenda itself, but I

17   did update the times and things of that sort.

18   I believe this is a template that Mikeya

19   initially set up, so I would go into a

20   template and update what we would do.

21          Q.     And by that, you mean you would

22   put the times in?

23          A.     That is correct.  And what we're

24   doing within those times.

25          Q.     And that would be the product of



1   your communications with the client?  How did

2   you know to put, for example, 10:15, system

3   admin training, master file management?

4        A.    So the template that she

5   actually had set up is -- the times are

6   already on there.  So if modifications needed

7   to be made, then I would do that.  But

8   essentially, I would go through the initial

9   template that was sent, usually not making

10  many modifications at all, send it to the

11  client, so that if modifications needed to be

12  made, so if the 9:00 to 10:00 training admin

13  overview didn't work for them, then I would

14  be able to adjust that.

15       Q.    Right.  But in the e-mail when you

16  say, "Attached is my on-site agenda," you had

17  done something to the template; correct?

18       A.    I believe this was when we

19  started doing workshops, which was something

20  we were trying out that was a little bit

21  different.

22       Q.    What's a workshop?

23       A.    A workshop is -- it's just

24  basically the way we worded it to say, okay,

25  for this specific time -- instead of just an



1  admin overview, we're going to spend these

2  three hours on pay codes, as you can see on

3  the first day, Tuesday.  And then the next

4  day, the workshop, you can see it's overtime

5  and comp time for several hours.  So it's

6  just basically breaking it down in more depth

7  in regards to the training we're doing.

8       Q.    Okay.  But I don't think you

9  answered my question.  When you say -- when

10  you send her this on-site agenda, I think you

11  said that you had modified the template to

12  tailor it to this particular implementation;

13  is that correct?

14       A.    That's -- to an extent, that's

15  correct.

16       Q.    Okay.  What did you do to the

17  template?

18       A.    So this --

19       Q.    What was your -- what was your

20  role in this document?

21       A.    So if I'm not mistaken, I

22  believe this is one of the first times we did

23  the workshop, so I added the workshops in

24  there.

25       Q.    Okay.  Okay.  And did you discuss



1  this schedule with the client?

2        A.    Yes, this is sent over to the

3  client as well.

4        Q.    And does the client approve the

5  agenda?

6        A.    They'll -- generally, they'll

7  say if any modifications need to be made.

8  But if not, it's usually, here's the agenda.

9  So it's not necessarily an approval, quote,

10  unquote, so to say.

11        Q.    I'm going to mark this document as

12  Exhibit 5.

13              (Whereupon, Exhibit 5 was marked

14              for identification.)

15        Q.    (By Mr. McKeeby) The document says

16  it's a position description for implementation

17  consultant?  Do you agree?

18        A.    The job title does say

19  implementation consultant, yes.

20        Q.    Have you seen this document before

21  I handed it to you?

22        A.    One moment so I can look through

23  this.

24        Q.    Sure.  Take your time.

25        A.    I believe so, yes.



1      Q.     When did you see it?

2      A.     I'm not sure of the date.

3      Q.     While you were employed with

4   Tyler?

5      A.     I believe so, yes.  It was a

6   document -- I can't say if it's this exact

7   document, but it was similar.

8      Q.     You saw a job description at some

9   point?

10      A.     At some point, yes, sir.

11      Q.     Did the job description you saw --

12   was it consistent with the duties you were

13   performing as an implementation consultant?

14          MR. HERRINGTON:  I'm sorry, are

15   you asking about this document or a document

16   that she believes she saw in the past?

17          MR. MCKEEBY:  The latter.

18      Q.     (By Mr. McKeeby) You testified

19   that at some point you -- during your

20   employment with Tyler, you didn't know when,

21   you saw a job description and that it might be

22   this document but you're not sure; right?

23      A.     That is correct.

24      Q.     When you saw the document while

25   you were employed with Tyler, did you read it?



1          A.      Briefly looked over it, I didn't

2     read it in full detail.

3          Q.      Did it appear, based on your

4     review, to be consistent with the job that you

5     had as an implementation consultant?

6          A.      For the most part.  The

7     overview -- I would say for the most part,

8     yes.

9          Q.      Okay.  And is this document, for

10    the most part, consistent with what you did as

11    an implementation consultant in terms of the

12    principal duties?  And take your time to read

13    it.

14         A.      Yeah, give me just a moment, if

15    you don't mind, please.

16         Q.      Yeah.

17              MR. MCKEEBY:  And after you're

18    done with that and this line of questioning,

19    we'll take our lunch break.

20              (A short discussion was held.)

21              THE WITNESS:  So the second bullet

22    says to create a new model to use in the

23    deployment of the project, I didn't do

24    anything as far as creating models are

25    concerned.



1          Q.      (By Mr. McKeeby) Okay.

2          A.      "Consult with users to identify

3    the proper data mapping" product -- excuse

4    me, "process for the product conversion," I

5    didn't do anything with data mapping.

6                  "Provide instruction on proofing

7    and analyzing data conversion from existing

8    software to Tyler applications," I did not do

9    that.

10         Q.      Okay.

11         A.      Train, of course I did that

12   part.  Plan out the role and troubleshooting,

13   yes.

14                 I'm not sure what that means by

15   "Create a custom report," because we didn't

16   offer custom reports, we had very standard,

17   generic reports within the application, so

18   I'm not sure what that means.

19         Q.      So you would disagree with the

20   notion that you created custom reports?

21         A.      Yeah, because that's -- that's

22   vague and I'm not really too sure what they

23   mean by that.

24         Q.      Okay.

25         A.      Arrange travel.  (Reading



1   document.)
2              Assist the QA staff with product
3   testing or modification testing as required,
4   that's a little vague, I'm not absolutely
5   sure what they're saying there.
6        Q.    Okay.  But you did -- the three
7   bullets before that you're okay with, arrange
8   travel upon receipt, keep up to date on
9   administrative tasks and design and conduct
10  training sessions?
11       A.    Yes.
12       Q.    Okay.  What about the last two?
13       A.    So the last one, "Create both
14  client facing and internal documentation,
15  such as quick tips, how tos," all of that is
16  templates that we may modify a little bit,
17  but I didn't necessarily create those
18  templates.
19             And the last one is pretty
20  accurate, because everything is self-study,
21  because there isn't, like, training or
22  anything, you kind of have to train yourself.
23       Q.    Okay.
24       A.    Should I read the next box as
25  well?



1        Q.      What box do you mean?

2        A.      Should I keep going?

3        Q.      No.

4        A.      Okay.

5        Q.      You may do that at your

6    convenience.

7        A.      Okay.

8                MR. MCKEEBY:  Let's take a break.

9                THE VIDEOGRAPHER:  Going off the

10   record at 12:48.

11               (A short break was taken.)

12               THE VIDEOGRAPHER:  We are back on

13   the record at 1:47.

14       Q.      (By Mr. McKeeby) Back on the

15   record after a lunch break.  I don't think I

16   asked you exactly this question.

17               When you were an implementation

18   consultant, how would you know when you were

19   assigned to a particular implementation?

20       A.      The implementation manager would

21   let us know and the project manager would

22   give me the cue when it was time for me to

23   step in as well.

24       Q.      Okay.  So you would get some type

25   of communication from the implementation



1  manager that you were assigned to a new

2  implementation?

3          A.      Yes.  But keep in mind, the

4  first part of the implementation, I didn't

5  work on.  So then that's why it was necessary

6  for a second step, for the project manager to

7  say, okay, I'm done with my stuff, go ahead.

8          Q.      And that would trigger the

9  handoff?

10         A.      Yes, sir.

11         Q.      Okay.  But you would know about

12 the fact that you were on the particular

13 project well before the handoff, based on the

14 notice that you would receive from the

15 implementation manager?

16         A.      That is correct.

17         Q.      And would that notice come in the

18 form of just an e-mail?

19         A.      E-mail or a phone call.  Either

20 one.

21         Q.      Would you receive any documents at

22 that point or just a notification of the

23 assignment?

24         A.      Generally, at that point, just,

25 hey, this has been assigned to you guys.



 1        Q.     So you wouldn't get the contract
 2   at that point to review?
 3        A.     No, generally, we would have to
 4   go look up that information.  We had, like, a
 5   shared drive where a lot of documents would
 6   be held at.
 7        Q.     Okay.  So the notification from
 8   the implementation manager of the assignment
 9   would trigger your responsibility to look up
10   the documents?
11        A.     Yes, sir.
12        Q.     And by the documents, at that
13   point, we're talking about the contract with
14   the client?
15        A.     The solution design -- or well,
16   excuse me, I'm sorry, solution design hasn't
17   quite been there yet.  Once it was my turn to
18   take the project, that's when I would look up
19   the documents; I didn't generally go in and
20   look up the documents when it was assigned to
21   the project manager.
22        Q.     What documents could you have
23   looked up when it was assigned to the project
24   manager?  You could look at the contract?
25        A.     Just the contract at that point,



 1  really.

 2      Q.    Okay.  But at that point, it

 3  wasn't necessary for you to review the

 4  contract, because you wouldn't be handed off

 5  the project until several weeks, at least,

 6  later?

 7      A.    Absolutely, until the solution

 8  design and the questionnaire because that has

 9  more information that I would actually need.

10      Q.    But you would review the contract

11  as part of that pre-handoff process; correct?

12      A.    I would briefly -- briefly, look

13  at the contract.  I would not go through that

14  contract like I did the questionnaire,

15  solution side.

16      Q.    Was there any particular provision

17  of the contract with the client that you

18  wanted to look at?

19      A.    Not that I can think of off the

20  top of my head, no.

21      Q.    Were you at a meeting in 2018 in

22  November in Little Rock where implementation

23  consultants were advised by Ms. Pasch that

24  there would be a change to how you recorded

25  time?



1        A.     Yes.

2        Q.     Okay.  Was that an implementation

3    consultant meeting, if I described it that

4    way, is that --

5        A.     No.

6        Q.     How you would describe it?

7        A.      It was an overall meeting,

8    project managers and implementation

9    consultants, it was a change for everyone.

10       Q.     Okay.  Was the meeting at the

11   Tyler offices in Little Rock?

12       A.     So, no, it was not.  They

13   actually reserved a room.  There was, like, a

14   golf course and stuff outside of the room,

15   but the office in Little Rock wasn't big

16   enough to hold everybody.

17       Q.     So was the meeting, like, in a

18   hotel or?

19       A.      It wasn't a hotel.  I couldn't

20   tell you exactly where it was.

21       Q.     Just a conference room?

22       A.     Yes, sir.

23       Q.     And Ms. Pasch presided over the

24   meeting, I take it?

25       A.      Her as well as Jamie.



```
 1        Q.     Jamie Burns?

 2        A.     Yes, Jamie Burns, uh-huh.

 3        Q.     Was it a multiple-day meeting?

 4        A.     Yes.

 5        Q.     Was this an annual meeting or

 6   just --

 7        A.     Yes, sir.

 8        Q.     Okay.  And you indicated

 9   affirmatively when I asked if there was a

10   disclosure of a change in time recordation by

11   implementation consultants, and I guess

12   project managers as well; right?

13        A.     Can you repeat that for me?  I'm

14   sorry.

15        Q.     No.  I can try to restate it.

16        A.     Okay.

17        Q.     I don't think it was a very good

18   question.

19               My understanding was at this

20   meeting you were told that there was going to

21   be a change in the way you recorded your time?

22        A.     That is correct.

23        Q.     That change would apply both to

24   implementation consultants and to project

25   managers?
```



 1          A.      That is correct.

 2          Q.      Okay.  And am I also correct that

 3   you were told that you would no longer have to

 4   record all of your time, that from then on,

 5   you would only have to record billable time?

 6          A.      We were only recording billable

 7   time from that point, which you are correct.

 8   Even previously, we weren't really recording

 9   all of the time.

10              So things that weren't billable

11   like admin items that you were working on,

12   not every single item that you worked on was

13   tracked, so to say.

14          Q.      Okay.  So then I guess I'm

15   confused.

16          A.      Yes, sir.

17          Q.      What was going to be different

18   going forward as of November 2018?

19          A.      So prior to November 2018, our

20   timesheet had to at least equal up to 40

21   hours.  So you didn't have to go into great

22   detail of what you did with admin, but you at

23   least had to put the hours there where it

24   equaled to 40 hours for that week.

25              After November 2018 -- and I



1  believe we only tracked our time for about

2  six months or so, but after that, there was

3  no admin time required at all.  They didn't

4  care if it said 40 hours, they just wanted

5  what was billable and that was it.

6       Q.    Oh, okay.  You said you believed

7  you only tracked your time for six months or

8  so?

9       A.    About, that's a guesstimate, of

10  course.

11       Q.    Okay.  I understand, the

12  approximate time.

13       A.    Yes.

14       Q.    But so -- I don't understand what

15  you're saying.  So there was a -- six months

16  prior to this meeting in November, you tracked

17  your time but not before that?

18       A.    Huh-uh, we did not track time

19  prior to that.

20       Q.    Okay.  So -- so around May of 2018

21  is when you first started tracking time?

22       A.    Around -- around about.

23  Possibly a little bit before then, but --

24       Q.    In that range?

25       A.    Yes, sir.



1          Q.      So for 2017, for example, you did
2     not record your time?
3          A.      No, sir.
4          Q.      Okay.  Then at some point, I take
5     it in 2018, you were instructed that you
6     needed to start recording your time?
7          A.      At least have 40 hours on
8     that -- on the timesheet.
9          Q.      But before that you didn't even
10    record your time?
11         A.      No, sir.
12         Q.      Is that true?
13         A.      That is correct.
14         Q.      Okay.  So what -- when you started
15    recording your time around May of 2018, how
16    did you do that?  Was there a database you
17    would go into or a program?
18         A.      Yes, sir.  We had a tracker that
19    we would just --
20         Q.      Time tracker?
21         A.      Yes, sir.
22         Q.      So the time tracker was introduced
23    in May of 2018?
24         A.      Around that time, yes, sir.
25         Q.      Around that time?



1          A.      Yeah.

2          Q.      Sorry.   Sorry.

3                  And did you receive instruction as

4     to what you were supposed to do to record your

5     time?

6          A.      Yes, sir.

7          Q.      And in what form was that

8     instruction?

9          A.      The biggest thing was just

10    tracking the billable hours.  They weren't as

11    concerned with things that weren't billable,

12    like troubleshooting, like documents, like

13    doing other things of that nature.  They

14    weren't as concerned; they just wanted to

15    make sure that the billable time was listed

16    and our timesheet at least equalled to 40

17    hours.

18         Q.      Okay.  But my question was, how

19    did you receive that instruction?  Was it in a

20    memo, was there a policy that was put out or

21    was it training that you were given?  How were

22    you told these things?

23         A.      I cannot recall if it was either

24    a phone call meeting -- like on a GoToMeeting

25    or an e-mail, I'm not sure which one it was.



1        Q.    Okay.  So prior to this time,
2    there was no time tracker, obviously; right?
3        A.    That is correct.
4        Q.    So did you bill time prior to this
5    time?
6        A.    Sometimes we did.  But keep in
7    mind, we didn't always bill for our time with
8    ExecuTime.
9        Q.    What would that depend on?
10       A.    Once they started having us
11   bill.  So it was something, once we were
12   acquired by Tyler -- I can't remember the
13   exact date, but they said, we're going to
14   start billing for items.
15       Q.    So prior to the Tyler acquisition,
16   you did not bill your time?
17       A.    We did not, no.
18       Q.    Okay.  And did you bill your time
19   prior to this institution of time tracker?
20       A.    No, we didn't have, like,
21   billable hours; so that's what they called
22   it, sorry, was billable hours, is what they
23   actually called it.
24       Q.    And that was a concept that was
25   introduced around May of 2018 when this time



1   tracker system was put in place?

2          A.     It was a little bit before then,

3   but around about.  I want to say it was

4   probably more so like 2017, like, the end of

5   2017.  I could be a little off, but....

6          Q.     Okay.  So you're changing the

7   estimate, which is fine.

8          A.     Yeah, because I'm not absolutely

9   sure --

10         Q.     And you just told me that.

11         A.     I'm just trying to guesstimate.

12         Q.     Okay.  Okay.

13         A.     But I'm thinking like the last

14   meeting it may have been brought up and then

15   we implemented.

16         Q.     Okay.

17         A.     I can't remember.

18         Q.     There was some period of time at

19   the beginning of your employment where you

20   were not identifying, in any form, the hours

21   that you worked from week to week?

22         A.     That is correct.

23         Q.     And at some point, maybe May,

24   maybe earlier, you started doing through time

25   tracker a process whereby you would identify



1    the time?

2          A.      That is correct.

3          Q.      On a weekly basis?

4          A.      Correct.  Yes.

5          Q.      And did you designate what was

6    billable or what wasn't or did the system do

7    that?

8          A.      No, management did that.

9          Q.      Okay.  What did you record?  Did

10   you just, like, indicate what you did in a

11   narrative form?

12         A.      As far as billable time is

13   concerned?

14         Q.      No, as far as completing time

15   track.  Let's say you, for example, did a

16   power user training for eight hours at a

17   client site.  What would you -- would you just

18   list that in narrative form or was there,

19   like, a code that you would put in?  Or what

20   were you inputting into the system?

21         A.      So I would enter in the number

22   of hours and then a very brief description.

23   So I would put something like "ES training,"

24   which is end user supervisor training.

25         Q.      Okay.



1           Did you have any understanding of

2    why this change was instituted?

3           A.     No.

4           Q.     That wasn't something that was

5    covered in any type of training or anything

6    like that?

7           A.     As to why they were doing -- I

8    mean, I just assumed it was something with

9    Tyler that they probably did, like, billable

10   hours or something.

11          Q.     Okay.

12                 MR. MCKEEBY:  And -- so you have

13   -- I only have two of these.  It's the

14   timesheets?

15                 MR. HERRINGTON:  Okay.

16          Q.     (By Mr. McKeeby) Let me mark this

17   as deposition Exhibit 6.

18                 (Whereupon, Exhibit 6 was marked

19                 for identification.)

20          Q.     (By Mr. McKeeby) The good news is

21   that I'm not going to go over these.  But I do

22   want to ask you about what they are.

23          A.     Yes, sir.

24          Q.     These are documents that, I'll

25   represent to you, were produced by your



1   counsel in this case.  Do you recognize them?

2          A.     Yes, sir.

3          Q.     Am I correct that these are

4   screenshots of your time tracker entries?

5          A.     That is correct.

6          Q.     How did you go about obtaining

7   these to provide to your counsel?

8          A.     Took a screenshot.

9          Q.     Did you do that all at one time or

10  did you do that periodically as you entered

11  time?

12         A.     No, I just did it all at one

13  time.

14         Q.     When did you do that?

15         A.     I can't remember the exact date,

16  but it was this year, 2019.

17         Q.     2019?

18         A.     Yes, sir.  For sure.

19         Q.     Was it before or after you went

20  out on FMLA leave?

21         A.     I can't remember exactly.  I

22  would say around the same time, but I can't

23  remember exactly --

24         Q.     Okay.

25         A.     -- when I actually did it.



1          Q.      Did you do it for the purposes of
2    this lawsuit?
3          A.      Yes, sir.
4          Q.      And "it" being taking the
5    screenshots of the time tracker entries?
6          A.      Yes, sir.
7          Q.      Does the date on this first --
8    think I did my best to put these in
9    chronological order.  Assuming that I did it
10   correctly, does this refresh your recollection
11   as to when time tracker was introduced?
12         A.      Yeah.  So it was then, like, the
13   beginning of 2018 then.
14         Q.      Okay.  So do these screenshots
15   accurately depict the number of hours that you
16   worked in the time periods identified?
17         A.      No, sir, because I didn't add
18   anything that I did Saturday or Sunday, and
19   really my biggest thing was just making sure
20   it met 40 hours.  So no, this would not be
21   completely accurate.
22         Q.      It's not completely accurate
23   because you would not have entered time for
24   Saturday or Sunday?
25         A.      Saturdays and Sundays,



1    generally, whenever I worked on the weekends,

2    because a lot of times I would work over

3    those days, but if it was admin or something

4    of that sort, troubleshoot, that wasn't being

5    accounted for, I wouldn't add that on here.

6          Q.     But there's certainly time that's

7    listed here that's not billable; correct?

8          A.     Correct.

9          Q.     I mean, administrative time is

10   listed?

11         A.     Yes, sir.

12         Q.     You're just saying that for your

13   weekend time, it wasn't your habit to enter

14   that time?

15         A.     That is correct.

16         Q.     Did you ever tell anyone that that

17   was the case?

18         A.     No, because their biggest thing

19   was just making sure it met the 40 hours, so

20   it wasn't really anything that was relevant

21   to bring up.

22         Q.     And when you say, "their biggest

23   thing," you're talking about your supervisors

24   at Tyler?

25         A.     I'm sorry, yes, Tyler.



1          Q.     And Hillary Pasch, you mean?

2          A.     Uh-huh.  As well as Jamie,

3     because they really, more so, handled

4     timesheets and stuff like that.  I believe it

5     was actually Jamie that handled the

6     timesheets.

7          Q.     Handled them meaning what?

8          A.     Meaning just -- like that's who

9     it goes to for approval before the client

10    actually gets billed.  Because the biggest

11    thing they're looking for in the timesheets

12    is the billable hours that are going over to

13    the client.

14         Q.     That's based on communications you

15    received from Jamie Burns?  When you say the

16    biggest thing with the timesheet was --

17         A.     Well, that's an assumption.

18         Q.     Okay.  If someone -- if Ms. Burns

19    or Ms. Pasch, in this case, testified that

20    their understanding was that employees who

21    were entering time in time tracker, including

22    implementation consultants, were supposed to

23    record all of their work time, would you

24    disagree with that?

25         A.     I mean, if they were under that



1    impression, I was unaware that every single
2    item that you did had to be recorded, so.
3         Q.    You would -- if they testified
4    that that's something that they instructed
5    implementation consultants to do, to record
6    all of their time in time tracker, you would
7    say you didn't hear that instruction?
8         A.    I would say that that wasn't
9    anything that was relayed to us as far as,
10   make sure you put every single minute that
11   you spend, put on this time tracker.
12        Q.    Okay.  Is there any other document
13   that you have in your possession that would
14   identify the number of hours that you worked
15   on a week-to-week basis?
16        A.    An actual document, so to say?
17        Q.    Yes.
18        A.    No, sir.
19        Q.    When you say "actual document,"
20   that sounds like a qualifier.  Is there
21   something other than an actual document?
22        A.    No -- well, you said "document."
23        Q.    I did say document.
24        A.    So when you're saying a
25   document, I'm saying no.  The answer would be



```
 1   no.
 2        Q.    Okay.  So you didn't take journal
 3   entries or diary entries to record your time
 4   or anything like that?
 5        A.    Not consistently, no, sir.
 6   Huh-uh.
 7        Q.    Well, you didn't do it at all, did
 8   you?
 9        A.    No, you just -- you get the
10   project done, you get it done and you keep
11   working.
12        Q.    No, I understand.  But if you were
13   trying to keep track of what your hours were,
14   you might enter them into a journal or a
15   diary, I'm just saying you didn't do that;
16   correct?
17        A.    I had no reason to keep track of
18   my hours.
19        Q.    And you didn't do it?
20        A.    That's correct.
21        Q.    Okay.  So you would say that for
22   the purposes of quantifying the number of
23   hours that you worked, these documents that
24   I've marked as Exhibit 6, the time tracker
25   screenshots, wouldn't be of any particular
```



1    use?

2         A.     I would say they're not 100

3    percent accurate, is what I would say to

4    that.

5         Q.     Are any of them accurate?

6         A.     As far as the exact time, no,

7    because I didn't enter Saturday or Sunday's

8    time that I actually worked or did things.

9         Q.     And your testimony is that you

10   worked every Saturday or Sunday?

11        A.     If I did not work -- I wouldn't

12   say every Saturday or Sunday, because it

13   varied based on my workload --

14        Q.     Sure.

15        A.     -- and what I had going on that

16   week.

17        Q.     Sure.

18        A.     So I wouldn't say consistently

19   every single Saturday or Sunday, but majority

20   of them, yes, sir, as well as additional

21   hours on the week.

22        Q.     Well, what's that last part,

23   "additional hours on the week"?

24        A.     During the week.

25        Q.     So now you're saying that there's



1  sometimes that there were hours during the

2  week that you chose not to record as well?

3       A.    No.  I'm saying that sometimes I

4  would exceed the eight hours during the week

5  as well.

6       Q.    Okay.  And are you saying that on

7  those -- in those instances, you would not

8  record the time?

9       A.    It just depended if it was

10 billable or not.  So it really depends on

11 what type of time.  Because everything

12 billable had to be put down.  Like, that was

13 very important to make sure all billable time

14 is recorded.

15      Q.    I understand.  But you also

16 recorded time that was not billable, we've

17 established?

18      A.    Yes, sir.

19      Q.    Is it your testimony then that

20 when you had eight hours for a day of total

21 time, that you would not record additional

22 time in time tracker even if you worked that

23 time?

24      A.    There may have been certain

25 circumstances where that did happen.



1       Q.      And when you say, "There may have
2   been certain circumstances," is that because
3   you're not sure or you know that happened,
4   you're just not sure when?  But -- I'm
5   confused.
6       A.      Well, I mean, it's -- we're
7   talking going back three years.
8       Q.      I know.  But you told me that
9   there were specific times that -- you knew
10  that there were weekends that you worked --
11      A.      Yes, sir.
12      Q.      -- where you did not record your
13  time; right?
14      A.      Uh-huh.
15      Q.      Is that yes?
16      A.      That is correct, yes.
17      Q.      You also know and can say under
18  oath that there were times during the work
19  week, not weekends, where you worked time that
20  you did not record?
21      A.      Yes.
22      Q.      Okay.  And that would happen how
23  often?
24      A.      It -- once again, depends on the
25  workload and what I had going on that week.



1    Some weeks I would work an extra ten hours,

2    some weeks it would be six or something of

3    that sort.  It varied and it really depended

4    on what needed to be completed, what open

5    items I had -- there was a number of things

6    that would kind of determine.

7         Q.    Okay.  So back, I think, to a

8    previous question.

9         A.    Uh-huh.

10        Q.    Is it your testimony that none of

11   these screenshots accurately reflect the

12   number of hours that you worked in a week?

13        A.    I would need to go back and see

14   if any of them are completely accurate,

15   because you'll even see that some I did put

16   additional time on there as well.  If you do

17   look through some of them.

18        Q.    Right.  Some of these have more

19   than 40 hours.

20        A.    Yes, sir.

21        Q.    And how do you account for that?

22        A.    Well, because if it was

23   something that was important or that I needed

24   to put on the tracker to know that it was

25   done, I would, of course, add it.  For sure.



1          Q.     That was a determination you would
2     make?
3          A.     Yeah, that's a determination I
4     would make, if it was something that was
5     imperative that I needed to put on there.
6     But if it was something that was not as
7     important, then I wouldn't.
8          Q.     But "imperative" is not the same
9     as "billable"?
10         A.     Correct.  Yes, sir.
11         Q.     And you would agree with me that
12    you took a screenshot of every pay period
13    between January of 2018 and October of 2018?
14         A.     One second.  Let me check the
15    dates on these.
16                To October, yes, sir.
17         Q.     Okay.  How often would you work on
18    the weekends where you wouldn't record your
19    time?  Is that something that happened every
20    other weekend, once a month, more than that?
21         A.     More than that.
22         Q.     Every other weekend?
23         A.     Probably more than that too.  It
24    was pretty -- it was pretty often that I was
25    working at least one day on the weekend.



1        Q.     Do you have an estimate of the
2    number of hours that you worked -- let me
3    scratch that.
4               2018, could you have -- if you
5    wanted to -- the last one of these time
6    tracker screenshots is October 21st, 2018;
7    correct?
8        A.     Yes, sir.
9        Q.     Could you have taken screenshots
10   after that date and produced them in this
11   case?
12       A.     Well, November 2018 is when we
13   had the change that took place.
14       Q.     Okay.  But you still kept your
15   time -- you entered billable time?
16       A.     Only billable.
17       Q.     Right.  Okay.  So if you took a
18   screenshot for November of 2018 -- I don't
19   know what the day would be, but I guess we
20   could probably figure it out -- so I think it
21   would be maybe November -- let's say November
22   12th was the end of a pay period.  You could
23   take a screenshot of that, but it would not
24   have -- it would not have shown anything other
25   than billable time?



1      A.    That's correct.

2      Q.    So you didn't do that, because --

3  well, why didn't you do that?

4      A.    I don't have a good answer for

5  that.

6      Q.    But you could have?

7      A.    Yeah, I probably could have.

8      Q.    As of that time when you started

9  tracking only billable time, you were no

10 longer including the admin time?

11     A.    No, we weren't including

12 anything else but billable.

13     Q.    Do you intend to tell the jury in

14 this case how much overtime you worked on a

15 weekly basis?

16     A.    Yes, sir.

17     Q.    What do you intend to say?

18     A.    Well, to be on the safe side,

19 just because integrity is everything and I

20 know I've at least worked an extra five hours

21 a week, in cases definitely more than that,

22 but I would rather under estimate than over

23 estimate, so I would say about 45.

24     Q.    But there's no real way to

25 determine what the correct number would be;



1  correct?

2        A.      That's correct, yes, sir.

3        Q.      And these documents would at least

4  show -- these timesheets that I've identified

5  as Exhibit 6, would at least show certain

6  instances where you worked more than 40 hours;

7  correct?

8        A.      Some of them will, yes, sir.

9  Uh-huh.

10       Q.      I'm sorry.  Did you tell me or --

11  well, let me just ask it again, I apologize.

12              Did you print these out before or

13  after you went on FMLA leave?

14       A.      I can't recall if it was before

15  or after.

16       Q.      When you went out on FMLA leave,

17  were you considering legal action at that

18  time?

19       A.      At the time I went on the leave,

20  no.

21       Q.      You hadn't been referred to

22  counsel by your sister at that time?

23       A.      I had been referred, but I

24  wasn't -- I was on the fence completely.  So

25  I wasn't at a moment where I'm, like, yes,



1  I'm definitely going to move forward with

2  this.  So no, it was not a definite.

3       Q.    But it's accurate to say you were

4  considering legal action?

5       A.    Considering, yes, sir.

6       Q.    Have you -- while you were

7  employed at Tyler, did you ever discuss the

8  possibility of taking legal action against

9  Tyler with any other Tyler employee?

10      A.    No.

11      Q.    Since you have taken legal action

12 against Tyler, have you had any discussions

13 with any Tyler employee or former employee

14 about your lawsuit?

15      A.    No, I don't really talk to

16 anybody from my old job.

17      Q.    Are you still in touch with

18 Ms. Harrison?

19      A.    Every blue moon, we'll check on

20 each other but not consistently.

21      Q.    Have you told her that you filed a

22 lawsuit?

23      A.    No.  She still works there.

24      Q.    And why does that matter?

25      A.    Because he told me not to talk



1  │  to anybody about it.

2  │       Q.    Okay.  Well, don't tell me what he

3  │  told you.

4  │       A.    Okay.

5  │       Q.    Tell me again, the job that you

6  │  held before Tyler, Allconnect?

7  │       A.    Allconnect?  Yeah, that was

8  │  right before Tyler.

9  │       Q.    And you were in sales at that job?

10 │       A.    Yes, sir.

11 │       Q.    Why did you leave that position?

12 │       A.    Because it was a very, very far

13 │  commute, and I wasn't making enough money.

14 │       Q.    Did you leave voluntarily?

15 │       A.    Yes, sir.

16 │       Q.    In that role, you said it was a

17 │  sales role, did you receive commissions?

18 │       A.    Yes, sir.

19 │       Q.    Was that the only way you were

20 │  compensated at Allconnect?

21 │       A.    No, we had a base rate as well,

22 │  in addition to the incentives.

23 │       Q.    You would agree with me that at no

24 │  point at Tyler -- while you were employed with

25 │  either ExecuTime or Tyler, did you receive



1    commissions?

2          A.     Repeat that question.

3          Q.     It's a true statement that at no

4    point during your employment with either

5    ExecuTime or Tyler that you received

6    commissions?

7                 MR. HERRINGTON:  I'm going to

8    object to the extent it calls for a legal

9    conclusion about what commissions are.

10         Q.     (By Mr. McKeeby) Commissions as

11   you would use the term.

12         A.     Billable hours?

13         Q.     Well, how do you define

14   commissions, let's do that?

15         A.     I mean, I would define

16   commission as additional money in addition to

17   your salary, wage.

18         Q.     So the same thing as a bonus?

19         A.     Something like a bonus, that's

20   the way I would think of it.

21         Q.     How about if we define it a

22   different way or we can call it something

23   different too.  When you were paid at

24   Allconnect, what was it that you were selling?

25         A.     Like cable TV, internet, stuff



1  like that.

2        Q.     And who were you selling to,

3  businesses?

4        A.     Just different clients,

5  different people.

6        Q.     Okay.  And when you generated a

7  sale, did you receive a percentage of that

8  sale as a commission?

9        A.     I'm not sure how their -- let me

10  not answer that with no.  I'm not sure how

11  their incentive structure worked to see how

12  they based the pay out, so I can't answer

13  that.

14        Q.     Okay.

15             But you would agree with me that

16  when the sales team at ExecuTime or Tyler made

17  a sale, that did not trigger any income

18  entitlement to you?

19        A.     Not that I'm aware of, no.

20        Q.     Well, you would know, wouldn't

21  you?

22        A.     I'm not sure.  I mean, how would

23  I know?

24        Q.     Because you would get the money.

25        A.     Well, I never -- not that I'm



 1  aware of, no.

 2        Q.    Okay.  Were you ever on a

 3  performance improvement plan at Tyler?

 4        A.    Yes, sir.

 5        Q.    When was that?

 6        A.    I can't tell you the exact date,

 7  because I can't remember.

 8        Q.    Was it in 2019?

 9        A.    I don't believe so.

10        Q.    Were you aware that Ms. Pasch had

11  drafted a performance improvement plan for you

12  prior to you going out on medical leave?

13        A.    No.

14        Q.    Is this the first you're hearing

15  of it?

16        A.    Uh-huh, it is.

17        Q.    Is that yes?

18        A.    Yes, that's a yes.

19              MR. MCKEEBY:  Let me take five

20  minutes.  I may be done.

21              THE VIDEOGRAPHER:  Going off the

22  record at 2:21.

23              (A short break was taken.)

24              THE VIDEOGRAPHER:  Back on the

25  record at 2:27.



1      Q.     (By Mr. McKeeby) Ms. Greene, did

2   you have a monthly call with Ms. Pasch?

3      A.     We started doing those, yes.

4      Q.     At what point did you start doing

5   those?

6      A.     I can't recall the time we

7   started doing them, but that is something

8   that she started doing, was monthly calls.

9      Q.     Was it in 2018?

10      A.     Around sometime in there,

11   probably so.

12      Q.     Okay.  And was it a monthly call

13   between just you and her, or was it a monthly

14   call with all implementers?

15      A.     Well, we did a monthly call with

16   just me and her, she would meet with people

17   separate as she started doing that.

18      Q.     Okay.  And your -- she wouldn't

19   meet with you face to face, that would

20   typically be done over a telephone call?

21      A.     Yes, sir, or a GoToMeeting.

22      Q.     GoToMeeting is a?

23      A.     It's like a Skype call --

24      Q.     Skype call.

25      A.     -- where you can share screens



1   and stuff.

2        Q.    Okay.  And would you discuss the

3   progress of your implementations during those

4   calls?

5        A.    Yes, sir.

6        Q.    What does it mean to put an

7   implementation on hold?

8        A.    That is -- that's what I was

9   referring to earlier when a client may say,

10  we need a little bit more time or we had

11  another project come up or something came up.

12  There's been situations where, you know,

13  maybe someone on the project managing team

14  had to have surgery.

15            There are so many things, but

16  those are several examples of what would be

17  considered quote, unquote on hold.

18        Q.    So you would put the Go-Live date

19  on hold; is that what was being put on hold?

20        A.    Yes, sir.

21        Q.    Would that be one of the things

22  you would talk to Ms. Pasch about during these

23  monthly calls?

24        A.    No, because they handled the

25  Go-Live date.  I would just tell them the --



```
 1   you know, essentially the client is
 2   requesting to put on hold, and they would
 3   take it from there.
 4        Q.     "They" being who?
 5        A.     The project manager as well as
 6   the implementation manager.
 7        Q.     And the calls with Ms. Pasch, did
 8   you discuss the progress of the
 9   implementations and whether or not deadlines
10   were being met?
11        A.     That was more so on the group
12   call, with me as well as the project manager.
13   The one-on-one calls, not as much.
14        Q.     What did you discuss during the
15   one-on-one calls?
16        A.     Just different things that may
17   come up, different issues, things of that
18   sort.  And, of course, you know, the projects
19   would come up as well.  But we went into more
20   depth when it was all three of us on the call
21   in regards to timelines and stuff.
22        Q.     And you mean all three, you mean,
23   you, Ms. Pasch and the project manager?
24        A.     Yes, sir.
25        Q.     And was that a call that happened
```



1    regularly?

2          A.     She started doing that as well.

3          Q.     That was a separate monthly call?

4          A.     Yes.

5          Q.     On those calls, did you discuss

6    the status of the implementations and whether

7    or not there were any delays in the checklist

8    of deadlines?

9          A.     Yes, sir.

10               MR. MCKEEBY:  No further

11   questions at this time.

12               MR. HERRINGTON:  Nothing for me.

13               Read and sign.

14               THE VIDEOGRAPHER:  Going off the

15   record at 2:30.

16      (The deposition concluded at 2:30 p.m.)

17

18

19

20

21

22

23

24

25



1              C E R T I F I C A T E

2

3    STATE OF GEORGIA)

4    COUNTY OF FULTON)

5

6        I hereby certify that the foregoing

7    transcript was taken down, as stated in the

8    caption, and the questions and answers thereto

9    were reduced to typewriting under my

10   direction, that the foregoing pages represent

11   a true, complete, and correct transcript of

12   the evidence given upon said hearing.

13       I further certify that I am not of kin or

14   counsel to the parties in the case; am not in

15   the regular employ of counsel for any of said

16   parties, nor am I in any way financially

17   interested in the result of said case.

18                  _Cindy C. Jenkins_

19

20                  Cindy C. Jenkins

21                  Certified Court Reporter, 470

22

23

24

25



1                    D I S C L O S U R E

2          I, Cindy C. Jenkins, do herby disclose

3     pursuant to Article 10.B. of the Rules and

4     Regulations of the Board of Court Reporting of the

5     Judicial Council of Georgia that Esquire was

6     contacted by the party taking the deposition to

7     provide court reporting services for this deposition

8     and there is no contract that is prohibited by

9     O.C.G.A. 15-14-37(a) and (b) of Article 7.C. of the

10    Rules and regulations of the Board for the taking of

11    this deposition.

12         There is no contract to provide reporting

13    services between Esquire or any person with whom

14    Esquire has a principal and agency relationship nor

15    any attorney at law in this action, party to this

16    action, party having a financial interest in this

17    action, or agent for an attorney at law in this

18    action, party to this action, or party having a

19    financial interest in this action.  Any and all

20    financial arrangements beyond our usual and customary

21    rates have been disclosed and offered to all

22    parties.



23    _____

24    Cindy C. Jenkins

25    Certified Court Reporter, 470

1                 DEPOSITION ERRATA SHEET

2

3          DECLARATION UNDER PENALTY OF PERJURY

4    I declare under penalty of perjury that

5    I have read the entire transcript of

6    my Deposition taken in the captioned matter

7    or the same has been read to me, and

8    the same is true and accurate, save and

9    except for changes and/or corrections, if

10   any, as indicated by me on the DEPOSITION

11   ERRATA SHEET hereof, with the understanding

12   that I offer these changes as if still under

13   oath.

14   Signed on the _____ day of _____, 20___.

15

16   _____

17            Suzanne Greene

18

19

20

21

22

23

24

25



1                    DEPOSITION ERRATA SHEET

2      Page No._____Line No._____Change to:

3      _____

4      Reason for change:_____

5      Page No._____Line No._____Change to:_____

6      _____

7      Reason for change:_____

8      Page No._____Line No._____Change to:_____

9      _____

10     Reason for change:_____

11     Page No._____Line No._____Change to:_____

12     _____

13     Reason for change:_____

14     Page No._____Line No._____Change to:_____

15     _____

16     Reason for change:_____

17     Page No._____Line No._____Change to:_____

18     _____

19     Reason for change:_____

20     Page No._____Line No._____Change to:_____

21     _____

22     Reason for change:_____

23

24     SIGNATURE:_____DATE:_____

25                    Suzanne Greene



1            DEPOSITION ERRATA SHEET

2    Page No._____ Line No._____ Change to:_____

3    _____

4    Reason for change:_____

5    Page No._____ Line No._____ Change to:_____

6    _____

7    Reason for change:_____

8    Page No._____ Line No._____ Change to:_____

9    _____

10   Reason for change:_____

11   Page No._____ Line No._____ Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____ Line No._____ Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____ Line No._____ Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____ Line No._____ Change to:_____

21   _____

22   Reason for change:_____

23      SIGNATURE:_____ DATE:_____

24                 Suzanne Greene

25



**Exhibits**

4365006 Suz
anne.
Green DEFEN
DANT.
EXHIBIT1
 3:8
 29:22,25
 30:5

4365006 Suz
anne.
Green DEFEN
DANT.
EXHIBIT2
 3:9
 55:15,18

4365006 Suz
anne.
Green DEFEN
DANT.
EXHIBIT3
 3:10
 137:21
 139:10

4365006 Suz
anne.
Green DEFEN
DANT.
EXHIBIT4
 3:11
 137:23
 139:2

4365006 Suz
anne.
Green DEFEN
DANT.
EXHIBIT5
 3:12
 142:12,13

4365006 Suz
anne.
Green DEFEN
DANT.
EXHIBIT6
 3:13
 160:17,18
 166:24
 174:5

_____

**$**

$45,000
 30:16

_____

**1**

1
 29:22,25
 30:5

1,400
 12:12

10
 91:11
 110:7

100
 167:2

10:00
 140:12

10:15
 140:2

10:39
 52:5

10:50
 52:8

110
 5:5

11:42
 103:3

11:59

103:6

12
 110:7

120
 74:19,20
 75:2,7,24
 111:23

12:48
 147:10

12th
 39:15
 172:22

13-
 12:12

15
 91:15

16th
 139:7

1:47
 147:13

1st
 30:11

_____

**2**

2
 55:15,18

20
 93:24

2002
 52:25
 53:3

2003ish
 53:1

2016
 8:12,15
 9:5 28:13
 30:11,25
 31:2
 39:15

43:2,24

2017
 155:1
 158:4,5

2018
 40:22
 139:7
 150:21
 153:18,
 19,25
 154:20
 155:5,15,
 23 157:25
 162:13
 171:13
 172:4,6,
 12,18
 180:9

2019
 4:2,6 8:2
 10:18
 17:14
 45:9 46:4
 161:16,17
 179:8

21st
 172:6

29
 4:2

29th
 4:6

2:21
 179:22

2:27
 179:25

2:30
 183:15,16

_____

**3**

3
 130:7

137:19,21
 138:4
 139:10

3.5
 130:8

30
 81:8,15
 92:2,17
 93:1
 104:21
 105:25

30-minute
 117:18

_____

**4**

4
 137:20,23
 138:1,5,
 15,16
 139:2

40
 81:7,8,15
 84:21
 92:2,17
 104:21
 105:25
 153:20,24
 154:4
 155:7
 156:16
 162:20
 163:19
 170:19
 174:6

45
 30:2
 173:23

47,500
 29:8
 30:24
 40:2



**48,500**
40:17

**5**

**5**
93:24
142:12,13

**50**
42:3

**55**
42:3

**5:00**
128:25
129:20

**6**

**6**
160:17,18
166:24
174:5

**60,000**
54:25

**7**

**7**
12:13

**8**

**8:00**
128:25
129:20

**9**

**9:00**
140:12

**9:53**
4:2,7

**A**

**a.m.**
4:2,7
52:8
103:3,6

**Abby**
4:17

**absence**
122:7

**absolutely**
18:14
85:5
105:21
109:13
118:24
127:3
130:20
134:10
136:6
146:4
150:7
158:8

**abused**
19:5

**account**
75:3
88:16
170:21

**accounted**
163:5

**accounting**
53:21

**accurate**
30:8 57:7
61:9,10,
12 62:8
139:15
146:20

162:21,22
167:3,5
170:14
175:3

**accurately**
162:15
170:11

**acquired**
8:11
22:14
23:6
28:6,12
29:12
30:25
31:3
157:12

**acquisition**
10:11
18:7
33:20
36:15
43:21
44:4
50:22
57:16
157:15

**action**
132:16
174:17
175:4,8,
11

**actual**
24:18
27:3
31:24
46:5
48:22
61:3
73:4,14
78:2,8
83:18
86:7 92:3
99:22
100:24,25

101:9
107:1
110:2
114:20
123:9
126:7
139:16
165:16,
19,21

**add**
162:17
163:5
170:25

**added**
46:13
141:23

**adding**
62:11
70:24

**addition**
176:22
177:16

**additional**
45:12
92:13
96:10
111:15
167:20,23
168:21
170:16
177:16

**address**
5:4
135:20

**addressed**
123:21
137:3

**adjust**
140:14

**admin**
79:13
80:11,17
81:3 82:3

140:3,12
141:1
153:11,22
154:3
163:3
173:10

**administrat
ive**
7:15
146:9
163:9

**advanced**
19:24,25
20:7,11,
18,23
21:2,5
22:3
23:5,11
24:1,7
25:7,12,
18 26:25
28:17
48:5,24
49:5 58:4
60:24

**advise**
134:3

**advised**
150:23

**affect**
24:10
80:1

**affected**
16:25
121:6

**affiliated**
18:4

**affirmative
ly**
152:9

**afterward**
82:11



agencies
  85:25
  86:2

agency
  7:21

agenda
  118:3
  139:8,11,
  16 140:16
  141:10
  142:5,8

agree
  8:20 30:7
  43:1
  55:19
  57:6
  61:14
  98:11
  112:22
  120:18
  123:6
  131:6
  142:17
  171:11
  176:23
  178:15

agreeable
  6:2,16,25
  7:6 10:15
  38:21

ahead
  25:2
  131:15
  148:7

alert
  110:16

Alexander
  72:6

Allconnect
  39:19
  176:6,7,
  20 177:24

allocation
  15:16

allowed
  15:25

alongside
  84:1

ambiguity
  10:9

amount
  15:18
  16:21,22
  17:1
  45:22
  77:13
  111:14
  112:1
  113:5,6,
  14,15
  122:9
  130:23

amounts
  109:22

analyzing
  145:7

annual
  30:18
  152:5

answering
  67:17,18

answers
  8:24

anticipated
  54:2

anymore
  89:8

apologies
  65:17
  67:15

apologize
  28:4 51:6
  174:11

application
  24:17
  27:8 32:3
  62:5 71:5
  74:14
  79:11
  83:20
  84:4,20
  87:7
  119:12
  124:14,
  15,18
  125:10
  126:10,23
  127:4,10
  133:18,20
  134:17
  145:17

applications
  145:8

applied
  15:10
  55:8

apply
  152:23

approach
  58:8

approval
  142:9
  164:9

approve
  142:4

approximate
  89:13
  154:12

approximately
  40:20,21
  47:17
  75:13
  80:25
  81:15

90:16
  91:25
  92:1

approximation
  105:2

Arkansas
  35:19
  38:12

arrange
  145:25
  146:7

aspect
  53:21
  58:15

aspects
  125:15

assigned
  36:18
  147:19
  148:1,25
  149:20,23

assignment
  148:23
  149:8

assist
  89:1
  146:2

assistance
  47:15,16,
  19,22

assisting
  57:21,22

assume
  54:2

assumed
  160:8

assuming
  82:10
  162:9

assumption
  14:12
  164:17

Atlanta
  46:4,17
  68:20
  84:17

attached
  135:13
  139:7
  140:16

attend
  117:4,5

attendance
  20:13,18,
  21 21:12
  22:4
  23:4,11,
  25 24:9,
  16 25:5,
  8,11,19
  28:18
  48:25
  49:4,8,9
  53:22
  60:23,24
  124:5

attended
  52:16

attendees
  125:19

attorney
  10:17

atypical
  107:24

audibly
  5:25

August
  4:2,6

automatically
  25:16



SUZANNE GREENE
SUZANNE GREENE vs TYLER TECHNOLOGIES

August 29, 2019
Index: aware..breaks

26:7
84:21
85:19
111:25
112:6

**aware**
94:21,23
114:25
134:2
178:19
179:1,10

———————

**B**

———————

**back**
6:24  21:1
26:7
28:15
32:7
46:22
48:14
51:5
52:7,9
55:7
56:23
60:17
72:24
78:4  86:6
95:9
97:20
102:23
103:5,7
115:22
123:16
135:15
137:11
147:12,14
169:7
170:7,13
179:24

**back-end**
75:16

**backgrounds**
122:4

**backup**
32:22

**Baltimore**
132:14

**base**
27:6,13
176:21

**based**
10:6
15:17
16:20,21
22:15
27:16
58:18
64:10
67:3
78:10,12,
15  80:10
84:8,10
96:20
101:7
110:17
112:1
120:11,19
134:25
144:3
148:13
164:14
167:13
178:12

**basic**
20:21
48:15

**basically**
24:12
45:18
62:7
72:23
89:7
120:8
135:7
136:1
140:24
141:6

**basis**
14:25
24:21
30:18
97:4
159:3
165:15
173:15

**began**
36:14

**beginning**
117:13
158:19
162:13

**believed**
154:6

**believes**
143:16

**Benjamin**
11:3,6

**big**
25:17
93:25
151:15

**biggest**
156:9
162:19
163:18,22
164:10,16

**bill**
135:8
157:4,7,
11,16,18

**billable**
28:24
111:8,9,
23  112:5
113:5,15
134:19,21
135:2
153:5,6,
10  154:5
156:10,

11,15
157:21,22
159:6,12
160:9
163:7
164:12
168:10,
12,13,16
171:9
172:15,
16,25
173:9,12
177:12

**billed**
111:14
115:15
116:8
164:10

**billing**
113:16
157:14

**bit**
48:14
55:7
69:19
72:2
73:20
74:13
90:7
93:13
123:19
133:7
140:20
146:16
154:23
158:2
181:10

**biweekly**
59:20
92:23
103:24
116:19
117:17
118:14

**blank**
38:22
39:2

**block**
87:3

**blocked**
129:1

**blue**
175:19

**bonus**
12:5
14:9,22
15:3,7,
16,17,19,
24  16:1,7
17:8
30:20
41:5
177:18,19

**bonuses**
14:24

**bought**
43:8

**box**
79:18
146:24
147:1

**break**
9:16
51:18,22
52:1,6
87:8
102:3
103:4,8
144:19
147:8,11,
15  179:23

**breaking**
141:6

**breaks**
31:18
96:12



129:4

**briefly**
112:19
114:1,15
144:1
150:12

**briefs**
91:7,10,
12,20

**bring**
41:14
45:21
163:21

**bringing**
68:24

**brought**
45:15
158:14

**budget**
106:5
109:19,
20,21
110:18
111:13
112:9

**budgeting**
109:18

**build**
25:21,25
26:2,7,
12,21
99:15
100:11,
13,14,18,
20,24

**building**
25:13

**buildup**
26:24

**built**
111:18

**bulk**
25:17

**bullet**
94:7
98:8,10
99:14
102:2
103:10
106:4,25
108:21
116:13
119:11,23
120:19
144:21

**bullets**
120:3,5
121:25
146:7

**bump**
29:9

**Burns**
12:22
14:1,5
34:17,20
152:1,2
164:15,18

**businesses**
178:3

**buy**
66:9

―――――――
        **C**
―――――――

**cable**
177:25

**calculate**
16:1

**calculated**
14:22

**calculation**
17:5

**calendar**
12:1  96:2
129:1

**California**
134:14
137:7
138:21

**call**
11:20
16:10,15
62:3
65:6,10,
13,15,21
66:3  73:2
76:5,10
79:14
82:25
104:6,10,
11,15
117:21
118:5,9,
23,25
134:9
148:19
156:24
177:22
180:2,12,
14,15,20,
23,24
182:12,
20,25
183:3

**called**
8:24  76:5
89:3
157:21,23

**calling**
19:6

**calls**
33:10
59:21
66:5,6
77:7,23
82:17

89:23
92:19
103:21,24
116:19,25
117:10,
11,17,18
119:8
126:21
177:8
180:8
181:4,23
182:7,13,
15  183:5

**care**
114:16
154:4

**career**
21:4

**Carolina**
35:2,4
72:7

**Carolinas**
35:3,9

**case**
8:25  9:20
42:4
51:13
55:19
69:7
132:5,10
161:1
163:17
164:19
172:11
173:14

**cases**
49:1
173:21

**categories**
77:22
82:15

**category**
60:13

**challenges**
94:4

**challenging**
131:16

**change**
14:11,21
16:15,18,
19,20
17:4
21:14,15
22:18,21,
22  23:24
24:22
27:23
28:5,10,
16,22
31:14
33:25
35:12
36:20
44:3,17
107:7
128:16
150:24
151:9
152:10,
21,23
160:2
172:13

**changed**
22:20
27:25
31:5
40:24
43:17
72:18
90:24
107:6
113:8
129:15,24
131:15

**changing**
107:1
158:6



**characteriz**
**ation**
  55:20

**charge**
  7:15,19
  75:4,9

**check**
  12:2,13
  42:5,24
  171:14
  175:19

**checking**
  79:18

**checklist**
  68:7
  69:15,17,
  18,20
  70:12
  94:25
  95:1
  96:12
  98:19
  102:11
  106:14,16
  109:2
  183:7

**checklists**
  64:22
  68:5
  94:15
  96:9
  101:17
  108:25

**chose**
  168:2

**chronologic**
**al**
  162:9

**Cindy**
  4:9

**circumstanc**
**es**
  25:23

88:9
168:25
169:2

**city**
  68:20,21
  84:16
  126:8

**clarify**
  15:6

**class**
  53:6
  126:18
  132:16

**classes**
  53:4
  127:23

**classroom**
  108:11
  123:22

**classroom-**
**type**
  108:6

**cleaner**
  6:15

**clear**
  49:20
  60:20
  66:7
  103:10,23
  104:4,17,
  18

**client**
  27:3,4,
  10,16
  31:24
  33:1,8
  57:11
  59:21
  62:1
  64:1,3,7
  65:3,22
  66:8,14
  68:2  69:5

71:20
72:3,5
76:6,12,
15,18,22
78:2,8,21
79:23
80:22
84:6,14
88:6,20
89:3,7
92:22
94:8
96:17
99:22,23
100:4
101:11
102:7,9
103:17,
20,25
105:9,12,
15,20,24
109:10,21
110:9,12
112:24
113:14
114:24
116:14
117:2,8,
25 118:8,
19 119:6
120:14,21
121:6,11,
12 125:2,
8,11
130:10,
11,14
131:16
133:18
134:3,13
140:1,11
142:1,3,4
146:14
149:14
150:17
159:17
164:9,13
181:9

182:1

**client's**
  27:20
  58:19
  59:1
  72:24
  78:12,15
  104:24
  105:4
  109:6
  133:19

**clients**
  54:2,3
  66:24
  81:2
  85:12
  90:17
  93:10,12
  127:20
  130:21,24
  178:4

**clock**
  26:9,10

**clocking**
  25:9,10
  62:10,11

**close**
  23:16

**co-project**
  48:6

**code**
  159:19

**codes**
  141:2

**coincided**
  43:20

**college**
  52:14,16

**comfortable**
  60:21

**commenced**

8:14

**commission**
  7:20
  177:16
  178:8

**commissions**
  176:17
  177:1,6,
  9,10,14

**common**
  25:19
  86:1
  108:1

**communicate**
  18:21,24
  85:3,7
  109:12
  131:3,11
  134:6,8

**communicate**
**d**
  18:15
  65:3
  109:24
  134:12

**communicati**
**ng**
  107:5
  118:18

**communicati**
**on**
  65:22
  147:25

**communicati**
**ons**
  64:10
  103:20
  122:3
  139:4
  140:1
  164:14

**commute**
  176:13



SUZANNE GREENE
SUZANNE GREENE vs TYLER TECHNOLOGIES

August 29, 2019
Index: comp..conversion

comp
79:16,24
84:17,19,
23 85:14
133:21,25
141:5

company
13:16
39:20
53:14
57:21

compare
111:13

compensate
41:5

compensated
176:20

compensation
12:5 14:6
16:8 17:9
19:1
28:16,20,
23 51:8
61:11
132:6

complain
42:12
130:21,24

complaint
19:10
41:18

complaints
128:13
131:4,7

complete
68:7
134:20

completed
68:7
94:18
102:15

106:17
125:23
170:4

completely
24:7
44:15
47:22
63:11
89:19
162:21,22
170:14
174:24

completing
159:14

computer
129:3,6

concept
42:16
61:24
63:13
157:24

concerned
27:1
53:16
82:13
92:4
94:16
101:3,17
144:25
156:11,14
159:13

concluded
183:16

conclusion
177:9

conduct
125:13
146:9

conference
151:21

confidence
113:24

confident
115:3

confirm
9:19
126:5

confused
91:2
129:14
153:15
169:5

conjunction
90:1

connection
18:19
55:24
63:25

consecutive
129:21,25

considered
181:17

consist
100:4

consistent
143:12
144:4,10

consistently
166:5
167:18
175:20

consists
20:17

consult
63:25
145:2

consultant
19:23
20:7 22:8
23:13
28:1,11
31:6,16

32:1,16,
25 33:11,
17 34:3
36:13
43:3,7,18
44:10,20
46:11
50:3 51:2
58:11,22
59:5,13,
19 65:12
75:5,25
77:10
90:9
91:19
95:7 99:2
104:23
111:2,12
114:6
115:12
123:21
128:22
142:17,19
143:13
144:5,11
147:18
151:3

consultants
16:11
22:19
35:17,23
36:6,9
131:20,25
132:3,4
150:23
151:9
152:11,24
164:22
165:5

contact
31:24
33:3 64:4
117:2
132:12
137:2

contacted
10:17
11:6

contemplated
73:8

contested
9:11

contesting
9:9

continue
33:7

continued
45:21

contract
74:24
75:1
112:16,
20,23
113:10,
19,20
114:4,17
115:17
116:6,11
130:12
149:1,13,
24,25
150:4,10,
13,14,17

contracts
66:14,18
113:21
114:1,11
115:1,5,7

convenience
147:6

conversation
42:18

conversion
145:4,7



SUZANNE GREENE
SUZANNE GREENE vs TYLER TECHNOLOGIES

August 29, 2019
Index: convert..cut

**convert**
133:20,24

**coordinate**
76:19
119:24
120:6

**coordinated**
120:14

**coordinating**
120:9,10

**cop**
48:12

**copied**
12:23

**copy**
55:5,8,9,
23 136:1
138:5

**correct**
8:13,15,
16 10:24
12:6
13:8,9
14:23
15:1
17:7,10,
17,22
20:19,20
21:13
22:8
23:14,15
27:18,22
30:12,17
32:9,17
33:12,13,
17,18,24
34:8,9,25
35:14
36:11,16,
20 37:1,5
41:9,10
43:21
44:5

46:13,14
48:17,18,
20,22
49:12,17,
18 50:11,
14,17,19,
20,23
51:3,10,
14 54:6,8
55:23
56:10
57:25
59:2
61:1,6,
13,22,23
62:21
63:14
64:1,11
65:4,6
66:10,16
67:22
68:10,11,
16 69:24
70:10
76:1
77:12
78:14
80:20
88:8
94:12
96:22
99:13
103:12,13
105:21
106:7
107:8,19
108:19,20
110:19
111:3,6
112:9,12
115:15
116:9,17,
20
119:10,21
121:23,24
123:5,14
124:2,6,

12,20
125:3,6,
7,11,12
126:10
129:7
130:9
135:12,13
137:18
138:22
139:1,5,
9,23
140:17
141:13,15
143:23
148:16
150:11
152:22
153:1,2,7
155:13
157:3
158:22
159:2,4
161:3,5
163:7,8,
15
166:16,20
169:16
171:10
172:7
173:1,25
174:1,2,7

**correction**
55:14
56:3

**correctly**
61:16
62:15
67:6
93:17
94:11
99:17
116:16
119:15
162:10

**counsel**

4:11,17
5:12 7:24
38:22
138:9
161:1,7
174:22

**count**
57:1

**County**
72:6

**couple**
5:24
72:12

**courses**
53:5

**court**
4:9,13
5:19
97:19

**covered**
59:14,15
160:5

**crammed**
127:22
128:2

**create**
27:15,19
49:11
50:15
94:3
95:19
118:3
139:16
144:22
145:15
146:13,17

**created**
49:24
95:20
98:20
139:11
145:20

**creates**
95:21

**creating**
144:24

**critical**
61:15
62:14

**cross**
41:23
42:8,14,
16,19

**cue**
147:22

**current**
5:3
100:17

**curriculums**
53:4

**curve**
24:13,19

**custom**
145:15,
16,20

**customer**
62:19
81:14
99:21
119:24
120:7
121:6

**customer's**
73:1

**customers**
48:16
120:16

**cut**
11:20
12:7



**D**

**data**
145:3,5,7

**database**
155:16

**date**
4:6 13:12
30:10
69:13
70:18
71:13
72:9,18
73:24
74:5
96:25
102:15
106:21
143:2
146:8
157:13
161:15
162:7
172:10
179:6
181:18,25

**dated**
139:6

**dates**
8:3
70:11,15
101:2
102:1
130:3
171:15

**day**
17:11,13
43:8
118:13
129:2
141:3,4
168:20
171:25

172:19

**day-to-day**
23:23
24:11,21

**days**
46:24
74:19
75:2,7,24
90:25
113:7
127:24
128:1,4,
10
129:12,21
130:1,2
163:3

**deadline**
109:8,11,
15

**deadlines**
64:15
70:2
94:10,14,
20,21,24
96:7,21
98:13,14
99:3
100:2
102:1
182:9
183:8

**deal**
20:3,15
53:25
63:10
76:24
113:22,25
114:11
138:20

**dealing**
96:14

**deals**
53:20

**dealt**
15:14

**December**
66:5

**decide**
84:14
85:1
122:6

**decided**
122:10

**decision**
22:1,15
23:9
84:18
85:4,7

**decisions**
23:18
84:3,5,8,
11

**decrease**
12:14
14:5

**decreased**
12:3

**dedicated**
19:13

**deduct**
111:25
112:6

**defect**
135:7,10,
12,17

**Defendant's**
29:24

**define**
177:13,
15,21

**definite**
175:2

**Del**

52:21

**Delaware**
52:21

**delay**
71:9 72:8
73:24

**delayed**
71:13

**delays**
183:7

**delegate**
102:6,9,
13

**delegating**
102:18

**delegation**
102:5

**delineating**
97:3

**delivery**
119:13

**department**
7:21 58:6
68:22
69:4
115:7
126:8

**departments**
20:4
25:14
68:23

**depend**
69:6
77:15
130:11
157:9

**depended**
168:9
170:3

**depending**

72:2
74:21
80:21
92:22
109:23
116:7
123:25

**depends**
10:3
75:14
81:6
121:10
168:10
169:24

**depict**
162:15

**deployment**
144:23

**deposition**
4:4 5:9
8:18 15:9
29:18
51:18
55:18
160:17
183:16

**depositions**
51:16
91:14,20

**depth**
26:17
141:6
182:20

**describe**
151:6

**description**
142:16
143:8,11,
21 159:22

**descriptions**
122:1



design
78:7,20
79:9,22
80:8,10
82:24
95:13,14,
24
101:19,22
117:14
146:9
149:15,16
150:8

designate
159:5

designs
31:22

detail
112:20
128:12
144:2
153:22

details
96:11

determination
111:15
134:23,25
171:1,3

determine
85:16,18
96:19
100:14
101:18
114:21
117:16
170:6
173:25

determined
15:19
117:12
136:4

developers
49:24

devoted
75:8

diary
166:3,15

Diaz
4:17

differently
98:23
129:16

direct
12:23
13:1 14:1
31:23
33:1,3
99:15

directions
32:23

disagree
145:19
164:24

disclosure
152:10

discrepancy
14:9

discrete
99:7

discuss
11:16
66:18
67:23
76:13
141:25
175:7
181:2
182:8,14
183:5

discussed
14:20
16:14
27:24
41:12
46:7

80:22
82:4
90:10
105:8
119:19

discusses
73:10

discussing
138:22

discussion
16:7
144:20

discussions
33:7
66:23
175:12

distinct
22:22
120:2,5

distinction
10:1,10
65:19

distributed
136:25

divided
60:22

division
19:14

document
15:12,23
56:18
94:24
107:2
141:20
142:11,
15,20
143:6,7,
15,22,24
144:9
146:1
165:12,
16,19,21,

22,23,25

documentati
on
146:14

documents
64:25
79:1,6
89:25
117:16
138:6,19
148:21
149:5,10,
12,19,20,
22 156:12
160:24
166:23
174:3

door
36:3

double
49:19
97:16

drafted
69:20,23
179:11

drive
149:5

drove
39:6

drug
72:10

due
96:3,11
101:2

duly
4:22

duration
44:12
74:17

duties
21:14,19

23:21
27:24
31:14
34:4 43:4
44:11
50:2 57:9
59:3,17
60:12,14
115:13
116:5,10
143:12
144:12

duty
50:6

_____

E

e-mail
14:7
16:13
17:24
65:7,8
84:25
89:8
104:3
137:5
139:3,6
140:15
148:18,19
156:25

earlier
44:1 77:6
88:5
158:24
181:9

easier
37:15

education
53:4

effective
119:25
120:9
121:1,16



**effectivene**
**ss**
  120:20
  121:5
  122:3

**elaborate**
  90:6

**elder**
  73:19

**employed**
  39:18
  40:4
  41:24
  53:10
  143:3,25
  175:7
  176:24

**employee**
  17:12
  19:5,8
  47:24
  51:7
  108:18
  135:13
  175:9,13

**employees**
  15:10
  68:9,13
  83:19
  86:9,15
  87:5,9
  124:15
  132:25
  133:4
  136:19
  164:20

**employees'**
  45:1,3

**employer**
  7:16 9:3
  10:14
  100:18

**employers**

  56:5,21

**employment**
  7:20 8:3,
  14,19 9:5
  10:13
  13:7,18
  17:20
  21:11
  22:1 34:7
  35:12
  41:18
  43:5
  44:12
  53:3
  55:25
  56:17
  57:15
  123:1
  129:17
  143:20
  158:19
  177:4

**encouraged**
  127:3

**end**
  17:21
  26:8
  44:18
  61:2
  63:16
  71:16
  81:4,22
  83:17
  86:14,21
  87:1,5
  92:14
  94:17
  97:2
  105:13
  106:12,17
  108:10
  119:19
  123:1
  124:1
  125:21,22

  129:17
  135:15
  137:12,17
  158:4
  159:24
  172:22

**ended**
  14:1

**engaging**
  122:4

**ensure**
  109:5
  116:15
  137:2

**enter**
  112:4
  159:21
  163:13
  166:14
  167:7

**entered**
  161:10
  162:23
  172:15

**entering**
  164:21

**entire**
  9:4 24:16
  68:21
  117:3
  129:2

**entirety**
  8:19

**entities**
  48:17
  54:4

**entitlement**
  178:18

**entries**
  161:4
  162:5
  166:3

**environment**
  122:15

**Eps**
  58:1

**equal**
  7:20
  153:20

**equaled**
  153:24

**equalled**
  156:16

**error**
  136:1
  138:18

**errors**
  136:3

**ES**
  159:23

**escalate**
  135:21
  136:7

**essentially**
  31:20
  34:5 61:2
  63:8
  67:13
  76:7 78:1
  90:18
  109:1,6
  124:16
  127:10
  137:4
  140:8
  182:1

**established**
  168:17

**estate**
  53:6

**estimate**
  13:20,21
  158:7

  172:1
  173:22,23

**estimating**
  13:14

**events**
  23:18

**everything'**
**s**
  127:12

**exact**
  13:12
  23:3
  40:23
  75:18
  143:6
  157:13
  161:15
  167:6
  179:6

**EXAMINATION**
  4:24

**examined**
  4:22

**examples**
  113:1
  133:22
  181:16

**exceed**
  84:21
  168:4

**excellent**
  122:3

**exclusively**
  19:13

**excuse**
  12:24
  37:9 55:6
  65:14
  78:4
  90:19
  133:21
  145:3



149:16

**Executime**
8:6,12,
15,20
10:13
13:8
15:11
18:4
19:14
20:2,10,
17 22:13
27:21
28:23
30:7,14,
25 34:7
35:22
38:1 41:1
43:21
48:17
50:22
57:15,23
60:21
62:5,10
66:9 74:3
124:14,18
125:10
157:8
176:25
177:5
178:16

**Executime/
tyler**
40:4

**executive**
125:9

**exempt**
98:1,2,3

**Exhibit**
29:22,25
30:5
55:15,18
137:21,23
139:2,10
142:12,13

160:17,18
166:24
174:5

**exhibits**
137:19

**existing**
145:7

**expect**
121:21

**expectation
s**
27:12
103:11,
19,23
104:5

**experience**
22:15

**expert**
115:9

**explain**
7:17
14:10
15:4

**explained**
11:21
17:4
45:24

**export**
92:15

**extent**
14:15
32:21
113:12
141:14
177:8

**extra**
138:8
170:1
173:20

―――――――

**F**

―――――――

**face**
180:19

**face-to-
face**
116:22

**facility**
107:13,
15,17

**facing**
146:14

**fact**
16:24
51:13
110:16
148:12

**factor**
112:7

**factors**
74:22

**fair**
44:2,10
71:23
75:22
82:6

**familiar**
48:12
58:7
114:7

**Fayettevill
e**
5:6

**February**
8:1,2,15
9:5 10:18
30:11

**federal**
29:5,8

**fee**
116:7

**feet**
72:10

**fell**
15:20
16:22

**felt**
41:25
42:2

**fence**
174:24

**fighters**
20:15

**figure**
45:19
172:20

**file**
45:2
140:3

**filed**
7:14
132:19
175:21

**files**
44:22
46:8

**fill**
26:23
38:24

**filled**
27:4,17

**find**
31:4
37:25

**fine**
65:18
158:7

**finish**
6:12

**finished**
6:19,24

**fire**
20:4,15
25:14
58:6

**firm**
10:23
13:6
132:10

**firms**
54:7

**fit**
20:12

**fix**
135:21,24
136:5

**fixed**
115:1
116:6

**flew**
46:3,22

**fly**
39:4

**FMLA**
17:15,18
122:7
161:20
174:13,16

**focused**
25:9
114:19

**forever**
48:12

**form**
148:18
156:7
158:20
159:11,18

**forward**
153:18



175:1

**found**
16:12

**fourth**
103:10
106:4

**Friday**
12:2
16:13
46:22

**Fridays**
26:6

**friend**
38:7

**front**
108:13
113:14
115:14

**full**
5:1 10:21
46:24
127:25
128:10
129:11
144:2

**function**
99:7

**functionalities**
125:16

**functions**
50:6
58:14
59:13
82:15
89:15
90:4 97:4
98:18
102:19
105:8
118:4

─────── **G** ───────

**gathered**
78:10

**gauge**
93:9

**gave**
37:7
46:10
85:14

**Geez**
52:24

**general**
15:24
34:2
46:10
50:12
91:24
122:1
138:20

**generally**
76:9
80:24
87:24
88:15
104:4
105:11
106:14
117:5,16
126:18
129:22
135:23
142:6
148:24
149:3,19
163:1

**generated**
178:6

**generic**
15:9 80:9
145:17

**gentleman**
122:16

**Georgia**
5:6 11:14
46:17

**gesture**
6:7

**give**
6:13
40:10
55:7 92:8
106:11
138:6,9
139:12
144:14
147:22

**giving**
91:17

**Go-live**
61:19
62:24
63:3,6,9,
20,21
67:8,10,
12,14
68:3,15,
21 69:13
70:18
71:13
72:9,18
73:24
74:5
87:14,17,
24 88:2,
18 89:6
108:25
109:15
181:18,25

**goal**
104:6

**goals**
103:11,
19,23
104:9

**golf**
151:14

**good**
8:8 20:12
40:10
53:25
76:13
134:15
152:17
160:20
173:4

**gosh**
42:22

**Gotomeeting**
119:2
156:24
180:21,22

**government**
7:15,21
48:17
54:4

**graduate**
52:13

**grasp**
131:17

**grasping**
130:22

**great**
40:15
93:10
100:23
153:21

**Greene**
4:4,5,20,
21,25 5:2
52:10
180:1

**ground**
5:13

**group**
68:22
87:6

123:25
136:15,16
182:11

**groups**
68:18

**guess**
22:7
27:20
34:23
41:15
47:22
56:25
57:6
67:21
68:6,13
69:5
71:21
77:13
79:14,21
81:25
82:3,11
85:11
89:12
96:1
119:5
138:18
152:11
153:14
172:19

**guesstimate**
92:2
154:9
158:11

**guesstimates**
89:17

**guesstimating**
81:7

**guidelines**
29:5

**guiding**
48:9



**guys**
148:25

---

**H**

---

**habit**
163:13

**half**
11:20
12:7
13:14,18
18:12
74:2
127:20
128:2,14
129:24
130:17
131:8,18

**hand**
61:21
72:2

**hand-off**
104:11

**handed**
70:14
142:21
150:4

**handle**
26:18
44:24
46:7
64:18
76:8 85:1
113:17
114:23
115:7

**handled**
137:8
164:3,5,7
181:24

**handles**
32:12

**handoff**
32:15,18,
25 33:12
75:5,10,
24 76:5
77:11,16
79:4,6
82:25
90:1 95:7
148:9,13

**happen**
45:6 72:4
88:12,14,
16 105:20
168:25
169:22

**happened**
6:23
23:16
37:3 44:9
45:7
107:14
169:3
171:19
182:25

**hard**
36:4
75:20
93:9,21
127:21
130:22

**harder**
73:20
121:13

**Harrison**
37:22
38:2
41:12
46:4,10
175:18

**head**
5:18
60:16
83:24

123:18
150:20

**hear**
165:7

**heard**
29:16
114:5

**hearing**
179:14

**held**
144:20
149:6
176:6

**Henderson**
37:19
138:25
139:4

**Herrington**
4:18,19
9:8,17,
22,25
10:7,18
11:2
29:16
52:2
53:24
97:8,11,
17,22,25
98:6
132:9
138:11,16
143:14
160:15
177:7
183:12

**Herrington's**
10:23

**hey**
40:14
42:3
65:23
85:18

96:24
100:1
106:20
148:25

**high**
52:24

**higher**
83:23
84:2

**highlighted**
95:12

**Hillary**
13:3
14:17
34:21
35:1
37:6,16,
17 40:13
45:21
122:23
164:1

**hiring**
20:14

**hold**
56:23
72:22,23
116:13
151:16
181:7,17,
19 182:2

**holding**
72:2

**Holly**
11:12

**home**
34:8,12,
22 35:13,
19,21
54:12

**honestly**
66:22
132:22

**honor**
56:3

**horrible**
114:10

**hostile**
122:15

**hotel**
151:18,19

**hour**
54:20
87:4 93:1
115:15
117:18
129:25

**hours**
28:24
41:6 42:3
51:8
84:22
90:20,25
109:22,23
110:4,7,
9,12,17,
21,23
111:1,4,
14,16,23
113:6,15
116:8
127:20
128:2,7,
10,14
129:24
130:5,6,
8,18
131:8,18
141:2,5
153:21,
23,24
154:4
155:7
156:10,17
157:21,22
158:20
159:16,22



160:10
162:15,20
163:19
164:12
165:14
166:13,
18,23
167:21,23
168:1,4,
20 170:1,
12,19
172:2
173:20
174:6
177:12

**house**
46:19

**Howell**
19:9,18,
19

**HR**
17:24
18:10
19:12
76:24
84:2
122:15

**Huh-uh**
154:18
166:6

─────────

**I**

**identificat
ion**
30:1
55:16
137:22,24
142:14
160:19

**identified**
98:19
162:16
174:4

**identify**
145:2
158:25
165:14

**identifying**
158:20

**imperative**
171:5,8

**implementat
ion**
16:10
19:23
20:6
22:7,18
23:13
27:25
28:11
31:6,16,
25 32:8,
16,19,20,
25 33:11,
16 34:3
35:17,22
36:6,9,13
37:4
43:3,7,18
44:10,20
46:11
47:10
50:3 51:2
58:11,22
59:5,13,
19 63:17
64:14
65:11,24
69:6
70:14
74:18
75:5,25
77:6,10
86:20
90:9
91:19
95:7 99:1
102:19

104:23
111:2,12
112:15
114:6
115:12
123:10,21
128:22
131:20,25
132:3,4
135:1
137:8
138:21
141:12
142:16,19
143:13
144:5,11
147:17,
19,20,25
148:2,4,
15 149:8
150:22
151:2,8
152:11,24
164:22
165:5
181:7
182:6

**implementat
ions**
47:18
48:3
66:15
80:23
81:13
93:15
94:3,9,13
96:15,17
104:22
119:7,24
120:7
181:3
182:9
183:6

**implemented**
158:15

**implementer
s**
180:14

**important**
32:6
168:13
170:23
171:7

**impression**
165:1

**improvement**
179:3,11

**in-house**
4:17

**incentive**
11:20
12:3,4,11
14:6
15:7,24
17:1
178:11

**incentives**
176:22

**incident**
42:8

**inclined**
126:25

**included**
66:21

**including**
92:4
118:4
119:14
164:21
173:10,11

**income**
178:17

**incorrectly**
7:4

**increase**
40:1,3,6,

11,15,16

**increased**
30:24

**independent**
51:1

**individual**
15:2

**ineffective**
121:20

**information**
26:22
44:22
59:1 78:9
101:23
124:16,17
125:2,9
126:6
127:22
131:17
149:4
150:9

**informed**
11:24
14:13
16:11

**initial**
11:19
44:23
48:7
58:18,23,
25 59:7,
17 77:7,
23 80:1,5
82:16
83:2
89:22
92:8,10,
12 97:1
104:6,10
112:15
124:19,21
140:8

**initially**



SUZANNE GREENE
SUZANNE GREENE vs TYLER TECHNOLOGIES

August 29, 2019
Index: inputting..large

20:9
22:12
34:19
45:14
139:19

**inputting**
86:8
159:20

**instance**
69:7

**instances**
68:12
126:11
168:7
174:6

**instituted**
160:2

**institution**
157:19

**instructed**
155:5
165:4

**instruction**
145:6
156:3,8,
19 165:7

**integrate**
26:22

**integrated**
124:22

**integrating**
45:1

**integration**
31:22
44:22,23
50:8 70:7
75:15

**integrity**
173:19

**intend**
173:13,17

**intention**
122:8

**interface**
33:1

**internal**
99:20
101:23
127:18
146:14

**internally**
84:25

**internet**
177:25

**interrupt**
78:18

**interview**
38:13,15
39:5

**interviewed**
41:13
55:1

**intimately**
114:11

**introduce**
4:11
76:11

**introduced**
155:22
157:25
162:11

**involve**
81:20,22
135:10

**involved**
63:4 64:2
99:4,9

**issue**
134:12,17

**issues**
18:23,25

59:24
67:4,20,
24 70:22,
24 88:23
131:21
134:16
182:17

**item**
68:6
153:12
165:2

**itemized**
97:3

**items**
45:23
96:2
102:14
111:9,23
153:11
157:14
170:5

─────────────

**J**

─────────────

**Jamie**
12:22
13:25
14:12
34:20,22
151:25
152:1,2
164:2,5,
15

**Jamie's**
14:14

**January**
39:15
45:9 46:4
66:5
171:13

**Jason**
58:1

**Jenkins**
4:10 14:3
48:4
57:24

**job**
21:14,19
23:20
24:21
31:4
40:10,15
42:1 43:4
50:6
53:8,22
56:10
57:9
59:12
60:10
91:5,10
101:11
122:2,11
123:7
142:18
143:8,11,
21 144:4
175:16
176:5,9

**John**
14:3 48:4

**journal**
166:2,14

**June**
8:12
28:13
30:25
31:1
43:2,24
54:18

**jury**
173:13

─────────────

**K**

─────────────

**Kathy**
31:9,11

38:16
39:11

**kind**
36:1,2,4
39:20
48:9,15
53:14
57:10,11
72:13
78:24
82:5 83:6
87:20
88:21
90:6 93:7
95:25
96:1,12
100:1
104:7
109:1,14
118:21
120:13
122:1
125:14
126:13
133:9
146:22
170:6

**kinds**
102:8

**knew**
41:8
64:6,9,23
85:8
99:10
169:9

─────────────

**L**

─────────────

**Labor**
7:21

**large**
12:13
24:13



law
  53:19
  54:7

lawsuit
  7:9
  132:5,19
  162:2
  175:14,22

lawyer
  11:18
  12:15

lawyers
  97:13
  132:9

lead
  99:15
  101:1
  121:16

leadership
  102:5

leads
  31:20
  32:19

learn
  24:15

learners
  74:6

learning
  24:13,19

leave
  17:15,18
  18:20,22
  39:2 87:9
  122:7
  161:20
  174:13,
  16,19
  176:11,14
  179:12

left
  13:16
  35:25

43:9
128:19

legal
  174:17
  175:4,8,
  11 177:8

length
  23:22

letter
  30:6
  39:14
  51:5
  132:11,
  13,18,21
  133:1,4

level
  34:2
  50:10,12
  62:17
  76:16
  82:17
  119:19
  138:20

levels
  59:23
  77:8
  133:12

liability
  9:10 10:4

Lindsey
  18:2,16
  19:13

lines
  118:10

lingering
  74:2

Linkedin
  56:25
  57:4

list
  134:25
  135:4

159:18

listed
  77:21
  82:16
  102:12
  156:15
  163:7,10

listen
  45:18

listing
  60:13

lists
  30:10,16

literally
  118:24

live
  35:18
  38:9,11
  61:24
  62:2,9,
  14,20
  69:9
  87:21
  88:17,20
  89:4

lived
  5:7

lives
  11:14

located
  18:13
  35:1
  127:12

location
  73:1
  81:15
  104:24

log
  118:25
  119:3

long

5:7 13:15
17:18
18:9 21:8
46:20
75:11
127:13

longer
  25:21
  34:3 54:3
  62:2
  75:18
  88:5
  153:3
  173:10

looked
  82:23
  114:1
  144:1
  149:23

lot
  35:18,24,
  25 36:3
  42:22
  48:10
  58:5
  71:24
  75:15
  86:1
  91:22
  130:20
  149:5
  163:2

lunch
  129:3
  144:19
  147:15

---

**M**

---

made
  10:1
  16:16
  19:10
  22:2,14

41:17
42:8,19
127:18
140:7,12
142:7
178:16

main
  105:14

majority
  25:12,24
  31:21
  33:8
  62:24
  71:21
  83:8
  89:21
  128:20
  167:19

make
  9:13
  10:5,10
  32:4
  43:14
  61:5,8,21
  62:7
  67:17,20
  81:12
  84:3,18
  99:23
  101:11
  104:5
  105:23
  107:7
  109:3
  111:15
  126:6,9
  134:22,24
  156:15
  165:10
  168:13
  171:2,4

makes
  84:6

making



6:7 88:25
120:11
140:9
162:19
163:19
176:13

**manage**
94:8
96:16

**management**
31:7
53:19
130:25
140:3
159:8

**manager**
11:25
17:25
18:10
19:13
22:13
23:14
27:2,25
28:10
31:5,15,
20 32:12,
22 33:6,
16,22
34:4
36:13,19,
23 37:8,
13,16,18,
21 40:8,
12,24
43:17
45:5,23
47:11,19
48:2,4,7
51:2
54:11
57:12,13
58:9
63:22,24
64:6,9,
13,17

67:24
69:22
70:3,11
73:10,12
75:3,9,19
76:20
77:18
78:7,20
80:22
83:24
84:1,2
88:1
94:16
95:19,21
98:17,20
99:2,25
100:4
101:8,10,
25 104:8,
14 106:20
107:7,25
109:4,12,
24,25
110:8,14,
16 111:18
112:1
117:5,7,
13 120:11
122:19,22
123:10
124:23
135:1
136:9
138:24
147:20,21
148:1,6,
15 149:8,
21,24
182:5,6,
12,23

**managers**
22:17
36:25
37:10
45:16
64:18

66:24
76:8,21,
24 85:17
123:11
151:8
152:12,25

**managing**
57:20
119:6
181:13

**manipulate**
126:15

**mapping**
145:3,5

**March**
17:14

**Marietta**
54:15

**mark**
29:21
137:19
142:11
160:16

**marked**
29:25
30:5
55:15,17
137:21,23
142:13
160:18
166:24

**market**
50:25

**master**
140:3

**matching**
67:5

**matter**
4:4 7:25
51:8
115:11
116:6

175:24

**Matthew**
4:18

**maximizatio
n**
121:17,22

**maximize**
119:25
120:22
121:2,7

**Mckeeby**
4:15,24
9:15,18,
24 10:2,8
11:5
29:21
30:3
51:25
52:9 54:1
55:17
97:10,15,
18,24
98:4,7
102:22
103:1,7
115:21,24
137:25
138:15,17
142:15
143:17,18
144:17
145:1
147:8,14
160:12,
16,20
177:10
179:19
180:1
183:10

**meaning**
103:15
110:21
164:7,8

**means**

61:25
107:3,5
113:13,25
145:14,18

**medical**
179:12

**meet**
27:2
76:12
99:16
118:25
180:16,19

**meeting**
12:1
64:14
94:9
98:12,13
109:6,11
116:12
118:5
150:21
151:3,7,
10,17,24
152:3,5,
20 154:16
156:24
158:14

**meetings**
33:2,9
116:14,
21,22

**members**
132:10

**memo**
156:20

**memorialize
d**
5:23

**Memphis**
38:10

**mention**
6:8



mentioned
33:14
40:2 50:9
59:14,16
60:22
62:18
77:6
82:5,19
83:5
84:12
87:13
93:14
103:24
116:19
119:18
122:17
137:7

mentions
30:20

met
46:9
108:25
116:15
162:20
163:19
182:10

methods
119:13

Michael
19:9

Michael's
19:16

mid-year
40:23

Mikeya
37:19
40:7,24
138:25
139:18

milestone
109:11

milestones
106:5

108:22,
23,24
109:1,7
116:15

mind
41:23
42:8,14,
17,19
58:4
116:2
144:15
148:3
157:7

minimal
88:11

minus
129:3

minute
165:10

minutes
93:1
179:20

mistaken
141:21

misunderstood
118:12

Mitch
10:19,25

Mitchell
11:3,4,6

mixed
105:18

model
144:22

models
144:24

modification
146:3

modifications
140:6,10,
11 142:7

modified
141:11

modify
146:16

module
20:1,23
21:15
24:14,20,
25 60:24,
25

moment
12:23
139:12
142:22
144:14
174:25

Monday
46:22

money
176:13
177:16
178:24

monitor
88:21

month
44:5
171:20

monthly
14:25
180:2,8,
12,13,15
181:23
183:3

months
10:12
17:19
21:9 22:1
47:21

57:14
154:2,7,
15

moon
175:19

move
22:2 73:4
175:1

moved
28:17
38:10

multiple
37:12
45:16
72:19
90:17
93:15
94:8
96:15
119:6,8
127:15
128:23

multiple-
day
152:3

municipalities
48:19

municipality
76:17

_____

N

_____

names
45:2,3

narrative
159:11,18

nature
62:12
156:13

necessarily
49:7
68:17
83:7
100:20
105:19
116:23
118:6
121:9
135:16
142:9
146:17

needed
45:22
64:25
67:25
68:6,7
74:12
89:1
106:6
110:7,17
111:16
117:4
122:2
126:5
140:6,11
155:6
170:4,23
171:5

needing
11:17

negative
49:20
97:16

neglected
51:17

news
160:20

nice
72:13
122:20

nicer
89:9



nodding
    5:18 6:1
    70:8 83:1

North
    35:1,4,7
    72:7

noted
    78:24

notice
    148:14,17

noticed
    12:13

notificatio
n
    148:22
    149:7

notify
    110:7

notion
    145:20

November
    150:22
    153:18,
    19,25
    154:16
    172:12,
    18,21

number
    111:22
    159:21
    162:15
    165:14
    166:22
    170:5,12
    172:2
    173:25

numbering
    138:18

numerous
    67:6 71:1

— O —

O'RYAN
    53:13
    54:5,17,
    20 55:2,
    24 56:6
    57:13
    58:9,20
    59:4

oath
    5:15 7:12
    52:11
    169:18

object
    9:12
    177:8

objection
    9:21 10:5

objections
    9:13

objective
    61:4 79:7

objectives
    99:16
    100:2
    101:5,6,
    15,19

observed
    73:12

obtain
    7:24

obtaining
    161:6

occasion
    18:17

occasions
    107:24
    137:14

occur
    28:5
    29:11
    44:3
    77:11,25
    80:19
    83:14
    105:9
    117:20,23
    120:10
    121:23
    127:14
    128:16

occurred
    44:4
    62:19
    67:12
    82:20

occurrence
    42:7

occurring
    134:2

occurs
    76:4 82:5
    83:6

October
    171:13,16
    172:6

offer
    30:6
    39:14
    51:5
    145:16

office
    34:11,23
    54:14
    136:19
    151:15

officer
    26:3

officers
    20:15
    25:14

offices
    151:11

older
    71:21

on-site
    33:9 73:2
    119:14
    128:21
    129:19
    139:8,11
    140:16
    141:10

on-the-job
    47:3,5

one-on-one
    182:13,15

onsite
    81:9

open
    170:4

operating
    61:22
    62:15

operation
    126:13

opportunity
    7:20
    30:21

opposed
    6:1,5
    10:12
    23:4,13
    24:1 37:3

option
    21:1
    79:15

options
    85:8
    112:23
    113:2

order

20:22
    67:19
    77:25
    82:20
    162:9

original
    73:24

originally
    73:7

outline
    98:5

oversee
    88:21

overtime
    41:9,20
    42:10,13,
    16 54:22
    132:6
    133:18,
    21,25
    135:11,19
    141:4
    173:14

overview
    140:13
    141:1
    144:7

— P —

P-A-S-C-H
    13:4

p.m.
    183:16

paid
    14:24
    29:1
    54:19,21
    115:14
    177:23

paid-in-
full



113:9,19,
20 114:4

**paper**
72:15

**parallel**
62:3,4,7,
25 64:8
83:9,13
86:6
87:7,14
88:24
89:5

**parallels**
87:21

**Parker**
4:8

**part**
22:25
24:14
32:12
34:20
44:13
60:10
63:1
66:14
69:13,14,
16,24
84:9
106:3
114:14
127:6
144:6,7,
10 145:12
148:4
150:11
167:22

**party**
7:8

**Pasch**
13:3,6,10
16:7
37:17
40:13
123:13

131:4,12
150:23
151:23
164:1,19
179:10
180:2
181:22
182:7,23

**pass**
65:13
68:2

**passed**
29:9
63:14
64:15
65:2,21
67:1,11,
19 87:22

**passing**
63:25
65:24

**past**
143:16

**Paulo**
4:15 9:8

**pay**
51:9
113:14
141:2
171:12
172:22
178:12

**payout**
12:10

**payroll**
60:25
61:3,5,8
76:24
83:24
92:15

**people**
31:19
33:15

35:20,25
36:3 57:1
60:7
69:12
71:5,22
77:1
85:22
86:8
100:6,8
122:4
123:25
178:5
180:16

**percent**
81:8,15
91:11,16
92:3,18
104:21
105:25
167:3

**percentage**
80:25
89:14
90:3,13
91:10,24
92:8
93:3,6
178:7

**perform**
61:16
77:15
91:21
106:1
111:5

**performance**
179:3,11

**performed**
15:10
17:12
58:11
77:9
80:24
104:22

**performing**

115:13
143:13

**period**
17:21
48:3,7
51:9
74:23
110:1
158:18
171:12
172:22

**periodic**
33:10

**periodically**
64:13
161:10

**periods**
36:19
162:16

**person**
18:16
49:14
77:3
117:2
122:25
129:9
136:22
137:2

**phases**
77:5

**phone**
65:6,10,
14,21
116:19
148:19
156:24

**phones**
72:1

**phrase**
114:6

**physical**

17:13

**pick**
72:24

**picking**
71:17

**piece**
32:6

**pilot**
87:6

**pin**
89:18

**pitch**
50:25

**place**
46:16
68:16
100:7
158:1
172:13

**places**
79:16
100:9

**plaintiff**
4:20

**plan**
15:3,8,24
69:25
70:1
77:19
95:2,3,5,
15,18
96:6
101:9,20,
21,24
102:16
106:23
109:5
110:3
111:19
114:20
145:12
179:3,11



planned
    94:10

plate
    63:11

played
    120:20

point
    8:8 13:10
    22:7,10
    23:12
    27:21
    31:25
    33:23
    34:17
    42:15
    43:16
    62:13
    75:23
    76:6 88:5
    106:19
    108:22
    119:5
    126:22
    143:9,10,
    19
    148:22,24
    149:2,13,
    25 150:2
    153:7
    155:4
    158:23
    176:24
    177:4
    180:4

police
    20:4,14
    25:14
    26:3
    48:11
    58:5

policies
    27:5,8
    58:19
    78:10,13,

15 79:10
101:23

policy
    135:14
    156:20

populate
    25:16
    26:8
    84:21
    85:19

populating
    133:19
    135:11,19

portion
    61:8
    87:12
    110:3

portions
    81:9

position
    10:3
    19:21
    38:1,13
    41:2
    54:10
    55:2
    57:12,13
    68:15
    142:16
    176:11

possession
    165:13

possibility
    175:8

possibly
    83:24
    84:1
    154:23

postpone
    70:17

postponed
    74:5

postponing
    109:15

potentially
    9:13

power
    71:15
    73:15
    78:3,5
    80:11,16
    81:3,20
    82:2,9
    83:21,22
    86:21
    90:19
    92:12
    102:11
    105:12
    106:16
    108:10
    119:19
    124:1
    125:20
    126:2,3,
    12,21
    127:6,9,
    10,14,16
    128:8,24
    129:6,15,
    18,19
    130:18
    131:2
    137:10,16
    159:16

Powerpoint
    125:4

pre-handoff
    150:11

precise
    89:17

precisely
    69:3

preference
    20:25

preferences
    79:14,15,
    18 85:12
    135:15

preparation
    66:15

prepare
    136:12

prepared
    125:5

prepping
    92:14

present
    55:4 56:2

presented
    39:14
    55:24
    56:5

presided
    151:23

pretty
    80:9
    102:16
    109:9
    146:19
    171:24

prevent
    67:7

previous
    170:8

previously
    103:15
    153:8

price
    115:1

primarily
    20:3 32:1
    39:21

principal
    144:12

print
    174:12

prior
    13:25
    14:2
    44:21
    78:5
    89:25
    92:5 95:6
    106:13,
    15,17
    125:5
    153:19
    154:16,19
    157:1,4,
    15,19
    179:12

problem
    49:22
    137:3

problems
    134:2

procedures
    27:6,9
    58:19
    78:11,13,
    16 101:24

PROCEEDINGS
    4:1

process
    23:1 24:8
    32:9,13
    46:1,5
    63:17
    64:23
    65:24
    74:18
    75:4
    80:5,16
    82:6
    83:3,6
    86:4
    87:17,19
    102:20



114:14
133:11
145:4
150:11
158:25

**processes**
32:20

**produced**
55:18
160:25
172:10

**producing**
61:3

**product**
139:25
145:3,4
146:2

**program**
155:17

**programming**
26:13,16

**progress**
106:10
109:19
181:3
182:8

**project**
22:13,17
23:14
27:2,25
28:10
31:5,15,
19,20,21
32:11,22
33:6,16,
22 34:4
36:13,17,
19,22,25
37:8,9,
10,13,16,
17,20
40:8,24
43:17

45:5,23
47:10,19
48:2 51:2
54:11
57:12,13
58:9
63:21,24
64:6,9,
13,17,18
66:24
67:24
69:22,25
70:1,3,11
72:22
73:4,6,9,
12 75:3,
9,19
76:8,19,
21 77:18
78:7,20
80:22
83:23,25
84:1
85:17
87:25
88:16
92:11
94:10,16
95:2,3,5,
15,18,19,
21 96:6
97:1
98:12,13,
17,19
99:2,16,
19,23,24
100:3,4,
18,21
101:5,6,
8,9,10,
15,20,21,
24,25
102:16,20
103:11,14
104:7,14
106:4,19,
23 107:7,

24 109:4,
5,12,25
110:3,8,
14,16
111:15,
18,19
112:1
114:20
117:4,6,
7,13
120:11
123:11
124:23
136:9
138:24
144:23
147:21
148:6,13
149:18,
21,23
150:5
151:8
152:12,24
166:10
181:11,13
182:5,12,
23

**projects**
37:5,11,
13 57:20
71:8
75:17
182:18

**promoted**
37:7 40:8

**proofing**
145:6

**proper**
145:3

**properly**
61:6,22
63:4
68:14

**provide**

53:18,19
56:20
121:1
145:6
161:7

**provided**
100:17
115:1
121:20
123:20

**providing**
119:12,25

**provision**
150:16

**proximity**
23:17

**pulling**
124:9

**purchase**
20:22,23
109:22
110:9
115:17

**purchased**
48:16

**purchases**
66:9

**purchasing**
48:22

**purposes**
5:14 8:17
162:1
166:22

**push**
74:11
106:21

**put**
25:13
33:15
37:4
38:22

42:23
44:19
72:13,23
74:25
77:18
78:8,20
94:16
102:17
109:4
124:22
126:10
139:22
140:2
153:23
156:20
158:1
159:11,23
162:8
165:10,11
168:12
170:15,24
171:5
181:6,18,
19 182:2

**puts**
101:25

**putting**
72:21
102:1

_____

Q

_____

**QA**
146:2

**qualifier**
165:20

**quantifying**
166:22

**question**
6:11,14,
20 7:2,6
10:6,9
15:22
30:4



36:21
42:17
43:11
54:3 56:8
59:10
67:18
74:16
75:21
81:12
83:4 86:1
88:13
97:9,19
98:21
100:23
107:10
113:18
115:18,
19,25
116:1,3
118:12
141:9
147:16
152:18
156:18
170:8
177:2

**questioning**
144:18

**questionnaire**
27:3,14,
16 31:23
78:6,19
79:8,21,
22 80:8
82:23
89:25
95:12,24
117:15
150:8,14

**questions**
8:23
32:23
48:15
58:2,6,7

78:24
88:23
89:4
125:18,
22,24
183:11

**queue**
136:24

**quick**
146:15

**quote**
26:12
29:7,17
61:19
72:22
111:8
114:8
135:16
142:9
181:17

─────────

───── R

**ran**
59:24
67:5

**range**
92:25
93:25
154:24

**ranged**
93:21

**rare**
88:9

**rate**
176:21

**re-characterize**
105:23

**reach**
47:23

58:3 64:5
106:19
118:7
132:17

**reached**
11:22
12:14,15,
16 40:9

**reaching**
131:1

**read**
94:10
97:11,20,
21 99:17
102:22,24
115:21,23
116:16
119:15
143:25
144:2,12
146:24
183:13

**reading**
145:25

**ready**
64:15
66:25
72:24

**real**
10:20
53:6
173:24

**realize**
9:10

**reason**
7:4
11:17,19,
21 14:11
16:15
74:8
81:18
123:15
130:16

166:17

**reasoning**
16:17

**reasons**
105:14
109:17
132:5

**recall**
13:12
15:12
16:5 18:2
23:3
47:12
66:20
132:15
156:23
174:14
180:6

**receipt**
146:8

**receive**
17:2
28:19,23
47:3 51:7
54:22
64:22
132:18
148:14,21
156:3,19
176:17,25
178:7

**received**
55:10
132:11
133:5
164:15
177:5

**receiving**
28:20
42:13,16
132:25
136:2

**recent**

76:9

**recently**
90:24

**recognize**
161:1

**recollection**
162:10

**recommend**
110:11,15

**recommendations**
85:21

**recommended**
11:8

**record**
4:7 5:1,
15 6:15
11:2
52:5,8,10
97:21
102:24
103:1,3,
6,8
104:18
105:2
115:23
147:10,
13,15
153:4,5
155:2,10
156:4
159:9
164:23
165:5
166:3
168:2,8,
21
169:12,20
171:18
179:22,25
183:15

**recordation**



152:10

**recorded**
150:24
152:21
165:2
168:14,16

**recording**
153:6,8
155:6,15

**refer**
60:21
116:18

**references**
119:12

**referred**
11:7,9
174:21,23

**referring**
9:4 33:3
43:6
65:19
76:16
99:20
116:24
119:21
181:9

**refers**
86:18

**reflect**
105:3
170:11

**refresh**
162:10

**regard**
6:9

**regularly**
116:14
183:1

**reiterate**
100:1
101:3

**reiterating**
102:16
104:7

**relate**
18:25
19:3
119:5

**related**
17:5
50:6,9

**relates**
60:25

**relayed**
165:9

**relevant**
163:20

**rely**
45:22

**remain**
22:17
87:10

**remainder**
21:10
32:19
43:5

**remained**
44:11

**remember**
14:16
38:18,19,
23 39:1
66:19
117:14
157:12
158:17
161:15,
21,23
179:7

**remind**
9:9

**reminder**

118:22

**remote**
34:22
80:25
81:5
128:1,15
129:18,23
136:18

**remotely**
80:20
130:19

**reoccurring**
119:2

**repeat**
97:9,19
98:21
102:21
115:19
120:23
152:13
177:2

**report**
34:10,14
54:14
73:11
99:11
145:15

**reported**
122:14
123:1,12

**reporter**
4:9,13
5:20
97:20

**reports**
145:16,
17,20

**represent**
4:12,16
160:25

**representin
g**

4:19

**request**
64:22
84:23

**requested**
47:1

**requesting**
64:25
182:2

**required**
26:9 92:5
106:15
146:3
154:3

**reserved**
151:13

**residential**
5:3

**resignation**
9:6

**resigned**
17:20

**resolve**
12:17

**resolved**
12:25

**resolving**
36:3

**respect**
10:4 88:6
129:16

**responded**
14:18

**response**
14:14

**responsibil
ities**
23:23,24
24:11,22
44:19

45:13
46:12
59:18
87:16,18
88:6,19
90:4 94:8

**responsibil
ity**
26:12
98:14
111:11
149:9

**responsible**
88:15
137:1

**responsive**
59:10

**restate**
152:15

**result**
21:15
37:3 61:3
70:21
74:6
109:15
124:18

**resulted**
17:8
73:23

**resume**
55:5,8,9,
10,19,23
56:4,9,
12,16,21
57:3,7
94:6
99:15
100:17
103:9,16
107:1
108:22
112:9
116:13
119:6



SUZANNE GREENE
SUZANNE GREENE vs TYLER TECHNOLOGIES

August 29, 2019
Index: retired..sense

120:25

**retired**
20:14,15

**return**
122:6

**review**
40:14
66:14
79:3
94:24
95:22
111:13
112:16
114:13,15
144:4
149:2
150:3,10

**reviewed**
95:6,10,
11

**reviewing**
78:17
79:8
101:19

**revise**
106:5,25

**revised**
106:21

**revising**
106:8

**reword**
36:21

**Rock**
34:24
35:19
38:11
39:4
136:15,
16,18,20
150:22
151:11,15

**role**
15:11
20:6
26:24
43:7
46:11
59:8
91:18
120:21
141:20
145:12
176:16,17

**roles**
22:16
33:23
58:10
77:15

**room**
129:2
151:13,
14,21

**rotated**
35:24

**rotates**
26:3

**Rotell**
18:16

**Roto**
18:3

**rule**
51:21

**rules**
5:13
51:16

**run**
83:10
90:20
126:7,9,
25 127:2
134:15

**running**
117:7

**runs**
61:21

**rushed**
90:23

**Ryto**
18:3

_____

_____

S

_____

**safe**
173:18

**salaried**
41:2
42:1,23
51:7

**salary**
29:3,4
30:16,24
40:1,3
41:4
54:19,21,
24 177:17

**sale**
178:7,8,
17

**sales**
39:21
49:3
50:22,24
66:12
115:6,10
176:9,17
178:16

**Saturday**
162:18,24
167:7,10,
12,19

**Saturdays**
162:25

**scenarios**
64:5

**schedule**
26:1,2,7,
13 27:15,
19 87:3
96:20,24
106:12
117:11,24
118:3,9,
19 142:1

**schedule-wise**
94:4

**scheduled**
12:1 16:9
116:14
118:23
119:1
128:17

**schedules**
25:13,15,
22 27:6,
14 97:3

**scheduling**
19:24,25
20:8,11,
18,23
21:3,6
22:3
23:5,11
24:1,7
25:7,12,
18 26:25
28:17
48:5,25
49:5 58:5
60:24
65:16

**school**
52:25
72:14

**scratch**
89:12
172:3

**screen**
124:9,12
125:1
126:14

**screens**
180:25

**screenshot**
161:8
171:12
172:18,23

**screenshots**
161:4
162:5,14
166:25
170:11
172:6,9

**seasoned**
71:22
73:19
93:12
121:11

**seasonedness**
74:8

**self-study**
146:20

**sell**
50:18

**selling**
177:24
178:2

**send**
84:24
99:5,11
119:2
137:5
140:10
141:10

**seniority**
17:6

**sense**
15:9 50:2



71:14
82:19
89:19
90:2

**separate**
8:24 20:1
22:22
23:8,18
79:1
86:25
95:23
128:4
180:17
183:3

**separately**
8:23

**separating**
22:16

**series**
78:23

**serve**
47:18

**service**
56:10
66:8

**services**
17:12
111:5

**session**
125:6
127:15
128:5,24

**sessions**
127:15
128:23
129:25
146:10

**set**
74:23
79:11
94:20
98:12

103:10,
18,22
104:4,8
107:10
112:2
118:12,16
139:19
140:5

**sets**
70:11

**setting**
118:18

**setup**
24:8 32:1
36:14
58:18,23,
25 59:7,
17 77:7,
23 80:2,
6,9 82:17
83:3
89:23
92:5,9,
10,12,13,
16,17
97:1
110:24
124:14,
19,22

**share**
180:25

**shared**
149:5

**Sheldon**
5:5

**shifts**
26:4

**short**
52:6
103:4
110:1
130:23
144:20

147:11
179:23

**shortly**
36:15

**shot**
136:4

**show**
15:8
110:4
125:15
127:12
174:4,5

**shown**
172:24

**shrugging**
6:1

**side**
19:24
20:11,13,
16 24:7,
9,17
25:9,11,
20 26:17
58:5
66:12
117:8
136:25
150:15
173:18

**sides**
24:24

**sign**
65:1
183:13

**signed**
16:2
39:14

**similar**
53:15
57:13,17
133:1
143:7

**simple**
79:17
135:14

**simply**
42:17

**simultaneou**
**sly**
94:9
96:17
119:7

**single**
128:24
153:12
165:1,10
167:19

**sink**
45:19

**sir**
5:16 6:17
7:1 12:8
17:22
19:2 21:7
22:5
23:19
28:14
30:9,19
32:10,14
33:5 36:7
37:14
38:6,8,
14,25
39:12,16
41:3,7,22
43:15,19,
22,25
49:16,25
51:4,12,
15 52:12
53:11
54:6,13,
23 55:3,
21 56:1,
11,14,19
57:5,8

58:13,24
59:11
60:5,11
61:17
62:16,21
63:15,18
64:11
65:5
66:1,17
67:22
71:11
75:6 76:1
77:4
78:14
79:2,25
80:3,18
81:17,21,
24 82:7
83:8,15
84:7,15
85:5,10,
15 86:10,
19,23
87:15
93:4,18
94:19,22
95:4,17
96:8,10,
22 97:8
98:15
99:18
101:16
104:1,12,
25 105:6
108:8,12
109:9
110:22
112:11,
17,25
115:10
118:1,20
119:22
121:3
122:5
124:3,7
125:7,17
133:14



137:10
138:7,23
143:10
148:10
149:11
151:22
152:7
153:16
154:25
155:3,11,
18,21,24
156:6
160:23
161:2,18
162:3,6,
17 163:11
165:18
166:5
167:20
168:18
169:11
170:20
171:10,16
172:8
173:16
174:2,8
175:5
176:10,
15,18
179:4
180:21
181:5,20
182:24
183:9

**sister**
11:10,17
174:22

**sister's**
11:11

**sit**
45:25
76:10
86:14
129:2

**site**
56:10
72:1
73:3,5,8,
15 80:20
81:1,3,19
82:10
104:19
105:5,9,
11,20,24
127:24,25
128:3
137:9
159:17

**sits**
136:15,16

**sitting**
108:15,16
114:10
123:24

**situation**
62:22
63:2
71:12
72:17,25
135:18

**situations**
63:8
70:16
71:16,20
72:3 85:2
122:14,
19,24
181:12

**skills**
102:6

**Skype**
39:9
180:23,24

**slightly**
24:3
74:11

**slow**

74:6

**small**
93:6

**smaller**
93:2

**smart**
71:25

**software**
20:1,3,
17,21
22:3,4,23
24:1,2
26:14,21,
25 27:13,
21 39:22,
25 48:22,
25 49:12,
23 50:1,
7,10,13,
16,19,25
53:15,17,
20 57:10
59:25
60:22
61:5,15,
16,20,22
62:10,15
63:3
66:10
68:10,14,
25 73:21
74:7
80:14
84:13
119:12
120:1,12,
22 121:2,
8,17,22
124:6
125:1,15
127:1
131:9
135:19
145:8

**specific**
12:10

**solution**
31:22
78:7,20
79:8,22
80:8,10
82:24
95:13,14,
24
101:19,22
117:14
149:15,16
150:7,15

**sort**
20:5,21
21:3
23:17
32:6,23
45:3 46:8
48:6
60:13
71:8 92:6
94:19
110:25
115:8
118:2
139:17
163:4
170:3
182:18

**sounded**
21:25

**sounds**
165:20

**South**
35:7

**speak**
110:8
127:1

**speaking**
104:4
117:6
129:22

21:18,23
27:5,8
36:17
42:7,18,
25 60:6
78:10,12,
15 102:14
136:21
140:25
169:9

**specifically**
15:15
23:7 73:7

**specifics**
34:1

**spend**
141:1
165:11

**spending**
89:20

**spent**
89:15
90:3
91:25

**split**
81:4

**spoke**
110:13

**staff**
146:2

**stage**
112:15

**standard**
145:16

**standing**
123:23,24

**start**
30:10
32:3
54:16



SUZANNE GREENE
SUZANNE GREENE vs TYLER TECHNOLOGIES

August 29, 2019
Index: started..taking

68:23
75:19
83:19
88:2
122:11
127:4
155:6
157:14
180:4

**started**
8:5 20:9,
10,14
21:5
22:12
23:25
25:5
30:13
40:25
44:25
48:8 66:4
111:21,22
131:1
140:19
154:21
155:14
157:10
158:24
173:8
180:3,7,
8,17
183:2

**starting**
46:7
128:18
130:13,21

**starts**
139:3

**state**
4:12,25
6:5 76:17

**statement**
97:6,7,14
121:4
177:3

**States**
48:19

**status**
183:6

**stay**
101:12

**stayed**
36:1
37:8,9

**step**
46:6
48:14
80:16
147:23
148:6

**steps**
63:22
76:14

**stick**
35:8

**stood**
98:18
99:3,10

**stopped**
113:4

**stress**
122:9,12

**Strong**
102:5

**structure**
15:17,20
45:20
178:11

**struggled**
127:17

**stuff**
44:25
58:3 64:8
75:16
76:13
148:7

151:14
164:4
177:25
181:1
182:21

**submit**
84:22
136:11,22

**substance**
131:7

**subtract**
110:5

**successful**
87:21

**successor**
9:10,11
10:4

**suddenly**
23:12

**suggest**
10:5

**Sunday**
162:18,24
167:10,
12,19

**Sunday's**
167:7

**Sundays**
162:25

**super**
81:4,23
83:17
86:1,11,
15,17,22
87:1,11
92:14
94:17
105:13
106:13,18
108:10
119:20
124:2

125:21
137:12,17

**supervisor**
11:23
12:17,20,
22,24
13:2,7,
11,13,15,
17,23
14:2
34:16
84:24
86:18
87:11
159:24

**supervisor'
s**
11:23
12:21

**supervisors**
76:25
86:9,13,
16 87:10
163:23

**support**
20:7 50:4
63:9,10,
14,23
64:1,16
65:2,13,
21,25
66:7,19
67:1,11,
14,19
68:2
87:23
88:3,7,14
89:8

**supported**
21:12
50:1

**supporting**
21:5,16
22:2,23

23:10,25
25:5,6

**supposed**
12:11
46:1
88:21
94:18
106:17
156:4
164:22

**surgery**
181:14

**suspect**
9:25

**Suzanne**
4:4,5,20,
21 5:2

**swear**
4:13

**swim**
45:19

**switched**
23:4

**sworn**
4:22

**system**
79:13
124:12
126:14
140:2
158:1
159:6,20

_____

**T**

_____

**tailor**
141:12

**taking**
5:20,22
116:22
162:4



175:8

**Talia**
  37:22
  38:2
  46:4,9
  64:21

**talk**
  6:12
  9:15,16
  14:4
  23:22
  89:20
  123:19
  131:24
  132:3
  133:7
  138:19
  175:15,25
  181:22

**talked**
  82:1,2
  85:17
  89:21,22,
  23 132:8,
  24 133:3

**talking**
  6:14
  28:25
  67:9
  82:14
  91:23
  132:2
  149:13
  163:23
  169:7

**tasks**
  59:3
  77:22
  102:6
  146:9

**teaching**
  50:7

**team**
  31:19

33:15
36:12
50:22,24
77:1 88:7
99:23
100:3,8,
11,15,19,
21 102:20
103:15
117:3
124:24
136:10,14
178:16
181:13

**teamed**
  36:18

**teams**
  99:16,19,
  20 100:25
  101:1
  103:11

**tech**
  52:21
  124:23
  136:10,
  14,21
  137:2

**technical**
  7:3 10:13
  26:15,17
  44:25
  49:14
  53:7
  67:20
  70:22,24
  135:25

**technically**
  57:1

**Technologie
s**
  4:5,16
  8:4,6

**telephone**
  180:20

**template**
  111:18
  139:18,20
  140:4,9,
  17
  141:11,17

**templates**
  26:23
  146:16,18

**ten**
  36:6
  100:8
  170:1

**tenure**
  9:4 21:11

**term**
  7:4 50:2
  108:21
  114:3
  133:9,10
  177:11

**terms**
  23:9,20,
  23 24:20,
  21 26:11,
  21,24
  33:8
  48:11
  50:7 53:4
  57:9
  59:12
  73:12
  80:23
  81:1
  82:15
  98:17
  99:3
  107:2
  113:23
  115:12
  116:5
  117:19
  124:25
  128:17

132:5
138:18
144:11

**test**
  61:21
  62:3,4,7

**testified**
  4:23
  57:24
  88:4
  143:18
  164:19
  165:3

**testimony**
  5:20 7:11
  30:23
  32:6
  93:16
  133:10
  167:9
  168:19
  170:10

**testing**
  63:1 64:8
  83:9,13
  87:8,14
  88:24
  89:6
  146:3

**thing**
  6:8 29:9
  64:16
  80:4
  109:14
  156:9
  162:19
  163:18,23
  164:11,16
  177:18

**things**
  5:25 19:7
  20:4
  21:2,3
  25:4,11

26:17
32:23
45:3 46:8
48:11,21
53:21
58:16
60:6,9
62:11
67:7
71:2,7,8
79:12
83:11
86:2
90:10,12
91:6 92:5
94:18
98:18
99:1,3,10
101:3,17
102:8,10
108:24
110:24
112:14
115:8
121:1
122:1
126:23
127:5
139:17
153:10
156:11,
13,22
167:8
170:5
181:15,21
182:16,17

**thinking**
  42:11
  158:13

**thought**
  67:18
  71:18
  75:22
  95:11
  97:16,25



**three-hour**
  127:23
  128:5

**throw**
  111:22

**Thursday**
  97:2

**Thursdays**
  26:5

**ticket**
  88:10
  136:11,
  12,22

**tickets**
  26:19

**time**
  4:6 8:2
  15:18
  16:12,21,
  23 20:13,
  18,20
  21:12
  22:3,19
  23:3,4,6,
  10,25
  24:9,15,
  16 25:5,
  8,10,12,
  19,24
  28:17,21
  29:14
  31:2,10
  32:24
  34:20
  35:23
  36:19
  37:3
  38:5,12
  39:24
  40:14,23
  44:7,8
  45:8,9,
  10,11
  46:3,6

  47:24
  48:25
  49:4,7,9
  51:18
  53:22
  60:23
  61:9,10
  62:11
  64:7 67:5
  70:24,25
  71:3,6
  72:14
  73:21
  74:13
  75:3,8,19
  76:22
  77:14
  79:5,16,
  24 81:16
  82:25
  83:7
  84:17,19,
  22,23
  85:14
  86:8
  89:14,21
  90:3,13
  91:12,16,
  24 93:3,
  16,20
  94:3
  96:15
  106:2
  108:15,16
  110:1,5
  112:4
  118:13,23
  121:13
  124:5
  126:17
  127:21
  128:14,20
  129:17
  130:17,
  18,22,23
  131:2,8
  133:21,25

  135:8
  139:14
  140:25
  141:5
  142:24
  144:12
  147:22
  150:25
  152:10,21
  153:4,5,
  7,9
  154:1,3,
  7,12,17,
  18,21
  155:2,6,
  10,15,20,
  22,24,25
  156:5,15
  157:1,2,
  4,5,7,16,
  18,19,25
  158:18,24
  159:1,12,
  14 161:4,
  9,11,13,
  22 162:5,
  11,16,23
  163:6,9,
  13,14
  164:21,23
  165:6,11
  166:3,24
  167:6,8
  168:8,11,
  13,16,21,
  22,23
  169:13,19
  170:16
  171:19
  172:5,15,
  25 173:8,
  9,10
  174:18,
  19,22
  180:6
  181:10
  183:11

**time-wise**
  23:17

**timeline**
  104:8
  106:5

**timelines**
  182:21

**times**
  6:9 8:22
  45:16
  72:19
  105:25
  139:17,
  22,24
  140:5
  141:22
  163:2
  169:9,18

**timesheet**
  153:20
  155:8
  156:16
  164:16

**timesheets**
  160:14
  164:4,6,
  11 174:4

**timing**
  77:16,17

**tips**
  146:15

**title**
  22:6,10,
  19 27:24
  28:10
  31:5
  43:17
  44:3
  76:18
  94:7
  123:8,9
  142:18

**titles**
  22:18

**today**
  5:10 7:12
  23:22

**Today's**
  4:6

**Todd**
  4:8

**toes**
  138:1

**told**
  8:10
  15:15
  38:2 44:1
  82:22
  95:11
  104:20
  152:20
  153:3
  156:22
  158:10
  169:8
  175:21,25
  176:3

**top**
  60:16
  123:18
  150:20

**tos**
  146:15

**total**
  168:20

**touch**
  175:17

**touched**
  74:22

**track**
  69:19
  101:13
  106:4
  109:19



112:8
154:18
159:15
166:13,17

**tracked**
153:13
154:1,7,
16

**tracker**
155:18,
20,22
157:2,19
158:1,25
161:4
162:5,11
164:21
165:6,11
166:24
168:22
170:24
172:6

**tracking**
111:2
154:21
156:10
173:9

**train**
45:25
60:7
130:18
145:11
146:22

**trained**
45:8,11,
12,17,24
68:14
131:9

**training**
32:2 33:9
45:21
46:10,15,
20,25
47:4,6
50:8

58:15
59:6,16
69:8,10
70:5
71:10,14,
17 73:2,
13,14,16
77:7,22
78:3,6
80:11,17
81:1,10,
20,23
82:2,3,9,
16 83:3,
14,18,22
84:9 85:8
86:7,12,
14,17,18,
21,22
87:9
89:22
90:13,14,
18,20
91:21,22,
23,25
92:3,13,
15 97:2
105:5,13
106:1,13
107:11,
13,14,18
108:6,9,
14 110:21
119:13,
14,18,20,
25 120:9,
10,20
121:1,5,
11,16,21
123:20,22
124:1,4
125:1,5,
14,20,23,
25 126:2,
15,22
127:7,9,
11,14,16

128:5,9,
21,24
129:16,
18,20,23
134:4
137:11,
16,17
140:3,12
141:7
146:10,21
156:21
159:16,
23,24
160:5

**trainings**
106:14

**transcript**
5:23
38:23

**transfer**
63:22

**transferred**
23:10

**transition**
65:15,16
88:14

**translate**
91:18

**travel**
60:4,6,7
77:8,24
82:8,18
105:14
127:24
145:25
146:8

**traveling**
60:9,10

**trigger**
148:8
149:9
178:17

**trouble**
74:7
136:4

**troubleshoot**
83:12
135:8
163:4

**troubleshooting**
32:2
59:24
62:18,25
77:9,24
82:4,12,
18 83:5
89:24
93:5,8
105:18
110:24
133:8,13,
15
134:18,20
135:3,5,
9,24
145:12
156:12

**true**
55:23
97:6,7,13
121:4
155:12
177:3

**truthful**
57:7

**Tuesday**
141:3

**Tuesdays**
26:4

**Turlock**
134:14
137:7
138:21
139:8

**turn**
21:2
79:13
149:17

**TV**
177:25

**two-hour**
87:3

**two-month**
17:21

**Tyler**
4:5,16
8:4,6,11,
18,20 9:4
13:8,19
15:11,19
16:17
17:6,12
18:23
21:11
22:1,14
29:12
30:25
31:17
33:15,20
34:7
36:14
41:19,24
43:8,21
56:17
57:16
58:12,22
59:5,14
63:5
70:17
81:14
99:20
104:23
108:18
122:2,7,
10 123:2,
16 127:18
132:25
133:4
143:4,20,



SUZANNE GREENE
SUZANNE GREENE vs TYLER TECHNOLOGIES

August 29, 2019
Index: Tyler's..utilizing

25 145:8
151:11
157:12,15
160:9
163:24,25
175:7,9,
12,13
176:6,8,
24,25
177:5
178:16
179:3

**Tyler's**
18:7

**type**
53:17
64:16
99:11
111:24
114:17
133:15
135:23
147:24
160:5
168:11

**types**
19:6
91:22
112:23
113:2
115:5
119:17
134:18
136:3

**typical**
35:16
74:17
89:2

**typically**
65:11
66:3
74:19
75:24
76:19

77:25
80:16,18
81:19,21
83:14
85:6
93:19
100:5
105:9,22
107:21,22
108:17
127:14
129:8,10
180:20

**typing**
29:20

———————

**U**

———————

**uh-huh**
70:6
90:11
91:8,13
117:22
123:3
152:2
164:2
169:14
170:9
174:9
179:16

**ultimately**
39:13
73:23

**unaware**
165:1

**uncommon**
70:20

**understand**
5:15,19
7:3 8:11
15:7
19:12
30:6
32:5,11

34:13
35:15
36:24
43:16
52:10
56:7
57:10
61:18
74:21
90:5
91:19,21
93:16
101:12,14
104:5
107:13
115:24
121:15
154:11,14
166:12
168:15

**understanda
ble**
7:6

**understandi
ng**
19:15
20:24
24:19
51:11
56:4
121:14
130:15
152:19
160:1
164:20

**understood**
41:1,4
51:6
67:11
95:9,10
99:24
120:12
123:12

**unique**
25:15

35:16

**unnecessary**
19:7

**unquote**
26:12
61:19
72:22
111:9
135:16
142:10
181:17

**update**
99:2
106:22
139:17,20

**updated**
98:17

**updates**
99:5

**updating**
64:12
110:2

**uploaded**
55:9
56:9,13,
24 57:3

**uploading**
44:22
45:2 46:7

**ups**
83:23
84:2

**user**
73:15
78:3,5
81:4,5,
20,23
82:9
83:17,21,
22 86:7,
11,14,17,
21,22

87:1,11
90:19
92:12,14
94:17
97:2
102:11
105:12,13
106:12,
13,16,18
119:19,20
125:20,21
126:21
127:7,9,
11,14,16
128:8,24
129:15,
18,19
131:2
137:10,
12,16,17
138:17
159:16,24

**users**
71:15,16
86:15
87:5
108:10
124:1,2
126:2,3,
12 129:6
130:19
145:2

**utilize**
27:13
62:10

**utilized**
56:16

**utilizing**
32:3
59:25
83:19



—————————
         V
—————————

vague
    145:22
    146:4

vagueness
    9:23

varied
    167:13
    170:3

varies
    100:7,10

variety
    119:13

vary
    71:1
    74:21
    81:19
    116:7
    125:11
    133:11

verbally
    19:5

verbatim
    14:16

versa
    81:5

versions
    56:15

versus
    4:5 81:1

vice
    81:5

videos
    45:19

violated
    8:10

vis-a-vis
    98:18

visual
    134:17

voluntarily
    176:14

—————————
         W
—————————

wage
    177:17

Wait
    30:3
    138:11

waiting
    6:19

walk
    125:14

wanted
    40:10
    84:13
    107:11
    150:18
    154:4
    156:14
    172:5

warrant
    69:9

watching
    127:11

ways
    57:17,18,
    19 103:22
    104:1,2

web
    107:14

web-based
    119:14

Wednesday
    96:25

Wednesdays
    26:6

119:1

week
    26:4,5
    42:4
    46:21,23
    88:2
    92:20
    96:20,23
    117:23
    119:8
    130:4,6
    153:24
    158:21
    167:16,
    21,23,24
    168:2,4
    169:19,25
    170:12
    173:21

week-to-
week
    97:4
    165:15

weekend
    163:13
    171:20,
    22,25

weekends
    163:1
    169:10,19
    171:18

weekly
    33:10
    59:20
    77:7,23
    82:17
    89:23
    92:19,23
    103:21,24
    116:18,25
    117:17,20
    118:8,14,
    22 126:21
    134:9

159:3
    173:15

weeks
    44:5
    126:20
    150:5
    170:1,2

word
    19:6

worded
    140:24

work
    17:13
    42:3,24
    50:8
    54:12
    63:3
    71:25
    74:13
    91:24
    115:16
    122:15
    124:19
    133:8
    140:13
    148:5
    163:2
    164:23
    167:11
    169:18
    170:1
    171:17

worked
    34:8,12,
    22 35:19,
    20 37:10,
    12 41:6
    48:2
    50:12
    51:9
    57:25
    58:2
    112:4
    123:12

153:12
    158:21
    162:16
    163:1
    165:14
    166:23
    167:8,10
    168:22
    169:10,19
    170:12
    172:2
    173:14,20
    174:6
    178:11

working
    35:13
    38:4
    39:24
    42:22
    54:17
    75:19
    88:10
    90:9,14
    110:5
    111:24
    137:6
    153:11
    166:11
    171:25

workload
    167:13
    169:25

works
    38:25
    175:23

workshop
    140:22,23
    141:4,23

workshops
    140:19
    141:23

worried
    97:14



**worries**
  51:24

**write**
  91:7,12,
  20

**writing**
  72:15
  91:10

**wrong**
  49:3

_____

**Y**
_____

**y'all**
  9:9

**year**
  5:8  8:2
  13:14,18
  18:11
  40:6,7,22
  52:23
  54:18
  74:2,12
  161:16

**years**
  16:22,23
  17:5
  18:12
  52:18
  72:12
  86:4
  169:7

