# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| SUZANNE GREENE,<br><br>Plaintiff,<br><br>vs.<br><br>TYLER TECHNOLOGIES, INC.,<br><br>Defendant. | Civil Action No. 1:19-cv-1338-AT |

## DEFENDANT TYLER TECHNOLOGIES, INC.'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF SUMMARY JUDGMENT

Pursuant to Local Rule 56.1(B)(1), Defendant Tyler Technologies, Inc. ("Tyler") submits this statement of material facts to which it contends that there is no genuine issue to be tried:

1. In February of 2016, Plaintiff began her employment with ExecuTime Software, LLC ("ExecuTime Software"), which was acquired by Tyler in June 2016. Pl.'s Dep. 8:11–16, 22:12–13.

2. After Tyler acquired ExecuTime Software, Plaintiff moved from a project manager position with Executime Software to an implementation consultant position in Tyler's Executime business unit. Pl.'s Dep. 22:12–20.

3. Plaintiff's resume accurately summarizes the primary duties, responsibilities and skills associated with her position as an implementation consultant for Tyler:

> Employer: Tyler Technologies
> Title: Implementation Consultant
> Duration: February 2016 – Present
> Job Duties
> - Manage multiple client implementations simultaneously, while meeting all project plan deadlines.
> - Build, lead and direct project teams to meet project objectives
> - Strong leadership and delegation skills
> - Set clear expectations and goals for project teams. Track progress against timeline, milestones and budget, revise as needed
> - Hold regularly scheduled meetings with the client to ensure that milestones are met
> - Provide software application training using a variety of delivery methods including web-based and on-site training
> - Coordinate new customer implementations, providing effective training to maximize use the software
> - Excellent communication (written and oral) and interpersonal skills
> - Effective at engaging with people from all backgrounds and work industries

Pl.'s. Dep. 55:17–56:1, 57:6–8; *see also* Pl.'s Dep. Ex. 2, Pl. Suzanne Greene's Resume.

4. After a client purchases the ExecuTime software, a Tyler project manager and implementation consultant are assigned to work with the client to implement the software based on a schedule of tasks and events. Pl.'s Dep. 31:17–32:3.

5. While the project manager makes the initial contact with the client to assess and determine the client's specific requirements, the project manager then "hands off" the client to the implementation consultant who completes the implementation process. Pl.'s Dep. 32:11–23.

US_ACTIVE-152639456.2

6. After the project manager transitioned a client to her, Plaintiff as the implementation consultant, worked directly with the client, often at the client's physical location, with little supervision. Pl.'s Dep. 32:18–33:13, 77:5–12, 107:17–22.

7. During Plaintiff's tenure as an implementation consultant, she handled anywhere from five (5) to twenty (20) different implementations at a time. Pl.'s Dep. 93:14–24.

8. Given the various deadlines and tasks involved with each implementation, part of Plaintiff's job involved regularly analyzing the status of the various implementations to determine her priorities and schedule for the week. Pl.'s Dep. 96:19–97:5.

9. Plaintiff's job duties broke down into four main areas: (1) setting up the software based on the client's data policies and procedures; (2) conducting training sessions for the client's employees; (3) helping troubleshoot issues identified during the implementation process; and (4) ensuring project deadlines were met throughout the implementation process. Pl.'s Dep. 32:24–33:13, 50:1–11, 58:9–24, 59:23–60:1. 98:11–15, 108:21–109:13.

10. Plaintiff performed her implementation consultant job duties either from her home or at a client site. Pl. Dep. 34:6–9, 60:4–7.

11. Throughout the entire implementation process, Plaintiff ensured the client understood the implementation objectives and remained on schedule. Pl.'s Dep. 101:5–13.

12. Plaintiff conducted weekly or bi-weekly calls with clients to discuss the status of the implementation to ensure that deadlines were met and that the project stayed on schedule. Pl.'s Dep. 59:17–60:7, 103:22–104:1.

13. Plaintiff exhibited "[s]trong leadership and delegation skills" by deciding which specific implementation-related tasks needed to be delegated to the client's internal project team. Pl.'s Dep. 102:5–25.

14. Plaintiff routinely updated her project manager on the status of the implementation and those updates included her assessment and advice as to whether the client was meeting deadlines. Pl.'s Dep. 64:12–17, 183:3–9.

15. If Plaintiff believed a client could not meet a particular deadline, she would recommend that the implementation milestone deadlines be changed or, if necessary, that the client purchase more implementation hours based on the budget. Pl.'s Dep. 106:8–107:8, 109:10–17, 110:11–19.

16. Plaintiff also recommended whether or not the client was ready to "go live"—i.e., transition from implementation to Tyler's support team after the software implementation process was completed. Pl.'s Dep. 63:6–64:11, 66:23–67:25.

US_ACTIVE-152639456.2

17. On certain occasions, Plaintiff recommended that a client's scheduled "go live" date be delayed either because of technical issues or because the client needed additional training to be ready to use the software in live production. Pl.'s Dep. 70:16–71:2, 71:12–72:4.

18. For example, Plaintiff once recommended that a client's "go live" date be delayed because the client's employees had a difficult time grasping the technology. Pl.'s Dep. 71:12–74:14.

19. The project manager accepted Plaintiff's recommendation and, as a result, the client's "go live" date was pushed out so Plaintiff could conduct additional on-site training with the client. Pl.'s Dep. 71:12–74:14.

20. Conducting client training on the ExecuTime software represented an important part of Plaintiff's job duties and comprised roughly 30% to 40% of her time as an implementation consultant. Pl.'s Dep. 91:24–92:18.

21. The effectiveness of the training she conducted directly impacted the client's ability to use the ExecuTime software. Pl.'s Dep. 121:20–24.

22. Proper use of the ExecuTime software is "critical" to the business and operations of Tyler's clients because it ensures their employees—i.e., city and state employees—are scheduled for work and paid correctly. Pl.'s Dep. 60:20–61:17, 54:1–6.

US_ACTIVE-152639456.2

23. About 30% to 40% of client trainings occurred on site at a client and required Plaintiff to travel to the client. Pl.'s Dep. 81:7–17, 125:8–25, 107:17–22.

24. Plaintiff conducted the other trainings remotely. Pl.'s Dep. 80:15–81:5.

25. Like the format, the substance of the trainings varied by client. Pl.'s Dep. 125:8–25.

26. Before each training, Plaintiff would communicate with the client regarding the upcoming training and then modify training agendas based on client feedback to create a custom agenda specific to the client's training needs. Pl.'s Dep. 139:6–14, 141:9–142:10.

27. Typically, during the trainings—both remote and on-site—Plaintiff would be the only Tyler employee present and would both ask and answer questions with trainees. Pl.'s Dep. 107:17-22, 108:17–19, 125:8-25.

28. Performing troubleshooting on client issues with the ExecuTime software represented another core area of Plaintiff's job duties. Pl.'s Def. 59:23–60:1, 93:5–13.

29. Troubleshooting involves a variety of issues with the software—e.g., overtime not populating, inability to convert overtime to comp time—that the client would raise with Plaintiff either during their weekly calls or during a training. Pl.'s Dep. 133:15–134:10.

30. To resolve a troubleshooting issue, Plaintiff would determine: (1) whether the issue was billable to client or involved a non-billable software defect, and (2) whether it involved a training issue or a technical issue. Pl.'s Dep. 134:21–136:2.

31. If the troubleshooting issue involved a defect within the software, it was Plaintiff's responsibility to escalate the issue to Tyler's technical team. Pl.'s Dep. 136:3–13.

32. If the troubleshooting issue involved a training issue or a technical issue, Plaintiff would be responsible for troubleshooting and resolving the issue herself. Pl.'s Dep. 135:18–136:2.

33. In March 2019, Plaintiff took leave under the Family and Medical Leave Act ("FMLA") for two months. Pl.'s Dep. 17:11–19.

34. Following her FMLA leave, Plaintiff resigned her employment. Pl.'s Dep. 17:18–22.

35. During her employment with Tyler, Plaintiff received a salary of $45,000 per year or more. Pl. Dep. 40:1-17; Pl.'s Dep., Ex. 1, Plaintiff's Offer Letter.

36. Tyler paid Plaintiff's salary as a fixed amount every bi-weekly pay period. Pl. Dep. 51:5-15; Pl.'s Dep., Ex. 6, Plaintiff's time records.

8

37.     The classification of implementation consultants as exempt under the FLSA was in part based on the advice of outside legal counsel.  30(b)(6) Dep. 16:3–18:21

US_ACTIVE-152639456.2

Respectfully submitted this 6th day of April, 2020.

    */s/ Paulo B. McKeeby*
R. Daniel Beale
Georgia Bar No. 043880
dan.beale@dentons.com
Maxwell R. Jones
Georgia Bar No. 451289
max.jones@dentons.com

303 Peachtree Street, NE
Suite 5300
Atlanta, GA 30308
Telephone: +1.404.527.4000
Facsimile: +1.404.527.4198
**DENTONS US LLP**

Paulo B. McKeeby
Texas Bar No. 00784571
pmckeeby@reedsmith.com
Amanda E. Brown
Texas Bar No. 24087839
aebrown@reedsmith.com

2501 N. Harwood St., Suite 1700
Dallas, TX 75201
Telephone: +1.469.680.4200
Facsimile: +1.469.680.4299
**REED SMITH LLP**

**COUNSEL FOR DEFENDANT**