IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

SUZANNE GREENE,

Plaintiff,

vs.

Civil Action No. 1:19-cv-1338-AT

TYLER TECHNOLOGIES, INC.,

Defendant.

## MEMORANDUM OF LAW
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Plaintiff Suzanne Greene's ("Plaintiff's") deposition testimony establishes that her job as an implementation consultant involved managing, directing, and leading Defendant Tyler Technologies, Inc.'s ("Tyler's") clients to successfully deploy software that is crucial to Tyler's clients' businesses.  Plaintiff's regular, extensive, and unsupervised client interactions, as well as her high level of responsibility, are the hallmarks of an exempt employee under the Fair Labor Standards Act ("FLSA").

Moreover, case law involving similar positions—i.e., those that involve implementation of software for an employer's clients—have consistently resulted in judicial determinations that employees like Plaintiff are properly classified under the FLSA's administrative exemption.   In those cases, the courts emphasized the

1

employees' direct client interaction, minimal supervision, decision-making skills, and ability to make recommendations that affected the client. Plaintiff's primary duties as implementation consultant for Tyler required her to perform all of these functions on a regular basis.

In sum, based both on Plaintiff's own testimony and existing case law, there is no genuine issue of material fact that Tyler properly classified Plaintiff as exempt under the FLSA and that she is not entitled to any overtime compensation.

## I.    BACKGROUND

### A.    Factual Background

Tyler provides integrated software and technology services (including software implementation services) to the public sector—e.g., states, cities, counties, and school districts.[1]  In February of 2016, Plaintiff began her employment with ExecuTime Software, LLC ("ExecuTime Software"), which Tyler acquired in June 2016.[2]  Thereafter, Plaintiff worked as an implementation consultant in Tyler's ExecuTime business unit, which provides time and attendance and scheduling software for government entities.[3]

---

[1] Ex. A, Pasch Decl. at ¶ 1.
[2] Ex. B, Pl.'s Dep. 8:11-16, 22:12-13; Ex. A, Pasch Decl. at ¶ 2.
[3] After Tyler acquired ExecuTime Software, Plaintiff moved from a project manager position with ExecuTime Software to an implementation consultant position in Tyler's ExecuTime business unit. Ex. B, Pl.'s Dep. 8:11-16. The job duties of the project manager position with ExecuTime Software were largely the same as the job

As an implementation consultant, Plaintiff directly interacted with Tyler's clients to manage the roll out of the ExecuTime software.[4]  As she explains in her own resume, Plaintiff's primary duties, responsibilities and skills as an implementation consultant for Tyler included:[5]

Employer: Tyler Technologies
Title: Implementation Consultant
Duration:   February 2016 – Present
Job Duties
- Manage multiple client implementations simultaneously, while meeting all project plan deadlines.
- Build, lead and direct project teams to meet project objectives
- Strong leadership and delegation skills
- Set clear expectations and goals for project teams. Track progress against timeline, milestones and budget, revise as needed
- Hold regularly scheduled meetings with the client to ensure that milestones are met
- Provide software application training using a variety of delivery methods including web-based and on-site training
- Coordinate new customer implementations, providing effective training to maximize use the software
- Excellent communication (written and oral) and interpersonal skills
- Effective at engaging with people from all backgrounds and work industries

1.   Overview of Software Implementation Process and Plaintiff's Job Duties

After a client purchases the ExecuTime software, a Tyler project manager and implementation consultant are assigned to work with the client to implement the

---

duties for an implementation consultant in Tyler's ExecuTime business unit. Ex. A, Pasch Decl. at ¶ 3.  ExecuTime Software classified its project managers as exempt employees.  Ex. A, Pasch Decl. at ¶ 3.

[4] Ex. A, Pasch Decl. at ¶ 4.

[5] Ex. B, Pl. Dep., Ex. 2 Pl. Suzanne Greene's Resume, 55:17-56:1, 57:6-8 (acknowledging her resume is truthful and accurate).

software based on a schedule of tasks and events.[6]   While the project manager makes the initial contact with the client to assess and determine the client's specific requirements, the project manager then "hands off" the client to the implementation consultant who thereafter leads the implementation process to completion (known as "going live" in a production environment).[7]   At her deposition, Plaintiff testified that, after the project manager transitioned a client to her, she worked directly with the client, often at the client's physical location as the only Tyler employee present, with little daily supervision.[8]

During Plaintiff's tenure as an implementation consultant, she handled anywhere from five (5) to twenty (20) different implementations at a time.[9]   Given the various deadlines and tasks involved with each implementation, part of Plaintiff's job involved regularly analyzing the status of the various implementations to self-determine her priorities and schedule for the week.[10]   According to Plaintiff, her job duties broke down into four main areas: (1) setting up the software based on the client's data policies and procedures (which she had to identify and understand); (2) conducting training sessions for the client's employees; (3) helping troubleshoot

---

[6] Ex. B, Pl.'s Dep. 32:11-23.
[7] Ex. B, Pl.'s Dep. 32:11-23.
[8] Ex. B, Pl. Dep. 32:18-33:13, 77:5-12, 107:17-22.
[9] Ex. B, Pl. Dep. 93:14-24.
[10] Ex. B, Pl. Dep. 96:19-97:5.

issues identified during the implementation process; and (4) ensuring project deadlines were met throughout the implementation process.[11]  Plaintiff performed her implementation consultant job duties either from her home or at a client site.[12]

        2.    <u>Managing the Client's Implementation Schedule and Recommending a Course of Action</u>

Throughout the entire implementation process, Plaintiff ensured each client understood their unique implementation objectives and remained on their unique schedule.[13]  For example, Plaintiff testified she conducted weekly or bi-weekly calls with each of her active clients to discuss the status of the implementation to ensure deadlines were met and that the project stayed on schedule.[14]  Plaintiff also testified that she exhibited "strong leadership and delegation skills" by deciding, on her own, which specific implementation-related tasks needed to be delegated to the client's internal project team at any given time.[15]

While the project manager remained involved at a high level throughout the implementation process, Plaintiff dictated the course of the implementation through

---

[11] Ex. B, Pl.'s Dep. at 32:24-33:13, 50:1-11, 58:9-24, 59:23-60:1 98:11-15, 108:21-109:13.
[12] Ex. B, Pl. Dep. 34:6-9 (testifying she worked at home); 60:4-7 (testifying she traveled to client for training).
[13] Ex. B, Pl. Dep. 101:5-13.
[14] Ex. B, Pl. Dep. 59:17-60:7, 103:22–104:1.
[15] Ex. B, Pl. Dep. 102:5-25.

her recommendations to the project manager.[16]  For example, Plaintiff testified she routinely updated her project manager on the status of each implementation she was handling, and that those updates included her assessment and advice as to whether the client was meeting project deadlines.[17]  If Plaintiff believed a client could not meet a given deadline, she would recommend that the implementation milestone deadlines be changed or, if necessary, that the client purchase more implementation hours based on the budget.[18]

Plaintiff also recommended whether or not the client was ready to "go live"— i.e., move to a production environment and then transition from implementation to Tyler's support team.[19]  On certain occasions, Plaintiff recommended, based on her own assessment, that a client's scheduled "go live" date be delayed either because of technical issues or because the client needed additional training to be ready to use the software in live production.[20]  For example, Plaintiff testified that she at least once recommended that a client's "go live" date be delayed because the client's employees had a difficult time grasping the technology.[21]  The project manager

[16] Ex. A, Pasch Decl. at ¶ 8.
[17] Ex. B, Pl. Dep. 64:12-17, 183:3-9.
[18] Ex. B, Pl. Dep. 106:8-107:8, 109:10-17, 110:11-19.
[19] Ex. B, Pl. Dep. 63:6-64:11, 66:23-67:25.
[20] Ex. B, Pl. Dep. 70:16-71:2, 71:12-72:4.
[21] Ex. B, Pl. Dep. 71:12-74:14.

6

accepted Plaintiff's recommendation and, as a result, the client's "go live" date was pushed out so Plaintiff could conduct additional on-site training with the client.[22]

### 3.   Conducting Client Trainings

Conducting client training on the ExecuTime software represented an important part of Plaintiff's job duties and comprised roughly 30% to 40% of her time as an implementation consultant.[23]   As Plaintiff acknowledged during her deposition, the effectiveness of the training she conducted directly impacted the client's ability to use the ExecuTime software.[24]   And, as Plaintiff' further acknowledged, proper use of the ExecuTime software is "critical" to the business and operations of Tyler's clients because it ensures client employees—i.e., city and state employees—are scheduled for work and paid correctly.[25]

Successful implementation of ExecuTime software is equally critical to Tyler's own business.  If Tyler cannot successfully implement its clients and bring them "live" in a production environment, Tyler cannot transition its implementation consultants to other implementation projects or move a client over to a Tyler support

---

[22] Ex. B, Pl. Dep. 71:12-74:14.
[23] Ex. B, Pl. Dep. 91:24-92:18.
[24] Ex. B, Pl. Dep. 121:20-24.
[25] Ex. B, Pl. Dep. 60:20-61:17, 54:1-6; Ex. A, Pasch Decl. at ¶ 10.

team.  And, if an implementation fails, Tyler risks the contract with the client and faces reputational challenges with prospective clients.[26]

About 30% to 40% of client trainings occurred on site at a client and required Plaintiff to travel to the client.[27]  Plaintiff conducted the other trainings remotely.[28] Like the format, the substance of the trainings varied by client.[29]  As a result, before each training, Plaintiff would communicate with the client regarding the upcoming training and then modify training agendas based on client feedback to create a custom agenda specific to the client's training needs.[30]  During all trainings—both remote and on-site— Plaintiff would be the only Tyler employee present and would both ask and answer questions with trainees.[31]

### 4.   Client Troubleshooting

Performing troubleshooting on client issues with the ExecuTime software represented another core area of Plaintiff's job duties.[32]  Troubleshooting involves a variety of issues with the software—e.g., overtime not populating, or an inability to convert overtime to comp time—that the client would raise with Plaintiff either

---

[26] Ex. A, Pasch Decl. at ¶ 10.
[27] Ex. B, Pl. Dep. 81:7-17, 125:8-25; Pl. Dep. 107:17-22.
[28] Ex. A, Pasch Decl. at ¶ 9; Ex. B, Pl. Dep. 80:15-81:5.
[29] Ex. B, Pl. Dep. 125:8-25.
[30] Ex. B, Pl. Dep. 139:6-14, 141:9-142:10.
[31] Ex. B, Pl. Dep. 107:17-22, 108:17-19, 125:8-25.
[32] Ex. B, Pl. Dep. 59:23-60:1, 93:5-13; Ex. A, Pasch Decl. at ¶ 11.

during their weekly calls or during a training session.[33]  To resolve a troubleshooting issue, Plaintiff would herself determine: (1) whether the issue was billable to the client or involved a non-billable software defect, and (2) whether it involved a training issue or a technical issue.[34]  If the troubleshooting issue involved a technical issue within the software, it was Plaintiff's responsibility to escalate the issue to Tyler's technical team.[35]  If it involved a training issue, Plaintiff would be responsible for troubleshooting and resolving the issue herself.[36]  Plaintiff was also responsible for ensuring the issue was resolved to the client's satisfaction and that the issue did not prevent the client from using the software in live production.[37]

5.    Plaintiff's Resignation of Her Employment

In March 2019, Plaintiff took leave under the Family and Medical Leave Act ("FMLA") for two months.[38]  Plaintiff resigned her employment rather than return to work following the expiration of her FMLA leave.[39]

---

[33] Ex. B, Pl. Dep. 133:15-134:10.
[34] Ex. B, Pl. Dep. 134:21-136:2.
[35] Ex. B, Pl. Dep. 136:3-13.
[36] Ex. A, Pasch Decl. at ¶ 11; Ex. B, Pl. Dep. 135:18-136:2.
[37] Ex. A, Pasch Decl. at ¶ 11.
[38] Ex. B, Pl.'s Dep. at 17:11-19.
[39] Ex. B, Pl.'s Dep. at 17:18-22.

**B.**         **Procedural Background**

On March 26, 2019, Plaintiff filed this lawsuit alleging Tyler misclassified her as an exempt employee and failed to pay her overtime as required under the FLSA.[40]  Tyler denies Plaintiff's claim and asserts it properly classified Plaintiff as an exempt employee under the FLSA's administrative exemption.[41]

## II.   ARGUMENTS AND AUTHORITIES

**A.**         **Legal Standard**

Under Rule 56 of the Federal Rules of Civil Procedure, a defendant is entitled to summary judgment when there is no genuine dispute of material fact.  FED. R. CIV. P. 56.  To determine whether a genuine dispute of material fact exists, courts review all facts and inferences in the light most favorable to the party opposing summary judgment.  *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1336 (11th Cir. 1999) (citation omitted).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (citations omitted).

**B.**         **Tyler Properly Classified Plaintiff As Exempt Under the FLSA**

Plaintiff cannot establish that Tyler unlawfully failed to pay her overtime under the FLSA because she qualified for the FLSA's administrative exemption, and

---

[40] ECF 1.
[41] ECF 10 at 9.

as such she was ineligible for overtime compensation.  Under the FLSA, certain employees are exempt from overtime requirements, including those in an administrative capacity.  *See* 29 U.S.C. § 213(a).  To qualify for the administrative exemption, Plaintiff's job must satisfy both the salary basis test and the primary duties test.  *See* 29 C.F.R. § 451.200(a)(1)-(3).  When determining whether an employee qualifies for an exemption under the FLSA, courts must give a "fair reading" to the exemption rather than construing it narrowly against the employer. *Encino Motorcars, LLC v. Navarro*, 13 S. Ct. 1134, 1142 (2018).  Plaintiff's position as an implementation consultant satisfies both prongs of the administrative exemption test.

### 1. The Salary Tyler Paid Plaintiff Satisfies The First Prong of The Administrative Exemption Test

There is no genuine dispute of material fact that Plaintiff's compensation satisfies the salary basis test.  To satisfy the salary basis test, an employee must be compensated on a salary or fee basis at a rate of at least $455/week.  29 C.F.R. §§ 541.200(a)(1).[42]  "Salary basis" is defined as regularly receiving "each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part

---

[42] Following Plaintiff's employment with Tyler, the Department of Labor ("DOL") increased the salary basis threshold from $455/week ($23,660/year) to $684/week ($35,568/year).

of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed." *Id.* at § 541.602.

Plaintiff's compensation satisfies the salary basis test because during her employment with Tyler she received a salary of $45,000 per year or more—almost double the minimum of $455/week ($23,660 per year).[43]   In addition, Tyler paid Plaintiff's salary as a fixed amount every bi-weekly pay period.[44]  As a result, there is no genuine issue of material fact that Plaintiff's position as an implementation consultant satisfies the salary basis test.

2.   <u>Plaintiff's Primary Duties Satisfy The Second Prong of The Administrative Exemption Test</u>

Plaintiff also qualifies for the administrative exemption because her job duties satisfy the primary duties test.  To satisfy the primary duties test, the employee must: (1) perform office or non-manual work directly related to management policies or general business operations of the employer or employer's customers; and (2) exercise discretion and independent judgment on significant matters.  29 C.F.R. §§ 541.200(a)(2)-(3).   Plaintiff's implementation consultant position satisfies both requirements.

---

[43] Ex. B, Pl. Dep. 40:1-17; Pl.'s Dep. Ex. 1 (Plaintiff's offer letter).
[44] Ex. B, Pl. Dep. 51:5-15 (testifying she received a salary); Ex. D (Plaintiff's time records).

       a.     *Plaintiff performed office or non-manual work directly related to management policies or general business operations of the employer or employer's customers.*

As confirmed by Plaintiff's own testimony, there is no genuine dispute of material fact that her primary duties involved the performance of office or non-manual work directly related to the management or general operations of Tyler's customers.  Non-manual or office work is defined as "work directly related to assisting with the running or servicing of the business" and includes work such as quality control and database administration, among others.  *Id.* at § 541.201(a), (b).  Further, "[e]mployees acting as advisers or consultants to their employer's clients or customers (as tax experts or financial consultants, for example) may be exempt."  29 C.F.R. § 541.201(c).

As an implementation consultant, Plaintiff's job duties directly related to at least the servicing of Tyler's business: delivering software to the public sector.  Plaintiff was responsible for taking the software developed and licensed by other Tyler resources and deploying it for the clients assigned to her.

Moreover, Plaintiff's primary duties directly related to the servicing of the business of Tyler's clients.  As Plaintiff testified, she led the deployment of ExecuTime software based on the client's policies and procedures, trained the client on the software, and helped troubleshoot issues clients experienced with the

software.[45]  Plaintiff's job duties are most analogous to an adviser or consultant on the ExecuTime software for Tyler's clients—indeed, "consultant" was part of her job title.

Further, Plaintiff cannot dispute that the effectiveness of her performance—particularly conducting client training—directly impacted Tyler's clients' businesses.[46]  As Plaintiff testified at her deposition:

> **A:** Essentially, that is the end result, is producing the actual payroll.
> **Q:** I mean, that's what the objective of the software is, to make sure the payroll is done properly; correct?
> **A:** So we don't actually do the payroll portion, but to make sure the time is accurate, yes.
> **Q:** And the time needs to be accurate because if it's not, then the compensation won't be accurate?
> **A:** That is correct.
> **Q:** So you would agree with me that – that **it was critical** that the software be – **that the software performed correctly**?
> **A:** **Yes**, sir.[47]

If Plaintiff failed to perform, not only would Tyler be vulnerable under its contract(s), face challenges in the market, and be at reputational risk with clients, but its clients would also be unable to schedule or pay their employees using the software they had licensed from Tyler.

---

[45] Ex. B, Pl.'s Dep. at 32:24-33:13, 50:1-11, 58:9-24, 98:11-15, 108:21-109:13
[46] Ex. B, Pl. Dep. 121:20-24.
[47] Ex. B, Pl. Dep. 61:2-17 (emphasis added).

Plaintiff's primary duties are in stark contrast with those that are identified under the FLSA as falling outside the administrative exemption: "manufacturing production-line work or selling a product in a service or retail establishment." *See* 29 C.F.R. at § 541.201(a). Plaintiff herself has emphasized that her role went well beyond the type of rote, non-discretionary work that is considered non-exempt from overtime wage requirements. As just one example, Plaintiff's resume highlights that her job responsibilities at Tyler included "build[ing], lead[ing] and direct[ing] project teams to meet project directives."[48]

Courts have found that positions similar to Plaintiff's—i.e., positions that involve implementation, training, and other consulting functions performed at client locations—constitute work directly related to the management or general business operations of the employer or the employer's customers and, as such, satisfy the administrative exemption.[49]  For example, in *Verkuilen v. Mediabank, LLC*, the court found the administrative exemption applied where the employee implemented her employer's software for clients and assisted those clients with training, troubleshooting, and modifications to the software.  No. 09 C 3527, 2010 WL

---

[48] Ex. B, Pl. Dep., Ex. 2.

[49] Importantly, the majority of the courts reached their holdings prior to the Supreme Court's recent instruction to give FLSA exemptions "a fair reading" rather than construing them narrowly against the employer.  *See Encino*, 13 S. Ct. at 1142.

15

3003860, at *1-*2 (N.D. Ill. July 27, 2010), *aff'd*, No. 646 F.3d 979 (7th Cir. 2011). The court emphasized that the employee, like Plaintiff here, represented her employer in relationships with customers and that "[t]he essence of [plaintiff]'s job was keeping the clients happy." *Id*. at *4. In addition, the fact that the employee, like Plaintiff, worked away from an office—i.e., remotely from her home or on-site at a client—supported a finding that the administrative exemption applied because non-exempt status does not fit with an employee who spends much of her work time off-premise where she cannot be supervised. *Verkulien v. MediaBank, LLC*, 646 F.3d 979, 981 (7th Cir. 2011); *see also Brooks v. Healthcare-Iq, Inc*., No. 8:17-CV-1897-02JSS, 2019 WL 497693, at *8 (M.D. Fla. Feb. 8, 2019) ("An employee who informs his supervisor he is 'working from home' at times of his choosing suggests one vested with discretion, without daily or close supervision. Certainly keeping hourly track of such an employee on a time-clock basis would be problematic for the employer."); *Carbaugh v. Unisoft Int'l, Inc.*, No. H-10-0670, 2011 WL 5553724, at *23 (S.D. Tex. Nov. 15, 2011) (finding administrative exemption applied to software consultant who spent much of his time away from the employer's office and on-site at employer's customers).

Plaintiff's own description of her responsibilities—whether in the resume she prepared prior to seek employment subsequent to her separation with Tyler or in the

testimony she gave in this case—as well as the clear weight of the case law establish that her implementation consultant role satisfies the first prong of the primary duties test.

        b.    *Plaintiff exercised discretion and independent judgment on significant matters.*

Plaintiff's own admissions also establish that she regularly exercised discretion and independent judgment on significant matters.  "[T]he exercise of independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have neem considered."  29 C.F.R. § 541.202(a).  Statutory guidance does not, however, "require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review."  *Id*. at § 541.202(c).  Rather, "decisions made as a result of the exercise of independent judgment may consist of recommendations for action rather than the actual taking of action."  *Id*.; *see also Cruz v. Lawson Software, Inc.*, 764 F. Supp. 2d 1050, 1067 (D. Minn. 2011) (finding administrative exemption applied to software consultant, reasoning "[t]he discretion to make recommendations can suffice" and the requirement to follow

certain methods and guides proscribed by the employer did not constrain employees' discretion).

While Plaintiff worked with a project manager during the implementation process, it is undisputed that Plaintiff's recommendations shaped the course and trajectory of any given implementation assigned to her—including whether the client could "go live" with Tyler's software—and that she often worked directly with the client with little supervision from any other Tyler employee.[50] Moreover, Plaintiff did not merely follow a script when working with a client. Instead, Plaintiff assessed client protocols and procedures, managed competing client deadlines and priorities, created custom training agendas based on client feedback, and was the sole authority on the ExecuTime software when conducting client trainings.[51] Further, when troubleshooting client issues with the software, Plaintiff had to evaluate issues presented, escalate issues as appropriate and ensure they were resolved to the client's satisfaction.[52] Finally, in addition to her deposition testimony, Plaintiff's own resume correctly emphasizes her management, leadership, and delegation skills.[53]

---

[50] Ex. B, Pl. Dep. 63:6-64:11, 66:23-67:8.
[51] Ex. B, Pl. Dep. 93:19-24, 96:19-97:5; Ex. B, Pl. Dep. 139:6-14, 141:9-142:10; Ex. B, Pl. Dep. 81:7-10, 125:8-25; Ex. B, Pl. Dep. 107:17-22, Ex. B, Pl. Dep. 81:7-10, 125:8-25; Ex. B, Pl. Dep. 107:17-22.
[52] Ex. B, Pl. Dep. 134:21-136:11.
[53] Ex. B, Pl. Dep., Ex. 2.

*See Brooks*, 2019 WL 497693, at *7 (finding employee exhibited discretion and independent judgment where employee described himself as a manager and leader).

Courts have held that employees in similar positions exercise discretion and independent judgment and qualify for the administrative exemption.  In *Verkuilen*, for example, the district court held that the employee exercised discretion and independent judgment when performing troubleshooting on the employer's software for clients, observing, "when confronted with a client's problem in using [her employer's] software, [the plaintiff] determined the nature of the problem and how to handle it."  *Verkuilen*, 2010 WL 3003860, at *4.  The court also found that conducting client training and troubleshooting on the employer's software involved the exercise of discretion and independent judgment, and that while the employee had supervisors to whom she reported, that did not change the fact that she exercised discretion and independent judgment.  *Id*.; *see also See Cruz*, 764 F. Supp. 2d at 1068 (finding periodic check in with project manager did not proscribe consultant's exercise of discretion and independent judgment).   Importantly, the court also noted that, like Plaintiff, the decisions of the employee directly impacted the employer's relationships with its customers.  *Id.*

Both Plaintiff's testimony and the case law holding that similar employees—i.e., consultants that implement software—establish that Tyler properly classified Plaintiff as an exempt employee under the FLSA's administrative exemption.

### 3.   Tyler Did Not Willfully Misclassify Plaintiff

Tyler did not misclassify Plaintiff as exempt under the FLSA.  However, even if it did, Plaintiff cannot establish that it did so willfully.  To establish willfulness, a plaintiff must prove by a preponderance of the evidence that the defendant either knew that the employee was non-exempt or showed a reckless disregard with respect to the employee's classification.  *Id.*  The standard for willfulness is high.  *See Ojeda-Sanchez v. Bland Farms, LLC*, 499 F. App'x 897, 902 (11th Cir. 2012) (holding neither negligence nor unreasonable conduct are sufficient to prove willfulness).

Plaintiff cannot meet the high standard to establish that Tyler acted willfully by classifying Plaintiff as exempt.  When Tyler acquired ExecuTime Software, Plaintiff was performing the same duties and was classified as exempt.[54]  In addition, as discussed above, Plaintiff's job duties as an implementation consultant for Tyler—and those of similarly situated employees in the industry—support an exempt classification.  *See, e.g.*, *Cruz*, 764 F. Supp. 2d 1050; *Verkuilen*, 2010 WL 2011713; *Carbaugh*, 2011 WL 5553724.  Finally, Tyler's general counsel, who was

---

[54] Ex. A, Pasch Decl. at ¶¶ 2, 4.

deposed in this case, testified that the classification of implementation consultants as exempt under the FLSA was in part based on the advice of outside legal counsel.[55] *See Bailey v. Innovative Contracting Sols., Inc.*, No. 1:13-cv-4114-LMM, 2014 WL 6816830, at *6 (N.D. Ga. Dec. 4, 2014) (finding no willfulness by employer where employer relief on advice of counsel regarding classification of employee).

Tyler properly classified Plaintiff as exempt from the FLSA's overtime wage provisions. Even if there is a genuine issue of material fact as to Plaintiff's exempt status, she cannot meet her burden to show that Tyler willfully mischaracterized her as exempt.

## III.   **CONCLUSION**

Based on the foregoing, Plaintiff cannot establish that Tyler failed to pay her overtime in violation of the FLSA because Tyler properly classified Plaintiff as an exempt administrative employee.  Therefore, Tyler respectfully requests that the Court grant its request for summary judgment and dismiss Plaintiff's lawsuit with prejudice.

---

[55] Ex. C, 30(b)(6) Dep. 16:3-18:20.

Respectfully submitted this 6th day of April, 2020.

> */s/ Paulo B. McKeeby*
> R. Daniel Beale
> Georgia Bar No. 043880
> dan.beale@dentons.com
> Maxwell R. Jones
> Georgia Bar No. 451289
> max.jones@dentons.com
>
> 303 Peachtree Street, NE
> Suite 5300
> Atlanta, GA 30308
> Telephone: +1.404.527.4000
> Facsimile: +1.404.527.4198
> **DENTONS US LLP**
>
> Paulo B. McKeeby
> Texas Bar No. 00784571
> pmckeeby@reedsmith.com
> Amanda E. Brown
> Texas Bar No. 24087839
> aebrown@reedsmith.com
>
> 2501 N. Harwood St., Suite 1700
> Dallas, TX 75201
> Telephone: +1.469.680.4200
> Facsimile: +1.469.680.4299
> **REED SMITH LLP**
>
> **COUNSEL FOR DEFENDANT**

## <u>LOCAL RULE 7.1(D) CERTIFICATE</u>

Pursuant to Local Rule 7.1(D), I hereby certify that Defendant's Memorandum of Law in Support of Motion to Dismiss has been prepared using 14-point Time New Roman font, in compliance with Local Rule 5.1.

*/s/ Paulo B. McKeeby* _____

Paulo B. McKeeby

## <u>CERTIFICATE OF SERVICE</u>

I certify that on April 6, 2020, I filed a copy of the foregoing document using the Court's CM/ECF system, which will send a Notice of Electronic Filing to all registered attorneys.

*/s/ Paulo B. McKeeby* _____

Paulo B. McKeeby

US_ACTIVE-152537731.2-AEBROWN