IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

SUZANNE GREENE,

      **Plaintiff,**

     **vs.**                         Civil Action No. 1:19-cv-1338-AT

TYLER TECHNOLOGIES, INC.,

      **Defendant.**

---

**BRIEF IN SUPPORT OF PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

Plaintiff Suzanne Greene, through the undersigned counsel, hereby files this Brief in Support of her Motion for Partial Summary Judgment, showing the Court as follows:

## 1.   INTRODUCTION

This is an FLSA action brought by a former "implementation consultant" against her former employer for unpaid overtime wages. Plaintiff now move the Court to grant her summary judgment on the following issues: (1) Defendant Tyler Technologies, Inc., is the successor in interest of Plaintiff's former employer, ExecuTime Software, LLC, and (2) Plaintiff was not an exempt administrative employee in her position as a "project manager" when employed by ExecuTime

Software, LLC, and in her position as an "implementation consultant" when employed by Defendant Tyler Technologies, Inc.

In both of her positions, Plaintiff's work consisted primarily of training the employees of her employer's local government customers in how to use ExecuTime time and pay software. She was also responsible for troubleshooting issues that the customers encountered with the software. If the problem could be fixed by simply turning on or off a certain functionality of the software, then Greene could fix the problem herself. Anything technical, she sent to other Tyler employees. Greene's training materials were drafted by others. She did not advise Tyler's customers as to how they should operate their own entities.

Greene had no authority to make any significant decisions beyond managing her own workload. She supervised no one, did no hiring or firing, no purchasing, and no contracting. Because the undisputed facts of this case show clearly that Greene was misclassified, she is entitled to summary judgment on that issue.

## 2.   SUMMARY OF FACTS

Defendant Tyler Technologies, Inc., is in the business of providing software and technology services to the public sector. Exhibit 1, ¶ 7. Tyler acquired ExecuTime Software, LLC in June 2016. Exhibit 1, ¶¶ 2–3.

Plaintiff Greene had been employed by ExecuTime Software, LLC as a "project manager" since February 2016. Exhibit 1, ¶ 1. For the first six months approximately, Greene worked with ExecuTime's "Advanced Scheduling" software module, which is primarily used by police and fire departments. Dkt. 47 at 20:2–16, 21:4–13, 23:3–19.

In her position as a "project manager," Greene was responsible for building schedules, which involved setting the ExecuTime configurations on the back end so that the correct types of schedules would populate in the software for the clients. Dkt. 47 at 25:25 to 26:10. Greene created the schedules based on a questionnaire that the client filled out in consultation with the project manager examining the customer's policies and procedures. Dkt. 47 at 27:1–18.

Tyler continued to employ Greene, and most other ExecuTime employees after acquiring ExecuTime, and continued to provide services to most of ExecuTime's customers following the acquisition. Exhibit 1, ¶¶ 8–9. After the acquisition, Greene's title was changed to "implementation consultant." Dkt. 47 at 22:12–29. Her job duties changed only slightly, other than the fact that she was working with a different ExecuTime software module that performed different tasks and was no longer building schedules. Dkt. 47 at 23:22 to 25:20; Exhibit 2 hereto (Declaration of Suzanne Greene), ¶ 4.

In a March 2019 implementation job description, Tyler described ExecuTime as follows:

> ExecuTime™ is a leading time and attendance solution that empowers employees via self-service functionalities and allows supervisors to closely manage overtime, job costing, and labor data through reduces expenses. ExecuTime time assists organizations with the most complex time and seamlessly integrates with payroll software solutions. The Implementation Consultant is responsible for delivering high quality knowledge training to clients allowing them to use Tyler software products efficiently and effectively to achieve daily operations. . . .

Exhibit 1, ¶ 81 (emphasis added). A

An example of the "high-quality knowledge training" that Greene performed as an implementation consultant may be viewed in the attached video exhibit, which is an example of Plaintiff performing remote timeclock training for the city of Hendersonville, TN on April 18, 2018. Exhibit 3 hereto.

The first step for any ExecuTime customer is talking with a sales representative and possibly a "product owner" who focuses on a specific software. Dkt. 46 at 33:6–16. Once the customer has decided on what software it will purchase and what kind of service package (e.g., daily, hourly, milestone, or paid in full), a sales representative creates a contract, which also goes through the legal department. Dkt. 46 at 35:11 to 36:13.

After the contract has been signed, the sales rep. sent the contract to a team in the ExecuTime division. Dkt. 46 at 40:6–24. They determined what modules have been purchased and assign it to a project manager[1] and an implementation consultant. Dkt. 46 at 41:24 to 42:16. The project manager typically worked with the same implementation consultant on each project. Dkt. 46 (30(b)(6) Deposition of Hillary Pasch) at 43:7–10. The project manager then read the contract, determined where it would be installed physically, if timeclocks need to be purchased, and whether there was a mobile module . Dkt. 46 at 43:19 to 46:11.

When a project is assigned to an implementation consultant, they too first read the contract and then based on what the customer has purchased, she was responsible for creating a "template" based on that information to set up the software in preparation for customer training. Dkt. 46 at 67:10–16.

Tyler claims that implementation consultants typically decide with the client whether to have in-person trainings or remote, but cannot identify any instance of Plaintiff Greene ever doing that. Dkt. 46 at 70:2 to 71:8. Greene testified that, typically, in-person training sessions were for "power users,"

---

[1] Not to be confused with Plaintiff's former position at ExecuTime Software, LLC.

"end users," and "super users" (supervisors) who required knowledge of functionalities that lower level users did not. Dkt. 47 at 105:11–16.

Greene did not set the deadlines in the project plans but had to be aware of them. Dkt. 47 at 94:20–22. Because Greene dealt with multiple implementations (i.e., projects) at once, she had to manage her workload and the ensure that the deadlines in multiple concurrent project plans were met. Dkt. 47 at 94:6–19.

In any implementation, the project objectives were communicated to Greene by the supervising project manager and was contained in the project plan, which contained deadlines for when different categories of individual customer employees (e.g., end users, super users) were supposed to complete their training. Dkt. 47 at 101:5–13.

This would be done without the involvement of Greene, and only after the project plan was complete would Greene receive the project in a "hand-off call." Dkt. 47 at 103:18 to 104:16. Tyler's project managers generally were so involved in Greene's projects that usually did not have to update them about whether project deadlines were being met because they would already be aware. Dkt. 47 at 98:11 to 99:6.

During an implementation, Greene was responsible for ensuring that the customer employees that she trained clearly understood what the project manager had already gone over with them and remind them of their objectives and milestones. Dkt. 47 at 99:14 to 100:2.

When entering into a contract with Tyler for ExecuTime software and support—which occurs prior to Greene's involvement—each client can purchase different amounts of training hours. Dkt. 109:18 to 110:14. After she would begin working on a project, Greene would keep track of how many hours of training a customer had remaining and, if the customer got down to 10 or 12 hours remaining, Greene would notify the project manager so they could speak to the client and have them purchase more hours, if necessary. Dkt. 109:18 to 110:14. Greene did not make recommendations about needing to purchase additional training hours without speaking to a project manager first. Dkt. 109:18 to 110:14.

As part of her training duties, Greene was responsible for delegating tasks contained on checklists to the customer's employees who were being trained "and say, okay, these are the specific items that need to be completed by this date, pretty much like reiterating the project plan that was already put together." Dkt. 47 at 102:2–17. If project deadlines were behind schedule,

Greene would reach out to the project manager and let them know that "hey, this needs to be revised, we may need to push out the date, and then [the project manager] would actually update the project plan. Dkt. 47 at 106:3 to 107:8. A customer not meeting milestones in the project plan on time could result in postponing a Go-Live deadline. Dkt. 47 at 109:1–17.

Greene typically did not have any role in designing training materials but believes that on one occasion she was asked to update the current training manual template. Exhibit 2 hereto, ¶¶ 6–7. That update took approximately half of a single day or less. Exhibit 2 hereto, ¶ 8.

Greene estimates that she spent 30–40 percent of her work time conducting ExecuTime training sessions with Tyler customers, and that she spent 30–40 percent of her work time preparing for ExecuTime training sessions with Tyler customers. Dkt. 47 at 91:24 to 92:18. Greene spent a small amount of time on weekly or bi-weekly client calls, which ranged from 30 minutes to an hour. Dkt. 47 at 92:19 to 93:4. At any given time, the number of implementation projects to which Greene was assigned ranged from 5 to 20. Dkt. 47 at 93:14 to 94:1. The amount of time Greene spent on troubleshooting is more difficult to estimate because it occurred

"throughout" her workweek while engaged in other activities, and because some clients needed less help than others. Dkt. 47 at 93:5–13.

Asked to identify decisions made by implementation consultants that are not reviewed at a higher level, the Company stated that during on-site training, if "the agenda isn't getting done . . . [they may] make a decision that they're going to tell the client they need to come back on-site. And working with the client to get that built into the project timeline, stay longer that day maybe, work through lunch if they need to." Dkt. 46 at 73:1–15.

On a technical review call with a client, an implementation consultant may ask questions taken from a master list of questions that is provided to them, but, Tyler claims, "it's up to the discretion of the implementation consultant to know what questions to ask, what not to ask, what to elaborate on." Dkt. 46 at 74:8–13. The only example provided by Tyler: "If [the customer] did not purchase time clocks, maybe the implementation consultant could say, how are you going to be logging in your time? I'd make a recommendation you add time clocks. Or you don't have them on your contract, we're not going to discuss that." Dkt. 46 at 74:8–21. But the Company could not identify any instances in which Plaintiff ever actually made any such recommendation. Dkt. 46 at 74:22–25. Nor could the

Company provide an example of any time that Ms. Greene ever made recommendations to Tyler's customers about making changes to their own payroll systems rather than making changes to the configuration of Executime, or how often such recommendations were made, if ever. Dkt. 46 at 86:5–21, 90:18 to 91:22.

## 3.   ARGUMENT

### A.   Summary Judgment Standard

Summary judgment is properly granted where the pleadings, depositions, affidavits, admissions and other materials in the record show that there is no genuinely disputed issue of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. *Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1246 (11th Cir. 1999). Once the moving party has met this burden, the non-movant must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial. *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999).

The Court must view all evidence in the light most favorable to the party opposing the motion and must draw all inferences in favor of the non-movant, but

only "to the extent supportable by the record." *Garczynski v. Bradshaw*, 573 F.3d 1158, 1165 (11th Cir. 2009) (quoting *Scott v. Harris*, 550 U.S. 372, 381 n.8, 127 S. Ct. 1769, 1776 (2007)). However, in opposing the motion the non-movant must put forth more than a mere scintilla of evidence suggesting that reasonable minds could reach differing verdicts." *Abel v. Dubberly*, 210 F.3d 1334, 1337 (11th Cir. 2000). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party" summary judgment is proper. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986).

## B.   Defendant Tyler Technologies is the successor in interest of ExecuTime Software, LLC

"[S]uccessor liability is appropriate in suits to enforce federal labor or employment laws" to prohibit employers who violated those laws from avoiding liability by selling, or otherwise disposing of, their assets and dissolving, and the acquirer likewise does not assume liability in its purchase. *Hatfield v. A+ Nursetemps, Inc.*, 651 F. App'x 901, 906 (11th Cir. 2016) (quotation omitted). "Pragmatically, without FLSA successor liability, an FLSA violator could escape liability, or make it harder for employees to obtain relief, by selling or transferring its assets to a buyer and then dissolving." *Cuervo v. Airport Servs.*, 2013 U.S. Dist. LEXIS 163239, *8 (S.D. Fla. Nov. 15, 2013) (emphasis added).

"[W]hen liability is based on a violation of a federal statute relating to labor relations or employment, a federal common law standard of successor liability is applied that is more favorable to plaintiffs than most state-law standards to which the court might otherwise look." *Teed v. Thomas & Betts Power Sols., L.L.C.*, 711 F.3d 763, 764 (7th Cir. 2013). The federal standard for FLSA successor liability consists of the following questions (1) whether the successor had notice of the pending action; (2) whether the predecessor would have been able to provide the relief sought in the action before the sale; (3) whether the predecessor could have provided the relief after the sale; (4) whether the successor can provide the relief sought in the action; and (5) whether there is continuity between the operations and work force of the predecessor and the successor. *Hatfield*, 651 F. App'x 901 at 907 (citing *Teed*, 711 F.3d at 765–66. "These considerations do not represent a rigid or mechanical test but, rather, should be applied flexibly with an understanding that 'successor liability is appropriate in suits to enforce federal labor or employment laws . . . unless there are good reasons to withhold such liability.' " *Smith v. Ideal Towing, LLC*, No. 1:16-CV-1359-TWT, 2017 U.S. Dist. LEXIS 187476, at *16 n.72 (N.D. Ga. Nov. 13, 2017) (citing *Kerns v. Lamot Indus. LLC*, No. 3:16cv76-RV/EMT, 2017 U.S. Dist. LEXIS 169110, 2017 WL 2903348, at *4 (N.D. Fla. June 1, 2017). Here because no fewer than four of the five factors weigh in favor

of successor liability, the Court should find as a matter of law that Defendant Tyler is liable to Greene for any of ExecuTime's unpaid FLSA obligations.

> ### i. Whether the successor had notice of the pending action

This action had not yet been filed at the time of Tyler's acquisition of ExecuTime. However, Tyler had previously been sued for failure to pay overtime wages to implementation consultants and therefore was well aware that any such employees classified by ExecuTime as exempt had potential FLSA claims.[2]

> ### ii. Whether the predecessor would have been able to provide the relief sought in the action before the sale

The record is devoid of any affirmative evidence regarding ExecuTime's ability to provide relief to Plaintiff Greene before its acquisition by Tyler, but Plaintiff is aware of no evidence that it was insolvent or behind on payroll payments.

> ### iii. Whether the predecessor could have provided the relief after the sale

The record is devoid of any affirmative evidence regarding ExecuTime's ability to provide relief to Plaintiff Greene after its acquisition by Tyler, but presumably its ability to provide relief is the same as that of Tyler, having been completely absorbed by the latter through a stock purchase.

---

[2] *Patty Beall et al. v. Tyler Technologies, Inc., and EDP Enterprises, Inc.,* 2:08-cv-422 TJW (E.D. Tex. 2008). The case was settled confidentially prior to issuance of a summary judgment order. *See* Dkt. 215 (order approving settlement).

*iv.*     whether the successor can provide the relief sought in the action

"Tyler is the largest company in the United States exclusively focused on providing integrated software and technology services to public sector agencies." Exhibit 4 hereto (excerpt from Tyler Technologies Employee Handbook). Tyler's gross revenues in 2019 were over $1 billion and in the same year it had gross profits of over $500 million. Exhibit 5 hereto (Tyler Technologies, Inc. Quarterly Statements of Operations), pg. 7. Tyler is clearly able to provide the relief sought by Plaintiff Greene.

*v.*     *Whether there is continuity between the operations and work force of the predecessor and the successor.*

After Tyler acquired ExecuTime in June 2016, it continued to employ the same employees and service the same customers. Exhibit 1, ¶¶ 8–9. Like the nurse employees in *Hatfield v. A+ Nursetemps*, implementation consultants were the "heart and soul" of ExecuTime and remained so as a division of Tyler. 651 F. App'x at 908–09. It is beyond doubt that there was a near total continuity in the operations and work force of ExecuTime and Tyler. Under these circumstances, there is ample reason to find that Tyler is ExecuTime's successor in interest with respect to Plaintiff Greene's overtime claim, and that there are no "good reasons to withhold such liability." *Teed*, 711 F.3d at 766.

### C.    Plaintiff Was Not an Exempt Administrative Employee

The Fair Labor Standards Act requires that covered employees must be compensated at one-and-one-half times their regular hourly rate for each hour worked over 40 in a given workweek. 29 U.S.C. § 207(a)(1). Numerous exceptions to this requirement exist, most notably the three "white collar" exemptions for employees working in "a bona fide executive, administrative or professional capacity." 29 U.S.C. § 213(a)(1). Each of the white collar exemptions are *affirmative defenses, which the employer must plead and prove*. *Diaz v. Jaguar Rest. Grp*., LLC, 627 F.3d 1212, 1214-15 (11th Cir. 2010) (emphasis added).

The Department of Labor has defined "employed in a bona fide administrative capacity" as an employee who is: (1) compensated on a salary or fee basis at a rate of not less than $455 per week; (2) has as a primary duty the performance of office or non-manual work *directly related* to the *management or general business operations* of the employer or the employer's customers; and (3) has as a *primary duty* the exercise of *discretion and independent judgment* with respect to *matters of significance. See* 29 C.F.R. § 541.200(a).

Neither as a "project manager" for ExecuTime or as an "implementation consultant" for Tyler Technologies did Plaintiff (1) have a primary duty directly related to the management or general business operations of ExecuTime, Tyler

Technologies, or their customers; or (2) have primary duties requiring the exercise of discretion and independent judgment with respect to matters of significance.

Defendants <u>contend</u> that Plaintiff exercised discretion and independent judgment in connection with the following job duties:

- Coordination and prioritization of her weekly schedule;

- Decision-making with respect to prioritizing the multiple implementation projects to which she was assigned;

- Identifying technical issues related to the conversion of client data to Tyler systems by troubleshooting problems and/or escalating problems to other departments;

- Ensuring that implementation projects were on track to meet milestones and deadlines through coordination with Tyler's clients;

- Reporting any problems with respect to meeting client or internal deadlines, advising her supervisors of such problems and making recommendations to address them;

- Scheduling and coordinating training sessions with client representatives and tailoring such sessions to particular client needs;

- Assessing the effectiveness of training and whether additional training, one-on-one training, or topic specific "workshops" might be appropriate;

- Assessing and making recommendations as to whether implementation projects could proceed to subsequent stages, including "going live" with the software and "passing" the client to Tyler's support team; and/or

- Generally assessing client needs, client satisfaction, and whether the implementation project was proceeding consistent with client expectations and within contractually proscribed [*sic*] deadlines.

Dkt. 49-1, ¶ pp. 1–2.

Plaintiffs' primary duties—both at Executime and Tyler—were dominated by her training activities and, to a lesser extent, troubleshooting. Well-established law indicates that these are neither related to the "general business operations" of Tyler's clients, nor do they involve discretion or independent judgment with respect to matters of significance. For these reasons, Defendant cannot meet its burden on the administrative exemption defense and Plaintiff is entitled to judgment on that issue as a matter of law.

### 1.    *Plaintiff's work was not directly related to the management or general business operations of Tyler's customers*

Work "directly related to management or general business operations" includes, but is not limited to, work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities. 29 CFR 541.201(b)

All administrative employees have in common that they "perform work directly related to assisting with the *running or servicing of the business*." 29 C.F.R. § 541.201(a) (emphasis added). Thus, the administrative employee "engages in

running the business itself or determining its overall course or policies, not just in the day-to-day carrying out of the business' affairs." *Cotten v. HFS-USA, Inc.*, 620 F. Supp. 2d 1342, 1343 (M.D. Fla. 2009) (quotation omitted). For example, if delegated sufficient discretion and authority, insurance claims adjusters, executive assistants, human resources managers, and purchasing agents may be properly categorized as administrative. 29 C.F.R. § 541.203.

In this case, Tyler only contends that Plaintiff Greene performed work "directly related to the general business operations of *Tyler's customers* . . . namely the implementation of time and attendance systems of Tyler's ExecuTime clients." Rogg. 1 (emphasis added).[3] Among the supposedly exempt duties identified by Defendant, the first two (coordination and prioritization of her weekly schedule; prioritizing multiple implementation projects). But Wage & Hour has stated in no uncertain terms that "planning one's own workload . . . and making similar decisions that promote effective and efficient use of that individual's own work time in performing assigned . . . activities, do not constitute exercising discretion and independent judgment with respect to matters of significance." Dep't of Labor,

---

[3] Because Tyler does not contend that Plaintiff's work directly related to its *own* general business operations, Plaintiff will not address the administrative-production dichotomy, which would have been dispositive on that issue. *See Schaefer-LaRose v. Eli Lilly & Co.*, 679 F.3d 560, 574 (7th Cir. 2012); *Desmond v. PNGI Charles Town Gaming, L.L.C.*, 564 F.3d 688, 694 (4th Cir. 2009); *Cotten*, 620 F. Supp. 2d at 1347–48.

Wage and Hour Div. (Aug. 19, 2005), 2005 DOLWH LEXIS 25, 2005 WL 3308592; *see also Fenton v. Farmers Ins. Exch.*, 663 F. Supp. 2d 718, 725–26 (D. Minn. 2009) (same). Moreover, to the extent these might be "matters of significance," they are not so to Tyler's customers. In fact, these have nothing to do whatsoever with their public sector customers' general operations.

Plaintiff Greene did not consult municipal governments about how to compensate their employees or how to track their time. Rather, she assisted them in teaching them how to their new time and pay software and how to configure its functionalities—a fancy way of saying "changing the settings." How the customers used the software was based on their own needs, which were determined long before Plaintiff ever became involved.

Simply acting as a conduit for information about how ExecuTime software works does not even arguably constitute the "general business operations" of Tyler's local government clients. No doubt, many of the government employees who use that software are engaged in work directly related to the running or servicing of the business, but that does not implicate Greene *directly* in running or servicing those municipal government operations, as the exemption requires.

Plaintiff simply taught Tyler's customers how to use the software that they had purchased, explaining its functionalities. All decisions about the type of software

package to purchase, whether it would be hosted remotely or locally, whether timeclocks would be purchased, the kind of training plan that would be used (i.e., daily, hourly, milestone, etc.) were made by other Tyler employees.

Because Plaintiff's work was not *directly* related to the general business operations of Tyler's customers, but was merely related to providing instruction on the operation of a piece of software that would later be used by employees who had those higher-level duties, she was not an exempt administrative employee as a matter of law.

### 2. *Plaintiffs' primary duties did not require discretion and independent judgment with respect to matters of significance*

Even if Plaintiff had a primary duty directly related to the management or general operations of Tyler's customers, she would nonetheless fall outside the scope of the administrative exemption because her primary duties did not include "the exercise discretion and independent judgment with respect to matters of significance" as required by 29 C.F.R. § 541.200(a)(3).

An employee's "primary duty" is "the principal, main, major or most important duty that the employee performs. Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." 29 C.F.R. § 541.700(a). Factors to consider when determining an employee's primary duty include, but are not

limited to, the relative importance of the exempt duties in relation to the other types of duties, the amount of time the employee spends performing exempt work, and the employee's relative freedom from direct supervision. *Id.*

"In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 CFR § 541.202(a). "The term 'matters of significance' refers to the level of importance or consequence of the work performed. 29 CFR § 541.202(a). An employee does not exercise discretion and judgment in matters of significance merely because the employer will experience financial losses if the employee fails to properly perform his or her job. 29 C.F.R. § 541.202(f). The phrase "discretion and independent judgment" must be applied in the light of all the facts involved in the particular employment situation in which the question arises. 29 C.F.R. § 541.202(b).

"Generally, 'matters of significance' include responsibilities dealing with matters of broad scope and significant detail that have a profound effect on the employer's business," such as: "matters that have significant financial impact, negotiating and binding the company on significant matters; and planning long- or short-term business objectives." *Allemani v. Pratt (Corrugated Logistics) LLC*, No. 1:12-CV-00100-RWS, 2014 U.S. Dist. LEXIS 77715, at *30 (N.D. Ga. June 6,

2014) (citing *Alvarez v. Key Transp. Serv. Corp.*, 541 F. Supp. 2d 1308, 1313–14

(S.D. Fla. 2008).

Defendants contend that Plaintiff exercised discretion and independent

judgment in connection with the following job duties:

- Coordination and prioritization of her weekly schedule;

- Decision-making with respect to prioritizing the multiple implementation projects to which she was assigned;

- Identifying technical issues related to the conversion of client data to Tyler systems by troubleshooting problems and/or escalating problems to other departments;

- Ensuring that implementation projects were on track to meet milestones and deadlines through coordination with Tyler's clients;

- Reporting any problems with respect to meeting client or internal deadlines, advising her supervisors of such problems and making recommendations to address them;

- Scheduling and coordinating training sessions with client representatives and tailoring such sessions to particular client needs;

- Assessing the effectiveness of training and whether additional training, one-on-one training, or topic specific "workshops" might be appropriate;

- Assessing and making recommendations as to whether implementation projects could proceed to subsequent stages, including "going live" with the software and "passing" the client to Tyler's support team; and/or

- Generally assessing client needs, client satisfaction, and whether the implementation project was proceeding consistent with client expectations and within contractually proscribed [*sic*] deadlines.

Dkt. 49-1, ¶ pp. 1–2. Tyler is, however, unable to describe the percentage of Plaintiff's workweek that was occupied by any of the purportedly exempt duties it identified. Dkt. 49-1, ¶ 7, pp. 7.

Plaintiff Greene's unrebutted testimony shows that she spent approximately 60–80 percent of her work time preparing for or conducting ExecuTime training sessions with Tyler customers. Tellingly, Defendant omits the training duties that were the very core of Plaintiff's work from its list of supposed exempt duties. Dkt. 49-1, ¶ pp. 1–2.

As for the troubleshooting that Plaintiff also performed, Wage & Hour has long taken the position that this type of technical support work is outside the scope of the administrative exemption:

> An information technology support specialist . . . who is responsible for the diagnosis of computer-related problems, conducts problem analysis and research, troubleshoots, resolves complex problems either in person or by using remote control software, and ensures timely closeout of trouble tickets is not exempt as an administrative or professional employee.
>
> . . .
>
> The primary duty of the information technology support specialist as described above consists of installing, configuring, testing, and troubleshooting computer applications, networks, and hardware. Maintaining a computer system and testing by various systematic routines to see that a particular piece of computer equipment or computer application is working properly according to the specifications designed by others . . .

> lacks the requisite exercise of discretion and independent
> judgment within the meaning of the administrative
> exemption. . . . Such work does not involve formulating
> management policies or operating practices, committing the
> employer in matters that have significant financial impact,
> negotiating and binding the company on significant matters,
> planning business objectives, or other indicators of exercising
> discretion and independent judgment with respect to matters of
> significance discussed in 29 CFR 541.202(b).

Wage & Hour Field Operations Handbook, 2.22i19 (citing WHD Opinion Letter

FLSA2006-42, available at https://www.dol.gov/sites/dolgov/files/WHD/legacy/

files/2006_10_26_42_FLSA.pdf).

Plaintiffs' discretion, to the extent it existed at all, was limited to the manner in

which she arranged her own schedule and prioritized different tasks, and did not

encompass "matters of significance" that the regulations require. It is not sufficient

that an employee makes decisions regarding "when and where to do different tasks,

as well as the manner in which to perform them," which is true of virtually all

employees. *Clark v. J. M. Benson, Co.*, 789 F.2d 282, 287–88 (4th Cir. 1986). Nor

is it sufficient that an employee may make decisions within "prescribed

parameters." *Dalheim v. KDFW-TV*, 706 F. Supp. 493, 509 (N.D. Tex. 1988),

*aff'd*, 918 F.2d 1220 (5th Cir. 1990). And just because an employee's duties may

require "some learning and ability," that alone does not demonstrate that he has

any real discretion. *Donovan v. Shell Oil Co., Inc.*, 168 F.2d 229, 232 (4th Cir. 1948).

Based on the undisputed facts in this case, Plaintiff's primary duties were purely instruction and "troubleshooting" within constrained and pre-established parameters that did not permit any real discretion with respect to matters of significance, much less as a *primary duty*. This record would not permit any factfinder to conclude that Plaintiff was properly classified as exempt administrative employees and she is entitled to summary judgment on the administrative exemption.

## 4.   CONCLUSION

For the foregoing reasons, Plaintiff requests that the Court issue an order holding (1) that Tyler Technologies is the successor in interest to ExecuTime and liable for its unpaid overtime obligations to Plaintiff; and (2) that Plaintiff was not an exempt administrative employee, either as a "project manager" when working for ExecuTime or as an "implementation consultant" when working for Tyler Technologies.

This 6th day of April 2020,

Respectfully submitted,

**DELONG CALDWELL BRIDGERS FITZPATRICK & BENJAMIN, LLC**

*/s/Matthew W. Herrington*

101 Marietta Street NW
Suite 2650
Atlanta, Georgia 30303
(404) 979-3171
(404) 979-3170 (f)
benjamin@dcbflegal.com
matthew.herrington@dcbflegal.com

Mitchell D. Benjamin
Georgia Bar No. 049888
Matthew W. Herrington
Georgia Bar No. 275411

Counsel for Plaintiff

### Certification of Compliance

Pursuant to LR 7.1, NDGa, I certify that the foregoing brief was prepared using

Times New Roman 14-point font, one of the font and point selections approved by

the Court in LR 5.1, NDGa.

*/s/Matthew W. Herrington*
Matthew W. Herrington
Georgia Bar No. 275411