IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **SUZANNE GREENE,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**TYLER TECHNOLOGIES, INC.,**<br><br>**Defendant.** | Civil Action No. 1:19-cv-1338-AT |

**PLAINTIFF'S RULE 56.1(B) STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED**

Plaintiff Suzanne Greene submits the following Statement of Material Facts as to Which There is No Genuine Issue to Be Tried, showing the Court as follows:

1. Defendant Tyler Technologies, Inc., is in the business of providing software and technology services to the public sector. Exhibit 1 (Tyler Technologies' Responses to Plaintiff's Requests for Admission), ¶ 7.

2. "Tyler is the largest company in the United States exclusively focused on providing integrated software and technology services to public sector agencies." Exhibit 4 hereto (excerpt from Tyler Technologies Employee Handbook).

3. Tyler's gross revenues in 2019 were over $1 billion and in the same year it had gross profits of over $500 million. Exhibit 4 hereto (Tyler Technologies, Inc. Quarterly Statements of Operations As of December 31, 2019 (https://s3.amazonaws.com/b2icontent.irpass.cc/499/180708.pdf) (accessed April 6, 2020), pg. 7.

4. Tyler acquired ExecuTime Software, LLC in June 2016. Exhibit 1, ¶¶ 2–3.

5. Plaintiff Greene was employed by ExecuTime Software, LLC as a "project manager" beginning in February 2016. Exhibit 1, ¶ 1.

6. For the first six months approximately, Greene worked with ExecuTime's "Advanced Scheduling" software module, which is primarily used by police and fire departments. Dkt. 47 (Deposition Plaintiff Greene) (Deposition Plaintiff Greene) at 20:2–16, 21:4–13, 23:3–19.

7. In her position as a project manager, Greene was responsible for building schedules, which involved setting the ExecuTime configurations on the back end so that the correct types of schedules would populate in the software for the clients. Dkt. 47 (Deposition Plaintiff Greene) at 25:25 to 26:10.

8. However, "building schedules" did not mean that Greene was programming the software; as Greene put it, "I'm not very technical, so when it comes to, like, programming and things in depth on the technical side, I did not handle

any of that. All of that would go through tickets." Dkt. 47 (Deposition Plaintiff Greene) at 26:11–19.

9. Greene would simply create the schedule based on a questionnaire that the client filled out in consultation with the project manager examining the customer's policies and procedures. Dkt. 47 (Deposition Plaintiff Greene) at 27:1–18.

10. Tyler continued to employ Greene, and most other ExecuTime employees after acquiring ExecuTime, and continued to provide services to most of ExecuTime's customers following the acquisition. Exhibit 1, ¶¶ 8–9.

11. After the acquisition, Greene's title was changed to "implementation consultant." Dkt. 47 (Deposition Plaintiff Greene) at 22:12–29.

12. Her job duties changed only slightly, other than the fact that she was working with a different ExecuTime software module that performed different tasks and was no longer building schedules. Dkt. 47 (Deposition Plaintiff Greene) at 23:22 to 25:20; Exhibit 2 (Declaration of Suzanne Greene), ¶ 4.

13. In a March 2019 implementation job description, Tyler described ExecuTime as follows:

> ExecuTime™ is a leading time and attendance solution that empowers employees via self-service functionalities and allows

> supervisors to closely manage overtime, job costing, and labor data through reduces expenses. ExecuTime time assists organizations with the most complex time and seamlessly integrates with payroll software solutions. The Implementation Consultant is responsible for delivering high quality knowledge training to clients allowing them to use Tyler software products efficiently and effectively to achieve daily operations. The incumbent consults and partners with clients to gain a comprehensive understanding of workflow, business/technical requirements and needs to ensure that the knowledge transfer addresses client's needs. The Consultant ensures that the transition to Tyler software is completed according to predetermined timelines and establishes a positive baseline for the new relationship between the client site and Tyler Technologies.

Exhibit 1, ¶ 81.

14. An example of the "high-quality knowledge training" that Greene performed as an implementation consultant may be viewed in the attached video exhibit, which is an example of Plaintiff performing remote timeclock training for the city of Hendersonville, TN on April 18, 2018. Exhibit 3 hereto (placeholder for video exhibit).

15. The first step for any ExecuTime customer is talking with a sales representative and possibly a "product owner" who focuses on a specific software. Dkt. 46 (30(b)(6) Deposition of Hillary Pasch) at 33:6–16.

16. Once the customer has decided on what software it will purchase and what kind of service package (e.g., daily, hourly, milestone, or paid in full), a sales representative creates a contract, which also goes through the legal department. Dkt. 46 (30(b)(6) Deposition of Hillary Pasch) at 35:11 to 36:13.

17. After the contract has been signed, the sales rep. sends the contract to a team in the ExecuTime division, consisting of the Manager of Implementation, the Director of ExecuTime, and the Manager of Implementation and Support. Dkt. 46 (30(b)(6) Deposition of Hillary Pasch) at 40:6–24.

18. They determine what modules have been purchased and assign it to a project manager and an implementation consultant. Dkt. 46 (30(b)(6) Deposition of Hillary Pasch) at 41:24 to 42:16.

19. The project manager typically works with the same implementation consultant on each project. Dkt. 46 (30(b)(6) Deposition of Hillary Pasch) at 43:7–10.

20. The project manager then reads the contract, determines where it will be installed physically, if timeclocks need to be purchased, and

whether there is a mobile module . Dkt. 46 (30(b)(6) Deposition of Hillary Pasch) at 43:19 to 46:11.

21. When a project is assigned to an implementation consultant, they too first read the contract and then based on what the customer has purchased, she is responsible for creating a "template" based on that information to set up the ExecuTime software in preparation for customer training. Dkt. 46 (30(b)(6) Deposition of Hillary Pasch) at 67:10–16.

22. Tyler claims that implementation consultants typically decide with the client whether to have in-person trainings or remote, but cannot identify any instance of Plaintiff Greene ever doing that. Dkt. 46 (30(b)(6) Deposition of Hillary Pasch) at 70:2 to 71:8.

23. Greene testified that, typically, in-person training sessions were for "power users," "end users," and "super users" (supervisors) who required knowledge of functionalities that lower level users did not. Dkt. 47 (Deposition Plaintiff Greene) at 105:11–16.

24. Greene did not set the deadlines in the project plans but had to be aware of them. Dkt. 47 (Deposition Plaintiff Greene) at 94:20–22.

25. Because Greene dealt with multiple implementations (i.e., projects) at once, she had to manage her workload and the ensure that the deadlines in multiple concurrent project plans were met. Dkt. 47 (Deposition Plaintiff Greene) at 94:6–19.

26. In any implementation, the project objectives were communicated to Greene by the supervising project manager and was contained in the project plan, which contained deadlines for when different categories of individual customer employees (e.g., end users, super users) were supposed to complete their training. Dkt. 47 (Deposition of Plaintiff Greene) at 101:5–13.

27. This would be done without the involvement of Greene, and only after the project plan was complete would Greene receive the project in a "hand-off call." Dkt. 47 (Deposition of Suzanne Greene) at 103:18 to 104:16.

28. Tyler's project managers generally were so involved in Greene's projects that usually did not have to update them about whether project deadlines were being met because they would already be aware. Dkt. 47 (Deposition of Suzanne Greene) at 98:11 to 99:6.

29. During an implementation, Greene was responsible for ensuring that the customer employees that she trained clearly understood what the project manager had already gone over with them and remind them of their objectives and milestones. Dkt. 47 (Deposition of Suzanne Greene) at 99:14 to 100:2.

30. When entering into a contract with Tyler for ExecuTime software and support—which occurs prior to Greene's involvement—each client can purchase different amounts of training hours. Dkt. 109:18 to 110:14.

31. After she would begin working on a project, Greene would keep track of how many hours of training a customer had remaining and, if the customer got down to 10 or 12 hours remaining, Greene would notify the project manager so they could speak to the client and have them purchase more hours, if necessary. Dkt. 109:18 to 110:14.

32. Greene did not make recommendations about needing to purchase additional training hours without speaking to a project manager first. Dkt. 109:18 to 110:14.

33. As part of her training duties, Greene was responsible for delegating tasks contained on checklists to the customer's employees who were

being trained "and say, okay, these are the specific items that need to be completed by this date, pretty much like reiterating the project plan that was already put together." Dkt. 47 (Deposition of Suzanne Greene) at 102:2–17.

34. If project deadlines were behind schedule, Greene would reach out to the project manager and let them know that "hey, this needs to be revised, we may need to push out the date, and then [the project manager] would actually update the project plan. Dkt. 47 (Deposition of Suzanne Greene) at 106:3 to 107:8.

35. A customer not meeting milestones in the project plan on time could result in postponing a Go-Live deadline. Dkt. 47 (Deposition of Suzanne Greene) at 109:1–17.

36. Greene typically did not have any role in designing training materials but believes that on one occasion she was asked to update the current training manual template. Exhibit 2 hereto (Declaration of Suzanne Greene), ¶¶ 6–7

37. That update took approximately half of a single day or less. Exhibit 2 hereto (Declaration of Suzanne Greene), ¶ 8.

38. Greene estimates that she spent 30–40 percent of her work time conducting ExecuTime training sessions with Tyler customers, and that she spent 30–40 percent of her work time preparing for ExecuTime training sessions with Tyler customers. Dkt. 47 (Deposition of Suzanne Greene) at 91:24 to 92:18.

39. Greene spent a small amount of time on weekly or bi-weekly client calls, which ranged from 30 minutes to an hour. Dkt. 47 (Deposition of Suzanne Greene) at 92:19 to 93:4.

40. At any given time, the number of implementation projects to which Greene was assigned ranged from 5 to 20. Dkt. 47 (Deposition of Suzanne Greene) at 93:14 to 94:1.

41. The amount of time Greene spent on troubleshooting is more difficult to estimate because it occurred "throughout" her workweek while engaged in other activities, and because some clients needed less help than others. Dkt. 47 (Deposition of Suzanne Greene) at 93:5–13.

42. Asked to identify decisions made by implementation consultants that are not reviewed at a higher level, the Company stated that during on-site training, if "the agenda isn't getting done . . . [they may] make a decision that they're going to tell the client they need to come back

on-site. And working with the client to get that built into the project timeline, stay longer that day maybe, work through lunch if they need to." Dkt. 46 (30(b)(6) Deposition of Hillary Pasch) at 73:1–15.

43. On a technical review call with a client, an implementation consultant may ask questions taken from a master list of questions that is provided to them, but, Tyler claims, "it's up to the discretion of the implementation consultant to know what questions to ask, what not to ask, what to elaborate on." Dkt. 46 (30(b)(6) Deposition of Hillary Pasch) at 74:8–13.

44. The only example provided by Tyler: "If [the customer] did not purchase time clocks, maybe the implementation consultant could say, how are you going to be logging in your time? I'd make a recommendation you add time clocks. Or you don't have them on your contract, we're not going to discuss that." Dkt. 46 (30(b)(6) Deposition of Hillary Pasch) at 74:8–21.

45. But the Company could not identify any instances in which Plaintiff ever actually made any such recommendation. Dkt. 46 (30(b)(6) Deposition of Hillary Pasch) at 74:22–25.

46. Nor could the Company provide an example of any time that Ms. Greene ever made recommendations to Tyler's customers about making changes to their own payroll systems rather than making changes to the configuration of Executime, or how often such recommendations were made, if ever. Dkt. 46 (30(b)(6) Deposition of Hillary Pasch) at 86:5–21, 90:18 to 91:22.

47. Turlock and Hendersonville were the only two projects for which Tyler produced documents reflecting any of Greene's activities on the job, despite having reviewed approximately 50 project files prior to the production. Dkt. 46 (30(b)(6) Deposition of Hillary Pasch) at 86:22–25, 89:16–22.

48. Tyler Technologies, Inc. was sued in a putative collective action in 2008 for alleged misclassification and overtime violations with respect to implementation consultants. *Patty Beall et al. v. Tyler Technologies, Inc., and EDP Enterprises, Inc.,* 2:08-cv-422 TJW (E.D. Tex. 2008).

This 6th day of April 2020,

Respectfully submitted,

**DELONG CALDWELL BRIDGERS FITZPATRICK & BENJAMIN, LLC**

*/s/Matthew W. Herrington*
Mitchell D. Benjamin
Georgia Bar No. 049888
Matthew W. Herrington
Ga. Bar No. 275411

Counsel for Plaintiff

101 Marietta Street NW
Suite 2650
Atlanta, Georgia 30303
(404) 979-3171
(404) 979-3170 (f)
benjamin@dcbflegal.com
matthew.herrington@dcbflegal.com