IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| SUZANNE GREENE, | |
| Plaintiff, | |
| vs. | Civil Action No. 1:19-cv-1338-AT |
| TYLER TECHNOLOGIES, INC., | |
| Defendant. | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Suzanne Greene hereby responds in opposition to the Motion for

Summary Judgment [Dkt. 56] of Defendant Tyler Technologies, Inc., showing the

Court as follows:

## 1.    INTRODUCTION

This is an FLSA action brought by a former "implementation consultant"

against her former employer for unpaid overtime wages. Defendant has moved for

summary judgment on the following issues: (1) the FLSA's administrative

exemption (29 U.S.C. § 213(a)(1)), and (2) willfulness (29 U.S.C. § 255(a)). [Dkt.

56] Plaintiff has filed her own motion for partial summary judgment on the

exemption issue. [Dkt. 57]

Plaintiff Greene's work for Defendant consisted primarily of training the employees of Tyler's local government customers in how to use its ExecuTime time and pay software. She was also responsible for troubleshooting issues that the customers encountered with the software. If the problem could be fixed by simply turning on or off a certain functionality of the software, then Greene could fix the problem herself. Anything technical, informed her supervisor who then sent the issue on to another Tyler team. Greene's training materials were drafted by others. She did not advise Tyler's customers as to how they should operate their "businesses" (i.e., government operations). Greene had no authority to make any significant decisions beyond managing her own workload. She supervised no one, did no hiring or firing, no purchasing, and no contracting. Because Defendant has failed to show that any of Plaintiff's primary duties were directly related to the general business operations of Tyler's customers, Defendant's Motion must fail on the administrative exemption issue.

Similarly, as to the issue of willfulness, Defendant is not entitled to summary judgment. Willfulness is almost universally held to be a jury issue that requires credibility determinations. Moreover, despite multiple depositions on the issue, Defendant cannot offer any specifics about the exemption-related advice they purportedly received from their attorney—when it was sued for the very same

FLSA violation, prior to Plaintiff's employment—or the information they provided their attorney on which the advice was based. Nor can Defendant produce even a single document relating to the advice it received or its classification decision. A jury must determine whether Defendant's story is credible or not and whether Defendant conducted a reasonable inquiry into its FLSA obligations. Finally, because Defendant's counsel is available to testify on the willfulness issue but refuses to do so, a jury is entitled to conclude that his testimony regarding the decision to classify implementation consultants as exempt would have been unfavorable to Defendant.

**2.    FACTUAL SUMMARY**

    **a.    Preliminary Statement**

Throughout its Statement of Material Facts, Defendant repeatedly misrepresents the record in serious and material ways, proffering purported "facts" that have no relationship to the record citations. These misrepresentations are enumerated in the attached Response to Defendant's Statement of Material Facts.

Additionally, in its Brief, Defendant repeatedly cites to facts and exhibits that were not included in its Statement of Material Facts, thereby violating LR 56.1(B)(1) as well as section (III)(h) of Judge Totenberg's Standing Order. The

Court should disregard all proffered facts not included in the Statement of Material Facts.

### b.     Plaintiff's Job Duties

Defendant Tyler Technologies, Inc., provides software and technology services to the public sector. Plaintiff Greene was employed by ExecuTime Software, LLC in a position called "project manager" from February 2016. Dkt. 57-1 (Defendant's Responses to Plaintiff's First Requests for Admission), ¶ 1. After Tyler acquired ExecuTime Software, LLC, it continued to employ Greene in a position called "implementation consultant" (hereinafter "IC"). Dkt. 47 at 22:12–29. Greene's duties in the two positions were largely the same. Dkt. 47 at 23:22 to 25:20; Dkt. 57-2 (Declaration of Suzanne Greene), ¶ 4.

In a March 2019 IC job description, Tyler described ExecuTime as follows:

> ExecuTime™ is a leading time and attendance solution that empowers employees via self-service functionalities and allows supervisors to closely manage overtime, job costing, and labor data through reduces expenses. ExecuTime time assists organizations with the most complex time and seamlessly integrates with payroll software solutions. The Implementation Consultant is responsible for delivering high quality knowledge training to clients allowing them to use Tyler software products efficiently and effectively to achieve daily operations. . . .

Dkt. 57-1, ¶ 81 (emphasis added). A representative example of this "high-quality knowledge training" that Greene performed as an implementation consultant may

be viewed in the video exhibit attached to Plaintiff's Motion for Partial Summary Judgment, in which Plaintiff performs remote timeclock training for the city of Hendersonville, TN on April 18, 2018. [Dkt. 57-3] That video is representative of a typical remote timeclock training session that Greene performed. Exhibit 1 hereto (Declaration of Suzanne Greene), ¶ 30.

After speaking with an ExecuTime sales representative to determine what software it will purchase and what kind of service package (e.g., daily, hourly, milestone, or paid in full), the sales representative creates a contract, which also goes through the legal department. Dkt. 46 (30(b)(6) Deposition of Hillary Pasch) at 35:11 to 36:13. After the contract has been signed, the sales representative sends the contract to an ExecuTime team. Dkt. 46 at 40:6–24. That team determines what modules have been purchased and assign it to a project manager and an IC. Dkt. 46 at 41:24 to 42:16. The project manager typically works with the same IC on each project. Dkt. 46 at 43:7–10. The project manager then reads the contract, determines where the software would be installed physically, if timeclocks need to be purchased, and whether there was a mobile module . Dkt. 46 at 43:19 to 46:11.

When a project is assigned to an IC, she too first reads the contract and then, based on what the customer has purchased, she is responsible for creating a

"template" based on that information to set up the software in preparation for customer training. Dkt. 46 at 67:10–16.

Tyler claims that IC's typically decide with the client whether to have in-person trainings or remote, but cannot identify any instance of Plaintiff Greene ever doing that. Dkt. 46 at 70:2 to 71:8. Greene testified that, typically, in-person training sessions were for "power users," "end users," and "super users" (supervisors) who required knowledge of functionalities that lower level users did not. Dkt. 47 at 105:11–16. Decisions about whether trainings would be in-person or remote were made before Greene was even assigned to a project. Exhibit 1, ¶ 9.

In any implementation, the project objectives were communicated to Greene by the supervising project manager and were contained in the project plan, which contained deadlines for when different categories of individual customer employees (e.g., end users, super users) were supposed to complete their training. Dkt. 47 at 101:5–13.

This process would be done without the involvement of Greene, and only after the project plan was complete would Greene receive the project in a "handoff call." Dkt. 47 at 103:18 to 104:16. Tyler's project managers generally were so involved in Greene's projects that she usually did not have to update them about whether project deadlines were being met as they they would already be aware. Dkt. 47 at

98:11 to 99:6. Greene typically communicated with her project manager every day, and often multiple times per day. Exhibit 1, ¶ 13.

During an implementation, Greene was responsible for ensuring that the customer's employees whom she trained clearly understood what the project manager had already reviewed with them and to remind them of their objectives and milestones. Dkt. 47 at 99:14 to 100:2.

When entering into a contract with Tyler for ExecuTime software and support—which occurs prior to Greene's involvement—each client can purchase different amounts of training hours. Dkt. 109:18 to 110:14. After she began working on a project, Greene would keep track of how many hours of training a customer had remaining and, if the customer got down to 10 or 12 hours remaining, Greene would notify the project manager so they could speak to the client and have them purchase more hours, if necessary. Dkt. 109:18 to 110:14. Greene did not make recommendations about needing to purchase additional training hours without speaking to a project manager first. Dkt. 109:18 to 110:14.

As part of her training duties, Greene was responsible for delegating tasks contained on checklists to the customer's employees who were being trained "and say, okay, these are the specific items that need to be completed by this date, pretty much like reiterating the project plan that was already put together." Dkt. 47 at

102:2–17. If project deadlines were behind schedule, Greene would reach out to the project manager and let them know that "hey, this needs to be revised, we may need to push out the date, and then [the project manager] would actually update the project plan. Dkt. 47 at 106:3 to 107:8. A customer not meeting milestones in the project plan on time could result in postponing a Go-Live deadline. Dkt. 47 at 109:1–17.

Greene typically did not have any role in designing training materials but believes that on one occasion she was asked to update the current training manual template. Dkt. 57-2, ¶¶ 6–7. That update took approximately half of a single day or less. Dkt. 57-2, ¶ 8.

Greene estimates that she spent 30–40 percent of her work time conducting ExecuTime training sessions with Tyler customers, and that she spent 30–40 percent of her work time preparing for ExecuTime training sessions with Tyler customers. Dkt. 47 at 91:24 to 92:18. Greene spent approximately 20% of time on weekly or bi-weekly client calls. Dkt. 47 at 92:19 to 93:4; Exhibit 1, ¶ 20.

Asked to identify decisions made by IC's that are not reviewed at a higher level, the Company stated that during on-site training, if "the agenda isn't getting done . . . [they may] make a decision that they're going to tell the client they need to come back on-site. And working with the client to get that built into the project timeline,

stay longer that day maybe, work through lunch if they need to." Dkt. 46 at 73:1–15. Greene denies that she ever made recommendations to clients about having her come back on site. Exhibit 1, ¶ 21.

On a technical review call with a client, an IC may ask questions taken from a master list of questions that is provided to them, but, Tyler claims, "it's up to the discretion of the implementation consultant to know what questions to ask, what not to ask, what to elaborate on." Dkt. 46 at 74:8–13. The only example provided by Tyler was that an IC might make a recommendation about purchasing time clocks. Dkt. 46 at 74:8–21. But the Company could not identify any instances in which Plaintiff ever actually made any such recommendation. Dkt. 46 at 74:22–25. Greene herself does not recall ever making any such recommendation. Exhibit 1, ¶ 23. Nor could the Company provide an example of any time that Ms. Greene ever made recommendations to Tyler's customers about making changes to their own payroll systems rather than making changes to the configuration of ExecuTime, or how often such recommendations were made, if ever. Dkt. 46 at 86:5–21, 90:18 to 91:22. Greene denies ever doing so. Exhibit 1, ¶ 24.

Tyler was sued in 2008 in the Eastern District of Texas for misclassifying implementation consultants and other employees as exempt.[1] It settled that case in

---

[1] *Beall et al. v. Tyler Technologies, Inc. et al.*, 2:08-cv-00422-TJW (E.D. Tex.).

March 2011, thereby avoiding a ruling on the pending summary judgment motions, which were already fully briefed.[2] Tyler's current counsel, Paulo McKeeby, represented Tyler in that litigation and purportedly advised them on the issue of implementation consultant classification. That advise is the basis of Tyler's good faith defense in this case.

Tyler's current general counsel, Abby Diaz, was deposed about the substance of its good faith defense, but she could provide no concrete information about the information that was provided to Mr. McKeeby, the nature of his investigation, or the substance of his advice, other than that he said the implementation consultants were exempt. Dkt. 35 (30(b)(6) Deposition of Abby Diaz) at 17:24 to 18:4, 35:12–22.

Plaintiff attempted to depose Mr. McKeeby, but this Court would not permit it, instead mandating a third 30(b)(6) deposition of Defendants' former general counsel and current CEO, Lynn Moore. Dkt. 36 (Order on discovery dispute), pg. 6. In that deposition, Mr. Moore also provided no specifics about the advice given or the information that Tyler provided to Mr. McKeeby. Dkt. 48 (Deposition of Lynn Moore) at 16:10 to 22:21. No documents relating to McKeeby's advice or investigation were identified by Mr. Moore. Dkt. 48 at 14:24 to 16:9.

---

[2] *Id.* at Dkt. 215 (order approving motion for settlement)

**3.    DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE FLSA ADMINISTRATIVE EXEMPTION**

Defendant's argument that Plaintiff Greene was an exempt administrative employee fails for two independent reasons: (1) she did not perform work directly related to the management policies or general business operations of Tyler's customers,[3] and (2) she did not have a primary duty involving the exercise of discretion and independent judgment with respect to matters of significance. *See* 29 C.F.R. § 541.200(a).

Greene's work of training Tyler's customers on how to use their new ExecuTime software undoubtedly did have some sort of indirect effect on the general business operations of Tyler's customers, but not *directly* so, as the exemption requires.

Greene's discretion, to the extent that it existed at all, was limited to the minutiae of how she performed her own tasks and how she organized her own schedule. That is not even arguably the discretion with respect to "matters of

---

[3] Tyler argues in passing in its brief that Plaintiff's work was directly related to its own general business operations. Not only does this argument fail on the merits because Plaintiff's work was *production work* with respect to Tyler, but Defendant should be precluded from even making it, having never put Plaintiff on notice of the argument in discovery.

significance" that an administrative employee must exercise to relieve an employer of its overtime obligations.

For these reasons, Defendants' summary judgment motion must fail on the exemption question, and Plaintiff is entitled to partial summary judgment on the same issue.

### a. Plaintiff did not perform work directly related to management policies or general business operations of her employer's customers

All exempt administrative employees have in common that they "perform work *directly related* to assisting with the running or servicing of the business." 29 C.F.R. § 541.201(a) (emphasis added). Thus, the administrative employee "engages in running the business itself or determining its overall course or policies, not just in the day-to-day carrying out of the business' affairs." *Cotten v. HFS-USA, Inc.*, 620 F. Supp. 2d 1342, 1343 (M.D. Fla. 2009) (quotation omitted). For example, if (and only if) delegated sufficient discretion and authority, insurance claims adjusters, executive assistants, human resources managers, and purchasing agents may be properly categorized as administrative. 29 C.F.R. § 541.203. Administrative employees stand in opposition to production employees who are "engaged in the core function of a business." *Schaefer-LaRose v. Eli Lilly & Co.*, 679 F.3d 560, 574 (7th Cir. 2012) ("when an employee is engaged in the core

function of a business, his or her task is not properly categorized as administrative."); *see also Haywood v. N. Am. Van Lines, Inc.*, 121 F.3d 1066, 1072 (7th Cir. 1997) (" '[s]ervicing' a business within the meaning of [the former regulation] denotes employment activity ancillary to an employer's principal production activity")).

A non-exclusive list of types work "directly related to management or general business operations" is found at 29 CFR 541.201(b). Of the duties enumerated there, the only ones identified by Defendant in its Motion as relevant to this case are "quality control and database administration." Plaintiff Greene performed neither of those duties.

In reality, Greene merely taught Tyler's customers how to use its ExecuTime software. If they had difficulties with it, she then either explained what they were doing wrong, or if it appeared to be a software issue rather than a training issue, she informed her project manager who then made a decision about sending a ticket to the technical team. Exhibit 1, ¶ 4. When Greene tried to create a ticket for a technical issue on her, she was reprimanded for it. Exhibit 1, ¶ 5.

During training sessions, Greene would use "dummy" information to show the customers' employees how various types of information could be inputted into the ExecuTime software, and how to access its various functionalities. Exhibit 1, ¶ 28.

Which functionalities the employees needed to understand how to access and use were based on specifications determined before Greene became involved in the implementation process. Exhibit 1, ¶ 29. Greene had absolutely no input into the payroll or management policies of Tyler's government employees. Exhibit 1, ¶ 24–25. She did not advise customers on how to manage their information databases and she did not analyze or inspect ExecuTime software for quality issues. Exhibit 1, ¶ 24–25.

Defendant also contends that Greene regularly analyzed the status of the various implementations to which she was assigned to "self-determine her priorities and schedule for the week." But the U.D. Dep't of Labor's Wage & Hour Division has stated in no uncertain terms that "planning one's own workload . . . and making similar decisions that promote effective and efficient use of that individual's own work time in performing assigned . . . activities, do not constitute exercising discretion and independent judgment with respect to matters of significance." Dep't of Labor, Wage and Hour Div. (Aug. 19, 2005), 2005 DOLWH LEXIS 25, 2005 WL 3308592; *see also Fenton v. Farmers Ins. Exch.*, 663 F. Supp. 2d 718, 725–26 (D. Minn. 2009) (same). Moreover, to the extent these might be "matters of significance," they are not so to Tyler's customers (for whom Defendants claim

she provided administrative services). In fact, these duties have nothing to do

whatsoever with their public sector customers' general business operations.

Plaintiff Greene did not consult municipal governments about how to

compensate their employees or how to track their time. Rather, she assisted them in

teaching them how to their new time and pay software and how to configure its

functionalities—a fancy way of saying "changing the settings." Exhibit 1, ¶ 28.

How the customers used the software was based on their own needs, which were

determined long before Plaintiff ever became involved. Exhibit 1, ¶¶ 9–10, 12, 29.

Simply acting as a conduit for information about how ExecuTime software

works does not constitute work *directly related* to the general business operations

of Tyler's local government clients. No doubt, many of the government employees

who use that software are engaged in work directly related to the running or

servicing of the business of government, but that does not implicate Greene in

running or servicing those municipal government operations _directly_, as the

exemption requires.

Tyler relies on three foreign decisions—two of them unpublished orders—in

support of its argument that Greene's duties were directly related to the general

business operations of Tyler's customers. Each of them is highly distinguishable

and entirely inapposite to this case because the employees were making

recommendations to the custmoer's employees about how to operate their businesses and how to customize their software purchases, in addition to any training duties.

In *Verkuilen v. Mediabank, LLC*, the plaintiff had been an "account manager" and provided computer software to advertising agencies; she "acted as a bridge between the software developers and the customers, helping to determine the customers' needs, then relaying those needs to the developers and so assisting in the customization of the software, and finally helping the customers use the customized software." 646 F.3d 979, 980 (7th Cir. 2011). Here, Plaintiff Greene was not even involved at all when decisions were made about the customer's needs, she had no input regarding customization of software, and she certainly did not help in the actual customization:

> Q.  But in terms of what your responsibility was to, quote, unquote, build the schedule, are you actually programming the software or what is it that you're doing?
>
> A.  No, I'm not very technical, so when it comes to, like, programming and things in depth on the technical side, I did not handle any of that.

Dkt. 47 at 26:11–18.

In the second case Tyler relies on, *Brooks v. Healthcare-Iq, Inc.*, the plaintiff worked as an "Applications Trainer (held briefly), Training Manager, and Training

and Development Manager." No. 8:17-CV-1897-02JSS, 2019 WL 497693, at *8
(M.D. Fla. Feb. 8, 2019). The plaintiff "managed the curriculum design and
delivery of three complex medical software programs targeting hospital
corporation supply chain operations, medical surgical optimization in performance
and strategic utilization and a dynamic fractal map presentation tools for key
management professionals." *Id.* He performed a "complete redesign of [the]
training curriculum," "managed the curriculum design, and managed the
curriculum delivery" without approval from other employees. *Id.* Additionally, he
"formulated instructional modules for new customers, on his own and with
extensive discretion exercised by himself." He would "submit a proposed
curriculum that he had designed for the specific customer" and completely
redesigned the approach that was taken in the curriculum." He approved another
employee's expense reports and reviewed other employees' work. *Id.* Plaintiff
Greene of course had none of these responsibilities, making *Brooks* completely
inapposite.

Finally, in *Carbaugh v. Unisoft Int'l, Inc.*, the third case upon which Defendant
relies, the plaintiff consult[ed] with clients to assess their needs and capabilities,"
"install[ed] and tailor[ed the employer's] software to suit the clients' needs,"
"work[ed] with [] programmers and coders to provide them information they

needed to produce software," "suggested who at the client site should receive training, and developed and tailored the training modules," and "was involved with infrastructure management, third party software and hardware management, recommendations and maintenance, and he developed and implemented cost savings to increase profit and revenue." No. H-10-0670, 2011 U.S. Dist. LEXIS 131551, at *64-67, 2011 WL 5553724 (S.D. Tex. Nov. 15, 2011). The position described in *Carbaugh* does not bear even the fainest resemblance to Plaintiff's job, which consisted merely of presenting canned software presentations that she did not herself create.

Because Ms. Greene's work was not directly related to the general business operations of Tyler's customers, but was merely related to providing instruction on the operation of a piece of software that would later be used by employees who may have had those higher-level duties, she was not an exempt administrative employee as a matter of law.

### b.    Plaintiff did not exercise discretion and independent judgment as to matters of significance.

Even if Plaintiff Greene had a primary duty directly related to the management or general operations of Tyler's customers, she would nonetheless fall outside the scope of the administrative exemption because her primary duties did not include

"the exercise discretion and independent judgment with respect to matters of significance" as required by 29 C.F.R. § 541.200(a)(3).

An employee's "primary duty" is "the principal, main, major or most important duty that the employee performs. Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." 29 C.F.R. § 541.700(a). Factors to consider when determining an employee's primary duty include, but are not limited to, the relative importance of the exempt duties in relation to the other types of duties, the amount of time the employee spends performing exempt work, and the employee's relative freedom from direct supervision. Id.

"In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 CFR § 541.202(a). "The term 'matters of significance' refers to the level of importance or consequence of the work performed. 29 CFR § 541.202(a).

Tyler has stressed how important the work of implementation consultants is to its business and the adverse consequence of an IC failing to do her job properly. But the FLSA's governing regulations are clear that "[a]n employee does not exercise discretion and judgment in matters of significance merely because the

employer will experience financial losses if the employee fails to properly perform his or her job." 29 C.F.R. § 541.202(f); *Watts v. Silverton Mortg. Specialists, Inc.*, 378 F. Supp. 3d 1164, 1172-73 (N.D. Ga. 2019) (same). Otherwise, *virtually every employee* would satisfy that prong.

"Generally, 'matters of significance' include responsibilities dealing with matters of broad scope and significant detail that have a profound effect on the employer's business," such as: "matters that have significant financial impact, negotiating and binding the company on significant matters; and planning long- or short-term business objectives." *Allemani v. Pratt* (Corrugated Logistics) LLC, No. 1:12-CV-00100-RWS, 2014 U.S. Dist. LEXIS 77715, at *30 (N.D. Ga. June 6, 2014) (citing *Alvarez v. Key Transp. Serv. Corp.*, 541 F. Supp. 2d 1308, 1313–14 (S.D. Fla. 2008). Troubleshooting is categorically not among "matters of significance," even if some level of discretion is exercised. *See* Wage & Hour Field Operations Handbook, 2.22i19 (citing WHD Opinion Letter FLSA2006-42, available at https://www.dol.gov/sites/dolgov/files/WHD/legacy/files/2006_10_26_42_FLSA.pdf).

As for the instruction side of Greene's job duties, cases are clear—even when they incorrectly characterize instruction as administrative—that using inherited lesson plans with only minor adjustments and without the ability to make

significant structural changes to the instruction does not qualify as an exempt duty. *See, e.g.*, *Ale v. Tenn. Valley Auth.*, 269 F.3d 680 (6th Cir. 2001) (training officer that inherited lesson plans and only adjusted those plans to incorporate newly issued procedures and protocols did not exercise discretion or independent judgment); *see also Hashop v. Rockwell Space Operations Co.*, 867 F. Supp. 1287 (S.D. Tex. 1994)), *Gallegos v. Equity Title Co. of Am., Inc.*, 484 F. Supp. 2d 589, 596 (W.D. Tex. 2007), *Kohl v. Woodlands Fire Dep't*, 440 F. Supp. 2d 626, 643 (S.D. Tex. 2006).

Here, Plaintiff Greene's discretion, to the extent it existed at all, was limited to the manner in which she arranged her own schedule and prioritized different tasks, and did not encompass "matters of significance" that the regulations require. It is not sufficient that an employee makes decisions regarding "when and where to do different tasks, as well as the manner in which to perform them," which is true of virtually all employees. *Clark v. J. M. Benson, Co*., 789 F.2d 282, 287–88 (4th Cir. 1986). Nor is it sufficient that an employee may make decisions within "prescribed parameters." *Dalheim v. KDFW-TV*, 706 F. Supp. 493, 509 (N.D. Tex. 1988), aff'd, 918 F.2d 1220 (5th Cir. 1990). And just because an employee's duties may require "some learning and ability," that alone does not demonstrate that she has

any real discretion. *Donovan v. Shell Oil Co., Inc*., 168 F.2d 229, 232 (4th Cir. 1948).

Because Plaintiff Greene's primary duties were purely instruction and "troubleshooting" within constrained and pre-established parameters that did not permit any meaningful discretion with respect to matters of significance, Tyler is not entitled to summary judgment on the administrative exemption issue.

4.   **DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THE FLSA WILLFULNESS ISSUE**

"To establish that the violation of the [FLSA] was willful in order to extend the limitations period, the employee must prove by a preponderance of the evidence that his employer either knew that its conduct was prohibited by the statute or showed reckless disregard about whether it was." *Morgan v. Family Dollar Stores*, 551 F.3d 1233, 1280 (11th Cir. 2008). Federal regulations define "reckless disregard" as the " 'failure to make adequate inquiry into whether conduct is in compliance with the [FLSA].' " *Id.* (quoting 5 C.F.R. § 551.104).

In this case, Plaintiff can show that Tyler was sued for the exact same violation in 2008. After summary judgment briefing in that case was complete, that matter settled without a ruling on the appropriateness of its classifications of ICs.[4] The

---

[4] Of course, given that all summary judgment briefing had been completed, a reasonable jury could also find Tyler was aware that its classification scheme

existence of that case is strong evidence that Defendant was put on notice that its classification of IC's was legally suspect. Yet it continued to compensate Plaintiff as exempt after being sued. In fact, it kept right on misclassifying its employees to the present day. It has kept no records on the advice that Mr. McKeeby purportedly provided about IC classification, nor can it provide any details about the specifics of that advice. It can provide no details about the investigation that Mr. McKeeby conducted prior to giving that advise. This is a more than sufficient basis to permit a jury to consider whether Tyler knew or should have known it was in violation of the FLSA, and whether it conducted an adequate investigation into its FLSA obligations.

Finally, because Defendant's counsel is available to testify on the willfulness issue and provide the critical information that Tyler cannot or will not provide, but refuses to do so at his client's command, a reasonable jury could conclude that his testimony regarding the decision to classify implementation consultants as exempt would have been unfavorable to Defendant. *See Jones v. Otis Elevator Co.*, 861 F.2d 655, 658-59 (11th Cir. 1988) ("if a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that

---

would fail at summary judgment and that this strategic maneuver was merely intended to avoid an adverse ruling.

he does not do it creates the presumption that the testimony, if produced, would be unfavorable.") (quoting *Graves v. United States*, 150 U.S. 118, 121, 14 S. Ct. 40, 41 (1893)). This possibility also renders summary judgment inappropriate on the question of willfulness.

## 5. CONCLUSION

For the foregoing reasons, Plaintiff Greene requests that this Court DENY Defendant Tyler's Motion for Summary Judgment in its entirety.

This 6th day of May 2020,

Respectfully submitted,

**DELONG CALDWELL BRIDGERS FITZPATRICK & BENJAMIN, LLC**

|  |  |
|---|---|
| 101 Marietta Street NW | *s/Matthew W. Herrington* |
| Suite 2650 | Mitchell D. Benjamin |
| Atlanta, Georgia 30303 | Georgia Bar No. 049888 |
| (404) 979-3171 | Matthew W. Herrington |
| (404) 979-3170 (f) | Ga. Bar No. 275411 |
| benjamin@dcbflegal.com | |
| matthew.herrington@dcbflegal.com | Counsel for Plaintiff |

**Certification of Compliance**

Pursuant to LR 7.1, NDGa, I certify that the foregoing brief was prepared using

Times New Roman 14-point font, one of the font and point selections approved by

the Court in LR 5.1, NDGa.

*s/Matthew W. Herrington*
Matthew W. Herrington
Ga. Bar No. 275411

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| SUZANNE GREENE, | |
| **Plaintiff,** | |
| **vs.** | Civil Action No. 1:19-cv-1338-AT |
| TYLER TECHNOLOGIES, INC., | |
| **Defendant.** | |

## CERTIFICATE OF SERVICE

I certify that on this date I caused the foregoing document to be filed with the

Clerk via the Court's CM/ECF system, thereby ensuring electronic service upon all

counsel of record.

Dated: May 6, 2020

*s/Matthew W. Herrington*
Matthew W. Herrington
Ga. Bar No. 275411
