# Exhibit 1
# Second Declaration of Suzanne Greene

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **SUZANNE GREENE,** <br><br> **Plaintiff,** <br><br> vs. <br><br> **TYLER TECHNOLOGIES, INC.,** <br><br> **Defendant.** | Civil Action No. 1:19-cv-1338-AT |

**SECOND DECLARATION OF SUZANNE GREENE**

1. My name is Suzanne Greene. I am over the age of majority; suffer no legal disabilities and am a resident of Fayette County, Georgia. I have personal knowledge of the facts herein.

2. My work for Tyler Technologies consisted primarily of training the employees of Tyler's local government customers on how to use its ExecuTime time and pay software.

3. The training materials I used in my training sessions were drafted by others and typically I filled in dates and other minor information like client names.

4. I was responsible for troubleshooting issues that the customers encountered with the software. If the problem could be fixed by simply turning on or off a certain functionality of the software, I could fix the problem myself.

However, if a customer's problem was at all technical, I would speak to my project manager about it, and s/he would then send the customer to the Tyler support group.

5. Early in my employment, I attempted to send a ticket to the support group without going through my project manager, and because of that I was reprimanded by an implementation manager.

6. At no point in my employment did I advise Tyler's customers as to how they should operate.

7. At no point in my employment did I have any authority to make any significant decisions beyond managing my own workload.

8. At no point in my employment did I ever supervise anyone, hire or fire, or do purchasing or contracting.

9. The decision whether a customer would have in-person trainings or remote trainings was made before I was brought in to work on a project.

10. Deadlines in project plans were established before I became involved in a project.

11. In any implementation, the project objectives were communicated to me by my supervising project manager and those objectives were contained in the project plan. That plan contained deadlines for when different categories of

individual customer employees (e.g., end users, super users) were supposed to complete their training.

12. All deadlines and objectives were established before I became involved in a project.

13. I typically communicated with my project manager on a daily basis either by phone or email, often several times a day.

14. Because the entire implementation plan was established before I became involved, but there were rarely if ever any significant decisions remaining to be made by the customer.

15. If a client appeared not to be meeting a deadline, I would communicate that to my project manager and the project manager would then work with the customer to determine whether and how to alter the schedule.

16. I never made any recommendations to Tyler customers about the possibility of purchasing additional training hours.

17. I would typically inform the project manager when a customer had a dozen or fewer purchased training hours remaining and then the project manager would make a decision about recommending additional training to the customer.

18. I was responsible for ensuring that the customer employees that I trained clearly understood what the project manager had already gone over with them and remind them of their objectives and milestones.

19. I was responsible for delegating tasks (i.e., training activities) to the customer's employees and reminding them of pre-established deadlines. When doing so, I was always merely reiterating what the project manager had already gone over with the customer.

20. Weekly or bi-weekly client calls, which ranged from 30 minutes to an hour, took up approximately 20% of my typical workweek.

21. At no point in my employment did I ever recommend that a customer have me come back on-site for additional training.

22. I can recall only one instance in which a client requested additional on-site training—the City of Coppell, Texas—and when that occurred I directed the customer to my project manager.

23. I cannot recall a single instance of ever making a recommendation to a customer about purchasing timeclocks. To my knowledge, that would be the job of Tyler salespeople and not implementation consultants.

24. I never made any recommendations to customers about making any changes to their payroll practices.

25. I never made any recommendations to customers on how to manage their information databases and I did not analyze or inspect ExecuTime software for quality issues.

26. I showed Tyler's customers how to create the files in ExecuTime that they would need to then import into their payroll database.

27. But it was the customer's payroll vendor—sometimes another Tyler department, and sometimes not—who would show the customer how to do the actual importing and set up.

28. During training sessions, I would use "dummy" information (e.g., names like "Jeff Hourly" and "Sally Supervisor") to show the customers' employees how various types of information could be inputted into the ExecuTime software, and how to access its various functionalities. That means, essentially, that I would explain how to change the "settings" on the software so that it would do what the customer needed.

29. Which functionalities the employees needed to understand how to access and use was based on specifications determined before I became involved in the implementation process.

30. The video of a Hendersonville, TN, training session that was attached as an exhibit to my Motion for Summary Judgment is representative of a typical

remote timeclock training session that I performed throughout my employment as an implementation consultant.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

This 6th day of May 2020,

DocuSigned by:

*Suzanne Greene*

Suzanne Greene