IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| SUZANNE GREENE,<br><br>Plaintiff,<br><br>vs.<br><br>TYLER TECHNOLOGIES, INC.,<br><br>Defendant. | Civil Action No. 1:19-cv-1338-AT |

**PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS**

Plaintiff Suzanne Greene submits her Statement of Additional Material Facts in support of her Response in Opposition to Defendant's Motion for Summary Judgment, showing the Court as follows:

1. Greene's work for Tyler Technologies consisted primarily of training the employees of Tyler's local government customers on how to use its ExecuTime time and pay software. Exhibit 1 (Second Declaration of Suzanne Greene), ¶ 2.

2. The training materials Greene used in her training sessions were drafted by others and typically she merely filled in dates and other minor information like client names. Exhibit 1, ¶ 3.

1

3. Greene was responsible for troubleshooting issues that the customers encountered with the software. If the problem could be fixed by simply turning on or off a certain functionality of the software, Greene could fix the problem herself. Exhibit 1, ¶ 4.

4. However, if a customer's problem was at all technical, Greene would speak to her project manager about it, and s/he would then send the customer to the Tyler support group. Exhibit 1, ¶ 4.

5. Early in her employment, Greene attempted to send a ticket to the support group without going through my project manager, and because of that she was reprimanded by an implementation manager. Exhibit 1, ¶ 5.

6. At no point in her employment did Greene advise Tyler's customers as to how they should operate. Exhibit 1, ¶ 6.

7. At no point in her employment did Greene have any authority to make any significant decisions beyond managing her own workload. Exhibit 1, ¶ 7.

8. At no point in her employment did Greene ever supervise anyone, hire or fire, or do purchasing or contracting. Exhibit 1, ¶ 8.

9. The decision whether a customer would have in-person trainings or remote trainings was made before Greene was brought in to work on a project. Exhibit 1, ¶ 9.

10. Deadlines in project plans were established before Greene became involved in a project. Exhibit 1, ¶ 10.

11. In any implementation, the project objectives were communicated to Greene by her supervising project manager and those objectives were contained in the project plan. That plan contained deadlines for when different categories of individual customer employees (e.g., end users, super users) were supposed to complete their training. Exhibit 1, ¶ 11.

12. All deadlines and objectives were established before Greene became involved in a project. Exhibit 1, ¶ 12.

13. Greene typically communicated with her project manager on a daily basis either by phone or email, often several times a day. Exhibit 1, ¶ 13.

14. Because the entire implementation plan was established before Greene became involved, but there were rarely if ever any significant decisions remaining to be made by the customer. Exhibit 1, ¶ 14.

15. If a client appeared not to be meeting a deadline, Greene would communicate that to my project manager and the project manager would then work with the customer to determine whether and how to alter the schedule. Exhibit 1, ¶ 15.

16. Greene never made any recommendations to Tyler customers about the possibility of purchasing additional training hours. Exhibit 1, ¶ 16.

17. Greene would typically inform the project manager when a customer had a dozen or fewer purchased training hours remaining and then the project manager would make a decision about recommending additional training to the customer. Exhibit 1, ¶ 17.

18. Greene was responsible for ensuring that the customer employees that she trained clearly understood what the project manager had already gone over with them and remind them of their objectives and milestones. Exhibit 1, ¶ 18.

19. Greene was responsible for delegating tasks (i.e., training activities) to the customer's employees and reminding them of pre-established deadlines. When doing so, Greene was always merely reiterating what the project manager had already gone over with the customer. Exhibit 1, ¶ 19.

20. Weekly or bi-weekly client calls, which ranged from 30 minutes to an hour, took up approximately 20% of Greene's typical workweek. Exhibit 1, ¶ 20.

21. At no point in her employment did Greene ever recommend that a customer have her come back on-site for additional training. Exhibit 1, ¶ 21.

22. Greene can recall only one instance in which a client requested additional on-site training—the City of Coppell, Texas—and when that occurred she directed the customer to her project manager. Exhibit 1, ¶ 22.

23. Greene cannot recall a single instance of ever making a recommendation to a customer about purchasing timeclocks. To her knowledge, that would be the job of Tyler salespeople and not implementation consultants. Exhibit 1, ¶ 23.

24. Greene never made any recommendations to customers about making any changes to their payroll practices. Exhibit 1, ¶ 24.

25. Greene never made any recommendations to customers on how to manage their information databases and Greene did not analyze or inspect ExecuTime software for quality issues. Exhibit 1, ¶ 25.

26. Greene showed Tyler's customers how to create the files in ExecuTime that they would need to then import into their payroll database. Exhibit 1, ¶ 26.

27. But it was the customer's payroll vendor—sometimes another Tyler department, and sometimes not—who would show the customer how to do the actual importing and set up. Exhibit 1, ¶ 27.

28. During training sessions, Greene would use "dummy" information (e.g., names like "Jeff Hourly" and "Sally Supervisor") to show the customers' employees how various types of information could be inputted into the

ExecuTime software, and how to access its various functionalities. That means, essentially, that Greene would explain how to change the "settings" on the software so that it would do what the customer needed. Exhibit 1, ¶ 28.

29. Which functionalities the employees needed to understand how to access and use was based on specifications determined before Greene became involved in the implementation process. Exhibit 1, ¶ 29.

30. The video of a Hendersonville, TN, training session that was attached as an exhibit to Greene's Motion for Summary Judgment is representative of a typical remote timeclock training session that she performed throughout her employment as an implementation consultant. Exhibit 1, ¶ 30.

31. Neither Tyler's current general counsel nor its current CEO (and former general counsel) were able to identify any concrete information about the information that Tyler provided to Mr. McKeeby, the nature of his investigation, or the substance of his advice, other than that he said the implementation consultants were exempt. Dkt. 35 (30(b)(6) Deposition of Abby Diaz) at 17:24 to 18:4, 35:12–22; Dkt. 48 (Deposition of Lynn Moore) at 16:10 to 22:21. Neither could identify any specific documents

memorializing or even relating to McKeeby's advice or investigation. Dkt. 35 at 19:19–24; Dkt. 48 at 14:24 to 16:9.

This 6th day of May 2020,

                                Respectfully submitted,

                                **DELONG CALDWELL BRIDGERS FITZPATRICK & BENJAMIN, LLC**

                                */s/Matthew W. Herrington*

| | |
|---|---|
| 101 Marietta Street NW | Mitchell D. Benjamin |
| Suite 2650 | Georgia Bar No. 049888 |
| Atlanta, Georgia 30303 | Matthew W. Herrington |
| (404) 979-3171 | Ga. Bar No. 275411 |
| (404) 979-3170 (f) | |
| benjamin@dcbflegal.com | Counsel for Plaintiff |
| matthew.herrington@dcbflegal.com | |